ORIGINAL

FOLGER LEVIN & KAHN LLP

SAMUEL R. MILLER (*pro hac vice*)
DENELLE M. DIXON-THAYER (*pro hac vice*)
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Tel. No. (415) 986-2800
Fax No. (415) 986-2827
Email address: ddixon-thayer@flk.com

MOTOOKA YAMAMOTO & REVERE
A Limited Liability Law Company

TERRANCE M. REVERE 5857-0
JACQUELINE E. THURSTON 7217-0
BRIANNE L. ORNELLAS 8376-0
1000 Bishop Street, Suite 801
Honolulu, Hawaii 96813
Tel. No. (808) 532-7900
Fax No. (808) 532-7910
Email address: terry@myrhawaii.com

Attorneys for Plaintiffs.

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 0 5 2006

at 1 o'clock and 09 min. P M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

WESTERN SUNVIEW
PROPERTIES, LLC; GUY HANDS
and JULIA HANDS,

                             Plaintiffs,

    vs.

IRWIN FEDERMAN;
CONCEPCION S. FEDREMAN;
*(caption continues)*

CIVIL NO. CV03-00463 JMS/LEK
(Other Civil Action, Declaratory
Judgment)

**PLAINTIFFS' OPPOSITION TO
MAUNA KEA'S MOTION FOR
SUMMARY JUDGMENT
REGARDING ALL SPECIAL
SETBACK AND PUNITIVE
DAMAGES CLAIMS;
CERTIFICATE OF SERVICE**

THE BLUFFS AT MAUNA KEA
COMMUNITY ASSOCIATION;
MAUNA KEA PROPERTIES,
INC.; MAUNA KEA
DEVELOPMENT CORP.;
COUNTY OF HAWAII; JOHN
DOES 1-100; JANE DOES 1-100;
DOE PARTNERSHIPS 1-100; and
DOE CORPORATIONS 1-100,

Date:    January 23, 2006
Time:    9:45 a.m.
Judge:   Hon. J. Michael Seabright

Trial Date: March 14, 2006

                    Defendants.

## PLAINTIFFS' OPPOSITION TO MAUNA KEA'S MOTION FOR SUMMARY JUDGMENT REGARDING ALL SPECIAL SETBACK AND PUNITIVE DAMAGES CLAIMS

Plaintiffs Western Sunview Properties LLC ("Western Sunview"), Guy Hands, and Julia Hands (collectively, "Plaintiffs") respectfully submit this Opposition to Defendants Mauna Kea Properties, Inc. and Mauna Kea Development Corporation's (collectively, "Mauna Kea" or the "Mauna Kea Defendants") Motion for Summary Judgment as to All Special Setback and Punitive Damages Claims (the "Motion" or "Mauna Kea's Motion").

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................ 1

II.  FACTUAL BACKGROUND.............................................................. 4

    A.  After Having Difficulty Selling The Properties At The Bluffs, Mauna Kea Hatched A Scheme To Lie About The Sales Prices Of Lots At The Bluffs, To Induce Future Purchasers To Pay More............................................................................................... 4

    B.  Mauna Kea Created Design Requirements For The Bluffs That Promised Protected View Planes.................................................. 5

    C.  In Addition To Mauna Kea's Representations Concerning Sales Prices, Plaintiffs Purchased Lot 5 In Reliance On Mauna Kea's Material Promise That The View Planes Would Be Protected. ........... 6

    D.  Until At Least July 2001, Mauna Kea Controlled The Design Committee That Was Charged With Enforcing The Requirements Protecting The View Planes ......................................... 7

    E.  Mauna Kea Failed To Protect The View Planes – As Required By The Governing Documents – And Waived Design Requirements Without Notification To Other Property Owners, Or Any Other Process....................................................................... 8

    F.  Mauna Kea's Decision – Without Allowing Plaintiffs Notice Or An Opportunity To Be Heard – To Allow The Federmans To Build In The Special Setback Area, In Direct Contravention Of The Design Requirements, Caused Plaintiffs Substantial Harm ....... 10

    G.  Mauna Kea's Conduct In Running The Design Committee Has Been Universally Condemned By People Associated With The Bluffs ......................................................................................... 12

    H.  Mauna Kea's "Enforcement" Of The Design Requirements Was So Bad, That This Court Ruled That Section 4.17 Of The Design Requirements Had Been Abandoned To The Extent That It Prohibited Structures That Did Not Block Views .................. 13

III.  ARGUMENT ................................................................................ 13

    A.  Mauna Kea's Unreasonable, Bad Faith Conduct In Controlling The Design Committee Constitutes A Breach Of The Bluffs' Governing Documents........................................................... 13

1.  Mauna Kea Is Liable To Plaintiffs For Any
    Abandonment Of Section 4.17.................................. 14

    a.  The Governing Documents Obligated Mauna Kea
        Not To Let Section 4.17 Become Abandoned............... 14

    b.  Well-Established Legal Principles Show That
        Mauna Kea Was Obligated To Not Let Section
        4.17 Become Abandoned.................................. 15

2.  Mauna Kea's Own Authority Establishes That Its
    Conduct Was Unreasonable.................................... 18

B.  Mauna Kea's Egregious Scheme Of Defrauding Future
    Purchasers And Lying To Hawaii Taxing Authorities Renders
    Are Sufficient To Establish The Predicate For Punitive
    Damages, And To Allow The Jury to Determine Whether They
    Are Appropriate................................................ 21

    1.  Mauna Kea Acted Wantonly Or Oppressively.............. 23

    2.  Mauna Kea Acted With Such Malice As Implies A Spirit
        Of Mischief And Criminal Indifference................. 24

