ORIGINAL

FOLGER LEVIN & KAHN LLP

SAMUEL R. MILLER (*pro hac vice*)
DENELLE M. DIXON-THAYER (*pro hac vice*)
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Tel. No. (415) 986-2800
Fax No. (415) 986-2827
Email address: ddixon-thayer@flk.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 0 5 2006

at 7 o'clock and 08 min. P M
SUE BEITIA, CLERK

MOTOOKA YAMAMOTO & REVERE
A Limited Liability Law Company

TERRANCE M. REVERE 5857-0
JACQUELINE E. THURSTON 7217-0
BRIANNE L. ORNELLAS 8376-0
1000 Bishop Street, Suite 801
Honolulu, Hawaii 96813
Tel. No. (808) 532-7900
Fax No. (808) 532-7910
Email address: terry@myrhawaii.com

Attorneys for Plaintiffs.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC; GUY HANDS and JULIA HANDS,<br><br>               Plaintiffs,<br><br>vs.<br><br>IRWIN FEDERMAN;<br>*(caption continues)* | CIVIL NO. CV03-00463 JMS/LEK (Other Civil Action, Declaratory Judgment)<br><br>**PLAINTIFFS' OPPOSITION TO THE BLUFFS AT MAUNA KEA COMMUNITY ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF COMPLIANCE; CERTIFICATE OF** |

|  |  |
|---|---|
| CONCEPCION S. FEDREMAN; THE BLUFFS AT MAUNA KEA COMMUNITY ASSOCIATION; MAUNA KEA PROPERTIES, INC.; MAUNA KEA DEVELOPMENT CORP.; COUNTY OF HAWAII; JOHN DOES 1-100; JANE DOES 1-100; DOE PARTNERSHIPS 1-100; and DOE CORPORATIONS 1-100, | **SERVICE**<br><br>Date:   January 23, 2006<br>Time:   9:45 a.m.<br>Judge:  Hon. J. Michael Seabright<br><br>Trial Date: March 14, 2006 |
| Defendants. |  |

## PLAINTIFFS' OPPOSITION TO THE BLUFFS AT MAUNA KEA COMMUNITY ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Western Sunview Properties, LLC ("Western Sunview"), Guy Hands, and Julia Hands (collectively, "Plaintiffs") respectfully submit this Opposition to Defendant The Bluffs at Mauna Kea Community Association's (the "Association") Motion for Summary Judgment (the "Motion" or the "Association's Motion").

## Table of Contents

I.  INTRODUCTION ............................................................................................. 1

II. FACTUAL BACKGROUND......................................................................... 3

    A.  The Association's Design Committee Is Charged With Enforcing The Design Requirements, Which Govern And Serve As The Standard For All Construction At The Bluffs ...................... 3

    B.  Section 4.17 Of The Design Requirements Expressly Prohibits Building In Special Setback Areas So That Views Will Be Protected .............................................................................................. 4

    C.  Plaintiffs Bought Lot 5 In Reliance On The Design Requirements' Promises Of Protected Views ............................. 5

    D.  The Design Committee Was Rife With Conflicts Of Interest: At Various Times, It Included The Federmans' Engineer, The Federmans' Co-Conspirator, And The Federmans' Lawyer............... 6

    E.  The Design Committee Acted Unreasonably, Unfairly, Arbitrarily, And In Bad Faith ................................................................ 8

        1.  The Design Committee Waived Design Requirements To Help Mauna Kea Make Sales And To Reward Purchasers Who Agreed Not To Disclose Evidence Of Mauna Kea's Fraud....................................................................................... 8

        2.  The Design Committee's Early Conduct Has Been Universally Condemned By People Associated With The Bluffs.................................................................................... 10

        3.  Even After Homeowners Took Over The Design Committee, Its Conduct Continued To Be Arbitrary, Unreasonable, Unfair, And In Bad Faith ................................. 11

            a.  The Federmans Had No Hardship Or Special Factor That Required A Variance................................. 11

            b.  The Design Committee That Approved The Federmans' Plans Was Advised By The Federmans' Own Engineer ........................................... 12

    c.    An Attorney For Mr. Federmans' Company Sat On The Design Committee And Did Not Recuse Himself From Consideration Of The Federmans' Plans .................................................................. 12

    d.    Plaintiffs Were Given No Notice Or Opportunity To Be Heard Regarding The Federmans' Plans, But The Design Committee Took Other Homeowners' Concerns Into Account .......................... 13

    e.    The Design Committee Never Visited Plaintiffs' Lot To Gauge The Impact Of The Federmans' Proposed Construction On Plaintiffs' Views ................ 13

    f.    The Design Committee's Position Is That Clusters Of Palm Trees Are Not Allowed In Special Setback Areas, But The Federmans Still Were Allowed To Plant Them ................................................ 14

    g.    The Only Homeowners Allowed To Construct Pools Entirely In Their Special Setback Areas Were Design Committee Member Gunderson And His Two Clients ........................................................... 14

  F.    Plaintiffs Have Suffered Substantial Damages As A Result Of The Design Committee's Conduct .................................... 15

  G.    "Enforcement" Of The Design Requirements Was So Bad, That This Court Ruled That Section 4.17 Of The Design Requirements Had Been Abandoned To The Extent That It Prohibited Structures That Did Not Block Views ............................ 15

  H.    The Third Circuit Court Of Hawaii Denied The Association's Motion For Summary Judgment In A Similar Case Involving Plaintiffs' Other Neighbors, The Leones ............................ 16

  I.    The Association Has Done Nothing To Stop The Federmans From Blocking Plaintiffs' Views Following This Court's Summary Judgment Decision .......................................... 17

III.  ARGUMENT ...................................................................... 17

  A.    The Association Is Liable To Plaintiffs For Any Abandonment Of Section 4.17 ................................................................ 17

  B.    Triable Issues Of Fact Exist As To Whether The Association Acted Unreasonably And In Bad Faith ............................. 19

1.    The Association's Decisions Are Not Entitled To Deference And Should Be Given Meaningful Review By The Court And By The Jury .................................................. 20

2.    Triable Issues Of Fact Exist As To Whether The Association Acted Unreasonably ........................................... 21

    a.    The Association Has The Burden Of Showing It Acted Reasonably ....................................................... 22

    b.    The Association Failed To Follow Its Own Rules ........ 22

    c.    The Association Based Its Decision On Erroneous Standards .................................................................... 23

    d.    The Association Applied Its Own Criteria Inconsistently ................................................................ 25

    e.    The Association Failed To Visit Plaintiffs' Lot To Determine The Impact That The Federmans' Plans Would Have On Plaintiffs' Views ................................ 27

