# Transcript of the Testimony of
# GUY HANDS

**Date:** February 5, 2005
**Case No.:** CV03-00463
**Case:** WESTERN SUNVIEW PROPERTIES v. FEDERMAN

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

**EXHIBIT 36**

FEB 1 4 2005

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
---:---

WESTERN SUNVIEW PROPERTIES,        )   CIVIL NO. CV03-0463 DAE(LEK)
LLC; GUY HANDS; AND JULIA          )
HANDS,                             )
                                   )
              Plaintiffs,          )
                                   )
       vs.                         )
                                   )
IRWIN FEDERMAN; CONCEPCION         )
FEDERMAN; THE BLUFFS AT MAUNA      )
KEA COMMUNITY ASSOCIATION;         )
MAUNA KEA PROPERTIES, INC.;        )
MAUNA KEA DEVELOPMENT CORP.;       )
COUNTY OF HAWAII; JOHN DOES        )
1-100; JANE DOES 1-100; DOE        )
PARTNERSHIPS 1-100; DOE            )
CORPORATIONS 1-100,                )
                                   )
              Defendants.          )
_____)

DEPOSITION OF GUY HANDS

Taken on behalf of the Defendants Mauna Kea Properties, Inc. and Mauna Kea Development Corp., at the law offices of Watanabe Ing Kawashima & Komeji LLP, First Hawaiian Center, 999 Bishop Street, 23rd Floor, Honolulu, Hawaii, commencing at 9:08 a.m., on Saturday, February 5, 2005, pursuant to Notice.

BEFORE:

Amy Muroshige, CSR 166
Notary Public, State of Hawaii

## Page 2

APPEARANCES:

For the Plaintiffs:   TERRANCE MATTHEW REVERE, ESQ.
                      Motooka Yamamoto & Revere LLLC
                      1000 Bishop Street
                      Suite 801
                      Honolulu, Hawaii 96813
                      -and-
                      CHAD P. LOVE, ESQ
                      Love & Narikiyo
                      1164 Bishop Street
                      Suite 105
                      Honolulu, Hawaii 96813

For the Defendants    ANDREW V. BEAMAN, ESQ.
Irwin Federman and    Chun Kerr Dodd Beaman & Wong
Concepcion Federman:  Topa Financial Center
                      Fort Street Tower
                      745 Fort Street, Suite 900
                      Honolulu, Hawaii 96813

For the Defendants    J. DOUGLAS ING, ESQ.
Mauna Kea Properties, Watanabe Ing Kawashima & Komeiji
Inc. and Mauna Kea    First Hawaiian Center
Development Corp.:    999 Bishop Street
                      23rd Floor
                      Honolulu, Hawaii 96813

For the Defendants    RONALD SHIGEKANE, ESQ.
The Bluffs at Mauna   Ayabe Chong Nishimoto Sia
Kea Community         & Nakamura
Association:          2500 Pauahi Tower
                      1001 Bishop Street
                      Honolulu, Hawaii 96813

For the Defendant     JOSEPH K. KAMELAMELA, ESQ.
County of Hawaii:     Corporation Counsel
                      Hilo Lagoon Centre
                      101 Aupuni Street, Suite 325
                      Hilo, Hawaii 96720

Also Present: Guy Hands and Denise Ola Batty

## Page 3

INDEX

EXAMINATION BY:                                  PAGE
MR. ING                                          5
MR. BEAMAN                                       110
MR. SHIGEKANE                                    213
MR. KAMELAMELA                                   224
MR. ING                                          228

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 42 | Printout of Terra Firma website | 24 |
| 43 | Fax to Ronda from Debi Au, dated March 21, 2000 | 92 |
| 44 | Agreement Between Owner and Landscape Contractor, dated January 2, 2004 | 106 |
| 45 | Various pages from a diary | 130 |
| 46 | Letter to Guy Hands from Deborah Au, dated September 18, 1999, and attachment | 139 |
| 47 | Fax to Guy and Julia from Debi Au, dated January 26, 2000 | 182 |
| 48 | Fax to Guy from Debi, dated March 14, 2000 | 185 |
| 49 | Fax to Guy Hands from Ronda Kent, dated March 14, 2000 | 191 |
| 50 | Letter to Deborah Au from John Pugsley, dated March 24, 2000 | 196 |

