```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF HAWAII
 3
 4   WESTERN SUNVIEW PROPERTIES,) CIVIL NO. CV-3-00463
 5   LLC, et al.:               ) JMS/LEK
 6            Plaintiffs,        )
 7        vs.                    )
 8                               )
 9   IRWIN FEDERMAN, et al.,     )
10            Defendants.        )
11   _____)
12
13            DEPOSITION OF BARRY B. CRIVELLO
14
15   Taken on behalf of Defendants at the offices of Ralph
16   Rosenberg Court Reporters, Incorporated, Suite D212,
17   75-170 Hualalai Road, Kailua-Kona, Hawaii, commencing
18   at 2:15 p.m. on November 16, 2005, pursuant to Notice.
19
20   REPORTED BY:
21      DEBORAH A. NG, CSR 336
22      Registered Professional Reporter
23      Notary Public, State of Hawaii
24
25
```

**EXHIBIT VV**     DEC 09 2005

Page 2

```
 1              APPEARANCES
 2
 3   For Plaintiffs         TERRANCE M. REVERE, ESQ.
 4   Western Sunview        1000 Bishop Street
 5   Properties, LLC,       Suite 801
 6   et al.:                Honolulu, HI 96813
 7
 8   For Defendant          J. DOUGLAS ING, ESQ.
 9   Mauna Kea Properties,  Watanabe Ing & Komeiji
10   Inc., Mauna Kea        First Hawaiian Center
11   Development Corp.:     23rd Floor
12                          999 Bishop Street
13                          Honolulu, HI 96813
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3   EXAMINATION BY:                        PAGE
 4
 5   Mr. Ing                                  6
 6
 7       EXHIBITS FOR IDENTIFICATION
 8
 9   Deposition Exhibit 1
10   Engagement letter, 8/20/01.             16
11
12   Deposition Exhibit 2
13   Letter, 5/16/02.                        17
14
15   Deposition Exhibit 3
16   Engagement letter, 9/24/02.             19
17
18   Deposition Exhibit 4
19   E-mails, misc. letters.                 20
20
21   Deposition Exhibit 5
22   Fax letter, 8/15/02.                    39
23
24   Deposition Exhibit 6
25   Fax letter, 9/24/02.                    40
```

Page 4

```
 1   Deposition Exhibit 7
 2   Articles of incorporation, et al.       43
 3
 4   Deposition Exhibit 8
 5   Letter, wire transfer.                  56
 6
 7   Deposition Exhibit 9
 8   Page 2 of letter, 1/5/00.               57
 9
10   Deposition Exhibit 10
11   E-mail, 8/23/02.                        58
12
13   Deposition Exhibit 11
14   Re Clever Construction application.     59
15
16   Deposition Exhibit 12
17   Re Clever Construction.                 61
18
19   Deposition Exhibit 13
20   Application and certificate for payment. 63
21
22   Deposition Exhibit 14
23   Re landscaping.                         64
24
25
```

Page 5

```
 1   Deposition Exhibit 15
 2   Property project costs.                 65
 3
 4   Deposition Exhibit 16
 5   Reconciliation detail.                  68
```

Page 42

1  MR. REVERE: Well, as I sit here today, I don't
2  know if they were produced or not, so I'll go back and
3  check our files to see what was produced before.
4  MR. ING: Well, I'm making a request that since
5  you are screening Mr. Crivello's documents that we be
6  provided with all the documents referenced on
7  Exhibit 6 of the deposition, as well as those
8  referenced on Exhibit 5, third page in paragraph c.
9  MR. REVERE: Sure.
10  BY MR. ING:
11  Q. Now, Mr. Crivello, in capitalizing the expenses
12  associated with the building of the home, do those
13  capitalized expenses include trips taken by Mr. and
14  Mrs. Hands to inspect the home, those managers of
15  Western Sunview Properties?
16  A. I think there are some expenses that were
17  reimbursed that were business related.
18  Q. They were reimbursed to whom?
19  A. To Guy and Julia Hands.
20  Q. What were the nature of those expenses?
21  A. As you stated, they were managers of that
22  property and they came to inspect the progress being
23  done.
24  Q. Were they reimbursed for the deposit they made
25  on purchase, pursuant to the purchase contract for

