

Real Estate Consulting Services
1021 Smith Street, Suite 225
Honolulu, HI 96817
Tel • 808 • 524 • 1505   Fax • 808 • 524 • 1367

February 22, 2005

Chad P. Love, Esq.
1164 Bishop St, Ste. 1105
Honolulu, HI 96813

Re:   Western Sunview Properties, et al vs. Federman et al.

Dear Mr. Love:

This report is in response to your request of October 6, 2004 for my analysis and opinions on various issues in the above case.

## CASE BACKGROUND

In September 1999, Western Sunview et al., hereinafter collectively referred to as "Buyer," purchased property at The Bluffs at Mauna Kea from Mauna Kea Development Corp., hereinafter "Seller." Mauna Kea Properties, Inc., (dba as Mauna Kea Realty), and its agents, hereinafter collectively referred to as "MKR," were Seller's broker and MacArthur & Co. and its agents, hereinafter collectively, "M&C," represented Buyer.

The dispute in this case centers mainly on Seller's practice of reducing the listed sales prices of its properties by offering purchasers a substantial landscaping credit in return for a covenant of confidentiality, then allowing the listed (instead of actual) sales prices to be filed at the Bureau of Conveyances at the time of closing. This occurred in at least six transactions prior to Buyer's purchase. Buyer relied on the accuracy of the recorded sales prices (including that for the lot next door owned by the Federmans), was told by Seller the prices were firm, and paid the full price, receiving <u>no credit</u> on its purchase of Lot 5.

## MY BACKGROUND

I have been involved in real estate development, marketing, education, and consultation for over 40 years. I received my broker's license in 1970 and have handled over a hundred "personal" transactions and have overseen several hundred "company" transactions as a principal broker. For over 23 years, I have been involved in the development and marketing of unimproved as well as improved properties in Hawaii,

**EXHIBIT 2**

Chad P. Love, Esq.
February 22, 2005
Page 2

Guam, Puerto Rico, and Australia, and since 1970, I have been teaching credit and non-credit real estate courses for the University of Hawaii - Manoa, the Honolulu Board of Realtors, the Hawaii Association of Realtors, and various other institutes. Details concerning the foregoing, the course titles and other background are contained in my resume attached as Exhibits A and B.

It is this experience and the knowledge acquired therefrom -- plus the materials you furnished me, and my research -- that enable me to analyze the case and draw the conclusions listed below.

## MY CONCLUSIONS

1. Developer MKD's marketing scheme was deceptive and contrary to public policy.

2. Broker MKR's actions fell below the standard of care reasonably expected of a Hawaii real estate licensee in 1999.

3. Deborah Au's actions as an associate of M&C appeared to meet the requisite standard of care for a buyer's agent.

4. Federman violated the declaration he signed in the Conveyance Tax Certificate because he knowingly misstated "the actual and full consideration paid" and knew or should have known that his act could mislead purchasers, appraisers and the taxing authority.

## THE RATIONALE FOR MY CONCLUSIONS:

Before delving into the rationale for my conclusions, I would like to comment on two areas that are very relevant to this case and which I have given considerable thought to.

1. Standard of Care

The standard of care and diligence that real estate licensees are held to is based on a "reasonable agent" standard, i.e., what an ordinary, and reasonably knowledgeable and competent agent should know and do under the circumstances. To me, such an agent should know and abide by Hawaii's laws and rules dealing with real estate, especially those taught in pre-licensing classes, covered in pre-licensing and reference textbooks, and explained and reinforced by seminars and continuing education courses. The relevant laws and rules in this case are HRS 436B, 467, 484, and HAR 16-99. Agents should also know about and abide by the National Association of Realtor's Code of Ethics ("Code") since, for the most part, the Code now applies to all licensees, whether or not a member of a local realty board. I have applied the foregoing standard in arriving at my conclusions.

Chad P. Love, Esq.
February 22, 2005
Page 3

2. Credits

Crediting against sales price is not, in itself, an unusual practice in the buying and selling of real estate. Generally, it serves a practical function and involves no intent to deceive anyone. For instance, instead of requiring a seller to fix a defect before closing, it may serve both buyer's and seller's interest for seller to simply credit buyer at closing for the approximate cost of the fix and close the sale without delay. The alternative is for buyer to demand that seller fix the defect before closing and face the possibility that there may be delays or the job is not done right. Usually credits on real estate transaction are requested by buyers for relatively small sums in lieu or waiver of repairs, they are not intended to deceive anyone, and they are not covered by confidentiality agreements.

In the case of The Bluffs at Mauna Kea, however, the credits were offered by Seller and where substantial, as much as 15% of the list prices; the credits were not for the purpose indicated, i.e., landscaping the property; they were granted only if buyer signed a confidentiality agreement; and they resulted in misrepresentation of the "actual and full" consideration via erroneous conveyance tax certificates. I found these differences, caused by "the powers that were then (at MKD)" rather disturbing.

