# DEPOSITION OF WILLIAM MIELCKE TAKEN ON 05/29/03

*Page 1 to Page 85*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**RALPH ROSENBERG COURT REPORTERS, INC.**
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

EXHIBIT 4

BSA  DEPOSITION OF WILLIAM MIELCKE TAKEN ON 05/29/03  XMAX(1/1)

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

SANFORD R. ROBERTSON and ) CIVIL NO. 02-00207 HG LEK
JEANNE ROBERTSON,      ) (Other Civil Action)
     Plaintiffs,   )
     vs.          )
                  )
MAUNA KEA DEVELOPMENT   )
CORPORATION, a Hawaii   )
corporation and MAUNA KEA )
PROPERTIES, INC., a    )
Hawaii corporation,    )
     Defendants.    )
_____ )

DEPOSITION OF WILLIAM MIELCKE

Taken on behalf of Plaintiffs at the offices of Ralph Rosenberg Court Reporters, Incorporated, Suite D212, 75-170 Hualalai Road, Kailua-Kona, Hawaii, commencing at 2:10 p.m. on May 29, 2003, pursuant to Notice.

**REPORTED BY:**
   DEBORAH A. NG, CSR 336
   Registered Professional Reporter
   Notary Public, State of Hawaii

### Page 2

APPEARANCES

For Plaintiffs       ANDREW V. BEAMAN, ESQ.
Sanford Robertson,   BURNHAM H. GREELEY, ESQ.
Jeanne Robertson:    Chun, Kerr, Dodd, Beaman
                     & Wong
                     9th Floor
                     745 Fort Street
                     Honolulu, Hawaii 96813

For Defendants       J. DOUGLAS ING, ESQ.
Mauna Kea Development  Watanabe Ing Kawashima &
Corporation:         Komeiji
                     23rd Floor
                     999 Bishop Street
                     Honolulu, Hawaii 96813

### Page 3

INDEX

EXAMINATION BY:                        PAGE

Mr. Greeley                            5

EXHIBITS FOR IDENTIFICATION

Deposition Exhibit A37
Letter, 3/22/01.                       35

Deposition Exhibit A38
Letter, 4/24/01.                       38

Deposition Exhibit A39
Letter, 5/1/01.                        39

Deposition Exhibit A40
Letter, 5/11/01.                       40

Deposition Exhibit A41
Letter, 5/21/01.                       40

Deposition Exhibit A42
Addendum, additional disclosures.      62

### Page 4

Deposition Exhibit A43
Sales contract, 12/28/99.              62

Page 5

(1) WILLIAM MIELCKE
(2) called as a witness at the instance of the Plaintiffs,
(3) being first duly sworn to tell the truth, the whole
(4) truth and nothing but the truth, was examined and
(5) testified as follows.
(6) EXAMINATION
(7) BY MR. GREELEY:
(8) Q   Tell us your name.
(9) A   William, middle initial F, Mielcke,
(10) M-i-e-l-c-k-e.
(11) Q   I've known you as Bill for how many years.
(12) Do you mind if I use Bill in the deposition?
(13) A   Not at all, not the least.
(14) Q   And Bill, you've been through this process
(15) several times before?
(16) A   Yes, sir.
(17) Q   Do you want me to repeat the ground rules, or
(18) do you feel comfortable?
(19) A   Not unless you feel that you want to.
(20) Q   First of all, a little bit of background.
(21) You were employed at Mauna Kea?
(22) A   I was.
(23) Q   Tell me as what and when.
(24)     MR. ING:  Wait, let me object to that as
(25) being overly broad, vague and ambiguous.  He's been

Page 6

(1) employed at Mauna Kea since 1980, February of 1980.
(2) A   February 1st, 1980.
(3) BY MR. BURNHAM:
(4) Q   Just run through the whole litany quickly, if
(5) you could.
(6) A   February 1st, 1980 I joined Mauna Kea.  Mauna
(7) Kea at that time was a subsidiary of UAL, Inc.  I was
(8) with UAL, Inc. and its subsidiary Westin Hotel Company
(9) until February 1st, 1988 at which time there was a
(10) divestiture in process of the UAL, Inc. assets.  And
(11) with the divestiture of Westin Hotel Company Mauna Kea
(12) Properties was sold in a back-to-back transaction to
(13) Seibu Railroad Company of Japan.
(14)     Let me clarify the back-to-back transaction.
(15) Westin was sold to Aoki Bass.  Aoki Bass sold Mauna Kea
(16) to Seibu Railway Company.
(17) Q   And that was Mauna Kea Properties?
(18) A   Mauna Kea Properties.
(19) Q   What was your position at Mauna Kea
(20) Properties?
(21) A   Vice president and project director.
(22) Q   During what period of time, or was that your
(23) position all the way through until the end?
(24) A   I thought, Hod, you meant what was my
(25) position up till February 1st, 1988, vice president and

