

DEPOSITION OF WILLIAM MIELCKE TAKEN ON 04-29-05

*Page 1 to Page 185*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI  96813
Phone:  (808) 524-2090
FAX:  (808) 524-2596

EXHIBIT 9



BSA                          DEPOSITION OF WILLIAM MIELCKE TAKEN ON 04-29-05                          XMAX(1/1)

**Page 1**

(1) IN THE UNITED STATES DISTRICT COURT
(2) FOR THE DISTRICT OF HAWAII
(3) _____
(4) WESTERN SUNVIEW PROPERTIES, LLC;
(5) GUY HANDS; AND JULIA HANDS,
(6)        Plaintiffs,
(7)                    CIVIL NO. CV03-00463 DAE LEK
(8) IRWIN FEDERMAN; CONCEPCION S.    (Contract, Injunction; Other
(9) FEDERMAN; THE BLUFFS AT MAUNA KEA Non-Vehicle Tort; Declaratory
(10) COMMUNITY ASSOCIATION; MAUNA KEA Judgment, Other Civil Action)
(11) PROPERTIES, INC.; MAUNA KEA
(12) DEVELOPMENT CORP.; COUNTY OF
(13) HAWAII; JOHN DOES 1-100; JANE
(14) DOES 1-100; DOE PARTNERSHIPS
(15) 1-100 AND DOE CORPORATIONS 1-100,
(16)        Defendants.
(17) _____
(18)        DEPOSITION OF WILLIAM F. MIELCKE
(19)     Taken on behalf of the Plaintiffs at the office of
(20) Motooka Yamamoto & Revere, 1000 Bishop Street, Suite 801,
(21) Honolulu, Hawai'i, commencing at 9:08 a.m. on April 29th,
(22) 2005, pursuant to Third Amended Notice.
(23) BEFORE:   B. KANOELANI COCKETT
(24)     Certified Shorthand Reporter
(25)     HI CSR NO. 379, CA CSR NO. 7995

**Page 2**

(1) APPEARANCES:
(2) For Plaintiffs:  TERRANCE M. REVERE, ESQ.
(3)     Motooka Yamamoto & Revere
(4)     1000 Bishop Street, Suite 801
(5)     Honolulu, Hawai'i 96813
(6)     and
(7)     CHAD P. LOVE, ESQ.
(8)     BARBARA J. KIRSCHENBAUM, ESQ.
(9)     Love & Narikiyo
(10)     1164 Bishop Street, Suite 1105
(11)     Honolulu, Hawai'i 96813
(12)
(13) For Defendants:  DOUGLAS ING, ESQ.
(14) MAUNA KEA     Watanabe Ing Kawashima & Komeiji
(15) PROPERTIES, INC.  999 Bishop Street, 23rd Floor
(16) and MAUNA KEA   Honolulu, Hawai'i 96813
(17) DEVELOPMENT CORP.
(18)
(19) For Defendants:  LEROY F. COLOMBE, ESQ.
(20) IRWIN FEDERMAN   Chun Kerr Dodd Beaman & Wong
(21) and CONCEPCION   Topa Financial Center
(22) S. FEDERMAN     Fort Street Tower
(23)     745 Fort Street, 9th Floor
(24)     Honolulu, Hawai'i 96813
(25)

**Page 3**

(1) For Defendant:  GARY S. MIYAMOTO, ESQ.
(2) THE BLUFFS AT  Ayabe, Chong, Nishimoto, Sia & Nakamura
(3) MAUNA KEA    Pauahi Tower, Suite 2500
(4) COMMUNITY    1001 Bishop Street
(5) ASSOCIATION   Honolulu, Hawai'i 96813
(6)
(7)
(8) For Defendant:  JOSEPH KAMELAMELA, ESQ.
(9) COUNTY OF HAWAII  County of Hawai'i
(10)     Hilo Lagoon Center
(11)     101 Aupuni Street, Suite 325
(12)     Hilo, Hawai'i 96720
(13)     **(Present via telephone)**
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)               -oOo-

