"Buyer"), upon and subject to the terms and conditions hereafter set forth:

## ARTICLE I - GENERAL DESCRIPTION OF PROPERTY

1. Lot No. __6__ of The Bluffs at Mauna Kea, File Plan No. __2196__
2. Approximate Area of Lot: __48,020__ sq. ft.
3. Project Location: Ouli, Waimea, South Kohala, Hawaii
4. Tax Map Key No. (Third Division): 6-2-02:17 (por) 3/6-2-02-14-06

## ARTICLE II - BUYER INFORMATION

(Include all persons in whom title is to be vested. If title will vest in a corporation or partnership, indicate names and titles of officers authorized to execute documents, and if title will vest in a trust, indicate trustee(s) authorized to execute documents):

Print FULL name:

__Irwin Federman__

Address: __360 Walsh Road__
__Atherton, California 94027__

Tel No. (Res.) __(650)854-4457__ (Bus.) __(650)854-9080__

Social Security No.: __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__

Full name of spouse: __Concepcion Socarras Federman__

Title to include spouse: ( ) Yes ( ) No

Print FULL name: _____

Address: _____

Tel No. (Res.) _____ (Bus.) _____

Social Security No.: _____

Full name of spouse: _____

Title to include spouse: ( ) Yes ( ) No

Print FULL name: _____

Address: _____

Tel No. (Res.) _____ (Bus.) _____

Social Security No.: _____

Full name of spouse: _____

Title to include spouse: ( ) Yes ( ) No

E. If the Buyer is a corporation, partnership or trust, the Buyer must provide documentation satisfactory to Seller, evidencing the existence of such entity and good standing of such corporation or partnership and the authority of the entity to purchase the Property.

( ) trustee(s) of trust

## ARTICLE III - ESCROW AND PURCHASE PRICE

3.1 Purchase Price.

(a) Payment A (Deposit paid with this Agreement, by check payable to Escrow) ............................ $ __50,000__

(b) Payment B (Due fifteen (15) days after Buyer executes this Agreement) .................... $ __460,000__

(c) Payment C (Balance of Total Purchase Price due on the Scheduled Closing Date) ....... $ __2,040,000__

(d) TOTAL PURCHASE PRICE ... $ __2,550,000__

3.2 Estimate of Additional Sums To Be Paid:

(Due on the Scheduled Closing Date or at Preclosing as set forth in Sections 11.4 and 11.6 hereof, subject to adjustment for actual amounts payable.)

(a) Nonrefundable Project Start-Up Fee ............................ $ __500.00__

(b) Quarterly Bluffs Community Association Assessment ...... $ __1,106.00__

(c) Quarterly Master Association Assessment ............................ $ __271.00__

(d) Buyer's Share of Escrow Fees . $ __1,124.73__

(e) Title Insurance Fees ............ $ __2,930.00__

(f) Prorations and other costs as provided in Article XI hereof will be estimated at Closing or Preclosing.

NOTE: These amounts and any other amounts due under Article IV through XVI of this Agreement are in addition to and not part of the Total Purchase Price.

3.3 Escrow:  Title Guaranty Escrow Services
Hualalai Center
P.O. Box 1837
Kailua-Kona, Hawaii 96740
Attention: Janet Lum-Won
Escrow No.: _____

3.4 Interest on Deposit Funds. Buyer hereby waives the right to have Buyer's deposits placed in an interest-bearing account. Buyer and Seller instruct Escrow to credit any interest earned on Buyer's funds deposited with Escrow to Seller; provided that upon Buyer's written request to Escrow, and Buyer's payment of a $25.00 processing fee, and any other costs of setting up, maintaining and closing such account, Escrow shall establish a separate account for Buyer's funds, and except as otherwise provided herein, any interest earned on funds deposited in such account shall accrue to the credit of Buyer.

3.5 Scheduled Closing Date. Closing shall occur on or before February 1, 1996 (the "Scheduled Closing Date"), subject to the provisions of Section 11.1 hereof

MKR 01057

EXHIBIT 10

forth in Section 4.5 or as otherwise provided by law, and any other cancellation rights set forth herein the Seller agrees to sell and the Buyer agrees to purchase the Property described in Article I above and for the Total Purchase Price set forth in Section 3.1(a) above and upon and subject to all of the terms, conditions and provisions set forth in Articles I through XVI of this Agreement which by this reference are made a part hereof and incorporated herein for all purposes. BUYER ACKNOWLEDGES HAVING READ ALL OF ARTICLES I THROUGH XVI IN FULL.

**Receipt of Documents.** Buyer's obligation to purchase the Property is subject to Buyer's review and approval of the final Project Documents in accordance with Section 8.1 hereof. Buyer shall have at least twenty (20) calendar days to review the Project Documents, as provided in Section 8.1 hereof.

**Buyer's Rights Cancel.** Buyer has a seven-day period, after signing this Agreement to rescind this Agreement at no penalty to Buyer, as set forth in the "Receipt for Written Notice of Rescission Right" executed by Buyer concurrently herewith, and to be deposited with Escrow together with this Agreement. In the event that the Public Offering Statement for the Project is amended, Buyer shall also have a seven-day period, after receipt of the amended Public Offering Statement, to cancel this Agreement and receive a refund of all sums paid by Buyer, without penalty.

.6 **Additional Disclosures made part hereof.**
.7 **Addendum #1 Handscaping & Grading made part hereof.**

___Kevin Federman___  
Buyer (Print Name)

___Conception Boomerar Federman___  
Buyer (Print Name)

Buyer (Print Name)

Date: 12/27/98  
(Signature) _Conception S. Federman_  
(Signature)  
(Signature)

Time:

808-987-3300  
Phone Number  
Facsimile Number

808-882-7000  
Phone Number  
Facsimile Number

Phone Number  
Facsimile Number

Phone Number  
Facsimile Number

**DEPOSIT RECEIPT:**

The Broker hereby acknowledges receipt of Payment A, in the form of a check payable to Escrow, which is required to be paid pursuant to Section 3.1(a) above.