    3.  Mauna Kea Engaged In Willful Misconduct Or Exercised
        An Entire Want Of Care That Evidences An Indifference
        To Consequences....................................... 25

C.  Mauna Kea's Misconduct Has Continued During These
    Proceedings................................................... 26

IV.  CONCLUSION.................................................... 27

# CASES

*Bailey Development Corporation v. MacKinnon-Parker, Inc.,*
60 Ohio App. 2d 307 (1977) ................................................................. 19

*Cohen v. Kite Hill Community Ass'n,*
191 Cal. Rptr. 209 (Cal. Ct. App. 1983) ........................................ 19, 20

*Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,*
303 So. 2d 665 (Fla. App. 1974) ............................................................ 20

*Fogelsong, et al v. Mauna Kea, et al.*
(Civil No. 01-1-0279, 3rd Cir. Hilo) ........................................................ 9

*Iddings v. Mee-Lee,*
82 Haw. 1, 919 P.2d 263 (1996) ........................................................... 24

*Johnson v. Pointe Community Ass'n,*
73 P.3d 616 (Ariz. App. 2003) ............................................................... 20

*Leonard v. Stoebling,*
728 P.2d 1358 (Nev. 1986) ............................................................. 18, 19

*Masaki v. General Motors Corp.,*
71 Haw. 1, 780 P.2d 566 (1989) .................................................. 4, 22, 25

*McNamee v. Bishop Trust,*
62 Haw. 397, 616 P.2d 205 (1980) ........................................................ 19

*Robertson v. Mauna Kea*
(Civil No. 02-00207 HG LEK) ................................................................. 9

*Western Sunview Properties, LLC v. Federman,*
338 F. Supp. 1106 (D. Haw. 2004) ........................................................ 13

*Wright v. Cypress Shores,*
413 So. 2d 1115 (Ala. 1982) .................................................................. 20

## OTHER AUTHORITIES

Black's Law Dictionary 1582 (6th ed. 1983) ........................................................ 24

Restatement (Third) of Property:  Servitudes § 6.13 ............................................. 15

Restatement (Third) of Property:  Servitudes § 6.20 ........................................ 16, 17

## I.    INTRODUCTION

Mauna Kea seeks to have this Court clear it of all liability for its lies, its failure to keep promises, and for the harm it caused to Plaintiffs.  Neither the law, nor the facts, support Mauna Kea's arguments.  In this motion, Mauna Kea combines two legally unrelated theories of liability – breach of contract and punitive damages.  Yet, these theories are tied together by the story of how Mauna Kea perpetrated the secret discount scheme – the scheme that serves as the predicate for punitive damages.  Mauna Kea is responsible for defrauding Plaintiffs into paying substantially more for Lot 5 than it was worth at the time by covering up the true sales prices for the other lots.  But Mauna Kea's bad acts do not stop there.  Mauna Kea also made other important representations that Plaintiffs relied on.  Mauna Kea created the CC&Rs and the Design Requirements for The Bluffs which expressly told Plaintiffs – and all the purchasers at The Bluffs – that the view planes that Plaintiffs paid for could not and would be obstructed or impaired.  In the CC&Rs and the Design Requirements, Mauna Kea created a "special setback" area and promised that <u>no structures</u> could be built in the area – and certainly no structures that would impair the view from any lot.  Plaintiffs relied on these representations and promises when they purchased Lot 5 – paying for unobstructed sunset and ocean views.

Unbeknownst to Plaintiffs, as quickly as these promises were written,

Mauna Kea began to abandon them. Without following established procedures and well-settled Hawaii law, Mauna Kea began waiving the Design Requirements and allowed building in the special setback area. Mauna Kea's failure to enforce its promises – promises that were used to lure Plaintiffs into purchasing Lot 5 – has caused Plaintiffs substantial harm.

Mauna Kea's motion largely ignores the facts and instead focuses on the "law of the case" doctrine – a doctrine that Mauna Kea fails to mention in its other motions for summary judgment, mainly because this Court's previous rulings were contrary to positions taken by Mauna Kea. Mauna Kea now suggests that this Court's previous rulings dispose of Plaintiffs' claims concerning the special setback area. However, Mauna Kea misinterprets, misconstrues, and misapplies this Court's previous rulings. The "law of the case" doctrine does not support Mauna Kea's motion for summary judgment. The motion should be denied for the following reasons:

First, this Court's previous ruling that aspects of Section 4.17 of the Design Requirements had been abandoned demonstrates that Mauna Kea is liable to Plaintiffs for breach of the promises made in the CC&Rs and the Design and Construction Requirements. The undisputed facts show that the promises made in the governing documents were a material factor in Plaintiffs' decision to purchase Lot 5. Had Mauna Kea enforced the requirements, Plaintiffs' view planes from

Lot 5 would have been protected.

Second, Plaintiffs have sufficient evidence to establish the predicate for punitive damages against Mauna Kea. Mauna Kea was the architect and primary economic beneficiary of a fraudulent scheme to defraud both Hawaii taxing authorities and future purchasers. Mauna Kea lied to Hawaii's taxing authorities by knowingly filing documents with the wrong sales prices (thereby subjecting itself to potential criminal liability); lied to potential purchasers of property at The Bluffs by misrepresenting the sales prices; entered into confidentiality agreements with purchasers that were given the secret discounts to cover up the lies and to protect the scam; and knowingly duped Plaintiffs and others into paying higher prices for the property at The Bluffs. Even Mauna Kea's own expert testified that Mauna Kea's conduct was "deliberately misleading." Mauna Kea's egregious conduct subjects it to punitive damages liability, since its conduct was wanton and oppressive and "implies a spirit of mischief or criminal indifference to civil obligations." *Masaki v. General Motors Corp.*, 71 Haw 1, 16-17, 780 P.2d 556 (1989).