3.    Triable Issues Of Fact Exist As To Whether The Association Acted In Bad Faith ............................................. 28

    a.    The Attorney For Mr. Federmans' Company Participated In The Deliberations Regarding The Federman's Plans .......................................................... 28

    b.    The Association Relied On The Advice Of The Federmans' Engineer ................................................... 28

    c.    The Association's Design Committee Granted Special Favors To Its Members And Clients Of Mr. Gunderson's .......................................................... 29

    d.    The Court's Previous Remarks About Good Faith Were Expressly Limited To Two Or Three Trees And Did Not Address The Evidence Presented In This Opposition ............................................................. 29

C.    The CC&Rs Do Not Insulate The Association From Liability For The Conduct At Issue Here ...................................................... 30

IV.    CONCLUSION ............................................................................. 33

# CASES

*Bailey Development Corp. v. MacKinnon-Parker, Inc.,*
60 Ohio App. 2d 307 (1977) ................................................................... 20

*Clark v. Wodehouse,*
4 Haw. App. 507, 669 P.2d 170 (1983) ................................................ 24

*Cohen v. Kite Hill Community Ass'n,*
191 Cal. Rptr. 209 (Cal. Ct. App. 1983) ................................. 20, 21, 32

*Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,*
303 So. 2d. 665 (Fla. App. 1974) ......................................................... 21

*Fogelsong, et al v. Mauna Kea, et al.*
(Civil No. 01-1-0279, 3rd Cir. Hilo) ..................................................... 9

*Fujimoto v. Au,*
95 Haw. 116, 19 P.3d 669 (2001) ......................................................... 31

*Johnson v. Pointe Community. Ass'n,*
73 P.3d. 616 (Ariz. App. 2003) ............................................................ 21

*Kaiser Hawaii Kai Development Co. v. Murray,*
49 Haw. 214 , 412 P.2d 925 (1966). ..................................................... 32

*Leonard v. Stobeling,*
728 P.2d. 1358 (Nev. 1986) ................................................................... 27

*McNamee v. Bishop Trust Co., Ltd.,*
62 Haw. 397, 616 P.2d 205 (1980) ....................................................... 19

*Robertson v. Mauna Kea*
(Civil No. 02-00207 HG LEK) ............................................................... 9

*Sandstrom v. Larsen,*
59 Haw. 491, 583 P.2d 971 (1987) ............................................................ 19

*Village Park Community Ass'n v. Nishimura,*
108 Haw. App. 487, 122 P.3d 267 (Haw. App. 2005)............................................ 20

*Western Sunview Properties, LLC v. Federman,*
338 F. Supp. 1106 (D. Haw. 2004) .............................................................. 6, 7, 15

*Wilson v. Handley,*
119 Cal. Rptr. 2d 263 (Cal. Ct. App. 2002) .................................................... 26

*Wright v. Cypress Shores,*
413 So. 2d. 1115 (Ala. 1982) ................................................................... 21

## OTHER AUTHORITIES

Restatement (Third) of Property:  Servitudes § 4.1 ............................................ 23, 24

Restatement (Third) of Property:  Servitudes § 6.9 ............................................ 21, 22

Restatement (Third) of Property:  Servitudes § 6.13 ................................. 18, 19, 31

## I.    INTRODUCTION

Plaintiffs' case against the Association is simple.  The selling point for the lots at the Bluffs was that the coastal and sunset views were unparallel.  The governing documents at the Bluffs – the CC&Rs and the Design and Construction Requirements – expressly guaranteed that the views would be protected and that the Design and Construction Requirements (which stated its purpose was to protect views) would be enforced.  The Association and its Design Committee were obligated by the governing documents to enforce the CC&Rs and the Design and Construction Requirements consistently, fairly and in good faith.  Yet, the Association's Design Committee failed in its sole responsibility, and instead carried out its duties in an arbitrary and unreasonable manner.

The Association's Design Committee was rife with undisclosed conflicts of interests that eventually dictated how the Committee would make decisions. Plaintiffs were not part of the "group in charge."  Members of that group were aware of variance requests, ensured that any such requests did not impact their property, and ultimately worked together to improve the value of one each other's lots at a cost to those who were not part of the Design Committee.  Plaintiffs, like other owners, were not told of any variance requests – even when it was clear that the requests would affect them.  The Design Committee, ignoring its obligations, granted variances that substantially decreased the value of Plaintiffs' lot, and never

acted to protect Plaintiffs' guaranteed right to the views that were purchased as part of Lot 5.

The Association now moves for summary judgment on Plaintiffs' claims by disregarding and misconstruing this Court's prior rulings. The Association cannot meet its burden of proving that there are no triable issues of fact. Indeed, the Association's Motion is without merit and should be denied for at least two independent reasons.

First, the Association was obligated to enforce Section 4.17 and not allow it to become abandoned. Insofar as Section 4.17 was abandoned (as this Court has determined that it was), the Association is liable to Plaintiffs for Plaintiffs' resulting damages.

Second, numerous triable issues of fact exist as to whether the Association acted unreasonably or in bad faith, including whether the Association's Design Committee followed the governing documents; whether the Design Committee's decision to allow the Federmans plans was tainted by conflicts of interest, such as the presence of the Federmans' lawyer on the Design Committee and the Design Committee's taking of advice from the Federmans' engineer; whether the Design Committee applied its standards inconsistently; whether the Design Committee gave special privileges to its members and its members' clients; whether the Design Committee gave Plaintiffs notice or an opportunity to be heard, or whether

the Design Committee even visited Plaintiffs' lot to gauge the impact of the Federmans' plans on Plaintiffs' views. Each of these issues of fact should be decided by the jury.

## II.    FACTUAL BACKGROUND

### A.    The Association's Design Committee Is Charged With Enforcing The Design Requirements, Which Govern And Serve As The Standard For All Construction At The Bluffs.

The Declaration of Protective Covenants, Conditions, and Restrictions for The Bluffs at Mauna Kea (the "CC&Rs") expressly adopts the Design Requirements as those requirements "which govern and serve as the standard of all buildings and improvements to be constructed or maintained within The Bluffs." Plaintiffs' Concise Statement of Facts In Opposition ("Plaintiffs' CSOF") 3; Declaration of Terrance Revere ("Revere Decl.") Ex. 32 § 8.12. The CC&Rs also established a Design Committee, whose members are appointed by the Association's Board. Revere Decl., Ex. 32 § 8.3; Plaintiffs' CSOF 25. The Association's Design Committee is expressly charged "with enforcing compliance with the[] Design Requirements." Revere Decl., Ex. 33 § 3.1.