## Page 4

INDEX

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 51 | Fax to Guy Hands from John Pugsley, dated March 24, 2000 | 197 |
| 52 | Fax to Guy Hands from John Pugsley, dated April 26, 2000 | 201 |
| 53 | Fax to Guy Hands from John Pugsley dated June 20, 2000 | 208 |
| 54 | Witness's handwritten notes | 233 |

### Page 137

1  was something like Hirakoshi, to go and pop in at some stage
2  and I can't remember if that was beforehand, after. I think
3  it was after I'd given them advice, but might have been
4  before, I just can't remember.
5  Q   (By Mr. Beaman) And you can't remember whether this was
6  the same trip in August of 1999 when you visited Black Sand
7  Beach?
8  A   No, I can't. I would be -- I just don't know. I'd be
9  guessing.
10 Q   How did you come to the conclusion that it would be an
11 environmental disaster?
12 A   How?
13 Q   Yes. What led you to that conclusion?
14 A   There were some documents that Nomura had which they'd
15 been given with regard to trails, burial sites, et cetera,
16 there was -- some of the stuff -- this is probably client
17 privilege to Nomura, so I have to be very careful. I can't
18 remember what is client privilege to Nomura, to be honest, so
19 just say there was a collection of documents which Nomura
20 gave me to read, which I didn't give back to Nomura, which I
21 just didn't like.
22 Q   (By Mr. Beaman) Ultimately you told Mr. Hirakoshi that
23 you thought Nomura should not invest in the project, is that
24 what happened?
25     MR. REVERE: Objection, misstates his prior testimony.

### Page 138

1      THE WITNESS: I wouldn't have told Mr. Hirakoshi, no.
2  I would have spoken to my superiors in London.
3  Q   (By Mr. Beaman) Okay. And do you remember when that
4  conversation occurred?
5  A   No.
6  Q   Would you refer to Exhibit 10 to your deposition. For
7  convenience, I'll show you my copy of Exhibit 10. It is a
8  fax from Rita Andrews, your assistant, to Deborah Au, dated
9  September 17 of 1999, and directing your attention to the
10 first sentence of the second paragraph, which says "Guy is
11 considering at present either this plot or another one." Do
12 you see that?
13 A   Yes.
14 Q   What other plot were you considering at that time?
15 A   I presume she's referring to Black Sands. What else
16 could she be referring to. Pretty obvious. We hadn't
17 rejected Black Sands at that stage. What else could it be.
18 Q   There weren't any other lands that you were considering
19 at that time?
20 A   I'd been sent some other stuff by Debi Au and, you
21 know, I'd glanced through it and didn't like it. I mean
22 my -- you know, put this in perspective, my time, my time was
23 pretty limited. If you just look at my diary, you know,
24 you've got -- you know, just every day is just packed and I
25 just got back from a pretty long vacation. You know, I was

### Page 139

1  not exactly spending much time considering other properties
2  so two properties would be more than enough to consider.
3  Q   You recall during your first deposition you testified
4  that you had visited Lot 5 before you put in the offer on it.
5  You later submitted a correction page to your deposition
6  indicating that you had not visited Lot 5 before you put in
7  an offer on that. Do you recall that?
8  A   Yeah, I do.
9  Q   How was your memory refreshed on that subject?
10 A   It was refreshed as soon as you walked out. The reason
11 I said that was you -- I'd have to have the actual testimony,
12 but you stated something to me like when you visited Lot 5,
13 did you drive around, did you look at things, so I basically
14 said yes, and I mean these depositions are pretty tiring and
15 what I just was understanding was Black Sands, which is what
16 we did do, Lot 5 we never did.
17     MR. REVERE: Andy, we've been going for 50 minutes.
18 Can we take a break, please?
19     MR. BEAMAN: Sure.
20     (Recess from 3:47 p.m. to 3:59 p.m.)
21     MR. BEAMAN: Would you please mark this as the next in
22 order, please.
23     (Exhibit No. 46 was marked for identification.)
24 Q   (By Mr. Beaman) I'm showing you what's been marked as
25 Exhibit 46 to your deposition, Mr. Hands. There's an exhibit