Page 43

1  Lot 5?
2  A. Not by me. I don't know the answer to that.
3  Q. You do recall receiving a copy of the operating
4  agreement for Western Sunview Properties?
5  A. I don't remember. Do you have it there?
6  (Deposition Exhibit 7
7  marked for identification.)
8  Q. Mr. Crivello, I've handed you what's been
9  marked by the reporter as Exhibit 7. This appears to
10  be a letter or transmittal that was sent to you from
11  Ronda Kent dated September 14, 2000.
12  A. I'm really uncertain as to the date on that
13  being September 14th, 2000. If I look at the date
14  that we have it received, it's August 10th, '01. I
15  don't know for sure that I had anything to do with
16  those guys that early on. I would have to check my
17  records.
18  Q. I'm sorry.
19  MR. REVERE: He's talking about the fax
20  transmittal line.
21  A. The fax transmittal and the date that we show
22  it was received were very different dates, so I'm not
23  certain September 14th is the date we received it.
24  BY MR. ING:
25  Q. At least the transmittal on the face of it, it

Page 44

1  says September 14, 2000 --
2  A. Yes.
3  Q. -- from Ronda Kent to Barry Crivello?
4  A. Right.
5  Q. But you're not certain that you had received
6  that as of the date of September 14, 2000?
7  A. Right. If you look at this, it shows
8  August 10th, 2001 was when it was, actually, sent to
9  us.
10  Q. And you're looking at the very top of the
11  sheets of paper that comprise Exhibit 7, right?
12  A. Right.
13  Q. Now, we were talking about the operating
14  agreement for Western Sunview Properties and if you
15  could refer to the Bates-numbered page beginning with
16  BC 01465 at the bottom right-hand corner?
17  A. Okay.
18  Q. Does this appear to you to be a copy of the
19  operating agreement?
20  A. Yes.
21  Q. Did the operating agreement provide that the
22  managers were to be reimbursed their expenses?
23  MR. REVERE: I just want to object, the
24  document speaks for itself.
25  A. Which section are you referring to?

Page 45

1  BY MR. ING:
2  Q. Yes, I'm referring to page 6 as numbered at the
3  bottom of the operating agreement and in particular
4  paragraph 5.5.
5  A. Yes.
6  Q. Managers are entitled to be reimbursed from the
7  company for reasonable out-of-pocket expenses incurred
8  on behalf of the company; is that correct?
9  A. Yes.
10  Q. And the company here refers to Western Sunview
11  Properties?
12  A. Correct.
13  Q. So you do recall writing checks to the Hands
14  for certain reimbursable expenses; is that correct?
15  A. Certain reimbursable expenses, yes.
16  Q. Is it your understanding that pursuant to this
17  operating agreement, that the company is required to
18  reimburse them for reimbursable expenses?
19  A. For reasonable reimbursable expenses, yes.
20  Q. Did the company, as far as you were aware, ever
21  deny the Hands reimbursement of any expenses?
22  A. The company?
23  Q. Yes.
24  MR. REVERE: I just want to object that it
25  calls for speculation, given the witness' prior

Page 46

1  testimony about the approval process.
2  A.  You'll have to be more specific. I don't get
3  exactly what you're driving at.
4  BY MR. ING:
5  Q.  Did the Hands ever submit to you a request for
6  reimbursable expenses that was not paid?
7  A.  Yes.
8  Q.  What was the nature of those expenses?
9  A.  They submitted a series of different expenses,
10 some of them that looked like they may be personal and
11 I discussed them with them.
12 Q.  When was that?
13 A.  I have some, actually, in my office right now.
14 Q.  What was the nature of the expense that led you
15 to believe that it may be personal?
16 A.  Some expenses they incurred while they were
17 staying at the property.
18 Q.  For example, like what?
19 A.  Toiletries.
20 Q.  Anything else?
21 A.  There is a series of them but...
22 Q.  Are those copies of those expenses contained
23 within the documents that were brought?
24 A.  I just received those recently. No, I didn't
25 bring those in here.