My conclusions and rationale therefor are as follows:

1. Developer MKD's marketing scheme was deceptive and contrary to public policy.

    a. Under HRS 467-2(1), the Buyers and Salespersons law, developers selling their own properties are required to be licensed and thus held to the same standards of care as those selling the properties of others. That Seller was selling through its subsidiary did not lessen Seller's duties to deal with the public in a fair and forthright manner. Seller's duties were, in fact, equal to those of MKR's.

    b. HAR 16-99-3(b), the administrative rules that help implement HRS 467, states that "licensees shall protect the public against fraud, misrepresentation, or unethical practices in the real estate field (and) shall endeavor to eliminate any practices in the community which could be damaging to the public or to the dignity and integrity of the real estate profession."

    c. It is my opinion that Seller's method of concealing the discounted sales prices (by giving buyer a credit provided buyer agreed not to disclose the net or actual sales price) was devious and deceptive. I viewed six sale contacts in which credits were involved and therefore believe Seller's actions were deliberate and well orchestrated to achieve one ultimate objective -- stimulate sales by "discounting" ostensible but actually fictitious "market" prices. The

Chad P. Love, Esq.
February 22, 2005
Page 4

> Seller did this by offering purchasers a credit or discount in exchange for purchaser's convent of confidentiality, thereby giving subsequent purchasers the impression that the lots were being sold for more than they actually were. In addition, Seller's actions were contrary to one of the major reasons why sales data is collected by our Bureau of Conveyances -- to provide accurate sales information to county tax assessors and the public at large. Thus, Seller's subterfuge violated public policy.
>
> d. I also believe that Seller's marketing scheme was contrary to the letter and spirit of HRS 484-12 which prohibits false, misleading advertising or sales methods.

2. Broker MKR's actions fell below the standard of care reasonably expected of a Hawaii real estate licensee in 1999.

   a. MKR, through its agents, knew the purpose of the credit was not for landscaping, but to "kick start" sales and "maintain the integrity of the prices." According to Agent Kohler, it was a "sales and marketing tool" where "the asking prices and sales prices would be the same." MKR knew the credits had to be kept confidential for the Seller's scheme to work and that "<u>after a sale closes, it becomes public knowledge what the lot sold for and this credit, obviously, was not reflective in the tax records</u>" (emphasis added). See Kohler deposition of 5/29/03 pg. 38 & 39. Further, MKR recognized the <u>net</u> sales price (after the credit) was the true sales price, as sales commissions were apparently based on the net price, not the gross (contrary to most transactions involving a credit to buyer). Finally, MKR knew or should have known that this marketing tool was contrary to legal and ethical guidelines applicable to real estate licensees because it was deceptive and concealed information the government and public had a right to know.

   b. MKR was required to "protect the public against fraud, misrepresentation or unethical practices in the real estate field (and) endeavor to eliminate any practices in the community which could be damaging to the public or to the dignity and integrity of the real estate profession." (HAR 16-99-3 (b)). I consider the Seller's aforesaid actions to be in violation of this section and, by virtue of Seller's agent's awareness and furtherance of Seller's scheme to "maintain price integrity," MKR was also in violation. That MKR was aware of the credit there can be no doubt since MKR knew what the list and net prices were on each sale, the need for confidentiality agreements, and the purpose they served.

      1) Rather than endeavoring to eliminate a practice that could be damaging to the public or to the integrity of the real estate profession,

Chad P. Love, Esq.
February 22, 2005
Page 5

    MKR aided and abetted Seller in its plan to mislead prospective buyers into thinking the prices were as high as recorded by condoning and cooperating with Seller's policy and failing to raise any concerns.

    2) I believe MKR's cooperation in furthering Seller's scheme was unethical and served to hurt rather than protect the public against fraud and misrepresentation.

c. Not only did MKR collude with Seller in misrepresenting sales prices to the public, a violation of HRS 467-14(1), but it continued its misrepresentation through advertising that MKR knew to be false (verifying that the prices listed were actually realized). This violated HRS 467-14(3). Also, Article 2 of the NAR Code of Ethics was violated.

    1) Article 2 of the Code applies to all real estate licensees, both members and non members of the Board of Realtors (MKR was a member). This is because HRS 436B-19(9), the State's Professional and Vocational licensing law passed in 1991, states that real estate licensees can lose their licenses if their "conduct or practice is contrary to recognized standards of ethics for the licensed profession." The Code is the recognized standard of ethics for the real estate profession.