Page 7

(1) project director.
(2) Q   Until '88?
(3) A   Yes.
(4) Q   And the sale to Seibu Railway took place,
(5) roughly, when again?
(6) A   February 1st, 1988.
(7) Q   And after February 1st, 1988 did you stay on
(8) at Mauna Kea Properties?
(9) A   Yes.  I remained on as an employee of Westin
(10) Hotel Company for, I don't know, three to six months
(11) until Seibu Railway Company could really kind of sort
(12) out the assets and who was there and what the
(13) respective duties and responsibilities of those
(14) individuals were.
(15)     And sometime within a period of, say, three
(16) to six months, I was asked to remain at Mauna Kea and
(17) shortly thereafter promoted to president of Mauna Kea
(18) Properties.
(19) Q   So your term as president was after Seibu
(20) Railway bought the company?
(21) A   That's correct.
(22) Q   And how long were you president of Mauna Kea
(23) Properties?
(24) A   Up until my retirement, July 26, 2001.
(25) Q   And during that entire time Seibu Railway was

Page 8

(1) the owner of Mauna Kea Properties?
(2) A   Gee, there were so many organizations and
(3) reorganizations during that period of time, Hod, it's
(4) hard for me to go back and tell you who owned Mauna Kea
(5) Properties at what time.
(6) Q   As a generalization, did Seibu Railway ever
(7) sell to some totally unrelated company, or was it just
(8) simply reorganizations within subsidiaries or
(9) affiliated companies?
(10) A   I think your latter characterization is
(11) correct.
(12) Q   So in other words, General Motors didn't come
(13) along and buy it or Texaco or some other Japanese
(14) unrelated company?
(15) A   No.
(16) Q   Where did your paycheck come from, from Mauna
(17) Kea Properties?
(18) A   Mauna Kea Properties.
(19) Q   What about Mauna Kea Development, did you
(20) ever hold any positions with them?
(21) A   I did.
(22) Q   And what was your position there at the time
(23) you retired.  Let's work backwards.
(24) A   Oh, gosh, I don't really remember.  I was an
(25) officer and director.  Which officer, at this point I



### Page 77

(1) see that?
(2) A  I do.
(3) Q  And right below that 4.9 - a flat roof will
(4) be acceptable. On any of those documents does your
(5) signature appear?
(6) A  Yes.
(7) Q  Where? Give me the page number.
(8) A  It's marked as MK 013211.
(9) Q  And where on the page is your signature?
(10) A  Bottom of the page on the left-hand side,
(11) acceptance by seller.
(12) Q  And you signed as, in what capacity? I
(13) apologize, the photocopying is obviously cut off.
(14) A  It looks like I signed this as president.
(15) Q  And there is a signature just to the right of
(16) yours, correct?
(17) A  Correct.
(18) Q  And whose signature is that?
(19) A  Mr. Asari.
(20) Q  So would it be correct that the handwritten
(21) 4.8 and 4.9 above Mr. Robertson's signature would have
(22) been present and on the document when you signed lower
(23) down on the page?
(24) A  Yeah.
(25) Q  Did you have any recollection of discussing

### Page 78

(1) the provision of flat roof will be acceptable with
(2) anybody?
(3) A  With anybody?
(4) Q  Yes.
(5) MR. ING: Counsel, at the time he signed it
(6) or at some subsequent time?
(7) MR. GREELEY: Yes.
(8) A  At the time I signed it?
(9) Q  Anytime, with somebody other than your
(10) attorneys, obviously.
(11) A  As I recall, Tom Stifler brought this
(12) contract to our office, and you know, I don't remember
(13) whether I was in the office that day or Asari and I
(14) were in the office that day or one or the other of us
(15) were there which was not unusual.
(16) So it's possible that one of us signed it one
(17) day, one of us signed it the other day, but Tom was the
(18) vehicle who brought the contract to the office.
(19) Q  Do you recall ever discussing that with
(20) Mr. Asari?
(21) A  The contract?
(22) Q  That particular provision about the flat
(23) roof.
(24) A  You know, I don't have a specific
(25) recollection of saying look, Asari, there is 4.6, 4.7,

### Page 79

(1) 4.8, and 4.9. I don't recall that specifically, but
(2) it's quite possible we did discuss it at that time.
(3) Q  I'm missing something from that copy. Can I
(4) borrow yours for a second?
(5) Are you familiar with the use of a
(6) landscaping credit?
(7) A  Yes.
(8) Q  And tell me how it worked.
(9) A  When we brought the project to market,
(10) meaning -- we meaning when Mauna Kea Properties brought
(11) the project to market, Tom Stifler felt that it was
(12) important that we jump start the sales to build up some
(13) momentum in the project and felt that while it was
(14) important to maintain the integrity of the selling
(15) price, the price list, if you will, that by using a
(16) landscape credit as an incentive would help stimulate
(17) sales.
(18) Q  Purchasers when they constructed were
(19) required to put in a certain amount of landscaping?
(20) A  A landscape plan had to be submitted as part
(21) of the design review.
(22) Q  And where did this credit apply, how did that
(23) work?
(24) A  The credit applied to landscaping and
(25) grading, as I recall.