**Page 4**

(1)        I N D E X
(2) EXAMINATION BY:                      PAGE
(3) MR. REVERE                            7
(4) MR. MIYAMOTO                         173
(5) FURTHER EXAMINATION BY MR. REVERE        175
(6)      EXHIBITS FOR IDENTIFICATION
(7) PLAINTIFFS'                          PAGE
(8) 1   Design and Construction Requirements For   7
(9)     Homes dated February 19, 1997
(10) 2   A letter dated April 20, 2001 to Loriann   17
(11)     Gordon from William Mielcke
(12) 3   The Bluffs at Mauna Kea Sales Contract    34
(13)     for Sanford Robertson
(14) 4   A handwritten note dated 12-21-98      43
(15) 5   Addendum 1 to Sales Contract dated     57
(16)     February 1, 1999 for Sanford R. and Jeanne
(17)     Robertson
(18) 6   A handwritten letter to Jane Grisham from   58
(19)     Irwin Federman
(20) 7   Excerpted portions of the deposition of   64
(21)     William Mielcke taken on May 29, 2003
(22) 8   Declaration of William F. Mielcke       86
(23) 9   Bluffs at Mauna Kea price list        90
(24) 10  County Planning Department Final Plan    95
(25)     Approval

## Page 5

(1) EXHIBITS FOR IDENTIFICATION
(2) PLAINTIFFS'                                  PAGE
(3) 11    A letter dated October 9, 1995 to Virginia  97
(4)       Goldstein from Anne Mapes
(5) 12    An e-mail dated February 7, 2001 to      99
(6)       R. Willis from Lisa Reinke
(7) 13    A fax dated April 23, 2001 to Vladimir   100
(8)       Ilic from Joel Laber
(9) 14    A letter dated May 15, 2001 to Mr. Mielcke  104
(10)      from Mr. and Mrs. C.N. Reddy
(11) 15   A letter dated October 17, 2000 to J. Lynn  106
(12)      Reda from James Bell
(13) 16   A letter dated December 22, 2000 to     107
(14)      Mr. and Mrs. Federman from William Mielcke
(15) 17   A letter dated January 19, 2001 to       111
(16)      Mr. and Mrs. Federman from William Mielcke
(17) 18   A fax dated May 17, 2001 to Lisa Reinke  112
(18)      from Joel Laber
(19) 19   A letter dated July 11, 2001 to Joel     115
(20)      Laber and others from William Mielcke
(21) 20   An e-mail dated July 11, 2001 to Alan    116
(22)      Kato from Lisa Reinke
(23) 21   An e-mail dated May 1, 2001 to Bill Mielcke  119
(24)      and Rhonda Willis from Lisa Reinke
(25) 22   Meeting items discussed March 20, 2003  125

## Page 6

(1) EXHIBITS FOR IDENTIFICATION
(2) PLAINTIFFS'                                  PAGE
(3) 23    A letter dated March 1, 2001 to Shaun    126
(4)       Roth and David Tamura from William Mielcke
(5) 24    A letter dated March 10, 2000 to R.V. Hamel  131
(6)       and others from James Bell
(7) 25    A fax memorandum dated March 6, 2000 to  131
(8)       James Bell from Shaun Roth
(9) 26    A facsimile dated January 27, 2000 to    131
(10)      Tinguely Development from James Bell
(11) 27   An e-mail dated June 28, 2001 to Lisa    133
(12)      Reinke from Theresa Law
(13) 28   An e-mail dated January 25, 2001 to      135
(14)      Bill Mielcke from Lisa Reinke
(15) 29   A letter dated January 13, 2001 to Mr.   136
(16)      Mielcke from Mr. and Mrs. Reddy
(17) 30   A letter dated January 24, 2001 to Mr. and  139
(18)      Mrs. Reddy from William Mielcke
(19) 31   A letter dated December 19, 2000 to      145
(20)      Bettina Luma and others from C.N. Reddy
(21) 32   A letter dated July 30, 2001 to William  136
(22)      Mielcke from Alan Goda
(23) 33   Privilege and Redaction Log              170
(24)      (Updated 9/17/04)
(25)                    -o0o-