MAUNA KEA PROPERTIES, INC.,
dba Mauna Kea Realty, as Broker

By ___Kathrin G. Kohler___  
Sales Representative

Approved by: ___xxx Stifler___  
Principal Broker

N/A xxx  
Cooperating Broker

N/A xxx  
Commission Cooperating Broker

N/A  
Cooperating Sales Representative

**ACCEPTANCE BY SELLER:**

The Seller hereby accepts this Agreement on this 28 day of December, 19 98.

MAUNA KEA DEVELOPMENT CORP.

By _____  
Its Secretary  
Title

MKR 01058

be amended.

6. "Developer" means Mauna Kea Properties, Inc., its successor and assigns, as developer of the Project, pursuant to unrecorded Development Agreement dated October 15, 1993.

7. "Effective Date" means the date on which Seller executes this Agreement.

8. "Escrow" means Title Guaranty Escrow Services, Inc., its successors and assigns, as described in Section 3.3 hereof.

9. "Escrow Agreement" means the Escrow Agreement dated September 10, 1996, executed by Seller and Escrow, for the closing of sales of lots in the Project, as the same has been or may hereafter be amended.

10. "File Plan Map" means the subdivision map entitled "The Bluffs at Mauna Kea", recorded or to be recorded in the Bureau of Conveyances of the State of Hawaii.

11. "Master Association" means the Hapuna Community Association established pursuant to the Master Declaration.

12. "Master Declaration" means the Declaration of Protective Covenants, Conditions and Restrictions for Hapuna Resort, dated October 15, 1993, recorded in the Bureau of Conveyances of the State of Hawaii, as Document No. 94-032238, as the same has been or may hereafter be supplemented and amended.

13. "Lot" means the Lot in the Project described in Article 1 of this Agreement.

14. "Occupants" means the Buyer, and Buyer's family, tenants, lessees, servants, guests, invitees, licensees, agents, employees, and other persons who may use or occupy the Property or the Project by, through or under the Buyer, or any one of them.

15. "Project" means the project known as "The Bluffs at Mauna Kea" as described in Section 6.1 hereof.

16. "Project Documents" means this Agreement, The Bluffs Declaration, the Master Declaration, the Deed, the Design Requirements, The Bluffs Homeowners' Rules, the Escrow Agreement, and other related documents and agreements included in the Project Document Book to be provided to Buyer by Seller in accordance with Section 8.1 hereof, as said documents may be amended from time to time in accordance with Section 8.2 hereof.

17. "Property" means all of the property described in Section 6.2 hereof.

18. "Seller" means Mauna Kea Development Corp., its successors and assigns.

project located at Ouli, Waimea, South Kohala, Hawaii, to be known as "THE BLUFFS AT MAUNA KEA" (the "Project"), consisting of twenty-two (22) separate single-family residential lots, roadways and open area designated as common area, as shown on the File Plan Map. The Project does not include Lot 29 as shown on the File Plan Map, but The Bluffs Community Association has a non-exclusive easement for pedestrian access purposes over and across said Lot 29, for the benefit of all owners of lots in the Project.

6.2. Legal Description of Property. Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller, upon and subject to all of the terms and conditions of this Agreement, all of the following (the "Property"):

(a) The Lot in the Project described in and containing the approximate total area set forth in Article 1 above.

(b) Together with the right in the nature of a non-exclusive easement, to be used in common with others, for roadway, utility and other reasonably related purposes over, under, through and across the "Entry Road", as more particularly described in that certain Grant of Easement made by South Kohala Resort Corp. in favor of Mauna Kea Development Corp., dated October 15, 1993, recorded in said Bureau of Conveyances as Document No. 94-032235; provided, however, that said easement shall be automatically cancelled and terminated in part or whole upon recordation of a deed covering any portion of the Entry Road in favor of the County of Hawaii, State of Hawaii, or any other appropriate governmental entity.

(c) Together also with all rights and privileges set forth in the Master Declaration, including the appurtenant right and non-exclusive easement of access and enjoyment in and to any common areas described in the Master Declaration, including a perpetual non-exclusive easement and access rights under the Queen Kaahumanu Highway and over and across "Easement C", together with limited access rights over and across Boundaries "J" and "K", all as more particularly described in and in accordance with the provisions of that certain Grant of Easement (Underpass Easement) made by South Kohala Resort Corp. in favor of the Master Association dated October 15, 1993, recorded in said Bureau of Conveyances as Document No. 94-032237.

(d) Together also with all rights and privileges set forth in The Bluffs Declaration, including the appurtenant right and nonexclusive easement of access and enjoyment in and to any common areas described in The Bluffs Declaration.

3

MKR 01059

MKR 01060

[...] the Sellers and obligations set forth therein, Buyer hereby authorizes and instructs Escrow to comply with the terms of the Escrow Agreement and to disburse all deposited funds in accordance with the provisions thereof.

7.2  **Payment to Escrow.** All payments required to be made by Buyer hereunder shall be made directly to Escrow in accordance with Section 7.1 hereof, except for Payment A specified in Section 3.1 (a) hereof, which shall be made payable to Escrow but held by Broker in accordance with Section 4.2 hereof.

7.3  **Interest on Buyer's Deposits.** Unless Buyer has instructed Escrow to set up a separate account, and has paid Escrow any processing and other fees in accordance with Section 3.4 hereof, any and all interest received by the Seller or Escrow on any of Buyer's deposits shall accrue to the Seller. Whenever Escrow shall be directed to refund any monies to Buyer, such refund shall be made without interest thereon, unless a separate account has been established for Buyer in accordance with Section 3.4 hereof.