## II.    FACTUAL BACKGROUND

### A.    After Having Difficulty Selling The Properties At The Bluffs, Mauna Kea Hatched A Scheme To Lie About The Sales Prices Of Lots At The Bluffs, To Induce Future Purchasers To Pay More.

Mauna Kea is owned by Seibu Railway, perhaps one of the richest and most

scandal-ridden companies in the world.    Declaration of Terrance M. Revere ("Revere Decl."), Ex. 117.    Although Mauna Kea formed The Bluffs in the 1980s, it did not sell any of its properties until the late 1990s.  Mauna Kea's principal broker testified that "[t]he '90s were a very tough time."  Revere Decl., Ex. 42 (Kohler Depo.) at 39:17-18.

As discussed in more detail in Plaintiffs' Opposition to Mauna Kea's Motion for Summary Judgment Regarding Damages, to stimulate sales at the Bluffs and to maintain the selling prices, Mauna Kea hatched a scheme where it gave purchasers secret discounts off the list price.  These secret discounts were <u>not</u> reflected in the prices on Mauna Kea's Price List, or in the purchase prices that Mauna Kea reported to the State Bureau of Conveyances (the "Bureau") – Hawaii's taxing authority – because Mauna Kea purposefully failed to include them.  Revere Decl., Ex. 23 (Asari Depo.) at 107:5-11; Ex. 125 (Mielcke Depo.) at 79:5-81:11.  Mauna Kea's officers and agents admit that the secret discounts enabled Mauna Kea to report a higher purchase price than purchasers actually paid.  Revere Decl., Ex. 23 (Asari Depo.) at 107:5-11; Ex. 125 (Mielcke Depo.) at 80:9-12.  Mauna Kea's own expert testified that the scheme was "deliberately misleading."   Revere Decl., Ex. 149 (Gangnes Depo.) at 81:25.

**B.     Mauna Kea Created Design Requirements For The Bluffs That Promised Protected View Planes.**

The selling point for the ocean front lots at The Bluffs was the unobstructed views.  Owners of ocean-front properties were promised unparalleled views of the ocean and a rugged, pristine coastline.  The governing documents of The Bluffs protected the view planes.  Section 4.17 of the Design and Construction Requirements for Homes ("Design Requirements") expressly created a "special setback area" for individual lots in order to protect neighbors' views.  View protection was accomplished by prohibiting any buildings or structures in the "Special Setback Areas."  Section 4.17 provides that:

> Special setbacks have been placed on the individual Homesites to protect views and to preserve hillsides. No building or structure shall be placed within the special setback areas as shown on exhibit A.[1]

Plaintiffs' Separate and Concise Statement of Facts in Opposition to  Mauna Kea's Motion for Summary Judgment as to All Special Setback and Punitive Damages Claims ("Plaintiffs' CSOF") 33.  The governing documents also guaranteed that the Association's Design Committee could only approve variances from the Design Requirements that were suitable to the area – therefore in the special setback area where view planes are expressly protected, none could be disturbed.

---

[1] The "exhibit A" referenced in Section 4.17 shows the "Special Setback Area" for each lot (shaded area).  *See* Revere Decl., Ex. 32 at Ex. A.

Plaintiffs' CSOF 1, 4, 33; Revere Decl., Ex. 32 (§ 8.8); Ex. 33 (§ 4.17).

### C. In Addition To Mauna Kea's Representations Concerning Sales Prices, Plaintiffs Purchased Lot 5 In Reliance On Mauna Kea's Material Promise That The View Planes Would Be Protected.

After the Hands became interested in purchasing Hawaii property, the Hands' realtor sent them information about Lot 5 at the Bluffs, including the Hands photographs showing the views from Lot 5. Plaintiffs' CSOF 9, 12. Lot 5 was priced higher, but was smaller than other less expensive lots at The Bluffs.[2] *See, e.g.*, Revere Decl., Exs. 8, 9; Ex. 32 at Ex. A. The reason for the difference in price was that Lot 5 was promoted as having better view planes.

The view from the property was important to Plaintiffs. Mrs. Hands testified that she read the Design Requirements before the purchase of the property, and understood that these requirements prohibited building in the special setback areas to protect views and the natural terrain. Plaintiffs' CSOF 9, 12. She also testified that she believed that the views from Lot 5 depicted in the photos would be maintained because of the prohibition on building in the special setback areas. Plaintiffs' CSOF 9.

Relying on the Design Requirement's prohibition on building in special setback areas, and on Mauna Kea's representations concerning the sales prices for

---

[2] For example, Lot 6, the Federmans' lot, is 10,000 square feet larger than Plaintiffs' lot, yet was $700,000 less than Lot 5.

the other lots at The Bluffs, Plaintiffs' purchased Lot 5.  Plaintiffs' CSOF 9, 12;
Revere Decl. Ex. 16 ¶¶ 9, 10.

### D. Until At Least July 2001, Mauna Kea Controlled The Design Committee That Was Charged With Enforcing The Requirements Protecting The View Planes.

Before Plaintiffs purchased their property, Mauna Kea created a Design
Committee, which was charged with enforcing the Design Requirements.  Revere
Decl., Ex. 32 §§ 8.1, 8.5.  Pursuant to the CC&Rs, Mauna Kea had the sole right to
appoint and remove members of the Design Committee until February 17, 2017, or
until it assigned that right to the Board of Directors of the Bluffs at Mauna Kea
Community Association.  Revere Decl., Ex. 32 § 8.3.