### B.    Section 4.17 Of The Design Requirements Expressly Prohibits Building In Special Setback Areas So That Views Will Be Protected.

The unobstructed ocean and sunset views are central features of lots at The Bluffs. The importance of views is stated in Article I of the Design Requirements,

which is Design Requirements' "Purpose" section. Revere Decl., Ex. 33 Art. I. It refers to the "the inherent natural beauty of the Hapuna Resort and The Bluffs area" and states that "homesites are located where they can take maximum advantage of ocean views . . . . ." *Id..*

Views are not only mentioned in the "Purpose" section of the Design Requirements, but also are expressly protected by the Design Requirements themselves. Section 4.17 provides that:

> Special setbacks have been placed on the individual Homesites to protect views and to preserve hillsides. No building or structure shall be placed within the special setback areas as shown on exhibit A.[1]

Plaintiffs' CSOF 43.

The importance of view protection also is shown in other aspects of the Design Requirements. Section 4.10.2 provides that "[s]hrubs or trees, such as palm tress, which grow to significant heights are not encouraged." Revere Decl., Ex. 33 § 4.10.2. The Association has taken the position that the purpose of this restriction is to protect views. Plaintiffs' CSOF 43, 44, 45 46. Therefore, palm trees are not allowed in special setback areas. *Id.* The governing documents further guaranteed that the Association's Design Committee could only approve

---

[1] The "exhibit A" referenced in Section 4.17 shows the "Special Setback Area" for each lot (shaded area). *See* CSOF 43; Revere Decl., Ex. 32 at Ex. A.

variances from the Design Requirements that were suitable to the area – therefore in the special setback area where view planes are expressly protected, none could be disturbed.  Plaintiffs' CSOF 4, 43; Revere Decl. Exs. 32 § 8.8; 33 § 4.17.

### C.    Plaintiffs Bought Lot 5 In Reliance On The Design Requirements' Promises Of Protected Views.

After the Hands became interested in purchasing Hawaii property, the Hands' realtor sent them information about Lot 5 at the Bluffs, including the Design Requirements and photographs showing the views from Lot 5.  Revere Decl., Exs. 2; 130 (Julia Hands Depo.) at 58:2-59:4; 29 (Guy Hands Depo.) at 73:20-75:2; 30 (Julia Hands Depo.) at 25:4-27:13; 31 ¶4; 29 (Guy Hands Depo) at 45:13-20; 30 (Julia Hands Depo.) at 102:24-103:13, 120:3-9.  Mrs. Hands testified that she read the Design Requirements before the purchase of the property, and understood that these requirements prohibited building in the special setback areas to protect views and the natural terrain.  *Id.*  She also testified that she believed that the views from Lot 5 depicted in the photos would be maintained because of the prohibition on building in the special setback areas.  *Id.*

Plaintiffs purchased Lot 5 in reliance on the Design Requirement's prohibition on building in special setback areas to protect the views.  Plaintiffs' CSOF 23.

**D.**     **The Design Committee Was Rife With Conflicts Of Interest:  At Various Times, It Included The Federmans' Engineer, The Federmans' Co-Conspirator, And The Federmans' Lawyer.**

The Design Committee initially consisted of William F. Mielcke, the President of Defendant Mauna Kea Properties, Inc., and James Bell of Belt Collins. Plaintiffs' CSOF 26; Revere Decl., Ex. 151 ¶ 2.  Belt Collins was The Federmans' engineer.  Plaintiffs' CSOF 26.  This Court previously held that the Federmans may be co-conspirators of the Mauna Kea Defendants, based on the Federmans' agreement with Mauna Kea to not disclose a secret discount they received from Mauna Kea, which Mr. Mielcke signed.[2]  *Western Sunview Properties, LLC v. Federman*, 338 F. Supp. 1106, 1123 (D. Haw. 2004).[3]  Mr. Bell resigned from the Design Committee in December 2000, leaving Mr. Mielcke as its only member. Plaintiffs' CSOF 27.  Belt Collins, however, remained on as an advisor to the Design Committee.  Mr. Mielcke resigned from the Design Committee in July

---

[2] The list price of the Federmans property was $3,000,000, but the Federmans received a secret discount of $450,000, meaning that they actually paid $2,550,000 for their lot.  Revere Decl., Exs. 8, 98; Plaintiffs' CSOF 35.  Mauna Kea, however, reported the sales price as the full $3,000,000, not the $2,550,000 that the Federmans actually paid.  Revere Decl., Exs. 147 (Won Depo) at 18:14-19:21; 24:15-24.  In the confidentiality agreement, the Federmans agreed not to disclose their secret discount. Plaintiffs' CSOF 35.  These and other facts regarding Mauna Kea's fraud are discussed in more detail in Plaintiffs' Opposition to Mauna Kea's Motion for Summary Judgment on Damages.  For the sake of brevity, Plaintiffs will not repeat all those facts here.

[3] Thus, as originally constituted, the Design Committee contained not only the Federman's engineer but also the Federman's co-conspirator.

2001, and the Association began appointing its members. Plaintiffs' CSOF 30.

Robert Gunderson was among the owners that the Association appointed to the Design Committee. Mr. Gunderson is an attorney for Mr. Federman's company. Plaintiffs' CSOF 31. Mr. Gunderson did not recuse himself at the January 29, 2002 meeting at which approval for the Federmans' plans was discussed. Plaintiffs' CSOF 32, 33. The Federman-Gunderson relationship was not disclosed to Plaintiffs or to the other members of the Design Committee. Plaintiffs' CSOF 33. Thus, at various times, the Federmans' engineer, the Federmans' co-conspirator, and the Federman's lawyer each have served on the Design Committee.

### E.  The Design Committee Acted Unreasonably, Unfairly, Arbitrarily, And In Bad Faith.

#### 1.  The Design Committee Waived Design Requirements To Help Mauna Kea Make Sales And To Reward Purchasers Who Agreed Not To Disclose Evidence Of Mauna Kea's Fraud.

When Mr. Mielcke was on the Design Committee, he had direct conflicts between his role as a "impartial" committee member charged with enforcing the Design Requirements, and his role as the head of the Mauna Kea entity responsible for selling the lots at The Bluffs. Plaintiffs' CSOF 29. Mr. Mielcke did not resolve these conflict in favor of impartiality. Rather than fulfilling its obligation to enforce the Design Requirements, Mielcke waived Design Requirements (1) to

stimulate sales for Mauna Kea; and (2) to keep reward early buyers who had direct knowledge of Mauna Kea's fraud and agreed to keep that knowledge confidential.