### Page 140

1  mark from Deborah Au's deposition, No. 16, which we'll cross
2  off. You recognize Exhibit 46?
3  A   Let me read it.
4      Yeah, I believe I've seen something similar to this
5  document.
6  Q   Is Exhibit 46 to your deposition a copy of a fax that
7  Deborah Au sent to you on or about September 18 of 1999?
8  A   It certainly looks like it is, yes.
9  Q   Refer you first to the fax number at the top, that is a
10 173 number?
11 A   Yeah, that's our home fax number.
12 Q   So that is your home fax number, not your office fax
13 number, is that correct?
14 A   That would be correct.
15 Q   Why wasn't your copy of this fax turned over to us in
16 discovery?
17     MR. REVERE: Objection, vague and ambiguous, no
18 foundation, asked and answered.
19     THE WITNESS: Why -- I don't understand why I would
20 have a copy. I have -- you're asking me as Guy Hands.
21 Q   (By Mr. Beaman) Yes.
22 A   As Guy Hands, I have probably literally next to no
23 documents of anything on anything. Documents connected to --
24 pretty well everything in my life is either kept at work by
25 Christine or it's kept by Julia, so I certainly wouldn't have

Page 141

```
 1   kept -- I mean I don't keep a copy of anything. I'm trying
 2   to think if there's anything I keep copies of.
 3   Q    So when this document was faxed to your home in
 4   Sevenoaks, you would have given it to Julia?
 5        MR. REVERE: Objection, misstates his testimony,
 6   misleading the witness.
 7        THE WITNESS: I have absolutely no idea what would have
 8   happened to it. I certainly wouldn't have kept it. There
 9   is -- I would have either -- I mean one of three things could
10   have happened with it, one, just thrown away, that's what I
11   do with most things. I get an average, I would say, 200
12   pages plus of faxes a day. I travel 220 plus days in a year.
13   If I kept all these faxes, I'd have 40,000 pages following me
14   around, I'd have to have a small truck taken with me, so I
15   just tend to throw -- I just throw stuff away, give it to my
16   secretary at work or give it to Julia. Those are the three
17   choices.
18   Q    (By Mr. Beaman) Do you know why Julia would have kept
19   some of your records related to Lot 5 at The Bluffs at Mauna
20   Kea, but discarded this particular record?
21        MR. REVERE: Objection, assumes facts not in evidence,
22   no foundation, calls for speculation.
23        THE WITNESS: I have no idea whether Julia would have
24   kept this, I have no idea whether Julia had been given this,
25   I have no idea whether she would have -- you know, I've got
```

Page 142

```
 1   no idea on any of that.
 2   Q    (By Mr. Beaman) So the answer to my question as to why
 3   this -- why your copy of this document was not turned over to
 4   us in discovery is you don't know?
 5        MR. REVERE: Wait a minute, Andy, don't try to mislead
 6   the witness when obviously you know that we did turn it over
 7   to you. Where did you get it from if not through us, so quit
 8   trying to mislead the witness.
 9        MR. BEAMAN: Come on, Terry, you know that's a lie.
10        MR. REVERE: It's not a lie. Andy, don't accuse me of
11   lying. Andy, during the course of the very brief time I've
12   known you, you've accused Doug Ing of misconduct, Jerry Hiatt
13   of misconduct, Jim Wriston of misconduct, Chad Love of
14   misconduct, you accuse everyone, Ronda Kent of misconduct, so
15   don't start calling me a liar when you're a liar, Andy. Shut
16   up and ask him some questions.
17        THE WITNESS: Can we -- gentlemen, can we please just
18   repeat the question that --
19   Q    (By Mr. Beaman) Certainly. My question is -- remember
20   earlier we were talking about the document production numbers
21   that are affixed to these records and you see in the lower
22   right-hand corner of Exhibit 46 there's an M there?
23   A    Yes.
24   Q    As opposed to an H for Hands and M for MacArthur. My
25   question to you was why wasn't your copy of this record
```