Page 47

1  Q.  On how many occasions, to your knowledge, have
2  the Hands stayed at the property? By the property,
3  I'm referring to the home that's constructed on Lot 5.
4  A.  I don't know how many exactly. Am I aware of
5  any, yes.
6  Q.  On how many occasions?
7  A.  Half dozen that I'm aware of. They may have
8  come and stayed and I didn't know about it.
9  Q.  Are the Hands, when they stay there on a
10 personal basis, supposed to pay rent?
11    MR. REVERE: Objection, calls for speculation,
12 calls for a legal conclusion, no foundation, but you
13 can answer, if you can.
14 A.  I'm not aware that they have to pay rent.
15 BY MR. ING:
16 Q.  Is the home on Lot 5 held out for a rental?
17 A.  To my knowledge, it is not at this time held
18 out for rental.
19 Q.  Is it intended that the home on Lot 5 be held
20 out as rental?
21 A.  We've had discussions about having it as a
22 vacation rental.
23 Q.  Who is -- strike that.
24    Who do you mean when you say we had
25 discussions?

Page 48

1  A.  Guy Hands, Julia Hands, and myself.
2  Q.  On how many occasions?
3  A.  One face-to-face meeting and some e-mails.
4  Q.  When did the e-mail transmissions take place?
5  A.  I don't recall, recently.
6  Q.  Recently, 2005?
7  A.  Yes.
8  Q.  And when did the face-to-face discussions take
9  place?
10 A.  I believe it was August this year, July or
11 August. I don't remember.
12 Q.  The Hands were here for mediation at the Kona
13 Beach Prince Hotel on August -- third week of August
14 of this year. Does that refresh your recollection?
15 A.  I don't know what they were doing. They don't
16 discuss their legal problems with me.
17 Q.  Well, does that refresh your recollection as to
18 when you may have had a face-to-face meeting with them
19 about vacation rentals?
20 A.  I was on vacation in July and it was after July
21 because we discussed my vacation. So it was sometime
22 July, August.
23 Q.  And what was the substance of the discussion
24 regarding vacation rentals?
25 A.  What's the standard rate to charge, who's a

Page 49

1  good property manager to do that.
2  Q.  What rate or rates were discussed?
3  A.  I told them I wasn't qualified to determine
4  that because I'm not familiar with that, but that
5  there were certain property managers who could help
6  them.
7  Q.  Did you refer them to any property managers?
8  A.  Yes.
9  Q.  Who?
10 A.  MacArthur & Company.
11 Q.  To the best of your knowledge, did they engage
12 MacArthur & Company to manage the vacation rental
13 aspects of the property?
14 A.  I have seen no signed engagement letter.
15 Q.  You have seen no signed engagement letter?
16 A.  At this time. They may have one, but I'm not
17 aware whether they did or didn't.
18 Q.  To your knowledge, have they engaged anyone to
19 provide management services for a vacation rental?
20 A.  I don't know.
21 Q.  Were there any other expenses that you recall
22 the Hands submitting to you for reimbursement that
23 were not reimbursed?
24 A.  We have had discussions before what would be
25 reimbursable and what wouldn't be reimbursable so --