    2) Article 2, like HRS 467-14(1) and (3), also requires that licensees shall avoid misrepresentation and concealment of pertinent facts. I believe Seller's scheme (which MKR aided and abetted) misrepresented the true sales prices by concealing the landscape credit. That the recorded purchase price did not reflect a significant credit (or discount, incentive, concession or price adjustment) was a very pertinent fact for prospective purchasers or their agents in trying to determine actual market values.

d. MKR falsely advertised by publishing and circulating a price list with prices purportedly realized for lots already sold. Exh 5, 6 of Au depo.

    1) Article 12 of the Code requires that ads must portray a "true picture" of that which is being advertised. The lists did not because the "sold" prices were not the true selling prices, i.e., the prices that purchasers actually paid the Seller.

    2) In addition, HRS 436B-19(2) prohibits false or deceptive advertising or making untruthful statements. I believe the lists were deceptive and untruthful for the same reasons previously cited.

Chad P. Love, Esq.
February 22, 2005
Page 6

    e. MKR was dishonest to Buyer and the public by cooperating with Seller in disguising the true selling prices of lots sold. Dishonesty is a violation of both HRS 467-14(8) and Article 1 of the Code.

        1) The cited section of HRS 467 prohibits fraudulent or dishonest dealings. In my opinion, concealing the true prices of the lots constituted a fraud on Buyer and the public since the scheme constituted a knowing misrepresentation of the true prices (and concealment of a material fact) to induce Buyer and others to pay Seller's listed prices, or as Seller and MKP put it, to "maintain price integrity". To me what they did was degrade the integrity of what the Conveyance Tax Certificates are intended to accomplish -- provide the public with accurate sales data, i.e., prices "actually paid or required to be paid."

        2) Article 1 of the Code obligates an agent to treat all parties honestly. While this did not mean MKR was obligated to tell Buyer about Seller's discounts to others prior to Buyer's submission of an offer, honesty dictated that MKR should have at least tried to dissuade its client from concealing the discount in the manner Seller did, i.e., allowing the listed and not the actual sales prices to be recorded. This constituted a dishonest act to consumers interested in buying lots at the Bluff.

    f. MKR misled Buyer and the public by cooperating in Seller's scheme to conceal true selling prices. This deception violated HAR 16-99-3(c) and HRS 484 (Hawaii's Uniform Land Sales Practices Act).

        1) HAR 16-99-3(c) says licensees "shall not be a party to the naming of a false consideration in any document unless it be the naming of an obviously nominal consideration." Seller's scheme to disguise the selling prices certainly did not fall within the single exception of the rule. Since those associated with MKR were fully aware of the credits, the reason therefor, and Seller's insistence on confidentiality, it seems apparent that the consideration named on the sales contract and the Conveyance Tax Certificate were known to be false. Agents Kohler and Buboltz both knew of the credit and that they amounted to discounts. A price <u>actually</u> paid or <u>required</u> to be paid could only be net after a discount.

        2) HRS 484-12, which deals with the sale of unimproved land as in this case, states it is unlawful to "engage in false, misleading advertising or <u>sales methods</u>" (emphasis supplied). The law pertains to anyone

Chad P. Love, Esq.
February 22, 2005
Page 7

       involved in the disposition of subdivided lands, provides for both fines and civil penalties for violators, and states that one "who makes an untrue statement of a material fact is liable to the purchaser." It is my belief that both Seller and MKR engaged in false, misleading advertising <u>and</u> sales methods and that they made untrue statements of a material nature that were foreseeably harmful to the public, including Buyer.

  g. To summarize, MKR's actions violated the law and code of ethics because MKR: 1) failed to protect the public and Buyer against fraud and unethical practices and did not endeavor to eliminate damaging and undignified practices; 2) misrepresented information and continued the misrepresentation; 3) indulged in false and deceptive advertising; 4) was dishonest and committed a fraud against the public; and 5) misled the public by stating false consideration and by participating in a misleading sales method.

3. Deborah Au's actions as an associate of M&C appeared to meet the requisite standard of care for a buyer's agent.

  a. Assuming that Au did not know or have reason to know about MKR's policy of discounting its listed prices (I saw no evidence that would lead me to believe otherwise) there would have been no reason for her to ask Seller for a credit or suspect that the "sold" prices were inflated.

  b. Also, if Au did not know or hear of MKR's discounting its prices, there would have been no reason for Au to check on this issue by seeking out Diane Paulson, the Lot 12 sales agent, or Dodie MacArthur, Au's principal broker, or seek to examine the office file on the Lot 12 (Gifford) sale, which, incidentally, took place two years before. At the time of the Lot 5 sale, the subject property in this case, Au was a "working Realtor" or sales associate and not in a position of authority. According to the State's Office of Professional Vocational Licensing, Au did not become a broker-in-charge until about two years later. She was therefore under the supervision of MacArthur when the Lot 5 sale occurred and correctly had her contract reviewed by MacArthur (Au depo, pgs. 126, 127, 129), her supervisor.