### Page 80

(1) Q  Was there a requirement in the documents that
(2) the purchaser signed that said you got to spend X
(3) number of dollars on landscaping?
(4) A  No.
(5) Q  Then what are you crediting it against?
(6) A  It really was a form of discounting the
(7) selling price to help accelerate the sales of the
(8) project.
(9) Q  So by use of this "landscape credit" the
(10) buyer would actually be paying less money than the
(11) listed price for the lot?
(12) A  Correct.
(13) Q  Then when you recorded the documents with the
(14) state and I assume the selling documents would be
(15) recorded, right?
(16) A  Oh, sure.
(17) Q  Would that landscape credit show?
(18) A  As I recall, the conveyance indicated the
(19) gross selling price, in Robertsons' case of $3,500,000.
(20) Q  So if I was the next purchaser in line and I
(21) wanted to see what the last guy paid and I went down to
(22) the public records and looked, I would just see the
(23) listed price. I wouldn't see the actual price the
(24) purchaser paid if he got a landscape credit?
(25) A  Might not because they were also covered by a


### Page 81

(1) confidentiality agreement.
(2)   Q   The landscape credit part?
(3)   A   Yeah, between the buyer and seller.
(4)   Q   But the listed selling price would not be
(5) covered by that confidentiality agreement?
(6)   A   No. That was public record.
(7)   Q   When you say Mr. Stifler wanted to do this to
(8) maintain the integrity of the price, it was so you
(9) could tell the next purchaser that, hey, the selling
(10) price is the listing price, correct?
(11)  A   Correct.
(12)  Q   Going back to the Robertson sales contract
(13) the provision the flat roof would be acceptable, did
(14) you have any understanding of what that meant?
(15)  A   That the concept of a flat roof would be
(16) considered in the design process and would not on its
(17) own rule out the approval of the house.
(18)  Q   Literally, a flat roof will be acceptable?
(19)  A   Literally, that a flat roof in itself would
(20) not rule out the approval of the house. You really had
(21) to look at the whole house. I know I'm singing to the
(22) choir because we've talked about this before, but that
(23) aspect alone would not rule out the approval of the
(24) house but we had to look -- we had nothing to look at.
(25) We had no plans. So we had to look at the house in its

### Page 82

(1) totality.
(2)   Q   You had a picture of other designs done by
(3) the Robertsons' architect Mr. Legorreta, though, right?
(4)   A   Me personally?
(5)   Q   The design committee, maybe you personally
(6) also. There was a Legorreta house in the Architectural
(7) Digest in the same volume that showed the -- what's the
(8) big white house -- Growney house?
(9)   A   I understand that there was a letter from an
(10) attorney, John Child, concerning a Greenberg house. I
(11) did not become knowledgeable about that until much
(12) later. I think I was either in the hospital or on
(13) vacation or sick leave or something when that came out.
(14) And to the best of my recollection, that went directly
(15) to Jim Bell who drafted the response to that letter.
(16)  Q   He did, he did. I was just asking you
(17) whether you recall the article in Architectural Digest
(18) that was sitting in the sales office at Mauna Kea
(19) Properties that has the Growney house but also had a
(20) Legorreta house?
(21)  A   I learned about it later. The Growney house
(22) meaning the Rochetti design.
(23)  Q   Yes. What's the subdivision?
(24)  A   At Fairways North.
(25)      MR. GREELEY: We can't think of anything

### Page 83

(1) else. Can you think of anything else?
(2)     MR. ING: No.
(3)     (The deposition concluded at 4:20 p.m.)

### Page 84

(1)   I, WILLIAM MIELCKE, hereby certify that I have
(2) read the foregoing typewritten pages 1 through 83,
(3) inclusive, and corrections, if any, were noted by me,
(4) and the same is now a true and correct transcript of my
(5) testimony.
(6)   DATED: Kailua-Kona, Hawaii_____

_____
WILLIAM MIELCKE

Signed before me this _____
day of _____ 2003.

_____

Robertson vs. MKP, et al.; Civil No. 02-00207 HG LEK;
Deposition taken on 5/29/03 by Deborah A. Ng, RPR,
CSR 336.

85

```
  1   STATE OF HAWAII         )
                              ) SS.
  2   CITY & COUNTY OF HONOLULU )

  3        I, DEBORAH A. NG, RPR, CSR 336 Notary Public,

  4   State of Hawaii, hereby certify:

  5        That on May 29, 2003, at 2:10 p.m. appeared before

  6   me WILLIAM MIELCKE, the witness whose deposition is

  7   contained herein;

  8        That prior to being examined, the witness was by

  9   me duly sworn;

 10        That the deposition was taken by me in machine

 11   shorthand and was thereafter reduced to typewriting by

 12   me;

 13        That the foregoing represents, to the best of my

 14   ability, a full, true and correct transcript of said

 15   deposition.

 16        I further certify that I am not attorney for any

 17   of the parties hereto, nor in any way concerned with

 18   the cause.

 19        Dated:  Kailua-Kona, Hawaii, March 10, 2004.

 20
                         _____
 21                      DEBORAH A. NG, CSR 336
                         Registered Professional Reporter
 22                      Notary Public, State of Hawaii
                         My commission expires 6/20/2006
 23

 24

 25
```

RALPH ROSENBERG COURT REPORTERS, INC.