## Page 7

(1)                    WILLIAM F. MIELCKE,
(2)              Having been first duly sworn,
(3)         testified upon his oath as follows:
(4)                        EXAMINATION
(5)            (Plaintiffs' Exhibit No. 1
(6)            was marked for identification.)
(7) BY MR. REVERE:
(8)    Q.    Okay.  Good morning, Mr. Mielcke.
(9)          Could you state your name for the record, please.
(10)   A.    William Mielcke.
(11)   Q.    Okay.  And, Mr. Mielcke, what we're doing today is a
(12)   deposition.
(13)         I understand you've been deposed in the past, but
(14)   could you give me an idea as to the number of times that
(15)   you've been deposed?
(16)   A.    Four to six, I would guess.
(17)   Q.    All right.  Have all those depositions been in
(18)   connection with your activities with Mauna Kea?
(19)   A.    They have.
(20)   Q.    Okay.  I understand that you were deposed in a
(21)   matter involving the Robertsons.
(22)         Do you recall what the other depositions that you
(23)   took, what they involved?
(24)   A.    The Robertsons' case was the last one.  The one
(25)   before that involved a matter with a former employee over a

## Page 8

(1)   commission issue.
(2)    Q.    Okay.  And do you recall what was the former
(3)   employee's name?
(4)    A.    Lee, Lee Taylor.
(5)    Q.    Okay.  And that involved Mr. Taylor had a dispute
(6)   over the commission with the Hoffee sale at The Bluffs?
(7)    A.    That's correct.
(8)    Q.    Okay.  What about the other depositions?
(9)    A.    Oh, gosh, at this point I can't remember.
(10)   Q.    Okay.  Do you recall if there was any, if you were
(11)   ever deposed in any cases involving disputes between neighbors
(12)   at the Mauna Kea?
(13)         (Interruption in the proceedings.)
(14)   THE WITNESS:  Other than the Robertson case?
(15) BY MR. REVERE:
(16)   Q.    Yeah.
(17)   A.    Fogelsong and Gifford?
(18)   Q.    Right.
(19)   A.    No.
(20)   Q.    Okay.  Were there any -- are you aware of any
(21)   litigation involving covenant enforcement issues at the
(22)   Fairways at Mauna Kea?
(23)   A.    The Fairways North or the Fairways South?
(24)   Q.    Either one.
(25)   A.    Not that I'm aware of.

### Page 49

(1)   A.   I can't because it changed from -- there were
(2)   organizations and there were reorganizations, so you'd have to
(3)   show me which -- at what time frame on the organization chart
(4)   and then maybe I could answer your question, but --
(5)   Q.   Okay.
(6)   A.   -- off the top of my head, I can't answer your
(7)   question.
(8)   Q.   Okay.  In 1999 can you give me the organizational
(9)   chart for Mauna Kea Properties?  What company was on top of
(10)  it?
(11)  A.   Can't remember.
(12)  Q.   Okay.  Same thing for 2000?
(13)  A.   2000, '98, '97, '96.
(14)  Q.   Okay.
(15)  A.   I'm not trying to be sarcastic.  I mean, I really
(16)  just can't remember.
(17)  Q.   Okay.  So is there any individual or individuals
(18)  that you would communicate with from Japan about activities at
(19)  The Bluffs of Mauna Kea?
(20)       MR. ING:  Object.
(21)  BY MR. REVERE:
(22)  Q.   Or would everything be done through Mr. Asari?
(23)       MR. ING:  Object to the form of the question, vague
(24)  and ambiguous.
(25)       THE WITNESS:  Mr. Revere, Mr. Asari and I worked

### Page 50

(1)   together on a day-to-day basis.  I did not call Japan.  I
(2)   don't speak Japanese.  I wouldn't know who to call, although
(3)   I've met a number of people from Japan who have visited the
(4)   project, but I never talked to anybody about Mauna Kea
(5)   Properties.
(6)   BY MR. REVERE:
(7)   Q.   Okay.  When did you first hear of the phrase "a
(8)   landscaping credit"?
(9)   A.   Around the beginning of the sales of The Bluffs
(10)  project, probably with the Hoffee and Gifford sales.
(11)  Q.   Okay.  And who first -- how did you first -- did you
(12)  first hear the phrase orally, or was it something that was
(13)  written to you in a memo, or was it something that you came up
(14)  with?
(15)  A.   I think the recommendation for landscape credits was
(16)  brought to Mr. Asari and me by Tom Stifler.
(17)  Q.   Okay.  So it's your testimony that the idea of using
(18)  landscape credits was Tom Stifler's?
(19)  A.   Yes.
(20)  Q.   Okay.  Now, and Mr. Stifler was the principle broker
(21)  for Mauna Kea Realty?
(22)  A.   Yes.
(23)  Q.   And Mauna Kea Realty is -- basically it's just a dba
(24)  of Mauna Kea Properties; is that correct?
(25)  A.   That's correct.