7.4  **Buyer's Financial Capability.** Buyer represents that Buyer is financially capable of making, when due, all of the required payments set forth in Article III above at the times therein provided. Buyer further represents that the personal financial information to be submitted in connection with this Agreement to Seller or any prospective mortgage lender shall be true and accurate. Buyer agrees to notify Seller immediately of any material negative change which occurs in the Buyer's financial condition prior to the Closing Date. Buyer's failure to do so shall constitute a representation by Buyer that such financial condition has not materially negatively changed before the Closing Date. By executing this Agreement, Buyer agrees that Seller and any prospective mortgage lender are authorized to make credit inquiries about the Buyer insofar as Seller or the mortgage lender deems it necessary or appropriate to verify the Buyer's financial condition and capability to consummate this Agreement, and Buyer further agrees that, at Seller's request, Buyer shall confirm such authority promptly and in writing.

7.5  **Evidence of Buyer's Financial Capability.** Within thirty (30) days after the date Buyer executes this Agreement, or such longer period of time permitted by Seller, Buyer (a) shall deliver to Seller, written evidence reasonably satisfactory to Seller, of Buyer's ability to pay the Total Purchase Price and all other amounts payable hereunder at Closing, including without limitation, Buyer's financial statement, bank references and account information and any loan commitments for any portion of the Total Purchase Price intended to be financed; and (b) if

1.4  **No Present Transfer.** This Agreement shall not be construed as a present transfer of any interest in the Property but only as an agreement to transfer in the future.

1.5  **Obligation to Construct Improvements.** Buyer agrees that Buyer, at its sole cost and expense, (a) shall submit to the Design Committee established pursuant to Article VIII of The Bluffs Declaration within forty-eight (48) months after the Closing Date, plans and specifications for the construction of a single-family residential dwelling and related improvements on the Lot; and (b) shall complete construction of the single-family residential dwelling and related improvements on such Lot within sixty (60) months after the Closing Date, in accordance with the approved plans and specifications and other requirements imposed by the Design Committee. After completion of such construction, Buyer shall at all times keep and maintain in good condition and repair the approved single-family residential dwelling and related improvements on Buyer's Lot in accordance with The Bluffs Declaration, except for the actual time necessary for construction of any approved replacement structure.

1.6  **Approval of Plans.** Buyer understands and agrees that no such single-family residential dwelling and related improvements, building or other improvements may be constructed on the Lot except in accordance with Article VIII of The Bluffs Declaration and the Design Requirements, copies of which have been provided to Buyer in the Project Documents, as the same may be amended from time to time. Buyer acknowledges that Buyer has had the opportunity to examine and read The Bluffs Declaration and the Design Requirements and hereby approves and accepts the same. Buyer agrees with Seller that Buyer will comply with all requirements set forth in The Bluffs Declaration and the Design Requirements.

**Importance of Construction Requirements.** Buyer understands that Buyer's agreement to construct the required improvements on the Lot in accordance with the Design Requirements and within the time permitted, is of material importance to the Seller and the Developer, because of their overall plans for development of the area in which the Project is located. Buyer also understands that because of the impact of the Project on surrounding resort and development activities, the failure of the Buyer to comply with such requirements will have a substantial negative effect on the Developer and the Seller, although it would be difficult to calculate the actual amount of damage suffered. Buyer thus agrees that in addition to any other reme-

4

closing, then in any of the foregoing events, Seller may terminate this Agreement, at Seller's sole option, by delivering to Buyer and Escrow written notice of such termination. Upon such termination by Seller, Seller shall instruct Escrow to refund all deposits theretofore paid by Buyer hereunder to Buyer, less all Termination Costs, and neither Buyer nor Seller shall have any further rights, obligations, or liabilities hereunder; and Seller may sell the Property to any other person. Unless Seller decides, in its sole discretion, to cancel this Agreement for any such reason, Buyer shall not be released from any liability or obligation to Seller under the terms of this Agreement by reason of Buyer's financial condition or any changes therein.

### ARTICLE VIII - PROJECT DOCUMENTS AND SELLER'S RESERVED RIGHTS AND POWERS.

8.1 Buyer's Acceptance of Documentation. Buyer acknowledges having had a full opportunity to review the most current drafts of the File Plan Map, all other subdivision maps and/or file plans for the Project, and the Project Documents, all of which are available for inspection in the Broker's sales office. Seller will provide Buyer with copies of the final Project Documents in a "Project Document Book" within twenty (20) calendar days after a "Final Order of Registration" has been entered for the Project by the Director of Commerce and Consumer Affairs, and Buyer's obligations under this Agreement are subject to the review and approval of the final Project Documents in the Project Document Book by Buyer and/or Buyer's attorneys for a period of twenty (20) calendar days after Buyer's receipt of the Project Document Book. If Buyer disapproves any of the Project Documents, Buyer shall have the right to cancel and terminate this Agreement by providing written notice of such termination to Seller and Escrow within said 20-day period, and upon such termination, Seller shall instruct Escrow to refund all deposits previously made by the Buyer hereunder, together with any accrued interest thereon, less all Termination Costs, and neither party shall have any further rights, obligations or liabilities hereunder, and Seller may sell the Property to any other person. If Buyer does not provide such written notice to Seller and Escrow within said 20-day period, Buyer shall be deemed to have approved all Project Documents, and Buyer shall have no further right to terminate under this Section 8.1. Buyer understands and agrees that this sale is in all respects subject to the Project Documents, all of which are incorporated herein as part of this Agreement, subject to the Seller's right to amend the same as provided in Section 8.2 hereof.