Mauna Kea controlled the Design Committee until at least July 2001.
Revere Decl., Ex. 151 ¶¶ 2, 9.  In September 1996, Mauna Kea appointed William
Mielcke and James Bell to the Design Committee.  Revere Decl., Ex. 151 ¶ 2.  Mr.
Mielcke was the President of Mauna Kea Properties, Inc., in charge of sales; Bell
was of a principal of Belt Collins, the Federmans' engineer.  Revere Decl., Ex. 119
(Bell Depo.) at 18:5-9, 18-20; 15:18-20; Ex. 31 ¶ 8; Ex. 151 ¶ 2.  Mielcke and Bell
were the only Design Committee Members until December 2000, when Mr. Bell
resigned.  Revere Decl., Ex. 151 ¶¶ 3, 5.   From December 2000 until July 2001,
the only Design Committee member was Mr. Mielcke, Mauna Kea Properties,
Inc.'s President.  Revere Decl., Ex. 151  Decl. ¶¶ 2, 5.  Mr. Mielcke resigned from

the Design Committee in July 2001, and Mauna Kea assigned its rights to appoint and remove members of the Design Committee to the Board of Directors of the Bluffs at Mauna Kea Community Association. Revere Decl., Ex. 151 Decl. ¶ 9.

**E.    Mauna Kea Failed To Protect The View Planes – As Required By The Governing Documents – And Waived Design Requirements Without Notification To Other Property Owners, Or Any Other Process.**

Rather than fulfilling its obligation to enforce the Design Requirements – requirements that purchasers like Plaintiffs relied on in purchasing Lot 5 from Mauna Kea – Mauna Kea broke the rules that it had promulgated. Unbeknownst to Plaintiffs when they purchased Lot 5, soon after creating the Design Committee, Mr. Mielcke began waiving Design Requirements for certain purchasers. Mauna Kea's contract with the Robertsons, one of the early purchasers at The Bluffs, shows that Mauna Kea would not let its own written rules get in the way of making a sale. The Robertson contract contained two material changes from Mauna Kea's form: (1) an agreement by the Robertsons to keep quiet about their $500,000 secret discount; and (2) an agreement by Mauna Kea to allow the Robertsons to build a flat-roof Mexican-style house. Revere Decl., Exs. 6, 10. Mauna allowed the Robertsons to build such a flat-roof , despite the fact that the Design Requirements allow double-pitched roofs only. As Design Requirement § 4.6 expressly states, "ONLY ONE TYPE OF ROOF SHALL BE PERMITTED, as

follows: a. All roofs shall be designed such that the predominant form is a double-pitched roof." Revere Decl., Ex. 33 § 4.6. Mauna Kea's agreement to breach the Design Requirements led to at least two lawsuits: *Fogelsong, et al v. Mauna Kea, et al.* (Civil No. 01-1-0279, 3rd Cir. Hilo) and *Robertson v. Mauna Kea* (Civil No. 02-00207 HG LEK). Mauna Kea never advised Plaintiffs that the Design Requirements – especially those concerning view planes – would not be enforced.

The Federmans' expert, Wendelin Campbell, recognized the impermissibility of Mauna Kea's conduct. Revere Decl., Ex. 104 at 4; Ex. 105 (Campbell Depo.) at 49:25-51:11, 50:17-22, 63:24-64:20, 100:14-19, 104:8-12, 105:1-18. Campbell testified that Mauna Kea "signed a contract . . . that had a provision they were agreeing to, affirmatively agreeing to, that was in direct conflict with the design requirements that they had no authority in their capacity as seller to change." Campbell also stated that "[a]s the seller, developer, and the controlling member of the Design Committee, Defendants MKP and MKDC had an affirmative duty to ensure that the Design Requirements accurately portrayed the current standards and guidelines for the construction of residences in the Bluffs at Mauna Kea." Campbell further stated that it appeared that Mauna Kea was "'cutting a deal' with the Robertsons," that Mauna Kea "usurp[ed] the Design Committee's authority," and that it appeared that Mauna Kea had something to hide.

**F.    Mauna Kea's Decision – Without Allowing Plaintiffs Notice Or An Opportunity To Be Heard – To Allow The Federmans To Build In The Special Setback Area, In Direct Contravention Of The Design Requirements, Caused Plaintiffs Substantial Harm.**

Because Mauna Kea allowed the Federmans to build in the special setback area, the view from Lot 5 was substantially harmed.  Revere Decl. Ex. 115.  Mauna Kea gave this special treatment to early purchasers – like the Federmans – who knew of Mauna Kea's secret discount scheme, and had agreed not to disclose it. Plaintiffs, however, were not afforded this quid pro quo, and instead were told by Mauna Kea not to put even ornamental plants in their special setback area.  On the other hand, The Federmans – who received a secret discount of $450,00 and signed a confidentiality agreement agreeing to keep the discount a secret – received different treatment:  They were allowed to build a 3,500 square foot pool, deck, and spa in the special setback area, as well as plant a clusters of palm trees. Plaintiffs' CSOF 36.  The Federmans enjoyed this "special treatment" during the time that Mauna Kea controlled the Design Committee.  In August 2000, while Mr. Mielcke and Mr. Bell were the only members of the Design Committee, the Design Committee granted the Federmans preliminary approval to construct a pool, spa, terrace, and two pavilions ("palapas") in the special setback area.  Plaintiffs' CSOF 21.  Such preliminary approval was in direct contravention of Section 4.17 of the Design Requirements, which provides that "[n]o building or structure shall be placed within the special setback areas."  Plaintiffs' CSOF 33.  Mauna Kea did not

even visit Plaintiffs' lot to gauge the impact on Plaintiffs' views.[3]  This conduct continued even after Mauna Kea "turned over" control of the Design Committee.