Mauna Kea's contract with the Robertsons, one of the earliest purchasers at the Bluffs, shows that Mr. Mielcke would not let the Design Requirements get in the way of making a sale. The Robertson contract contained two material changes from Mauna Kea's form: (1) an agreement by the Robertsons to keep quiet about their $500,000 secret discount; and (2) an agreement by Mauna Kea to allow the Robertsons to build a flat-roof Mexican-style house. Plaintiffs' CSOF 36. The Robertsons were to build such a flat-roof, despite the fact that the Design Requirements allow double-pitched roofs only. As Design Requirement § 4.6 expressly states, "ONLY ONE TYPE OF ROOF SHALL BE PERMITTED, as follows: a. All roofs shall be designed such that the predominant form is a double-pitched roof." Revere Decl., Ex. 33 § 4.6. Mauna Kea's agreement to breach the Design Requirements led to at least two other lawsuits: *Fogelsong, et al v. Mauna Kea, et al.* (Civil No. 01-1-0279, 3rd Cir. Hilo) and *Robertson v. Mauna Kea* (Civil No. 02-00207 HG LEK).

The Design Committee gave special treatment to early purchasers who knew of Mauna Kea's fraud and agreed not to disclose it. For example, The Design Committee told Plaintiffs not to put even ornamental plants in their special setback area. The Federmans – who received a secret discount of $450,00 and signed a

confidentiality agreement agreeing to keep the discount a secret – were treated differently:  They were allowed to build a 3,500 square foot pool, deck, and spa in the special setback area, as well as plant clusters of palm trees.  Plaintiffs' CSOF 47.

The Design Committee also gave special consideration to other purchasers who had knowledge of Mauna Kea's fraud, including the Reddys – the Federmans' other neighbors who also received a secret discount and who also agreed to keep it confidential.    Mauna Kea visited the Reddys' lot to gauge the impact of the proposed structures on the Reddy's views and also took action to prevent roofed structures in the special setback area in response to the Reddy's concerns. Plaintiffs' CSOF 37.    Plaintiffs, however, were never given any notice or opportunity to be heard concerning the Federmans' request.  Mauna Kea did not even visit Plaintiffs' lot to gauge the impact of the Federman' plans on Plaintiffs' views.[4]  Plaintiffs' CSOF 51-53.

2.    **The Design Committee's Early Conduct Has Been Universally Condemned By People Associated With The Bluffs.**

The Design Committee's early conduct not only led to numerous lawsuits, it

---

[4] Even the Federmans' architect stated that the "reasonable" thing to do would have been to visit Plaintiffs' lot and determine the impact on Plaintiffs' views.  Revere Decl., Exs. 42 ¶ 6; 43, 44 (Laber Depo.) at 18:10-20; 25:9-26:6; 69:25-71:9; 85:16-21.

has been universally condemned by people associated with The Bluffs. For example, the current advisor to the Association's Board testified that it was fair to say that the "general consensus" of the owner-controlled committee was that the early Design Committee did a terrible job of enforcing the governing documents. Plaintiffs' CSOF 40. The initial owner members of the Association's Board also stated that "[i]t is the board's feeling that many of the design conflicts that have occurred at The Bluffs could have been minimized with a closer adherence to the original intent of the CC&Rs." Plaintiffs' CSOF 39. Additionally, the first President of the Association stated that the early Design Committee acted arbitrarily: "John Reid stated that the committee was trying to be unbiased and move in the direction away from Mauna Kea Properties' arbitrary decisions." Plaintiffs' CSOF 41.

On the specific issue of the Federmans' "improvements" that are at issue in this lawsuit, even Design Committee member Mr. Gunderson – the lawyer for Mr. Federman's firm – noted that "[t]his is yet another example of the mischief worked by Mielcke. I do not think it is an exaggeration to say that every submittal that Mielcke touched has (or had) a similar problem." Plaintiffs' CSOF 42.

> 3.    **Even After Homeowners Took Over The Design Committee, Its Conduct Continued To Be Arbitrary, Unreasonable, Unfair, And In Bad Faith.**

Despite the harsh criticism of the early Design Committee, it was run just as

poorly once the homeowners took over.  As an example, the Design Committee allegedly approved the Federmans' plans to install a 3,500 square foot pool-spa complex in their special setback area, as well as plant clusters of palm trees – despite the serious implications to Plaintiffs' lot.  The unreasonableness and unfairness of the Design Committee as to the Federmans' plans is further demonstrated by the testimony of the Design Committee's own consultants, as discussed below.

### a. The Federmans Had No Hardship Or Special Factor That Required A Variance.

Mr. Stringer, the Design Committee's consultant, testified that the Federmans had no hardship that required a variance allowing them to install 3,500 square feet of structures in their special setback area, as opposed to elsewhere in their 48,000 square foot lot.  Plaintiffs' CSOF 43-48.  Yet, the Design Committee was only supposed to approve deviations from the Design Requirements because of "some unusual factor."  Plaintiffs' CSOF 48.

### b. The Design Committee That Approved The Federmans' Plans Was Advised By The Federmans' Own Engineer.

Mr. Stringer testified that it was inappropriate for a design committee to take advice from consultants regarding submittals by the consultants' own clients. Plaintiffs' CSOF 34.  However, that is exactly what the Design Committee did

regarding the Federmans' plans – it took advice from Belt Collins, the Federmans' engineer.  Plaintiffs' CSOF 26, 28.

>c. **An Attorney For Mr. Federmans' Company Sat On The Design Committee And Did Not Recuse Himself From Consideration Of The Federmans' Plans.**

Design Committee member Mr. Gunderson is an attorney for Mr. Federmans' company.  Plaintiffs' CSOF 31.  Nevertheless, Mr. Gunderson did not recuse himself from the meeting at which the Federmans' plans were discussed.  Plaintiffs' CSOF 32, 33.  Mr. Gunderson also did not disclose his conflict of interest to other Design Committee members or to Plaintiffs.  *Id.*

>d. **Plaintiffs Were Given No Notice Or Opportunity To Be Heard Regarding The Federmans' Plans, But The Design Committee Took Other Homeowners' Concerns Into Account.**

Mr. Stringer testified that homeowners would ideally be given notice of potential variances before they were given.  Plaintiffs' CSOF 49.  Yet, Plaintiffs were given no notice or opportunity to be heard on the Federmans' plans.  Plaintiffs' CSOF 9.  Plaintiffs' treatment is in stark contrast to the treatment provided to the Reddys – the Federmans' other neighbors who, like the Federmans, received a secret discount from Mauna Kea and agreed to keep it a secret.  Plaintiffs' CSOF 35, 37, 53.  The Design Committee took action to prevent roofed structures in the special setback area in direct response to the Reddy's concerns.