Page 143

```
 1   produced to us in discovery and I think the short answer is
 2   you don't know.
 3   A    No, I don't, and that's not a good answer at all. I
 4   seem to remember yesterday you asked my wife why you hadn't
 5   had -- why she hadn't give checkbooks. The reality is she
 6   has handed over everything she has and that has gone to my
 7   attorneys. My understanding is everything she has regardless
 8   has gone to my attorneys.
 9        What I seem to be discovering, which is really getting
10   me a little upset and seems very bad, is that stuff goes to
11   my attorneys, presuming they're producing lists of what
12   they've got, everything is -- everything, to the best of my
13   knowledge, has gone there, and it's a question of reading
14   through those lists, so I don't understand why those
15   checkbooks, you haven't gotten. My understanding is
16   everything is gone.
17        I also don't know where this M comes from. This H, you
18   said to me a few minutes ago, it's my files. Who put the H
19   on there saying it's my files. Who put that M on there.
20   Q    The M was put on by our office in the course of
21   document production, indicates source of the document.
22   A    Sorry, whose office?
23   Q    By our office.
24   A    By your office.
25   Q    Certainly.
```

Page 144

```
 1   A    Well, are you sure that's a document from her and not a
 2   document from Terry?
 3   Q    I am sure. Let me direct you to the second page of
 4   this document, Mr. Hands. And, particularly, I direct your
 5   attention to the second sentence at the top of the second
 6   page of Exhibit 46 which says, "I also scanned this map and
 7   sent it as an attachment with my e-mail and photographs." Do
 8   you see that?
 9   A    Yeah.
10   Q    Why was that e-mail not turned over to us in discovery?
11        MR. REVERE: Objection, calls for speculation, assumes
12   facts not in evidence.
13        THE WITNESS: I think I've already answered the
14   question. Everything that I believe that Christine or Julia
15   have, I believe they have turned over to you, except, based
16   on Julia's testimony, there might be some duplicated
17   information she hasn't. Possibly, I don't know.
18        I believe that Christine has done a diligent and
19   appropriate job in locating what she can find. I believe
20   that my wife has done an appropriate and diligent job in
21   locating what she can find. I'm not quite sure what else it
22   is you want us to do.
23   Q    (By Mr. Beaman) This document, on the second page there
24   is a statement just around the middle of the page, "Guy,
25   question 16 in the attached Bluffs information discussed
```

Page 145

1  building a pool in the setback area." Do you see that?
2  A    Yes.
3  Q    In September of 1999, did you ask Deborah Au whether
4  you could build a swimming pool in the special setback area
5  of Lot 5?
6      MR. REVERE: Objection, asked and answered.
7      THE WITNESS: It looks like I did. I can't remember.
8  I presume -- the question would indicate that I will ask
9  whether one can build a pool in the special setback area.
10 Q    (By Mr. Beaman) Could you turn to the page labeled
11 M00247, please. And do you see question 16?
12 A    I do.
13 Q    And do you see that question 16 asks "Can a pool be
14 built in the special setback area on the makai side of the
15 residences on Lots 3 and 4 at The Bluffs?"
16 A    Yes.
17 Q    And could you read the answer to that question, please,
18 out loud?
19     MR. REVERE: Objection, Parole Evidence Rule,
20 irrelevant, not likely to the discovery of admissible
21 evidence.
22     THE WITNESS: I think, Andy, as we went through this
23 last time, I pointed out that you need to look at everything
24 in its total context and, indeed, I think, let me see, there
25 is a -- do we have a -- question three says, "Do we have a