Page 50

1 and I wouldn't say that they submitted it for
2 reimbursement. They submitted some receipts and asked
3 are these were reimbursable, and I haven't had a
4 discussion with them.
5   Q.  What do you use to determine whether
6 reimbursable expenses submitted by the Hands are,
7 actually, reimbursable?
8   A.  At the point where they were in the process of
9 developing property, was it necessary as a manager for
10 them to have incurred that expense; was it an ordinary
11 and necessary expense and a reasonable expense that a
12 manager would incur.
13   Q.  Do you use the tax code definition or tax
14 regulations regarding ordinary and reasonable?
15   A.  Ordinary and necessary.
16   Q.  And necessary. Is that what you use as a basis
17 to make that determination?
18   A.  Yes.
19   Q.  Were the Hands reimbursed any expenses by
20 Western Sunview Properties related to the acquisition
21 of the property?
22       MR. REVERE: I just want to object asked and
23 answered, but you can go ahead.
24   A.  I don't know.
25 BY MR. ING:

Page 51

1   Q.  Well, do you have any recollection?
2   A.  I have a recollection that I don't know what
3 happened, whether they were or they weren't. That
4 happened prior to the time that we were involved.
5 You're -- I've just looked at this. I don't know.
6   Q.  Do you recall whether in the records that were
7 listed on Exhibit 6, the bank statements, whether
8 there were any personal expenses that were reimbursed
9 to the Hands and were documented by those records?
10   A.  I would have to go back and review to see that.
11   Q.  Where would those documents be maintained?
12   A.  I would assume that you had these documents.
13 If not, they must be archived since they're so old.
14   Q.  If the Hands had reasonable and necessary --
15 strike that.
16       If the Hands incurred reasonable and necessary
17 expenses in the acquisition of Lot 5 and submitted
18 them for reimbursement, would they be paid?
19       MR. REVERE: I just want to object no
20 foundation, incomplete hypothetical, and also contrary
21 to the witness' former testimony about the approval
22 process. You can answer.
23   A.  Be specific, give me an expense, an example of
24 what you're talking about.
25 BY MR. ING:

Page 52

1   Q.  Deposit for the purchase of Lot 5.
2   A.  We have not been asked to reimburse for that
3 deposit.
4   Q.  But if they did ask you, would that be a
5 reasonable --
6   A.  I would want to have one of the legal people
7 look at the process because the process is that any
8 large amounts have to go through Ronda Kent's office
9 and they have to be approved before I would write a
10 check for that.
11   Q.  What does Ronda's Kent's office do in the
12 approval process?
13   A.  They collect all of the bills, and then they
14 have discussions as to the legalities of whatever
15 those things may be. I would not sign the check for
16 $50,000 without having somebody else verify it was a
17 legitimate expense.
18   Q.  And if it was verified by Ronda Kent's office,
19 you would pay it, or you would cut a check?
20   A.  Well, that is a hypothetical situation. If
21 that was a reimbursable expense, why haven't they
22 asked me to reimburse it.
23   Q.  Let me rephrase the question and request that
24 you answer my question.
25       MR. REVERE: I think he answered it, but

Page 53

1 anyway.
2   A.  Well, seriously, I mean if it's a reimbursable
3 expense, how come they haven't asked me to reimburse
4 them. So now you're asking me to make a legal
5 opinion, give a legal opinion as to whether it's a
6 legitimate expense or not.
7 BY MR. ING:
8   Q.  Well, they testified that they were reimbursed
9 a deposit.
10       MR. REVERE: That's not what they testified.
11   A.  I don't know about that. Who reimbursed?
12       MR. REVERE: Just so the record is clear,
13 that's not what they testified to.
14       MR. ING: That's exactly what they testified
15 to, Counsel.
16   A.  It wasn't from me.
17   Q.  I'm not asking you whether it was from you.
18   A.  Well, then why are you asking me whether I
19 would if somebody else reimbursed them?
20   Q.  No. The question was if Ronda Kent approved
21 the reimbursable expense and passed it on to you,
22 would you then cut a check for it?
23   A.  I would have to have a discussion with the
24 Hands, and if they approved it and I talked to her and
25 was satisfied it was a legitimate expense, I would.