  c. Au did not know that Gifford, the Lot 12 buyer, received a landscaping credit (Au depo, p. 12). Had she heard otherwise, and had the sale occurred earlier in 1999, she would have had a duty to probe further and disclose her findings to Buyer. She obtained sales information on lots at the Bluff from MKR and promptly transmitted it to her client as requested (Au depo, Exh. 4-9), faxed Buyer two offers for consideration and signature (Au depo. Exh. 20, 21),

Chad P. Love, Esq.
February 22, 2005
Page 8

    faxed Buyer six oceanfront lot sale comps (Au depo, Exh. 22), and transmitted Buyer's offers to MKR (Au depo, Exh. 23). The correspondence reflected an attentive, methodical and thorough handling of the transaction by Buyer's broker.

    d. In summary, Au was not aware of Seller's discounting practice and concealment of true sales prices, there were no "red flags" for her to follow up on regarding this issue, she was attentive to her client's needs, she did a comparative price analysis and, as was her practice, she confirmed the sales prices she was given by MKR through MLS and the Tax Office[1] (AU depo, p. 34) and she processed Buyer's offers expeditiously. She did everything she was expected to do and therefore met or exceeded the standard of care expected of a buyer's agent.

    e. As for MacArthur, she had put the earlier sale of Lot 12 out of her mind and wasn't thinking about it since it was done two years before the Hand transaction. However, even if she had remembered the credit on the Lot 12 sale, she would have breached her obligation of confidentiality had she discussed it. Earlier covenants of confidentiality survive agency relationships that have since expired. Further, the Lot 12 sale might have been of questionable materiality since it occurred two years before.

4. Federman violated the declaration he signed in the Conveyance Tax Certificate because he knowingly misstated "the actual and full consideration paid" and knew or should have known the consequence of his act would mislead appraisers, future purchasers and the taxing authority (which relies on accurate sales data to come up with fair tax assessment values).

    a. The Conveyance Tax Certificate that had a declaration signed by Federman stated, above his signature, that the Certificate was "true, correct and complete," that it was "made in good faith for the actual and full consideration paid." The form also stated that "The actual and full consideration to be reported on this certificate means the price or amount (whether cash or otherwise) actually paid or ultimately required to be paid for real property . . ." To me, this left no room for misunderstanding as to what

---

[1] MLS (Multiple Listing Service) can be accessed by any subscribing member to confirm prices realized on the sale of all properties, including those made outside of MLS. The Tax Office records, provided through Hawaii Information Services, are usually more detailed. MLS members are required by MLS to report when their sales go into escrow, when they close, and the final sales price. Should the reported price not coincide with the price shown at the Tax Office (obtained via Conveyance Tax Certificates), MLS' practice is to call its member to clarify the discrepancy.

Chad P. Love, Esq.
February 22, 2005
Page 9

was intended by the State when its form called for disclosure of the "Sales Price."

1) Conveyance Tax Certificates executed by seller and/or buyer must accompany every transfer document and the tax paid before the conveyance can be recorded. The Certificates are intended to provide County taxing authorities and the public with reliable information for public purposes such as research, planning, assessing and appealing taxes and pricing. Obviously, to be of value, the information provided must be accurate. Seller's and MKR's scheme of disguising the true price paid violates and frustrates the purpose of the law. By disregarding the words above the signature line, a declarant makes mockery of its meaning and the intent of the Certificate.

2) Federman, by his own admission, knowingly misstated the sales price he actually paid. His overstatement of the actual price was a part of his conspiracy with Seller to dupe future buyers into thinking the sales prices were higher than they were to "maintain price integrity," i.e., to "sustain values" that were made to appear higher than what they probably were.

3) Since assessed values are theoretically based on 100% of fair market value, Federman later attempted to reduce his real property taxes by claiming that the sales price indicated on his certificate was simply an "accounting artifice" and that the true price was somewhat less that he had earlier indicated. The explanation, I believe, was less than candid. He knew that the credit was to sustain prices which benefited himself, earlier buyers, and the Seller. He knew that it (the credit) was not in consideration of excusing Seller from something Seller was obliged to do. The credit was not really for landscaping or grading. It was a deceptive marketing scheme to stimulate sales by justifying higher prices. Finally, he knew that in order to get the credit, he had to participate in Seller's scheme to deceive and willingly did so.

4) Federman, as a sophisticated and successful business man, either knew or should have known that the actions he took served to mislead future purchasers and the taxing authorities. Other jurisdictions have similar procedures to track sales prices and thereby establish assessed valuations. He and other buyers who colluded with Seller and MKR in the concealment scheme must have known that what they were doing, stating a false sales price for public record, was a misleading and dishonest act injurious to the public and beneficial only to Seller and earlier buyers like himself. Having already secured the

Chad P. Love, Esq.
February 22, 2005
Page 10

Federman later amended his declaration to reflect what he actually paid to secure a reduction of his real property tax. Such manipulations are not what the law intended.