### Page 51

(1)   Q.   Okay.  And you have a real estate license, or you
(2)   had a real estate license at least in 1999, correct?
(3)   A.   I have, I still have a real estate license,
(4)   inactive.
(5)   Q.   Okay.  And I believe from one of your earlier
(6)   depositions you testified that you had your license under Mr.
(7)   Stifler; is that correct?
(8)   A.   Well, that's the way it works.  He's the principle
(9)   broker.  I'm just a realtor associate license and it was hung
(10)  with our office, that's correct.
(11)  Q.   Okay.  So you were Mr. Stifler's boss, but your real
(12)  estate license technically was under his; is that fair to say?
(13)  A.   Mr. Stifler reported to me.  If I were engaged in
(14)  the actual sale of real estate I would have reported to him.
(15)  Q.   Okay.  And do you recall the first time that Mr.
(16)  Stifler mentioned the idea of landscape credits?  Was it
(17)  something that was mentioned to you orally, or was it a memo
(18)  that he wrote, or was it communicated in other ways?
(19)  A.   As I recall, it was orally presented to Mr. Asari
(20)  and myself.
(21)  Q.   Okay.  And could you tell me about that discussion,
(22)  what was said?
(23)  A.   At this point not really.  I mean, we were launching
(24)  the sales of the Bluffs.  We wanted to get the project up and
(25)  running, accelerate the sales, if you will, and then -- and

### Page 52

(1)   Tom felt in evaluating the market and where it was at that
(2)   time that we should incentivize certain of the buyers, and he
(3)   recommended the use of landscape credits as a way of providing
(4)   that incentive for closing on sales.
(5)   Q.   Okay.  And what were the landscape credits?
(6)   A.   I'm sorry, what were the landscape credits?
(7)   Q.   Yeah.
(8)   A.   The landscape, it was a credit for closing.  It was
(9)   a credit that was given at closing for what we thought would
(10)  be used to offset the cost of landscaping, grading the lots.
(11)  Q.   Okay.  The lots at The Bluffs at Mauna Kea were
(12)  already graded before sales were made; is that correct?
(13)  A.   Yes, they were.
(14)  Q.   Okay.  And all the lots at The Bluffs at Mauna Kea,
(15)  except for perhaps the two model units, all needed
(16)  landscaping, correct?
(17)  A.   They all needed grading and landscaping.
(18)  Q.   Okay.
(19)  A.   And the landscaping was an important part of how
(20)  ultimately the project would look when it was finished, the
(21)  landscape elements.
(22)  Q.   Okay.  And there was no requirement that from
(23)  anybody who received a landscape credit, none of them were
(24)  required to spend the amount of credit on landscaping,
(25)  correct?

## Page 53

(1)     MR. ING: Well, object to the form of the question,

(2) vague and ambiguous.

(3)     THE WITNESS: By "requirement" do you mean that

(4) there was some additional agreement that said, "Okay. We're

(5) giving you a credit for X amount of money, and you have to

(6) spend that on landscaping or we get – something awful happens

(7) and ten lawyers are going to be screaming," no, there was no

(8) requirement.

(9)     However, I would hasten to say that the cost of

(10) landscaping and grading, which normally includes rock walls

(11) and other features in landscape, bushes, usually exceeded the

(12) amount of the landscape and grading for the house.

(13) BY MR. REVERE:

(14)    Q.   Okay. When Mr. Stifler presented this idea to you,

(15) did he mention that it would be kept confidential so that

(16) subsequent buyers wouldn't know about these credits?

(17)    A.   As I recall, the recommendation was that the

(18) landscape credit should be – Tom's recommendation was he

(19) wanted to project the sale, the list sales prices, and the

(20) recommendation was that the landscape credit be covered by a

(21) confidentiality agreement.