8.2 Seller's Right to Amend Documents. Seller reserves the right to change the Project Documents and any other documents as provided herein, and Buyer hereby autho-

8.3 Power of Attorney. Buyer hereby irrevocably appoints Seller as Buyer's attorney-in-fact, coupled with an interest, to execute any documents reasonably necessary or convenient to implement the provisions of Section 8.2, or any requirements which may be imposed by any governmental agency in connection with the Project.

8.4 Authority of Seller. Buyer acknowledges that Seller hereby reserves the right, as the present owner of the lots and common areas of the Project, the sale of which has not yet closed, to exercise all powers of The Bluffs Community Association attributable to each lot in the Project (including the Property which is the subject of this Agreement) until the recordation of a deed conveying Seller's interest in such lot.
Buyer agrees that the Seller may exercise all rights and incidents of membership in The Bluffs Community Association attributable to each lot in the Project (including the Property which is the subject of this Agreement) until the recordation of a deed conveying Seller's interest in such lot.

8.5 Managing Agent and Other Contracts. Buyer agrees that Seller may select the initial managing agent of the Project ("Managing Agent") and enter into a management contract on behalf of The Bluffs Community Association and that, although employed prior to the election of The Bluffs Community Association's Board of Directors, the Managing Agent shall have complete authority, subject to the provisions of The Bluffs Declaration and the By-Laws, of The Bluffs Community Association to assume full control and responsibility for the management, operation and maintenance of the Project at the expense of The Bluffs Community Association. If the Seller or any affiliate of the Seller acts as the first Managing Agent, then the contract shall not exceed one (1) year and shall also contain a provision for termination by either party upon thirty (30) days written notice. Buyer also agrees that Seller, prior to the recordation of Buyer's Deed, may enter into other contracts, licenses and concessions as Seller determines, in its sole discretion, to be necessary or desirable for the management, operation or maintenance of the Project.

### ARTICLE IX - TITLE

9.1 Title Information. The information appearing in Article II above will be used for preparing the Deed, closing statement and other necessary documents. Buyer shall inform the Seller and Escrow immediately if any of such information is changed. If, as a result of Buyer's failure to provide correct information, the Deed, closing statement or any other necessary document is prepared incorrectly and must be redrafted, Buyer agrees to pay all costs involved in such redrafting.

5

this Agreement, the Deed, and the Project Documents, and (b) nondelinquent taxes and assessments.

## ARTICLE X - BINDING EFFECT AND CANCELLATION OF AGREEMENT

10.1 Acceptance By Seller. Signing of this Agreement by the sales representative acknowledges receipt of the deposit paid with this Agreement and does not constitute acceptance by the Seller. This Agreement shall not be in force and effect until such time as the same has been executed by Seller, which execution shall be deemed to be the acceptance of this Agreement by Seller and the date of which execution shall be deemed to be the effective date hereof.

10.2 Buyer's Death. In the event that any one or more of the persons listed as Buyers in Article II above, should die prior to Closing, Seller shall have the right in its sole discretion (but is not obligated) to cancel and terminate this Agreement by written notice to Escrow and to the Buyer's representative. Upon such termination by Seller, Seller shall instruct Escrow to refund all deposits theretofore paid by Buyer hereunder to Buyer's representative, less all Termination Costs, and neither Seller nor Buyer (including Buyer's estate and legal representatives) shall have any further rights, obligations or liabilities hereunder, and Seller may sell the Property to any other person.

10.3 Seller's Right to Cancel. In the event that development of the Project is substantially delayed due to any governmental restrictions, regulations, permit requirements, or other governmental action, or due to any other reason beyond the reasonable control of Seller, and Seller determines that the Project is no longer feasible, Seller shall have the right to cancel and terminate this Agreement at any time prior to Closing, by providing written notice of such cancellation to Buyer and Escrow. Upon any such cancellation by Seller, the Buyer shall receive a refund of all deposits theretofore made hereunder, and neither Buyer nor Seller shall have any further rights, obligations or liabilities hereunder.

10.4 Condemnation. In the event that there is any taking by eminent domain of the Project or the Property or any substantial portion thereof prior to the Closing Date, this Agreement may be cancelled and terminated by Seller upon written notice to Buyer and Escrow. Upon any such termination, Seller shall instruct Escrow to refund all deposits theretofore paid by Buyer hereunder, together with any interest accrued thereon, less all Termination Costs, and neither Seller nor Buyer shall have any further rights, obligations or liabilities hereunder. Buyer understands and agrees that any taking by eminent domain of an easement or other limited right

must submit plans and specifications to the Design Committee for approval within forty-eight (48) months after the Closing Date and must complete construction of an approved single-family residential dwelling and related improvements on the Lot within sixty (60) months after the Closing Date; and (e) that substantial delay fees may be payable if Buyer fails to complete construction within the time permitted as provided in Section 6.7 hereof. The Seller will pay all operating costs of The Bluffs Community Association (including amounts payable to the Master Association) until such time that Seller has notified the Association of the date certain when the Association will become responsible for such costs (the "Assessment Date"), at which time the Association will commence collecting assessments from all lot owners.

3. Master Declaration. Buyer acknowledges that the Master Declaration provides that all present and future lot owners within the Project and the owners' employees, tenants, guests and invitees are subject to the Master Declaration. The Master Declaration provides, among other things, that the Buyer, automatically and without further action on Buyer's part, becomes a member of the Master Association upon delivery of the Deed to Buyer, and that the Buyer must pay assessments to the Master Association (through The Bluffs Community Association), in an amount equal to a pro rata share of the operating costs and expenses of the Master Association, including, without limitation, the Master Association's share of costs and expenses incurred in connection with the Hapuna Resort Entry Road, the security station located on the Hapuna Resort Entry Road near its intersection with the Queen Kaahumanu Highway and the security patrol serving The Bluffs and other areas, all as more fully set forth in the Master Declaration.