As a result of Mauna Kea's disregard of the Design Requirements, and its special treatment of other purchasers, the views from Lot 5 have been substantially harmed.   Revere Decl., Ex. 115; Ex. 16 at 44:25-45:4; Ex. 151,; Ex. 152. Plaintiffs' expert testified that the harm can be quantified as decreasing the value of the property by at least $700,000.  Revere Decl., Ex. 115.

### G.    Mauna Kea's Conduct In Running The Design Committee Has Been Universally Condemned By People Associated With The Bluffs.

Mauna Kea's conduct in running the Design Committee not only led to numerous lawsuits, it has been universally condemned by people associated with The Bluffs.  For example, the current advisor to the Association's Board testified that it was fair to say that the "general consensus" of the owner-controlled

---

[3] Even the Federmans' architect testified that the "reasonable" thing to do would have been to visit Plaintiffs' lot to determine whether there was any impact on the view.  Plaintiffs' CSOF 41.  While Mauna Kea never visited Plaintiffs' lot, representatives of Mauna Kea visited the Reddys' lot – the Federmans' other neighbor – to determine the impact the Federmans' proposed structure would have on the view from the Reddys' lot.  Plaintiffs' CSOF 40, 44.  Mauna Kea also took action to prevent roofed structures in the Federmans' special setback area in response to concerns raised by the Reddys.  Revere Decl, Ex. 46; Ex. 53 ¶ 7.5.4; Exs. 109-114.  Ironically, unlike Plaintiffs, the Reddys had also been given a secret discount and had knowledge of Mauna Kea's fraudulent conduct.  Revere Decl. Ex. 108 at MKR 00741.

committee was that Mauna Kea "did a terrible job in enforcing the governing documents." Revere Decl, Ex. 37 (Stringer Depo.) at 140:9-141:5. The initial owner members of the Association's Board also stated that "[i]t is the board's feeling that many of the design conflicts that have occurred at The Bluffs could have been minimized with a closer adherence to the original intent of the CC&Rs." Revere Decl., Ex. 93. Additionally, the first President of the Association stated that when Mauna Kea controlled the Design Committee, it acted in an arbitrary fashion: "John Reid stated that the committee was trying to be unbiased and move in the direction away from Mauna Kea Properties' arbitrary decisions." Revere Decl., Ex. 40, at 18.

On the specific issue of the Federmans' "improvements" that are at issue in this lawsuit, Design Committee member Bob Gunderson noted that "[t]his is yet another example of the mischief worked by Mielcke [Mauna Kea Properties, Inc.'s President]. I do not think it is an exaggeration to say that every submittal that Mielcke touched has (or had) a similar problem." Revere Decl., Ex. 106.

**H.    Mauna Kea's "Enforcement" Of The Design Requirements Was So Bad, That This Court Ruled That Section 4.17 Of The Design Requirements Had Been Abandoned To The Extent That It Prohibited Structures That Did Not Block Views.**

Mauna Kea's enforcement of the Design Requirements was so bad that, on previous motions for summary judgment, this Court ruled that "Section 4.17 has

been effectively abandoned as it pertains to structures built in the setback area that do not block views." *Western Sunview Properties, LLC v. Federman*, 338 F. Supp. 1106, 1115 (2004). This Court stated:

> Section 4.17 was abandoned in that pools or terraces that did not block views were consistently permitted in the special setback area. The Bluffs does not present a case where a single property, or even a handful of properties have built in the setback area. Instead, all of the oceanfront lots, namely Lots 1 through 12, including Plaintiffs' lot, have received one or more variances to build or make improvements in the special setback area. Lots 1, 2, 6, 8, 11, and 12 have received variances to build.

*Id.* Numerous facts leading to this Court's conclusion occurred during the time that Mauna Kea indisputably controlled the Design Committee.

## III.    ARGUMENT

**A.    Mauna Kea's Unreasonable, Bad Faith Conduct In Controlling The Design Committee Constitutes A Breach Of The Bluffs' Governing Documents.**

There is sufficient evidence to prove – or to at least create a triable issue of fact – that Mauna Kea, acting as the Design Committee, failed to enforce the Design Requirements at The Bluffs, thereby breaching the governing documents. Specifically, Mauna Kea's decision to allow the Federmans, Plaintiffs' neighbor, to build structures in the special setback area that severely impair Plaintiffs' views, have caused Plaintiffs' to be harmed. Mauna Kea does not dispute these facts.

Instead, Mauna Kea makes technical, and inaccurate legal arguments concerning this Court's prior rulings.

## 1.    Mauna Kea Is Liable To Plaintiffs For Any Abandonment Of Section 4.17.

Mauna Kea asks this Court to grant it summary judgment based upon this Court's prior abandonment ruling, despite the fact that any abandonment was Mauna Kea's fault. Mauna Kea – when it controlled the Design Committee – was obligated to enforce Section 4.17 and <u>not</u> allow it to become abandoned.

### a.    The Governing Documents Obligated Mauna Kea Not To Let Section 4.17 Become Abandoned.

Mauna Kea established the Design Committee pursuant to its own governing documents, and controlled the Design Committee until at least July 2001. By acting in ways that contributed to this Court's abandonment ruling, Mauna Kea violated Section 3.1 of the Design Requirements, which provides that

> The Bluffs Design Committee ("Design Committee") which is established or will be established pursuant to the Declaration, <u>is charged with enforcing compliance</u> with these Design Requirements.