Plaintiffs' CSOF 51-53.

> **e.   The Design Committee Never Visited Plaintiffs' Lot To Gauge The Impact Of The Federmans' Proposed Construction On Plaintiffs' Views.**

Mr. Stringer former partner, Terry Tusher, testified that he never visited

Plaintiffs' lot to gauge the impact of the Federmans' proposed construction on

Plaintiffs' views, and that he was unaware of any Design Committee member

having done so.   Plaintiffs' CSOF 52.   Indeed, no member of the Design

Committee visited Plaintiffs' lot to determine the impact that the Federmans' plans

would have on Plaintiffs' views.   Plaintiffs' CSOF 9, 51.   However, the Design

Committee did visit the Reddy's lot to determine the impact the Federmans'

construction would have on the Reddys' views.   Plaintiffs' CSOF 9, 53.   Again,

Plaintiffs were treated much differently than the Reddys, homeowners who had

evidence of Mauna Kea's fraud.

> **f.   The Design Committee's Position Is That Clusters Of Palm Trees Are Not Allowed In Special Setback Areas, But The Federmans Still Were  Allowed To Plant Them.**

Mr. Stringer testified that the Design Committee's position is that clusters of

palm trees are not allowed in special setback areas, and that the Design Committee

never approved the Federmans' landscape plans.   Plaintiffs' CSOF 46,   Revere

Decl. Exs. 64-65; 38 ¶0129.03); 37 (Stringer Depo.) at 84:12-86:8; 271:4-272:8; 36

¶5.  The Federmans, on the other hand, have been allowed to plant clusters of palm trees in the special setback area.  Plaintiffs' CSOF 47.  These palm trees – many of which have been planted subsequent to this Court's previous summary judgment decision – block Plaintiffs' ocean views.  Plaintiffs' CSOF 54.

> ### g.  The Only Homeowners Allowed To Construct Pools Entirely In Their Special Setback Areas Were Design Committee Member Gunderson And His Two Clients.

Stringer testified that the only homeowners at The Bluffs that were allowed to put their _entire_ pools in the special setback area were Design Committee member Robert Gunderson his two clients, Irwin Federman and Douglas Leone (whose properties unfortunately bookend Plaintiffs' lot).  Plaintiffs' CSOF 50.

### F.  Plaintiffs Have Suffered Substantial Damages As A Result Of The Design Committee's Conduct.

As a result of the Design Committee's disregard of the Design Requirements it was charged with enforcing, Plaintiffs' views have been impacted in ways that have decreased the value of Plaintiffs' property by at least $700,000.  Plaintiffs' CSOF 55.  The Federmans, on the other hand, have had the value of their property improve by $850,000.  _Id._

G.     **"Enforcement" Of The Design Requirements Was So Bad, That This Court Ruled That Section 4.17 Of The Design Requirements Had Been Abandoned To The Extent That It Prohibited Structures That Did Not Block Views.**

The Design Committee's enforcement of the Design Requirements was so bad that, on previous motions for summary judgment, this Court ruled that "Section 4.17 has been effectively abandoned as it pertains to structures built in the setback area that do not block views." *Western Sunview Properties, LLC v. Federman*, 338 F. Supp. 1106, 1115 (2004). Based on this abandonment ruling, the Court granted summary judgment to the Federmans on Plaintiffs' special setback claims, stating that the Federmans' "pool, through its alleged glare alone, does not 'block' Plaintiffs' view." *Id.*[5]   As discussed below, since the first summary judgment hearing, the Federmans <u>have</u> made "improvements" in the special setback area to <u>do</u> block Plaintiffs' views, and the Association has done nothing to stop them.

H.     **The Third Circuit Court Of Hawaii Denied The Association's Motion For Summary Judgment In A Similar Case Involving Plaintiffs' Other Neighbors, The Leones.**

The Design Committee also failed to enforce the Design Requirements against Plaintiffs' other neighbors, the Leones. Plaintiff Western Sunview sued the

---

[5] In deciding the previous summary judgment motions, the Court also ruled that Plaintiffs could not recover punitive damages from the Federmans. *Id.* at 1128-29. The Court made no such ruling as to Mauna Kea.

Leones and the Association in Hawaii state court. The Association filed a summary judgment motion similar to the one at issue here, which was denied by Judge Nakamura of the Third Circuit Court. As that court stated:

> The Design Committee had the obligation to exercise its discretion and powers reasonably and treat members of the Association fairly. This is according to Restatement of Property, Third, §6.13(1). Determining whether the design control powers have been unreasonably exercised requires a fact-specific, case-by-case inquiry. This is according to comment D, Restatement of Property, Third, §6.9. There are genuine issues of material fact as to whether the Design committee acted reasonably. The issues raised by the memoranda, such as Mr. Gunderson's participation in the Design Committee's deliberations, and whether plaintiff had the opportunity to participate in the proceedings, are not dispositive as to whether or not the Design committee acted reasonably; rather, they are factors to consider in making that determination.

Revere Decl., Ex. 124 at 21:8-24.

I. **The Association Has Done Nothing To Stop The Federmans From Blocking Plaintiffs' Views Following This Court's Summary Judgment Decision.**

Since this Court previous summary judgment motions were decided, the Federmans have filled their pool and have planted numerous additional trees that block Plaintiffs' views. Plaintiffs' CSOF 54. The Association has done nothing to enforce Section 4.17 with regard to these additional trees.

III.   **ARGUMENT**

A.   **The Association Is Liable To Plaintiffs For Any Abandonment Of Section 4.17.**

Plaintiffs, like other homeowners at the Bluffs, spent significant sums of money purchasing the property at The Bluffs, largely in reliance on covenants promising protected views – promises the Association had the duty to enforce. The Association utterly failed in that duty. Although the Association references this Court's abandonment ruling, it does not discuss the consequences of that ruling – namely, that the Association is liable to Plaintiffs for any damages resulting from such an abandonment.   Section 3.1 of the Design Requirements expressly provides that

> The Bluffs Design Committee . . . <u>is charged with enforcing compliance</u> with these Design Requirements.