Page 146

1  condensed version of the highlights and guidelines for
2  construction?" "No, the clients should be given the entire
3  Design and Construction Requirements for Homes." I'm happy
4  to read this out, but, as I mentioned last time, you have to
5  look at the guidelines. Those are the legally binding
6  documents. This is not the legally binding document.
7  However, I will read it out for you.
8      "The special setback rules in Article IV of The Bluffs
9  Design and Construction Requirements of Homes does not allow
10 buildings or structures in the special setback areas,
11 however, the variation rule in Article VI does allow
12 individual solutions which vary from the rule. The design
13 committee would be the judge of what's acceptable and what is
14 not." Do you want me to keep going?
15 Q    (By Mr. Beaman) Please.
16 A    "As an example, design committee at Fairways North
17 recently approved a patio and swimming pool extending into
18 the special setback areas. The lot owner would still need to
19 abide by the minimum yard requirements of the county's zoning
20 code (see question and answer number 9) and the various other
21 infrastructure and easements for the property. Accordingly,
22 it appears that a pool or structure that does not block views
23 can be built in the special setbacks."
24 Q    And that information was made known to you by Debi Au
25 before you signed the sales contract for Lot 5 at The Bluffs,

Page 147

1  is that correct?
2      MR. REVERE: Objection, vague and ambiguous, no
3  foundation, Parole Evidence Rule.
4      THE WITNESS: I'm not sure I subscribe to this
5  information. What this is is clearly somebody's opinion,
6  which they have qualified at the beginning by stating that
7  you have to actually look at the full document, which is
8  clearly not legally binding and which actually uses the word
9  "accordingly, it appears." There's nothing here to say that
10 this is in any way what can be done. In fact, this is,
11 bluntly, a completely worthless piece of paper and it would
12 be astonishing if Julia, as a lawyer, would have kept it
13 because it has got nothing to do with the purchase of The
14 Bluffs.
15     I would guess it's been produced by a salesperson,
16 which is why they at the beginning state categorically and
17 clearly you need to look at the whole thing.
18 Q    (By Mr. Beaman) My question was the information that
19 you've just, read the answer to question 16, was information
20 made available to you by Debi Au before you signed the sales
21 contract for Lot 5 at The Bluffs, true?
22     MR. REVERE: Objection, asked and answered, no
23 foundation, Parole Evidence Rule.
24     THE WITNESS: My answer is it's not information. What
25 it is is opinion. If you're saying was the opinion in the

Page 148

1  "Questions and Answers for The Bluffs" given to me
2  beforehand, you're dead right, the opinion was given, which
3  stated quite clearly you should look at the entire design and
4  construction requirements, and it stated that it is only an
5  opinion. "It appears," how more clear can you get than that.
6  Q    (By Mr. Beaman) Do you recall that when you were
7  deposed last time, I asked you what conversations you had
8  with people about the subject before you purchased Lot 5?
9      MR. REVERE: What page number?
10     MR. BEAMAN: Just asking the witness generally if he
11 recalls that.
12     THE WITNESS: I'm sorry, can you reask the question?
13 Q    (By Mr. Beaman) Certainly. Do you recall when you were
14 last deposed, that I asked you some questions on this
15 subject?
16 A    I was last deposed, I think, about 14 months ago, so
17 remembering everything that I was asked 14 months ago is
18 remarkably difficult. I mean, you know, if you'd like me to
19 look at the question, I'd be happy to look at the question
20 you asked me. If you don't want me to look at the question
21 you asked me, I -- because you're asking me and I -- what
22 would you like me to do?
23 Q    I just wondered whether you remembered answering the
24 question the last time we had this discussion, Mr. Hands. If
25 you don't, that's fine, we can come back to this question