If you have any questions, please let me know. My opinions are subject to change should additional information be provided.

Sincerely,

*[signature]*

Kenneth Chong

Attachments

# KENNETH D. H. CHONG

## SUMMARY

*In 1990, I retired from Kaiser and Bedford development companies after 26 years in various staff and operational management positions. During that time, I became familiar with the development, marketing and management of real property; also the financial, legal, governmental and joint venture aspects of development.*

*Since 1990, I have been in real estate consulting, sales and education. More particularly, I have served as a trustee for the US Bankruptcy Court, a receiver and foreclosure Commissioner for the First Circuit Court, advised clients on commercial and residential development projects, provided expert witness testimony in real estate litigation, been a real estate mediator and arbitrator, taught both credit and non-credit real estate courses for the University of Hawaii-Manoa, and instructed for the Honolulu Board of Realtors and various continuing education institutes.*

## EDUCATION

University of Hawaii, BA with honors
Yale Law School, JD
Harvard Graduate School of Business, MBA

## REAL ESTATE EXPERIENCE

Present:
- President, Pacific Realty Consultants (since June, 1990)
- Managing Director & Principal Broker, Avalon Realty LLC (since Sept. 2001)

1972-Present:
- Consultant to the Real Estate Commission, State of Hawaii, reviewing projects submitted for condominium public reports

1986-1990:
- Vice President, Marketing and Acquisitions, Bedford Development Co.
- President and Principal Broker, Kaiser Real Estate Services, Inc. (dba Pacific Homes), a wholly-owned subsidiary of Kaiser Development Co. The firm handled the sale and leasing of company products as well as general brokerage

1964-1986:
- Vice President and Assistant General Manager, Pacific Division of Kaiser Development Co.
- Vice President and General Manager, Oceanic Realty Services (Guam), a division of KACOR (Kaiser Aluminum Corp.)
- Vice President, Development Operations, Kaiser Aetna
- Vice President, Commercial Division, Kaiser Hawaii Kai Development Co.
- Vice President, Legal and Administration, Kaiser Hawaii Kai Development Co.

8/03



2

## TEACHING EXPERIENCE

| | |
|---|---|
| 1970-Present: | • Lecturer in Real Estate<br>Outreach College and College of Business Administration, University of Hawaii-Manoa (UHM) |
| 1990-Present: | • Lecturer in Real Estate<br>Kapiolani Community College |
| 1980-Present: | • Senior Instructor, Graduate Realtors Institute<br>Hawaii Association of Realtors |
| 1993: | • Recipient of "Outstanding Real Estate Educator of the Year" award given by the Hawaii Association of Realtors |
| 1989-Present: | • Taught real estate continuing education courses for various schools |

## PROFESSIONAL ORGANIZATIONS

Hawaii Developers Council – Director 2000. President 2002-2003
Advisory Committee, State Regulated Industries Complaints Office, 2002-2003.
Construction Industry Legislative Organization - served on the Board many
    years. President 1989.
Land Use Research Foundation - served on the Board many years. President 1986.
Development Association of Hawaii - President 1979.
Hawaii Association of Realtors - Director 1974, 1991-1995; Standard Forms Committee, 1992-1995
    (Vice Chair 1992, Chair 1993); 1998-2000.
Honolulu Board of Realtors - Director 1974, 1990-1991, 1994-1995.
Council of Real Estate Brokerage Managers – held CRB designation since 1995
State Coastal Zone Forum - Member 1976-1979.
State Housing Advisory Council - Member 1981-1988.
Advisory Council, Hawaii Real Estate Research & Education Center - Member 1984-1991.
Mayor's Committee on Development Streamlining - Member 1983-1984.

## COMMUNITY ORGANIZATIONS

Chinese Chamber of Commerce - Director 1981-1983, 1991-present; Treasurer 1992; Second Vice
    President 1993; First Vice President 1994; President Elect 1995; President 1996-97.
Friends of the East West Center - President 1986-1988; Director 1989-present.
Dr. Sun Yat Sen Hawaii Foundation – Vice President/Treasurer 1997-present.
Hawaii National Guard Association - President 1981.
Society of Asian Art of Hawaii - President 1990 and 1991.
U.S. China People's Friendship Association - President 1990-1992
Mutual Assistance Association Center - President 1985-1990; Director 1991-1992

Married, three children.

Retired in 1984 as a Lt. Colonel after 28 years of active and reserve duty with the
U.S. Air Force and the Hawaii Air National Guard.