(22)    Q.   Okay. And by "protect" the list sales prices, what

(23) that meant was that Mr. Stifler wanted – and his salespeople,

(24) I guess, he wanted – well, let me back up.

(25)    That Mr. Stifler wanted to be able to represent to

## Page 54

(1) subsequent purchasers, "Hey, we got our list price for these

(2) other lots that were already sold," correct?

(3)     MR. ING: Object to the form of the question, calls

(4) for speculation.

(5)     MR. COLOMBE: Join.

(6)     THE WITNESS: (Witness shakes head.) I think that

(7) he wanted to represent that these are our list prices. These

(8) are the sales prices.

(9) BY MR. REVERE:

(10)    Q.   Yeah, the list prices were the actual sales prices?

(11)    MR. ING: Object to the form of the question.

(12)    THE WITNESS: I don't think I said that. And if I

(13) did say that, I think that we – we had a sales price –

(14) BY MR. REVERE:

(15)    Q.   Um-hum.

(16)    A.   – list, and this was our sales price list, and Tom

(17) wanted to maintain the sales price list.

(18)    Q.   And do you recall seeing that sales price list

(19) before?

(20)    A.   Sure.

(21)    Q.   And do you recall that at certain occasions after

(22) lots were sold that there would be a stamp put on that would

(23) say "sold" on that sales price list?

(24)    A.   If you show me one, I could take a look at it, be

(25) more than happy to take a look at it.

## Page 55

(1)     Q.   Okay. Well, isn't it fair to say that basically

(2) what Mr. Stifler wanted to do was to cause subsequent

(3) purchasers to believe, "Hey, Mauna Kea got their sales, their

(4) list price for these earlier lots that they sold"?

(5)     A.   I think you'd have to ask Mr. Stifler that.

(6)     Q.   Okay. Wasn't that the impression that you got as to

(7) what he was trying to do?

(8)     A.   I think Mr. Stifler wanted to maintain the original

(9) sales prices, and in a market that we were hopeful of would

(10) improve, and we'd been through a really difficult period of

(11) time. The goal was to try to accelerate the sales of The

(12) Bluffs. We wanted to provide buyers with an incentive to

(13) close, and as we moved forward with the project and sales

(14) progressed, our goal was hopefully to be able to sell those

(15) lots for the sales prices that were listed, or more.

(16)    Q.   Okay. In your answer you used the word "maintain"

(17) the – you used the phrase "maintain the sales."

(18)    What do you mean by the word "maintain"?

(19)    A.   The printed, the printed sales, and if we had one

(20) around I could look at it. We had a printed sales. It was

(21) that handout.

(22)    Q.   You wanted to maintain that printed sales list

(23) handout?

(24)    A.   Yes.

(25)    Q.   Okay. When did you get your real estate license?

## Page 56

(1)     A.   I don't know.

(2)     Q.   More than ten years ago?

(3)     A.   A long time ago.

(4)     Q.   Okay. All right. Have you ever heard of the phrase

(5) "comparables" before?

(6)     A.   Comparables?

(7)     Q.   Yeah.

(8)     A.   Yes.

(9)     Q.   What's the word "comparables" mean to you?

(10)    A.   Usually used by appraisers when they are looking at

(11) other pieces of property for appraisal purposes.

(12)    Q.   And basically similar properties to determine the

(13) value of the property in question?

(14)    A.   Generally speaking.

(15)    Q.   Okay. Did Mr. Stifler – do you know if Mr. Stifler

(16) ever sought legal advice as to whether his plan for the

(17) landscape credit, using landscape credits was legal or not?

(18)    A.   The matter was discussed with Bettina Lum at Price

(19) Okimoto Himeno & Lum. Ms. Lum also drafted the

(20) confidentiality agreement.

(21)    Q.   Okay. So is it your testimony that Ms. Lum approved

(22) of the use of these landscape credits?

(23)    MR. ING: Object to the form of the question,

misstates the witness' testimony.

(25)    THE WITNESS: This matter was discussed with Ms.

BSA     DEPOSITION OF WILLIAM MIELCKE TAKEN ON 04-29-05     XMAX(15/15)

## Page 57

Lum. She had full knowledge of the landscape credits. It was she who drafted the confidentiality agreement.