Title Insurance. Buyer agrees to purchase a standard form Hawaii owner's policy of title insurance, or such joint protection policy of title insurance as Buyer and Buyer's mortgagee, if any, shall have agreed upon. Buyer shall be free to purchase such title insurance from any title insurer authorized to do business in the State of Hawaii.

Easements. Buyer acknowledges that pursuant to The Bluffs Declaration, Seller and its affiliates have certain non-exclusive easements for access purposes over and across the roadways and all common areas in the Project, and for drainage purposes over and across the drainage facilities located within the Project. Seller also reserves, and Buyer understands and acknowledges that Seller and its successors and assigns shall have the right at any time, if necessary or desirable, to designate easements for drainage and drainlines, waterlines, electrical,

6

MKR 01062

to make all payments necessary to close (other than mortgage loan proceeds), (b) to execute all documents required for Closing, including, without limitation, the Deed, promissory note, mortgage and other loan documents necessary for Buyer's financing of Buyer's purchase of Buyer's Lot, if applicable, the Conveyance Tax Certificate and a closing statement based on Seller's estimate of the Closing Date, and (c) to complete all other actions necessary to close. This Agreement shall constitute Seller's and Buyer's written authority to Escrow to date all documents and adjust the estimated prorations in accordance with the provisions of this Agreement.

11.7 Escrow. At Closing, Escrow will date all documents as of the Closing Date if such documents have not already been dated. Escrow will adjust the proration of taxes and assessments according to the actual Closing Date and notify Buyer and Seller as to the final amounts, which Buyer and Seller agree to pay. Upon receipt of all necessary documents and all funds required to be paid by Buyer hereunder, Escrow shall record in the Bureau of Conveyances of the State of Hawaii the Deed and any mortgage in favor of Buyer's lender. Escrow will deliver any promissory note received for a portion of the Total Purchase Price to the payee named therein. Escrow shall pay all costs and shall pay to Seller all of the Total Purchase Price and additional sums to be paid which Seller is entitled to receive, less costs and expenses payable by Seller. Escrow shall not close until Escrow has received a commitment from a title company authorized to do business in the State of Hawaii and approved by Buyer, to issue a Hawaii owner's policy of title insurance to Buyer, insuring the Buyer's interest in the Property free and clear of all liens, encumbrances and claims against the Property, except those mentioned in this Agreement and the Project Documents.

11.8 Real Property Taxes and Assessments; Inspection of Property. Real property taxes, maintenance charges and other prorations shall be made by Escrow, and risk of loss shall transfer from Seller to Buyer on the Closing Date. Inspection by Buyer of the Project or the Property shall not be a condition to Closing.

11.9 Buyer's Possession of the Property. Buyer shall not be entitled to actual possession of the Property until Buyer has made all payments required to be paid hereunder and has executed all documents relating to the purchase, and Buyer has performed the remaining terms and conditions of this Agreement which are required to be performed as of the Closing Date. Delivery of possession shall not occur prior to Escrow's recordation of the Deed.

Director of Commerce and Consumer Affairs of the State of Hawaii has entered a final order registering the Project, and the requirements of Sections 484-8.7 and 484-8.6 (b) and (c) of the Hawaii Revised Statutes have been met, and Seller may from time to time delay the Scheduled Closing Date as necessary to obtain such final order or to comply with such requirements, or any other applicable governmental rules, regulations or requirements.

2 Seller's Responsibilities at Closing. On or prior to the Scheduled Closing Date, Seller shall execute and deliver to Escrow the Deed, and authorize Escrow to disburse all closing costs payable by Seller pursuant to Section 11.5 hereof.

3 Buyer's Responsibilities at Closing. On or prior to the Scheduled Closing Date, Buyer shall execute and deliver to Escrow all documents which Buyer is required to execute in order to close, including, without limitation, the Deed and any note and mortgage in favor of Buyer's lender. Buyer shall also pay to Escrow, by cashier's or certified check or other "good funds" acceptable to Escrow, any cash payment required on account of the balance of the Total Purchase Price and other amounts payable by Buyer hereunder, and all closing costs and prorations payable by Buyer pursuant to Section 11.4 hereof.

4 Buyer's Closing Costs. Buyer agrees to pay one-half (1/2) of the Escrow fee, the full cost of a Hawaii standard owner's policy of title insurance and of any additional title insurance requested by Buyer or its lender, all costs incurred in connection with any loan obtained by Buyer (including the costs of preparing the promissory note and mortgage, and any points, fees, or other expenses payable to Buyer's lender, and all appraisal fees and charges for Buyer's credit report), all recording costs for the Deed and any mortgage, Buyer's notary fees and all costs of long distance telephone calls, mailing, air courier and other delivery charges. Buyer will also pay all prepaid real property taxes and assessments, if any (prorated as of the Closing Date), and the estimated amount of the first quarterly assessments payable to The Bluffs Community Association and the Master Association (which will be applied by the Managing Agent to the first quarterly assessments payable by Buyer after the Closing Date).