Design Requirements § 3.1 (emphasis added).[4]    Necessarily contained within the

---

[4] Even if the governing documents did not expressly prohibit building in special setback areas (which they do), Mauna Kea and the Association still would owe duties to Plaintiffs. The Restatement (Third) of Property (Servitudes) provides that:
(Continued...)

obligation to enforce the Design Requirements was the obligation to not allow them to become abandoned. Thus, if aspects of Section 4.17 were abandoned (as this Court has ruled that they were), Mauna Kea is liable to Plaintiffs for this abandonment.

   b.   **Well-Established Legal Principles Show That Mauna Kea Was Obligated To Not Let Section 4.17 Become Abandoned.**

The RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES also makes it clear that Mauna Kea owed a duty to Plaintiffs to not let Section 4.17 become abandoned. Section 6.20 of the Restatement, entitled "Developer's Duties to the Community," establishes that Mauna Kea was obligated to enforce Section 4.17 until Mauna Kea relinquished control of the Design Committee to the Association, which did not occur until at least July 2001:

> Until the developer relinquishes control of the association to the members, the developer owes the following duties to the association and its members:

> Sound management may also require that the association enforce restrictions and covenants against the members when failure to enforce may adversely affect property values or the members' legitimate expectations as to quality of life in the community. <u>The duty imposed by this section is owed to members independently of the governing documents</u>.

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.13 cmt. c (emphasis added).

. . .

>(5) <u>to comply with and enforce the terms of the governing documents, including design controls</u>, land-use restrictions, and the payment of assessments;

>(6) to disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining.

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.20 (emphasis added).   As a comment to Section 6.20 provides, "the rules stated in this section identify areas where protection of the members is particularly needed and can be afforded without unduly limiting the developer's flexibility, or ability to realize a profit on its investment." *Id.* cmt. a.

Another comment to Section 6.20 makes it clear that the developer should enforce the governing documents from the time the first lot is conveyed:

>The developer and the association should operate within the framework of the governing documents from the time the first lot or unit is       conveyed. . . . <u>If the developer fails to enforce, or engages in selective enforcement of, design controls, this may jeopardize the association's future ability to enforce them</u> by creating a basis for a claim for modification or termination under the changed-conditions doctrine.

*Id.* cmt. e (emphasis added).

Here, Mauna Kea failed to enforce the governing documents, which led this Court to conclude that Section 4.17 has been abandoned.  Revere Decl., Ex. 37 (Stringer Depo.) at 140:9-141:5; Ex. 40 at 18; Ex. 93; Ex. 106.  As such, the very

situation the drafters of the RESTATEMENT sought to avoid occurred here, and the evidence makes it clear that Mauna Kea shares in the blame. The initial owner members of the Association's Board stated that "[i]t is the board's feeling that many of the design conflicts that have occurred at The Bluffs could have been minimized with a closer adherence to the original intent of the CC&Rs." Revere Decl., Ex. 93. Additionally, the first President of the Association acknowledged that when Mauna Kea controlled the committee, it acted in an arbitrary fashion. Revere Decl., Ex. 40 at 18. On the specific issue of the Federman construction, Design Committee member Bob Gunderson noted that "[t]his is yet another example of the mischief worked by Mielcke [Mauna Kea Properties, Inc.'s President]. I do not think it is an exaggeration to say that every submittal that Mielcke touched has (or had) a similar problem." Revere Decl., Ex. 106.

Thus, both the governing documents and black-letter principles establish that Mauna Kea was obligated to not let Section 4.17 become abandoned. Mauna Kea cites no authority to the contrary. Plaintiffs suffered at least $700,000 in damages as a direct result of Mauna Kea's dereliction of duty. Revere Decl., Ex. 115. This Court should not allow Mauna Kea to escape liability for its dereliction based on an abandonment ruling for which Mauna Kea itself is largely to blame.

2.   **Mauna Kea's Own Authority Establishes That Its Conduct Was Unreasonable.**

Mauna Kea's own authority establishes that its conduct in granting variances to the Federmans, and other lot owners, was not reasonable.   Mauna Kea reliance on *Leonard v. Stoebling*, 728 P.2d 1358 (Nev. 1986) is misplaced.   Indeed, *Leonard* supports Plaintiffs' claims against Mauna Kea.   In *Leonard*, the Architectural Control Committee (the "Committee") failed to enforce a covenant that protected views.   *Id.* at 1362.   Leonard filed suit, and the Nevada Supreme Court agreed that the Committee's decision was arbitrary and unreasonable *per se*. *Id.*   The court noted that "[n]o member of the . . . . Committee visited Leonard's property in considering whether to grant approval for the addition."   *Id.* at 1361. The court went on to state:

> Our review of the record conclusively reveals that the Architectural Control Committee gave no heed to the impact of the Stoebling addition on appellants' view of the lake.   The committee's perfunctory deference to its prior approval of the original structure presented no basis for a meaningful exercise of its function to assure a perpetual lake view advantage to appellants and the other residents who had constructed homes within the unique setting of the subdivision.   At minimum, the committee members should have visited the proposed construction site and ascertained its impact on appellants' properties. The committee's failure to undertake such a minimum effort is unreasonable per se.   The product of the committee's inaction and disregard for appellants' rights was an arbitrary decision . . . .

*Id.* at 1362.  Here, undisputed evidence shows that Mauna Kea and the Association

did <u>not</u> visit Plaintiffs' property to determine whether the Federmans' plans would interfere with Plaintiffs' view. Plaintiffs' CSOF 40, 42. As such, Mauna Kea acted unreasonably even under its own authority.