Plaintiffs' CSOF 25 (emphasis added).  Necessarily contained within the obligation to enforce the Design Requirements was the obligation to not allow them to become abandoned.  Thus, the Association has breached its duties to Plaintiffs and other homeowners, and is liable to Plaintiffs for their resulting damages.[6]

Indeed, the RESTATEMENT (THIRD) OF PROPERTY:  SERVITUDES makes it

---

[6] The Association misunderstands Plaintiffs' claims against the Association, incorrectly asserting that "Plaintiffs' only actionable claim" against the Association is for punitive damages.  Motion at 8.  Plaintiffs alleged, and have sufficient
(Continued...)

clear that the Association has duties to Plaintiffs that are independent of the governing documents.   Section 6.13 of the RESTATEMENT provides that:

> In addition to duties imposed by statute and the governing documents, the association has the following duties to the members of the common-interest community:
>
> (a) to use ordinary care and prudence in managing the property and financial affairs of the community that are subject to its control;
>
> (b) to treat members fairly;
>
> (c) to act reasonably in the exercise of its discretionary powers including rulemaking, enforcement, and design-control powers;
>
> (d) to provide members reasonable access to information about the association, the common property, and the financial affairs of the association.

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.13 (1).   Commentary to this section states that "[b]reach of duty under this section gives rise to a cause of action against the association," and that an association may be liable to homeowners for breaches of the duty to use ordinary care.  *Id.* § 6.13 cmt. a & illus. 1, 2, 3.

Here, the Design Committee's enforcement of the Design Requirements was so bad that this Court determined that Section 4.17 had been largely abandoned.

evidence for, numerous claims against the Association, including that the Association breached the governing documents of The Bluffs (Count II).

Members of the Association's Board have condemned the actions of the Design Committee, and the Design Committee's own consultant has testified as to numerous ways in which the Design Committee's actions were unfair or unreasonable. At the very least, there are triable issues of fact as to whether the Association is liable to Plaintiffs as a result of any abandonment of Section 4.17.

**B.    Triable Issues Of Fact Exist As To Whether The Association Acted Unreasonably And In Bad Faith.**

It is well-established that covenants such as Section 4.17 are enforceable for the purposes of protecting views. *See, e.g.*, *Sandstrom v. Larsen*, 59 Haw. 491, 496 & n.3, 583 P.2d 971 (1978). Under the Association's own authorities, the Design Committee must have acted reasonably and in good faith in rejecting the clear directive of Section 4.17 an allowing the Federmans to put "improvements" in their special setback area. *McNamee v. Bishop Trust Co., Ltd.*, 62 Haw. 397, 407, 616 P.2d 205 (1980) (noting that absent specific written restrictions, the plaintiff's judgment in deciding whether to approve or disapprove the defendant's plans must be measured against the standards of good faith and reasonableness)[7];

---

[7] The Hawaii Supreme Court citing *Bailey Development Corp. v. MacKinnon-Parker, Inc.*, 60 Ohio App. 2d 307 (1977). Thus, it is only if there are no specific written restrictions that reasonableness comes into play. Here, there are written restrictions – Design Requirements § 4.17 – that the Association violated. This Court can determine that Mauna Kea breached its duties to Plaintiffs on the basis of the written restrictions alone.

*Village Park Community Ass'n v. Nishimura*, 108 Haw. 487, 501, 122 P.3d 267 (Haw. App. 2005).[8]   Whether the Association did so presents questions of fact for the jury. *Cohen  v. Kite Hill Community Ass'n*, 191 Cal. Rptr. 209, 216 (Cal. Ct. App. 1983).

> 1.    **The Association's Decisions Are Not Entitled To Deference And Should Be Given Meaningful Review By The Court And By The Jury.**

"[C]ourts must meaningfully review grants of variances in order to protect the interests of those who hold rights in property nearby the parcel for which a variance is sought." *Cohen*, 191 Cal. Rptr. at 215.   *Cohen* is almost directly on point.  There, an association allowed a homeowner to construct a nonconforming fence that blocked plaintiffs' view, over plaintiffs' objection. *Id.* at 211.  Despite the fact that the governing documents gave the association the "sole discretion" to grant reasonable variances, the court held that plaintiffs' claim could proceed and must be given meaningful review:

> The trial court must review the Association's decision approving the . . . fence to insure that it was neither arbitrary nor in violation of the restrictions contained in the Declaration.

---

[8]   The Association relies on the Hawaii Intermediate Court of Appeals' decision *Village Park*, but neglects to mention that the Hawaii Supreme Court has granted an application for a writ of *certiorari* to review that decision. *Village Park Community Ass'n v. Nishimura*, 2005 WL 2716544 (Haw. Oct. 21, 2005).

. . .

> Although the Declaration vests "sole discretion" in the Committee and allows for reasonable variances, their decisions must be 'in keeping with the general plan for the improvement and development of the Project,' and of course, must be in good faith and not be arbitrary. <u>These are clearly questions for the jury</u>.

*Id.* at 215, 216 (emphasis added). Numerous courts have followed *Cohen*, or independently reached the same conclusion. *See, e.g., Wright v. Cypress Shores*, 413 So. 2d 1115, 1123 (Ala. 1982); *Johnson v. Pointe Community. Ass'n*, 73 P.3d 616 (Ariz. App. 2003); *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So. 2d 665 (Fla. App. 1974).

### 2.     Triable Issues Of Fact Exist As To Whether The Association Acted Unreasonably.

"Determining whether design-control powers have been unreasonably exercised requires a fact-specific, case-by-case inquiry." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.9 cmt. d. The fact-specific inquiry should be made by the jury.

#### a.     The Association Has The Burden Of Showing It Acted Reasonably.

The Restatement provides that "[f]ailure . . . to permit interested property owners to prevent relevant information may . . . shift the burden to the association to establish that it acted reasonably." *Id.* Here, the Association did not allow

Plaintiffs to present any information as to the Federmans' proposal. Indeed, the Association did not even provide Plaintiffs with notice of the Federmans' proposal, even though the Federman's own architect stated that "ideally" this would have been done. Based on these facts, the Association has the burden of establishing that it acted reasonably. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.9 cmt. d.

The burden also shifts to the Association "[i]f the property owner establishes a prima facie case of unreasonableness." *Id.* "[I]nconsistent application of criteria may establish a prima facie case of unreasonableness." *Id.* Furthermore, "[d]ecisions made without deliberation and articulation of reasons for the decision, decisions based on irrelevant criteria or erroneous guidelines, and <u>decisions that violate association guidelines are nearly always held unreasonable</u>." *Id.* (emphasis added). As discussed below, the evidence establishes at least a prima facie case of unreasonableness.

### b.     The Association Failed To Follow Its Own Rules.

Section 4.17 of the Design Requirements is clear. It provides that:

> Special setbacks have been placed on the individual Homesites to protect views and to preserve hillsides. <u>No building or structure shall be placed within the special setback areas</u> as shown on exhibit A.