8/03

BACKGROUND OF KENNETH D. H. CHONG
for
REAL ESTATE EDUCATION, ARBITRATION & EXPERT WITNESS WORK

1. LICENSED as real estate salesperson in 1965, broker in 1970. Pre-licensing instructor since 1970

2. PRINCIPAL BROKER (P.B.) since 1970:
   - P.B. of Avalon Realty, LLC. (2001-present)
   - P.B. of Poipu Ohana Management, Inc. (2000-2001)
   - P.B. of Interstate Hotels Corporation (1998-2000)
   - Assistant Secretary and P.B. of Colony Hotels and Resorts Co. (1994-1998)
   - President & P.B. of Equity Realty, Ltd. (1990-1994); Exec. V.P. (1970-1986)
   - President & P.B. of Kaiser Real Estate Services, Inc. (dba Pacific Homes) 1986-90. The firm had 2 offices, about 40 agents and did approximately $55 million in annual sales.

3. DESIGNATIONS & APPOINTMENTS:
   - CRB (Certified Real Estate Brokerage Manager). This designation is awarded by the National Association of Realtors to managers of real estate firms who pass a series of advanced real estate exams.
   - First Circuit Court, State of Hawaii – Receiver and Foreclosure Commissioner
   - U.S. Bankruptcy Court - Trustee in bankruptcy

4. MEDIATOR/ARBITRATOR. Worked on Alternative Dispute Resolution seminars and cases involving lease rents, standards of practice.

5. EXPERT WITNESS in about 30 cases in the past 5 years on:
   - Standards of practice expected of RE sales agents
   - Condominium issues
   - Property Management
   - Development practices and procedures
   - Commercial leasing, rents and valuation

6. PROFESSIONAL STANDARDS & ARBITRATION COMMITTEE, Honolulu Board of Realtors – 3 years

7. HAWAII ASSOCIATION OF REALTORS Board of Directors - 3 terms
   HONOLULU BOARD OF REALTORS Board of Directors - 3 terms
   HAWAII ASSOCIATION OF REAL ESTATE SCHOOLS – former President and Director

8. STANDARD FORMS Committee, HAR., 1992-95 (Vice Chair '92, Chair '93), 1998-2000

9. REAL ESTATE COMMISSION Consultant since 1972
   - Review applications for Condominium Public Reports (current)
   - Prepared report on agricultural condominiums – 1988, proposed rules and regulations changes – 1992

10. PUBLICATIONS: Co-authored "Hawaii Real Estate Handbook", edited by S. W. Gilbert '92, published by the Law Book Store. Wrote courses for HAR on Disclosure and Misrepresentation '95 and Use of HAR Standard Forms '96. Wrote "New Contingent Final Report Law can Help Developers", Hawai'i Developers News, Oct. '97.

11. SEMINAR SPEAKER for CLE (Continuing Legal Education) on Environmental Hazards (1990-92, 1995), Agency Pitfalls (1993, 2000); Real Estate Practices (1994, 1995, 1999); for HICLE (Hawaii Institute for Continuing Legal Education) on Condominium Reports (1992), the New DROA (1993); for HFDC (Hawaii Finance and Development Corp.) on Residential Development (1993); and for NAR (National Association of Realtors) on the Taiwan Real Estate Market (1993)

12. TAUGHT credit and continuing education classes for the following schools and organizations:
    *UHM College of Business Administration:*
    - RE 320, "Real Estate Finance", 3 credits, 1992, 1993, 1994
    - RE 675, "Real Estate Development", 3 credits, 1995, 2003
    *UHM College of Continuing Education: Outreach College:*
    - "Real Estate Pre-Licensing" (1970-present)
    - Certain real estate continuing education courses listed below (1989-present)
    *Hawaii Association of Realtors and Honolulu Board of Realtors:*
    - GRI courses in "Agency", "Contracts", "Listings", "Disclosure & Misrepresentation", "Real Estate Ethics", "Development", "Environmental Problems", "Property Disclosure", "Residential Construction", "Financing" and "Appraisal" (1980-present)
    - Certain real estate continuing education courses listed below (1989-present)
    *Kapiolani and Honolulu Community Colleges, Duplanty, Flores & other Real Estate Schools:*

    | | |
    |---|---|
    | "Law Update & Ethics" | "DROA Pitfalls" |
    | "Real Estate Development" | "Agency Issues" |
    | "Real Estate Investment Analysis" | "Federal & State Fair Housing" |
    | "Condominium Issues" | "Real Estate Financing" |
    | "Landlord-Tenant Issues" | "Property Management" |
    | "Alternative Dispute Resolution in RE" | "Representing Foreign Clients" |
    | "Real Estate Disclosure" | "Use of HAR Standard Forms" |
    | "Broker Management" | "Real Estate Foreclosures" |
    | "Commercial Sales and Leasing" | "Avoiding Litigation" |

8-03

## ARTICLES AND PUBLICATIONS

Besides those items listed on page 3, ¶ 10 of my resume, I wrote an article entitled, "Recodified Condominium Bill Offers Many Changes," for the March, 2004 *Hawaii Developers' Council Quarterly*.