Did Mr. Stifler or I ask for a written legal opinion on that, no.

BY MR. REVERE:

Q. Oh, okay. All right. Let me show you the next exhibit here.

(Plaintiffs' Exhibit No. 5 was marked for identification.)

BY MR. REVERE:

Q. Mr. Mielcke, what we've marked as Exhibit 5 appears to be Addendum 1 to the Sales Contract for the Robertsons, and is that your signature under "Mauna Kea Development Corp."?

A. Yes.

Q. Okay. And do you rec --

A. On the first line?

Q. Yeah, right, sorry, under where it says "its secretary"?

A. Yes.

Q. Okay. And does this appear to be Addendum 1 to the Robertsons' sales contract?

A. Well, I don't know whether it's Addendum 1 or Addendum L or Addendum I or what, but it appears to be an addendum to the sales contract, yes.

Q. Okay. So is it your testimony that it was Bettina

## Page 58

Lum that drafted up this form?

A. As I recall, yes.

Q. Okay. All righty. I don't have any further questions on that.

(Plaintiffs' Exhibit No. 6 was marked for identification.)

BY MR. REVERE:

Q. If you could read this over, Mr. Mielcke, and let me know when you're done.

A. (Witness complies.) Okay.

Q. Okay. Have you ever seen this document before?

A. I may have. I don't specifically remember it, but I may have.

Q. Okay. Well, I'll represent to you that this is a letter that was written by Irwin Federman, who is a party to this case, and in the middle of his second paragraph there is a sentence that -- well, the middle paragraph reads as follows: "The listing price was $3 million, which we negotiated down to 2.550" -- 2.55 "million," and just stopping after that first sentence, do you recall if you were involved in the negotiations over the sales price of the Federman lot?

A. I'd have to go back and look at the Federmans' sales contract, and I don't remember the exact date of the Federman contract, but if you show me the contract, I'd be happy to take a look at it.

## Page 59

Q. Okay. Independent of reviewing the contract, you don't have any recollection about the negotiations with the Federmans?

A. I don't think I've ever met the Federmans.

Q. Okay. And I'm not saying that you directly spoke with them, but you might have been talking with Cha Cha Kohler.

Do you recall any discussions with Ms. Kohler about the Federman sale?

A. Normally I wouldn't check with the individual realtors, Mr. Revere, when an offer came in.

And we're talking about offer and acceptance now?

Q. Um-hum.

A. I mean, real estate is based on offer and acceptance.

Q. Um-hum.

A. When an offer came in or one of our realtors had an offer on for a lot, that offer would go to Tom Stifler. Tom would then bring the offer to Mr. Asari and myself, and we would discuss, we would discuss that offer, and usually Tom would have a recommendation, and Mr. Asari would discuss that with the other member of the board and we would make a -- we would come to a consensus as to whether we were going to counter the offer or whether we were going to reject the offer or whether we were going to accept the offer. And that's the

## Page 60

way it worked.

Q. Okay. And do you recall -- thank you for the answer.

Based on that process you have just described, do you recall any of that in regard to the Federman sale?

A. Not specifically.

Q. Okay. All right. The next sentence reads, "The discount is reflected on the statement as a landscaping credit of $450,000."

Do you see that sentence?

A. I do.

Q. Okay. Do you believe that sentence is accurate with regard to what the landscaping credit really was?

A. Well --

MR. ING: I'm sorry, what's the question?

THE WITNESS: What's the question?

BY MR. REVERE:

Q. Mr. Federman writes, "The discount was reflected on the statement as a 'landscaping credit' of $450,000," and so my question to you is: Is that basically accurate, that the landscaping credit was basically a discount?

MR. ING: Object to the form of the question, vague and ambiguous, misstates the witness' prior testimony.

THE WITNESS: It was a closing credit that was provided to the buyer to accelerate our sales at The Bluffs.

185

C E R T I F I C A T E

STATE OF HAWAII                    )

                                   )ss.