Buyer shall also pay the nonrefundable and nontransferable start-up fee for the commencement of operations of the Project and The Bluffs Community Association by the Managing Agent, in the amount specified in Article III above. The start-up fee shall be a one-time assessment at the time of sale. The start-up fee shall be held, accounted for and expended by the initial Managing

MKR 01063

7

vicinity of the Project; and (c) Seller reserves the right for itself, its sales representatives and prospective buyers to utilize the common areas of the Project for ingress and egress purposes (collectively (a), (b) and (c) above are called the "Development Conditions"). Buyer hereby accepts the Development Conditions set forth in this Section 12.1 as well as any inconvenience or annoyance which Buyer may experience as a result of such conditions and hereby expressly waives any rights, claims or actions which Buyer might otherwise have against Seller or third parties as a result of such circumstances. Buyer hereby covenants and agrees to assume all risks of impairment of the use and enjoyment of the Project and the Property, loss of market value of the Property, and property damage, personal injury, bodily injury or death arising out of or in connection with the Development Conditions, and Buyer shall indemnify and hold harmless Seller, Developer, Broker, their affiliates and all of their respective officers, directors, employees, agents, successors and assigns, from any and all liabilities, actions, claims, losses, damages, costs or expenses, including attorneys' fees, arising out of or in connection with such impairment of the use and enjoyment of the Project and the Property, loss of market value of the Property, or property damage, personal injury, bodily injury or death, to the property or person of Buyer or any Occupants arising out of or in connection with the Development Conditions. Buyer hereby irrevocably agrees to suffer and permit all actions and consequences incidental to the Development Conditions.

2.2 Condition of Property. Buyer understands and acknowledges that Buyer will be acquiring the Property "AS IS", in its present state and condition at the time of Closing. Notwithstanding any provision contained in this Agreement to the contrary, Buyer is relying and will rely solely upon Buyer's own inspection and investigation of the Property, and is not relying and will not rely in any way upon any representations, statements, warranties, or other information or material furnished by Seller, Developer, Broker or their respective representatives, whether written or oral, express or implied.

:.3 Golf Course and Resort Operations. Buyer understands and agrees that the Project is adjacent to two golf courses, which are owned and operated by Seller and/or Seller's affiliates, that there are golf cart path easements over and across portions of the roadways included in the common areas of the Project, and that resort-related activities, including without limitation golf tournaments, and other events may be held on and in the vicinity of such golf courses. Buyer acknowledges and understands

agents, successors and assigns, from any actions, liabilities, claims, losses, damages, costs or expenses including attorneys' fees, arising out of or in connection with such property damage, personal injury, bodily injury or death, to property or person of Buyer or any Occupants. Buyer hereby irrevocably agrees to suffer and permit all actions and consequences incidental to the construction, maintenance, operation and use of the golf courses and golf cart path easements and to the carrying out of all golf course related operations and resort related activities thereon.

12.4 Archeological Sites/Burial Easement/Pedestrian Easement. Buyer acknowledges and understands that portions of The Bluffs and areas adjacent to The Bluffs are subject to certain archeological restrictions, archeological setbacks, preservation plans, pedestrian access easements, easement and access agreements, and other easements, including the following:

(a) archeological setbacks and archeological sites nos. 5629, 5630 and 8018, as shown on the File Plan Map (the "Archeological Sites"), and as described in that certain plan dated September 1996, prepared by Paul H. Rosendahl, Ph.D., Inc. (the "Preservation Plan");

(b) that certain In Situ Burial Easement Agreement, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. 93-199811 ("Easement Agreement"); and

(c) the six foot wide pedestrian access easement (the "Pedestrian Easement") located within and/or adjacent to The Bluffs, as shown on the File Plan Map, and as described in that certain Settlement Agreement dated July 31, 1981, filed in the Civil Nos. 3072, 4961 and 5935, Circuit Court of the Third Circuit, State of Hawaii, on August 3, 1981 (the "Settlement Agreement").

Buyer shall comply with all requirements and restrictions of the Preservation Plan, the Easement Agreement and the Settlement Agreement which may be applicable to Buyer, and shall not take or permit any action which is inconsistent with the obligations of Seller, Developer or any of their Affiliates under the Preservation Plan, Easement Agreement or Settlement Agreement, or otherwise with respect to the Archeological Sites or Pedestrian Easement, and/or their obligations with respect thereto.

12.5 Survival of Covenants and Agreements. All of the provisions set forth in this Article XII, among other things, shall be included in the Deed, and Buyer agrees to include such provisions in any subsequent conveyance of the Property. Buyer and Seller agree that all

MKR 01064

of Seller's notice, Seller shall have the right, as its option, to CANCEL THIS AGREEMENT BY GIVING TO BUYER AND ESCROW WRITTEN NOTICE OF CANCELLATION. SELLER MAY THEN KEEP ALL SUMS DEPOSITED BY BUYER (INCLUDING ANY AND ALL INTEREST ACCRUED THEREON) AS "LIQUIDATED DAMAGES", IN LIEU OF ACTUAL DAMAGES, AS THE AMOUNT AGREED TO BY BUYER AND SELLER AS PROPERLY PAYABLE IN SETTLEMENT FOR BUYER'S BREACH OF CONTRACT AND NOT AS A PENALTY. BUYER AGREES TO THIS LIQUIDATED DAMAGES PROVISION BECAUSE IT WOULD BE DIFFICULT TO CALCULATE THE AMOUNT OF LOSS OR DAMAGE THAT SELLER WOULD SUFFER IN THE EVENT OF BUYER'S DEFAULT BECAUSE OF A NUMBER OF FACTORS INCLUDING (a) THE NATURE OF THE REAL ESTATE MARKET IN HAWAII, (b) SELLER'S FINANCIAL COMMITMENTS WITH RESPECT TO THE PROJECT, (c) THE DIFFICULTIES IN APPORTIONING TO THE PROPERTY A FAIR SHARE OF SELLER'S COSTS RELATING TO THE DEVELOPMENT OF THE PROJECT, AND (d) THE DIFFICULTY IN DETERMINING THE EFFECT OF DEFAULT AND CANCELLATION OF THIS SALE ON OTHER SALES OF LOTS WITHIN THE PROJECT BY SELLER. AS A REASONABLE ESTIMATE OF SELLER'S FAIR COMPENSATION FOR ANY DAMAGES RESULTING FROM SUCH DEFAULT BY BUYER, THE PARTIES AGREE THAT THE SUMS PAID BY BUYER HEREUNDER SHALL BELONG TO SELLER AS LIQUIDATED DAMAGES. IT IS UNDERSTOOD THAT THE DAMAGES SUFFERED BY SELLER BY VIRTUE OF A DEFAULT BY BUYER LATER IN TIME, WILL LIKELY BE GREATER THAN SUCH A DEFAULT OCCURRING AT AN EARLIER POINT IN TIME. Seller may, in lieu of retention of such sums as liquidated damages, pursue any other remedy at law or in equity for specific performance, damages, or otherwise, and all costs, including reasonable attorneys' fees incurred by Seller shall be paid by Buyer.