*Leonard* is consistent with Hawaii law and the law of other jurisdictions. *See, e.g., McNamee v. Bishop Trust*, 62 Haw. 397, 407, 616 P.2d 205 (1980) (imposing standard of reasonableness and good faith); *Cohen v. Kite Hill Community Ass'n*, 191 Cal. Rptr. 209, 217 (Cal. Ct. App. 1983) ("[W]e hold that the Association in reviewing the codefendants' improvement plan owed a fiduciary duty to plaintiffs to act in good faith and to avoid arbitrary action, and that there is an issue of fact raised by the pleadings as to whether the Association did so.").[5] In *Cohen*, the court held that there was an issue of fact as to whether an Association acted in good faith and non-arbitrarily, even though the Declaration gave it <u>sole discretion</u> to allow for reasonable variances. *See Cohen*, 191 Cal. Rptr. at 216, 217. In doing so, the court emphasized that an Association's decision must be in

---

[5] In *McNamee*, the Hawaii Supreme Court cited *Bailey Development Corporation v. MacKinnon-Parker, Inc.*, 60 Ohio App. 2d 307 (1977), with approval and provided the following parenthetical: "absent specific written restrictions, plaintiff's judgment in deciding whether to approve or disapprove defendant's plans must be measured against the standards of good faith and reasonableness." *McNamee*, 62 Haw. at 403-04 (emphasis added). Thus, it is only if there are no specific written restrictions that reasonableness comes into play. Here, there are written restrictions – Design Requirements § 4.17 – that Mauna Kea (and later the Association) violated. This Court accordingly can (Continued...)

keeping with the general plan of the community:

> Although the Declaration vests 'sole discretion' in the Committee and allows for reasonable variances, their decisions must be 'in keeping with the general plan for the improvement and development of the Project,' and of course, must be made in good faith and not be arbitrary.

*Id.* at 216.   Numerous courts have followed *Cohen*, or independently reached the same conclusion. *See, e.g., Wright v. Cypress Shores*, 413 So. 2d 1115, 1123 (Ala. 1982); *Johnson v. Pointe Community. Ass'n*, 73 P.3d 616 (Ariz. App. 2003); *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So. 2d 665 (Fla. App. 1974).

Here, the general plan of The Bluffs was to provide for protected views. Article I, the "Purpose" section of the Design Requirements, expressly provides that "[t]he homesites are located where they can take maximum advantage of ocean views and breezes."   Revere Decl., Ex. 32 Art. I.   Section 4.17 then expressly provides that "[s]pecial setbacks have been placed on the Individual Homesites to protect views and to preserve hillsides.  No building or structures shall be placed within the special setback areas as shown in exhibit A."  CSOF 33. By allowing the Federmans to build in the special setback and interfere with Plaintiffs' view, Mauna Kea (and later the Association) acted arbitrarily and in bad

---

determine that Mauna Kea breached its duties to Plaintiffs on the basis of the written instructions alone.

faith by failing to enforce the general plan of The Bluffs.

Therefore, this Court should allow Plaintiffs to proceed with the following claims against Mauna Kea: Counts II (Breach of Governing Document), IV (Breach of Contract), X (Negligence in Construction in the SSA); and XI (Breach of Covenant of Good Faith and Fair Dealing).

**B.    Mauna Kea's Egregious Scheme Of Defrauding Future Purchasers And Lying To Hawaii Taxing Authorities Renders Are Sufficient To Establish The Predicate For Punitive Damages, And To Allow The Jury to Determine Whether They Are Appropriate.**

Mauna Kea's secret discount scheme properly serves as the predicate to an award of punitive damages. Mauna Kea argues that Plaintiffs have no evidence that Mauna Kea's conduct was wanton, oppressive, or malicious. Mauna Kea is simply wrong.

The Hawaii Supreme Court held that the test for punitive damages is whether a defendant has acted with a lack of care which raises the presumption of a conscious indifference to the consequences.

> We have repeatedly said that the fundamental purpose underlying an award of exemplary or punitive damages is to punish the wrongdoer and to deter him [or her] and others from committing similar wrongs and offenses in the future . . . . [In order to merit an award of punitive damages,] the plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil

> obligations, or where there has been some willful
> misconduct or that entire want of care which would raise
> the presumption of a conscious indifference to
> consequences.

*Masaki v. General Motors Corp.*, 71 Haw. 1, 16, 780 P.2d 556 (1989). As discussed below, Mauna Kea meets this test.

There is ample evidence to support the predicate for punitive damages.[6] Mauna Kea lied to Hawaii taxing authorities and made false representations to purchasers to induce them to pay more. Plaintiffs' CSOF 49. Mauna Kea's own officers and agents admit that the purpose of the secret discount scheme was to keep the sales prices as the list prices. Plaintiffs' CSOF 50. To cover its tracks, Mauna Kea had purchasers sign confidentiality agreements in hopes that its fraud would never come to light. Plaintiffs' CSOF 53. Even Mauna Kea's own expert testified that Mauna Kea's conduct was "deliberately misleading." Plaintiffs' CSOF 51.

Punitive damages are appropriate in these circumstances. If undeterred by punitive damages, developers would have little disincentive to routinely defraud consumers via the misrepresentation of previous sale prices. Developers may then believe that all they would be liable for is the difference between the price the

---

[6] Mauna Kea does not and cannot argue that this Court's punitive damages ruling as to the Federmans applies to Mauna Kea. As the mastermind and primary (Continued...)

customers paid and the price the customers should have paid, absent the fraud – punitive damages ensures that it would not be just "a cost of doing business."

Mauna Kea's fraud affects the Hawaii real estate market in general, not just residents of The Bluffs.  As Plaintiffs' expert appraiser Richard A. Stellmacher has stated:

> [T]he practice of recording artificially high prices is misleading to the public who trust this information to be accurate. . . . It impacts the subject development directly and impacts other market segments indirectly.  If there is fraud in the reporting of real estate prices to a government agency this will have a negative impact on many aspects of the market.  It will negatively impact the actions of buyers and sellers as well as mortgage lenders and appraisers.