Plaintiffs' CSOF 4, 43. Here, the Association allowed the Federmans to construct

3,500 square feet of structures entirely within the special setback area, as well as plant clusters of palm trees.   There is at least a triable issue of fact as to whether the Association acted unreasonably in violating the clear directive of Section 4.17.

   **c.**  **The Association Based Its Decision On Erroneous Standards.**

  The Association's own brief shows that it based its decision on erroneous standards.   According to the Association, Design Requirements should be interpreted "in a manner which favors the unrestricted used of land."   Motion, at 15.   This is simply not the law or a standard contained in the Design Requirements, and the Association erred in applying such a principle.

  Section 4.1 of the Restatement provides that "[a] servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created."   RESTATEMENT (THIRD) OF PROPERTY:  SERVITUDES § 4.1.   Commentary to this section makes it clear that this rule replaces any principle favoring the unrestricted use of land:

> The rule that servitudes should be interpreted to carry out the intent of the parties and the purpose of the intended servitude departs from the often expressed view that servitudes should be narrowly construed to favor the free use of land. It is based in the recognition that servitudes are widely used in modern land development and ordinarily play a valuable role in utilization of land resources. The rule is supported by modern case law.

*Id.* § 4.1 cmt. a (emphasis added).[9]

Rather than interpreting Section 4.17 in a way most favorable to the Federmans, the Association should have followed the intention of Section 4.17 as expressed by its language. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.1 cmt. c.[10] "The language should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved." *Id.* § cmt. d. Here, an ordinary purchaser would interpret "[n]o building or structure shall be placed within the special setback areas" to mean that "no building or structure shall be placed within the special setback areas." Indeed, the evidence shows that this is the interpretation that purchasers had: Mrs. Hands

---

[9] The Association misunderstands *Clark v. Wodehouse*, 4 Haw. App. 507, 669 P.2d 170 (1983), which the Association cites for the proposition that "a restriction, 'requires only a reasonable construction which is most favorable to the servient estate.'" Motion, at 14. As the *Clark* court made clear, this interpretative tool is <u>not</u> to be applied generally, but only in the case of ambiguity: "An ambiguous restriction is not fatally defective. It 'requires only a reasonable construction which is most favorable to the servient estate.'" *Clark*, 4 Haw. App. at 511, 669 P.2d 170 (citation omitted).

Here, there is nothing ambiguous about the rule that "[n]o building or structure shall be placed within the special setback areas." The Association accordingly erred in giving the Federmans "the most favorable" interpretation of this rule.

[10] This principle is consistent with the Association's own authority. *See Clark*, 4 Haw. App. at 511, 669 P.2d 170 ("In determining the meaning of the language used in a restrictive covenant, the court 'will first look to the plain, ordinary and popular meaning of the words used in the covenant.'") (citation omitted).

testified that she read the Design Requirements before the purchase of the property, and understood that these requirements prohibited building in the special setback areas to protect views. Plaintiffs' CSOF 23.

Thus, the Association acted unreasonably in ignoring the plain language of Section 4.17 and instead giving the Design Requirements the interpretation that was most favorable to the Federmans.

### d. The Association Applied Its Own Criteria Inconsistently.

The Association's Design Committee applied its own standards inconsistently. The Design Committee told Plaintiffs not to put even ornamental plants in their special setback area, stating that the Design Requirements provide that:

> "shrubs or trees, such as palm trees, which grow to significant height are not encouraged." Care should be takes so that the landscape does not obstruct views from surrounding properties . . . .

> Special Setback area: A special setback area exists in the rear yard to protect views and to preserve the existing hillside. At the northwest corner of your property, the Committee requests that you consider a redesign of the ornamental landscape at the lot's corner and remove vertical plantings.

The Design Committee's own consultant also testified that the Design

Committee's position is that palm trees are not allowed in special setback areas.[11] Plaintiffs' CSOF 46.

While Plaintiffs were told not to put plants in their special setback area, the Federmans were allowed to plant numerous clusters of palm trees in theirs. Plaintiffs' CSOF 45, 47.   Many of these trees were planted _after_ this Court considered the previous motions for summary judgment and Plaintiffs' Motion for Reconsideration.[12]   The evidence establishes that, contrary to the Association's suggestion, the additional trees block Plaintiffs' view.   Plaintiffs' CSOF 54.   The evidence also shows that the Design Committee applied its standards inconsistently, creating at least a triable issue of fact as to whether the Association acted reasonably.

> **e.    The Association Failed To Visit Plaintiffs' Lot To Determine The Impact That The Federmans' Plans Would Have On Plaintiffs' Views.**

The case law also establishes that there is at least a triable issue of fact as to the Association's reasonableness.   In _Leonard v. Stobeling_, 728 P.2d 1358 (Nev.

---

[11] Clusters of palm trees are "structures" for purposes of Section 4.17.  _See, e.g._, _Wilson v. Handley_, 119 Cal. Rptr. 2d 263, 267, 272 (Cal. Ct. App. 2002) (rows of trees may be structures for purposes of spite fence statute).

[12] This Court's ruling on the previous summary judgment motion did not address the Federmans' palm trees, and this Court's remarks about palm trees in the Order on the Motion for Reconsideration were expressly limited to two or three trees only.

1986), the Architectural Control Committee (the "Committee") failed to enforce a covenant that protected views. *Id.* at 1362. Leonard filed suit, and the Nevada Supreme Court agreed that the Committee's decision was arbitrary and unreasonable *per se*. *Id.* The court noted that "[n]o member of the . . . Committee visited Leonard's property in considering whether to grant approval for the addition." *Id.* at 1361. The court went on to state:

> Our review of the record conclusively reveals that the Architectural Control Committee gave no heed to the impact of the Stoebling addition on appellants' view of the lake. The committee's perfunctory deference to its prior approval of the original structure presented no basis for a meaningful exercise of its function to assure a perpetual lake view advantage to appellants and the other residents who had constructed homes within the unique setting of the subdivision. At minimum, the committee members should have visited the proposed construction site and ascertained its impact on appellants' properties. The committee's failure to undertake such a minimum effort is unreasonable per se. The product of the committee's inaction and disregard for appellants' rights was an arbitrary decision . . . .

*Id.* at 1362. Here, the undisputed evidence is the Association failed to visit Plaintiffs' property to determine whether the Federmans' plans would interfere with Plaintiffs' view. Plaintiffs' CSOF 9, 51. This failure is unreasonable *per se*.