## CASES TESTIFIED IN AS AN EXPERT SINCE 2000

| Month/Year | Case Name | Trial/Arbitration/Deposition |
|---|---|---|
| September 2004 | Swan Pacific v. Whitlow | Trial |
| April 2004 | Bervar v. Koko Head Properties | Arbitration |
| March 2004 | Queen Emma Foundation v. Tatibouet | Trial |
| August 2003 | Scoufos v. Gannon | Arbitration |
| August 2003 | Paulson v. Bollay | Deposition |
| May 2003 | Carr v. Unity House | Trial |
| May 2003 | Uyeda v. Fletcher | Deposition |
| March 2003 | Koolau Golf Partners v. Koolau Catering Services | Deposition |
| February 2003 | Martinez v. Ketell | Deposition |
| June 2002 | Makanskas v. East Oahu Realty | Deposition |
| February 2002 | McCaskill v. Yap | Arbitration |
| November 2001 | Galanto v. Snow | Arbitration |
| September, October 2001 | Makanskas v. East Oahu Realty | Deposition |
| June, July 2001 | Carr v. Unity House | Deposition |
| February 2001 | Hinton v. Horita | Arbitration |
| August 2000 | Abad v. Gonzalez | Arbitration |
| July 2000 | Damon Estate v. Servco | Deposition, Trial |
| June 2000 | Duarte v. C. Brewer Homes | Arbitration |
| June 2000 | Meinhardt v. Lindberg | Arbitration |
| March 2000 | Lee v. Heftel | Arbitration |
| February 2000 | Hayashi v. Schuler Homes | Deposition |

## COMPENSATION

My hourly rate for this matter is $160 per hour (plus gross excise tax) for records review, drafting of a report, consultation, deposition preparation, and other time expended, except trial and deposition testimony, for which my hourly rate is $200 per hour (plus gross excise tax.



EXHIBIT B

## DOCUMENTS REVIEWED

The following are the documents that I reviewed in drafting my report.

*The Bluffs at Mauna Kea Sales contracts:*
- *Lots 1 & 2 - Hoffee*
- *Lot 3 - Marks*
- *Lot 4 - Gunderson*
- *Lot 4 - Leone*
- *Lot 5 - Western Sunview*
- *Lot 6 - Federman*
- *Lot 7 - Reddy*
- *Lot 8 - Gunderson*
- *Lot 9 - Elder*
- *Lot 10 - Engles*
- *Lot 11 - Robertson*
- *Lot 12 - Gifford Investments*
- *Lot 14 - Reid*

01/27/05 *Deposition Transcript - Jeanne Buboltz with Exhibits*

01/27/05 *Deposition Transcript - Kathrin Kohler with Exhibits*

11/22/04 *Deposition Transcript - Dodie MacArthur with Exhibits*

11/10/04 *Records Deposition of MacArthur & Company Volumes I and II*

05/16/03 Deposition transcript of Yoichi Asari (excerpts) in *Robertson et al., v. Mauna Kea Development Corporation*, et al, Civil No. 02-00207

05/29/03 Deposition transcript of Kathrin Kohler (excerpts) in *Robertson et al., v. Mauna Kea Development Corporation*, et al, Civil No. 02-00207

05/16/03 Deposition transcript of William Mielcke (excerpts) in *Robertson et al., v. Mauna Kea Development Corporation*, et al, Civil No. 02-00207

11/29/03 Deposition transcript (condensed) of Guy Hands with Concordance Report, exhibits, and Correction Sheet

12/02/03 Deposition transcript (condensed) of Julia Hands with Concordance Report, exhibits, and Correction Sheet

12/09/03 Deposition transcript (condensed) of the deposition of Irwin Federman

12/08/03 Deposition transcript (condensed) of the deposition of Concepcion S. Federman; Joint exhibits to Volume I and Volume II to depositions of Irwin and Concepcion S. Federman

*Sales Contracts redacted by Mauna Kea Development (MKR 04359-04425)*

*Conveyance Tax Certificates:*
- *Lots 1 & 2 - Hoffee*
- *Lot 3 - Marks*
- *Lot 4 - Leone*
- *Lot 5 - Western Sunview*
- *Lot 6 - Federman*
- *Lot 7 - Reddy*
- *Lot 8 - signed by Anne Gunderson*
- *Lot 8 - signed by Mauna Kea*
- *Lot 9 - Elder*
- *Lot 10 - Engles*
- *Lot 11 - Robertson*
- *Lot 13 - SSI Properties*
- *Lot 13 - Bakewell Assets*
- *Lot 14 - Reid*
- *Lot 15 - Sullivan*
- *Lot 16 - Somogyi*
- *Lot 17 - Acree*
- *Lot 18 - Gamoran*
- *Lot 20 = Hartley*