CITY AND COUNTY OF HONOLULU    )

        I, B. KANOELANI COCKETT, CSR, Notary Public,

State of Hawai'i, do hereby certify;

        That on April 29th, 2005, at 9:08 a.m. appeared

before me WILLIAM F. MIELCKE, the witness whose deposition is

contained herein; that prior to being examined he was

by me duly sworn;

        That the deposition was taken down by me in

machine shorthand and was thereafter reduced to

typewritten form under my supervision; that the foregoing

represents, to the best of my ability, a true and correct

transcript of the proceedings had in the foregoing matter.

        I further certify that I am not an attorney for

any of the parties hereto, nor in any way concerned with

the cause.

        Dated this 12th day of May 2005 in Honolulu,

Hawai'i.

_B. Kanoelani Cockett_____

B. KANOELANI COCKETT,

HI CSR NO. 379, CA CSR No. 7995

Notary Public, State of Hawai'i

My commission expires:  February 19th, 2009

**CASE:** WESTERN SUNVIEW PROPERTIES, LLC V. FEDERMAN **NO:** CV03-00463 DAE LEK

**DEPOSITION OF:** WILLIAM MIELCKE          **DATE TAKEN:** 04-29-05

## CORRECTION SHEET

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
|      |      | SEE ATTACHED CORRECTION SHEET |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |

(If additional space is needed, attach a blank sheet)

**Signature of Deponent:** _____          **Date:** _____

=======================================================

### CERTIFICATE

_xxx_  Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

_____  Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

_____  Please be advised that signature and/or corrections received are _not_ being filed with the deposition because they were received and/or signed after 30 days of notification.

_____  Please be advised that the above-named case is going to trial and/or hearing and the deponent has not read and signed the deposition before the filing of this transcript with the Court.

Dated: _6/8/2005        nt_____, Honolulu, Hawaii.

### RALPH ROSENBERG COURT REPORTERS

RECEIVED JUN 0 7 2005

CSR NO. 379

1001 Bishop Street, Suite 2460 American Savings Bank Tower, Honolulu, HI 96813 Ph: (808) 524-2090/Fax: 524-2596

MAY 1 2 2005

(12/03)

CASE: WESTERN SUNVIEW PROPERTIES, LLC V. FEDERMAN NO: CV03-00463 DAE LEK

DEPOSITION OF: WILLIAM MIELCKE          DATE TAKEN: 04-29-05

## CORRECTION SHEET

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 29 | 12 | After the sixth word "office" insert the word "who" | Clarification |
| 32 | 19 | Delete the eighth word "they" and insert the words "Belt Collins" | Greater accuracy |
| 32 | 20 | Delete the first word "engineering" and insert the word "engineers" | Greater accuracy |
| 44 | 23 | Delete the words "on our staff" and insert the words "in Hawaii" | Clarification |
| 51 | 9 | Delete the words "I'm just" and insert the words "I had" | Grammar |
| 82 | 9 | Delete the fourth word "looking" and insert the word "working" | Correction |
| 88 | 23 | Delete the words "in fact" | Correction |
| 89 | 1 | After the third word "that" delete the words "was just" | Correction |
| 117 | 13 | Delete the last word "Sheryl" and insert the word "Cheryl" | Correction |
| 117 | 14 | Delete the first word "Palish" and insert the word "Palesh" | Correction |
| 125 | 22 | Delete the words "something in" | Correction |
| 126 | 3 | After the third word "specifically" delete the word "take" and insert the word "till" | Correction |
| 138 | 7 | After the third word "review" delete the word "time" | Correction |
| 152 | 23 | After the third word "nor" delete the word "have" and insert the word "had" | Grammar |
| 154 | 6 | After the tenth word "know" insert the word "her" | Greater accuracy |
| 155 | 16 | After the second word "treatment" delete the words "plants to" and insert the word "plant" | Greater accuracy and correction |
| 159 | 8 | Delete the first word "Kona" and insert the words "South Kohala" | Greater Accuracy and correction |
| 160 | 23 | Delete the seventh word "and" | Correction |
| 169 | 13 | After the first word "remember" delete the words "what I serve on where" and insert the words "to which boards I serve on at what times" | Greater accuracy |
| 171 | 6 | Delete the second word "got" | Grammar |
| 174 | 9 | Delete the second word "in" and insert the words "on behalf" | Greater accuracy |
| 176 | 13 | Delete the words "I think" | Greater accuracy |

RECEIVED JUN 0 7 2005