13.2 **Default By Seller.** In the event that Seller shall fail to perform any of its obligations required hereunder to be performed by Seller, and such failure continues for a period of 30 days after Buyer provides written notice to Seller of such failure, Buyer may cancel this Agreement or bring a lawsuit against Seller for specific performance of this Agreement. If Buyer intends to cancel this Agreement by reason of Seller's default, Buyer shall deliver to Seller and Escrow written notice of such cancellation. Upon such cancellation, Buyer shall be entitled to receive a refund of all sums paid hereunder by Buyer.

## ARTICLE XIV - PRIORITY/ASSIGNMENT

14.1 **Seller's Lender Has Priority.** Seller has given or may give to one or more lenders ("Seller's Lender") a mortgage or SIGNED DEED TO THE BUYER. Buyer also consents to Seller's assignment by way of security of Seller's interest in this Agreement and Buyer's escrow deposits to Seller's Lender and agrees that in the event of passage of Seller's interest therein pursuant to said assignment, that Buyer will, at the option of Seller's Lender, perform to, attorn to and recognize the Seller's Lender (and its successors and assigns) as Seller hereunder, with all of the rights of Seller hereunder, all as if the Seller's Lender were the original Seller hereunder.

14.2 **Subordination Agreements.** At the request of Seller's Lender, Buyer will execute and deliver other documents to confirm the promises and agreements which Buyer is making in Section 14.1 hereof. If Seller's Lender takes the place of the Seller and wants the Buyer to perform its obligations under this Agreement, Buyer will observe and perform all of Buyer's promises and agreements contained in this Agreement. Buyer understands that before the final Closing and delivery of the signed Deed to the Buyer, the Seller's Lender will have the right, under circumstances described in the mortgage(s), security agreement(s) or other loan documents, to file suit to collect the loan funds and other amounts and have the Project, including the Property, sold at foreclosure or other sale. Buyer agrees that under this Agreement, Buyer has no rights or interests in the Property or the Project other than a contractual right enforceable only against the Seller and not the Property or the Project. If Seller's Lender files suit to collect its loan funds or other amounts owing to it or to have the Project sold as aforesaid, the Seller's Lender does not have to name Buyer as a party to the lawsuit or notify Buyer of the lawsuit or sale.

14.3 **Assignment By Buyer.** Buyer acknowledges and agrees that Buyer may not, without first obtaining the written consent of Seller, which consent may be withheld by Seller in its sole and absolute discretion, (a) assign or transfer this Agreement or any rights hereunder, (b) add any additional person or persons as a Buyer under this Agreement, (c) substitute any person or persons as a Buyer under this Agreement, or (d) delete any person as a Buyer under this Agreement. Any attempt by Buyer to do any of the aforementioned acts without the consent thereto by Seller shall be void and shall not have any legal effect. If Buyer undertakes any such action, then Buyer will be deemed to be in default of its obligations under this Agreement and Seller, at its sole option, may terminate this Agreement as provided in Section 13.1 hereof.

14.4 **Assignment by Seller.** Buyer agrees that Seller, without having to obtain the consent of Buyer, may assign or transfer this Agreement and its rights and obligations

9

MKR 01065

must be performed exactly on time.

16.4 **Entire Agreement.** This Agreement constitutes the entire agreement between Buyer and Seller and supersedes and cancels all prior and contemporaneous negotiations, representations, understandings and agreements, both written and oral, of Buyer and Seller. No variations of this Agreement shall be valid or enforceable unless approved by Seller and Buyer in writing, it being understood that no implied covenant or verbal agreement or representation by or on behalf of Seller or Buyer shall be held to vary the provision hereof, any law or custom notwithstanding. No salesperson, employee or agent of Seller is authorized or empowered to bind Seller to any representation or agreement not expressly set forth herein or in any such addendum.

16.5 **No Interest in Land.** This Agreement shall be valid only as a personal contract between Buyer and Seller, and Buyer shall not have any interest in the Property until recordation of the Deed.

16.6 **Joint Buyers.** If there is more than one person listed as Buyer in Article II hereof, then each such person will be jointly and severally responsible for fulfilling all of the promises and agreements of Buyer contained in this Agreement. Seller may enforce all rights of Seller under this Agreement against each such person individually or against all of such persons together.

16.7 **Survival of Covenants and Indemnities.** Except to the extent fulfilled at or prior to the Closing Date, all covenants, terms and conditions of this Agreement shall survive the Closing, and all representations, warranties and indemnities by Buyer to Seller or by Seller to Buyer, shall survive the conveyance of the Property and be binding upon and inure to the benefit of Seller and Buyer and their respective heirs, devisees, personal representatives, successors and assigns.