Revere Decl., Ex. 138, at 1.

### 1.    Mauna Kea Acted Wantonly Or Oppressively.

Mauna Kea lied to Hawaii taxing authorities and prospective purchasers to artificially inflate the prices of its lots.   In addition, it had purchasers sign confidentiality agreements in an attempt to hide its scam.   Plaintiffs' expert Kenneth Chong, who has 40 years experience in real estate, states that Mauna Kea's scheme was "disturbing," "devious," a "subterfuge," "unethical," "damaging to the public," and "deceptive and contrary to public policy."   This evidence is

---

economic beneficiary of the secret discount scheme, Mauna Kea is in a far worse
(Continued...)

sufficient for the jury to find that Mauna Kea acted wantonly or oppressively.[7]

Revere Decl., Ex. 100 at 2-5.

### 2.    Mauna Kea Acted With Such Malice As Implies A Spirit Of Mischief And Criminal Indifference.

In addition to defrauding prospective purchasers such as Plaintiffs, Mauna Kea broke the law.  Providing false information to the Hawaii tax office, which Mauna Kea did here as part of its scheme, is a violation of Hawaii Revised Statutes § 231-26 and a class C felony.   Plaintiffs' expert Leonard Kacher, who serves as a member of the Real Estate Advisory Committee for the Regulated Industries Complaints Office of the State of Hawaii Department of Commerce and Consumer Affairs, states that:

> In my opinion the Developer and the Developer's sales representatives intentionally misrepresented lot sale prices and acted in violation of the following Hawaii Revised Statutes:
>
> 463B-19(2)  Engaging in False, fraudulent, or deceptive advertising, or making untruthful or improbable statements;
>
> . . .

position than the Federmans.

[7] "Wanton" is defined as "[r]eckless, heedless, malicious, …recklessly disregardful of the rights or safety of others or of consequences." BLACK'S LAW DICTIONARY 1582 (6th ed. 1983).  In *Iddings v. Mee-Lee*, 82 Haw. 1, 919 P.2d 263 (1996), the court stated that "we have often noted, in the context of punitive damages, that reckless conduct is capable of being deterred." *Id.* at 8.

467-14(1)  Making any misrepresentation concerning any real estate transaction;

. . .

467-13(3) Pursuing a continued and flagrant course of misrepresentation, or making of false promises through advertising or otherwise;

. . .

467-14(8)  Any other conduct constituting fraudulent or dishonest dealings.

. . .

They also acted contrary to the Code of Ethics and Standards of Practice of the National Association of Realtors.

Revere Decl., Ex. 123 at 4.  Thus, there is sufficient evidence for the jury to find that Mauna Kea acted "with such as malice as implies a spirit of mischief or criminal indifference to civil obligations." *Masaki*, 71 Haw. at 16, 780 P.2d 556.

3.    **Mauna Kea Engaged In Willful Misconduct Or Exercised An Entire Want Of Care That Evidences An Indifference To Consequences.**

Mauna Kea's own documents show that its misconduct was willful, and that it did not care that it was defrauding future purchasers.  Among other things, Mauna Kea had purchasers sign confidentiality agreements in which the purchasers agreed not to disclose their secret discount – *i.e.*, evidence of Mauna Kea's fraud. Plaintiffs' CSOF 53.  Mauna Kea's own documents also show that it expected that future purchasers would rely on its false representations, and that it even

encouraged such reliance.  Its Dual Agency Consent Agreement provides that "[w]e will provide information about comparable properties so that the Buyer and the Seller may make an educated decision on which price to accept or offer." Revere Decl., Ex. 25 (doc. F027441).

Thus, there is sufficient evidence for the punitive damages question to go to the jury.

### C.   **Mauna Kea's Misconduct Has Continued During These Proceedings.**

Even during this litigation, Mauna Kea has attempted to hide the existence of a secret discount that it gave after Plaintiffs purchased their property.  When the Federmans moved for summary judgment, Mauna Kea submitted a declaration in support of the Federmans' motion from Mauna Kea's principal broker, stating that "[b]y the time plaintiffs were looking to purchase a lot, landscaping credits were not available."  Revere Decl., Ex. 102.  At the hearing on the Federmans' summary judgment motion, counsel for Plaintiffs noted that Mauna Kea continually relied on the point that the Hawaii real estate market had improved, but still failed to produce sales contracts – which Plaintiffs requested – that could provide evidence for their view.  Revere Decl., Ex. 116 at 40:1-4.  Magistrate Kobayashi then ordered Mauna Kea to produce the sales contracts.  It was only after Mauna Kea did so that Plaintiffs discovered that landscaping credits were available even *after*

Plaintiffs purchased their property.

As this Court s aware, Magistrate Kobayashi also ordered Mauna Kea to turn over attorney-client documents on Mauna Kea's secret discounts, finding that the crime-fraud exception applied. Mauna Kea appealed to this Court, and this Court requested to review such documents *in camera*. Thus, even throughout these proceedings, Mauna Kea has sought to conceal evidence of its fraud.

## IV.    CONCLUSION

For the foregoing reasons, the Court should reject, in its entirety, Mauna Kea's Motion for Summary Judgment Regarding All Special Setback and Punitive Damages Claims.

DATED: Honolulu, Hawaii, _____ JAN  5 2006 _____.


_____
TERRANCE REVERE

Attorney for Plaintiffs
WESTERN SUNVIEW PROPERTIES, LLC,
GUY HANDS, AND JULIA HANDS