3.  **Triable Issues Of Fact Exist As To Whether The Association Acted In Bad Faith.**

   a.  **The Attorney For Mr. Federmans' Company Participated In The Deliberations Regarding The Federman's Plans.**

Robert Gunderson, an attorney for Mr. Federman's company, was a member of the Design Committee. Plaintiffs' CSOF 31-33. Mr. Gunderson did not recuse himself at the January 29, 2002 meeting at which approval for the Federmans' plans allegedly was given. Plaintiffs' CSOF 32. The Federman-Gunderson relationship was not disclosed to Plaintiffs or to the other members of the Design Committee. Plaintiffs' CSOF 33. Mr. Gunderson's participation in the consideration of the Federman's plans, as well as his failure to disclose his relationship with the Federmans, at least creates a triable issue of fact as to whether the Association acted in good faith.

   b.  **The Association Relied On The Advice Of The Federmans' Engineer.**

In attempting to establish its good faith, the Association relies on its assertion that it hired an architectural consultant to assist it in its review process. Motion at 16. The Association neglects to mention that it also was advised by Belt Collins, the Federmans' engineer, and that its own architectural consultant testified that it was inappropriate for a design committee to take advice from consultants regarding submittals by the consultants' own clients. Plaintiffs' CSOF

34.  This also creates at least a triable issue of fact as to whether the Design Committee acted in bad faith.

### c.     The Association's Design Committee Granted Special Favors To Its Members And Clients Of Mr. Gunderson's.

The evidence also shows that special favors were granted to members of the Design Committee and their clients.  For example, the only homeowners at The Bluffs that were allowed to put their <u>entire</u> pools in the special setback area were Design Committee member Mr. Gunderson and his two clients, Mr. Federman and Mr. Leone.  Plaintiffs' CSOF 50.  As a direct result of the Association's actions, Plaintiffs' property was reduced in value by at least $700,000, while Gunderson's client the Federmans had their property improve in value by at least $850,000, a swing of over $1.5 million.  Plaintiffs' CSOF 55.  Again, this creates at least a triable issue of fact as to the Association's good faith.

### d.     The Court's Previous Remarks About Good Faith Were Expressly Limited To Two Or Three Trees And Did Not Address The Evidence Presented In This Opposition.

The Association relies on remarks this Court made about good faith in denying Plaintiffs' motion for reconsideration of this Court's summary judgment ruling as to the Federman's.  However, the only issue these remarks pertain to is two or three trees that the Court did not address in its summary judgment ruling.

Order Denying Plaintiffs' Motion for Clarification and Reconsideration, dated February 22, 2005, at 18-23.   As this Court stated, "[t]he two or three trees addressed by the Court at the hearing are the only trees that have been sufficiently discussed by the parties in their arguments and factual evidence to enable this Court to reach a ruling.  To the extent that Plaintiffs seek a ruling regarding other trees or trees generally, this issue was not properly before the Court." *Id.* at 23.  To the extent that the Association argues that these remarks apply to more than the two or three trees that were the subject of this Court's Order, Plaintiffs respectfully submit that other issues were not before the Court and the Court did not fully consider or address the evidence presented in this Opposition.

After this Court ruled on the motion for reconsideration, the Federmans planted numerous additional clusters of palm trees in their special setback area. These trees <u>do</u> block Plaintiffs' views, in direct contravention of Section 4.17 of the Design Requirements.  The Association acted unreasonably in allowing the Federmans to plant them, for the reasons discussed above.

### C.    The CC&Rs Do Not Insulate The Association From Liability For The Conduct At Issue Here.

The Association incorrectly relies on Section 12.10 of the CC&Rs to suggest that it can liable for bad faith, malicious conduct only, and that it is not liable here. Motion at 9.  This suggestion is incorrect, for at least three reasons.

First, the Restatement makes it clear that the Association has duties to Plaintiffs that are independent of the governing documents, and that the Association is liable to Plaintiffs for breaching these duties. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.13(1), cmt. c, illus. 1, 2, and 3. These duties include the duties: (a) "to use ordinary care and prudence," (b) "to treat members fairly," (c) "to act reasonably in the exercise of its discretionary powers," and (d) ") to provide members reasonable access to information." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.13(1). As established above, Plaintiffs have evidence that the Association violated each of these duties, none of which requires a finding of bad faith or malice.

Second, provisions that attempt to limit liability for a party's own negligence are looked up with disfavor by Hawaii courts. *Fujimoto v. Au*, 95 Haw. 116, 155, 19 P.3d 669 (2001). In *Fujimoto*, the Hawaii Supreme Court stated that "[e]xculpatory provisions are not favored by the law and are strictly construed against parties relying on them. Exculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power." *Id.* at 155 ("Nor will a contract be enforced if it has the effect of exempting a party from negligence in the performance of a public duty, or where a public interest is involved."). Homeowners' Associations, including the Association at The Bluffs, have "quasi-

governmental" responsibilities and occupy "a particularly elevated position of trust because of the many interests [they] monitor and the services [they] perform." *Cohen v. Kite Hill Community Ass'n*, 191 Cal. Rptr. 209, 214, 217 (Cal. Ct. App. 1983). As such, they involve a substantial public interest and cannot rely on exculpatory provisions to avoid suit. *See id.* at 217.

~~Third,~~ even assuming that the Association could rely on an exculpatory or limitation of liability provision (which it cannot) the Association ignores Section 8.14 of the CC&Rs, which expressly applies to the Design Committee and requires due diligence: "Provided that the Design Committee members act in good faith and with due diligence, neither the Design Committee nor any of its members shall be liable . . . ." CSOF 56 (emphasis added). Section 12.10, which the Association relies on, appears in the "Miscellaneous" article of the CC&Rs and refers to acts of the Association generally. In contrast, Section 8.14 specifically applies to acts of the Design Committee, including "the approval or disapproval of plans . . . ." CSOF 56. By seeking to rely on the general Section 12.10 at the expense of the specific Section 8.14, the Association ignores the well-established rule that the specific provision controls over a general one. *Kaiser Hawaii Kai Development Co. v. Murray*, 49 Haw. 214, 227-228, 412 P.2d 925 (1966). Thus, were this Court to determine that a limitation of liability provision should apply (which this Court should not), this Court should apply the more specific Section 8.14 and rule that

triable exists of fact exist as to the Association's good faith and due diligence.

### IV.    CONCLUSION

For the foregoing reasons, the Court should reject, in its entirety, the Association's Motion for Summary Judgment.

DATED: Honolulu, Hawaii,_____ JAN 5 2006 _____.

_____

TERRANCE REVERE

Attorney for Plaintiffs
WESTERN SUNVIEW PROPERTIES, LLC,
GUY HANDS, AND JULIA HANDS