09/15/98 Letter from Kathrin "Chacha" Kohler R to Irwin Federman

09/12/98 Letter from Debi Au to Guy Hands

09/16/99 Letter from Rita Andrews (Guy Hands' Assistant) to Debi Au

09/16/99 Letter from Jeanne Buboltz of Mauna Kea Realty to Debi Au

09/16/99 Letter from Debi Au to Julia and Guy Hands

09/20/99 Letter from Debi Au to Julia and Guy Hands

09/21/99 Letter from Debi Au to Tom Stifler of Mauna Kea Realty

01/25/99 Letter from Kathrin "Chacha" Kohler R to Janet Lum Won of Title Guaranty Escrow Services, Inc. with enclosure

First Amended Complaint filed April 27, 2004

Defendant Irwin Federman's Answer to Complaint

Defendant Irwin Federman's Response to Plaintiff Western Sunview Properties, LLC's First Request For Answers to Interrogatories To Defendant Irwin Federman

03/19/04 Hawaii County Real Property Tax Office Printout

Handwritten letter from Irwin Federman to Jane Grisham of the Real Property Department (undated)

11/10/99 Amended Notice of Property Assessment

11/10/99 Real Property Tax Board of Review re tax appeal of Irwin Federman

Handwritten letter from Irwin Federman to County of Hawaii, Real Property Assessment Division (undated)

Real Property Assessment Information Screen printout for the Federmans' lot

04/08/99 Taxpayer's Notice of Appeal on Real Property Assessment for the Federmans' lot

Notice of Property Assessment - 1999 for the Federmans' lot

12/28/98 Tentative Buyer Statement for the Federmans' lot

12/28/98 Tentative Seller Statement for Item A

MLS printout from Debi Au

[Specimen] Limited Warranty Deed

[Form] Sales Contract

04/10/97 Amended Public Offering Statement on The Bluffs at Mauna Kea

08/18/98 Dual Agency Consent Agreement signed by Irwin & Concepcion Federman

# LOVE & NARIKIYO

A LIMITED LIABILITY LAW COMPANY

ATTORNEYS AT LAW

CHAD P. LOVE
CHUCK T. NARIKIYO
BARBARA J. KIRSCHENBAUM

1164 BISHOP STREET, STE. 1105
HONOLULU, HAWAII 96813

TELEPHONE (808) 546-7575
FAX (808) 546-7070

February 22, 2005

**VIA HAND DELIVERY**

Andrew V. Beaman, Esq.
Leroy Colombe, Esq.
745 Fort St., 9th Flr.
Honolulu, HI 96813

Brian A. Kang, Esq.
999 Bishop St., 23rd Flr.
Honolulu, HI 96813

Ronald M. Shigekane, Esq.
2500 Pauahi Tower
1001 Bishop Street
Honolulu, HI 96813

Joseph K. Kamelamela, Esq.
Hilo Lagoon Center
101 Aupuni St., Ste. 325
Hilo, HI 96720
(via mail only)

Re: Western Sunview Properties, LLC vs. Irwin Federman, et al.
    Civil No. CV03-00463 DAE/LEK

Dear Counsel:

Pursuant to the Rule 26 of the Federal Civil Procedure and the Amended Rule 16 Scheduling Order filed by the Court on November 18, 2004, Plaintiffs hereby disclose below the trial expert witnesses retained for this case. The reports of each are enclosed.

1. James N. Reinhardt, c/o Architectural Diagnostics, Ltd., 800 Bethel Street, Ste. 500, Honolulu, HI 96813, report dated June 14, 2004, attached. This has been produced to you before but is being produced to you again.

2. David L. Callies, Esq., 1532 Kamole Street, Honolulu, HI 96821, report dated June 2, 2004, attached. This has been produced to you before but is being produced to you again.

February 22, 2005
Page 2

c 10o   3/   Kenneth Chong, c/o Pacific Realty Consultants, 1021 Smith St., Ste. 225, Honolulu, HI 96817, report dated February 22, 2005, attached.

c 11S   4/   Richard Stellmacher, Stellmacher & Sadoyama, 1042 Fort Street Mall, Ste. 300, Honolulu, HI 96813, report dated February 14, 2005, attached.

d23   5/   Leonard M. Kacher, 3652 Hilo Place, Honolulu, HI 96816, report dated February 22, 2005, attached.

Sincerely,

Chad P. Love

CPL:bjk:dll
all counsel022205.ltr
Enclosures