16.8 **Disclaimer.** Nothing contained in this Agreement, nor any advertising or other documentation in connection with the Project, shall be construed as obligating Seller, Developer or any other person to develop any land other than the land on which the Project is located and described in The Bluffs Declaration, or to construct any improvements, including any recreational facilities, other than the improvements described herein and in The Bluffs Declaration; nor as obligating Seller to annex to the Project any land located on the Island of Hawaii near or in the vicinity of the Project; nor as granting to or obtaining for Buyer membership or any other interest in any entity, club, association or facility (recreational or otherwise) other than the Project, except as provided in Section 15.2 hereof.

pool, health club, exercise trail and beach services. Members of The Club are also extended guest charging privileges at these facilities and at Hotel restaurants and shops. Members have NO EQUITY INTEREST in any of the Hotels or Golf Course assets or facilities, and the facilities available for use by members of The Club may be changed from time to time in the sole discretion of the Hotels. There is no Board of Governors elected by the membership, and all membership fees, charges and facilities use restrictions are subject to change at the discretion of the Hotels.

15.2 **Buyer's Right to Join The Club.** Seller agrees that (a) so long as Buyer is an owner of the Property, and so long as affiliates of Seller own the Mauna Kea Beach Hotel and the Hapuna Beach Prince Hotel and operate The Club, Seller will cause one membership in The Club to be made available for purchase by Buyer subject to such restrictions and limitations in use, fees, rates, charges and rules and regulations as The Club or the Hotels may impose from time to time on all members, and (b) in the event of the sale of either the Mauna Kea Beach Hotel or the Hapuna Beach Prince Hotel, or both, Seller will use its best efforts to cause the purchaser of the Mauna Kea Beach Hotel and/or the Hapuna Beach Prince Hotel to assume such obligation to make available such membership to Buyer; provided, that upon such sale, Seller shall be released from all obligations to Buyer with respect to The Club and shall have no further liability under this Section 15.2. This right of membership shall be available only to an owner of the Property, and if Buyer sells, assigns, subleases (for a term exceeding one year) or otherwise conveys Buyer's interest in the Property to another person, then this right shall transfer to such person and Buyer shall no longer have this right. If the Property is owned by more than one natural person, or if the Property is owned by a corporation or other entity, a limited number of such joint owners and directors or officers of such corporation may be eligible for membership in accordance with the rules and regulations of The Club. Seller's obligations under this Section 15.2 shall survive Closing and possession of the Property by Buyer and the delivery of the Deed and recording thereof.

## ARTICLE XVI - MISCELLANEOUS TERMS

16.1 **Notices.** Unless otherwise provided in this Agreement, notices to either Seller or Buyer may be delivered personally or mailed, postage prepaid, addressed to Seller's or Buyer's address as set forth above (or at such more recent address of which the mailing party may have notice) and shall be deemed to be effective when received in the case of personal delivery, or in the case

10

affect in any way the provisions hereof.

6.11 <u>Counterpart and Facsimile Signature.</u> This Agreement and any addenda or amendments hereto may be executed in several counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Executed counterparts may be delivered by facsimile transmission, and all signatures contained in the resulting facsimile copy of such executed counterpart shall be legally binding and valid.

MKR 01067

1. **Changes to the Project.** Buyers acknowledges that Seller is currently contemplating the following changes to the Project, and Buyers agree to any such changes which are effected:

   A. **Consolidation and Resubdivision of Certain Lots.** Seller shall have the right to consolidate and resubdivide Lots 1 and 2, and portions of Lot 27 (common area) and Lot 31 (Kewai Street) of the Project, and to remove a portion of the cul-de-sac leading to Lot 1, generally in accordance with the Preliminary Map prepared by Belt Collins Hawaii, dated December 12, 1997, a copy of which is on file in the Broker's office. Such consolidation and resubdivision, if completed, will consolidate Lots 1 and 2 with portions of Lots 27 and 31. The effect of the consolidation and resubdivision will be to increase the size of Lot 27 (part of the common area of the Project), to decrease the size of Lot 31 (Kewai Street) and to increase the size of Lots 1 and 2. Buyers agree to accept such changes, and to execute Amended Public Offering Statements and such other documents as may be necessary or appropriate in connection with the processing and approval of the consolidation and resubdivision, and the conveyance of portions of Lot 27 and Lot 31 to the buyer of Lots 1 and 2.

   B. **Roof Design and Material.** Buyers acknowledge that Seller has advised Buyers that the Bluffs at Mauna Kea Design Committee has agreed to grant the buyer of Lots 1 and 2 a variance from the provisions of the Design Requirements, to permit a single pitched hip roof, of copper material which is oxidized to a patina finish, for the residence to be constructed on the Lots; provided that the roof is designed to minimize negative impact on the views from other lots within The Bluffs at Mauna Kea, and is in compliance with all other applicable Design Requirements. Buyers accept and agree to such variance, and any

/041296/002/EXMTS2/A00-DISC.DSL/

MKR 01068

2. **Effect of Addendum.** Buyers and Seller acknowledge that the Contract, as amended hereby remains in full force and effect. Unless inconsistent with the context, capitalized terms used in this Addendum have the same meanings given to them in the Contract.

Seller and Buyers agree to all of the foregoing.

SELLER:

MAUNA KEA DEVELOPMENT CORP.

By _____
Its Secretary

By _____
Its Treasurer

BUYERS:

_____

_____

2

MKR 01069

This Addendum is made part of the above-referenced sales contract made by and between Mauna Kea Development Corp. ("Seller") a Hawaii corporation and the Buyers named above ("Buyer") for the lot described above in the Bluffs at Mauna Kea (the "project") as more fully described in the contract. Buyer and Seller agree as follows:

1. The purchase price for the property shall be $3,000,000

2. Seller agrees to Buyer a credit of $450,000 at closing for the purpose of landscaping and grading the lot.

3. Buyer agrees that the landscaping credit shall remain confidential and not be disclosed to any person except to Buyer's legal, tax or accounting advisors, to tax authorities or as otherwise required by law.

Date: *12/27/98

* _____  _____ Its Secretary
Buyer                      Mauna Kea Development Corp.

* _____  _____
Buyer                      Its Treasurer

MKR 01070