# EXHIBIT 153

```
 1              IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

 2                          STATE OF HAWAII

 3     _____
                                       ) CIVIL NO. 04-1-0212
 4     WESTERN SUNVIEW PROPERTIES,     )
       LLC,                            )
 5                                     )
                    Plaintiffs,        )
 6                                     )
             vs.                       )
 7                                     )
       LEONE-PERKINS FAMILY TRUST;     )
 8     BLUFFS AT MAUNA KEA COMMUNITY   )
       ASSOCIATION; DOUGLAS LEONE AND  )
 9     PATRICIA LEONE, INDIVIDUALLY    )
       AND AS TRUSTEES OF THE          )
10     LEONE-PERKINS FAMILY TRUST,     )
       JOHN DOES 1-100, JANE DOES      )
11     1-100, DOE PARTNERSHIPS 1-100   )
       AND DOE CORPORATIONS,           )
12                                     )
                    Defendants.        )
13     _____)
```

```
14              PARTIAL TRANSCRIPT OF PROCEEDINGS

15     held in connection with the above-entitled cause

16     before the Honorable Greg K. Nakamura, First Division

17     Judge, presiding on the 30th day of January, 2006.

18     APPEARANCES:

19     TERRANCE M. REVERE, AAL    For Plaintiffs
       BRIANNE ORNELLAS, AAL         Guy Hands and Julia Hands
20     1000 Bishop Street
       #801
21     Honolulu, HI 96813

22     RONALD SHIGEKANE, AAL    For Defendant Bluffs and
       GAIL KANG, AAL              Mauna Kea Association
23     1001 Bishop Street
       2500 Pauahi Tower
24     Honolulu, HI  96813

25     REPORTED BY:  Geraldine L. Saffery, CSR 328, RPR
```

1          MONDAY, JANUARY 30, 2006

2                    * * *

3               (Beginning portion of proceedings

4               reported but not transcribed herein

5               by request.)

6                    * * *

7    (Jury sworn; Mr. Hands now present at the bar.)

8               THE COURT:  Mr. Revere?

9               MR. REVERE:  Thank you, Your Honor.

10              Good afternoon again.  Um, again, I'm Terry

11   Revere and my colleague here is Brianne Ornellas, and we

12   represent plaintiff in this matter.  And with me today

13   is Mr. Guy Hands, um, British guy I was telling you

14   about earlier, and his wife Julia Hands is there in the

15   front row.

16              What -- As, uh, Judge Nakamura mentioned to

17   you folks what an opening statement is suppose to be is

18   a road map where I tell you where I think -- what I

19   think the evidence is gonna show in this case and then

20   Mr. Shigekane says what he thinks the evidence is gonna

21   show in this case.  And really, what this case boils

22   down to is two things; one is it's about broken

23   promises.  Promises were made to this associ -- by this

24   association to my client and those promises have been

25   broken.  The second thing that this case is about is

1    abuse of power and about people on the inside of this          14:55

2    association abusing power that they have for themselves

3    and their buddies and their clients.

4            I've talked a little about, um, the Hands.

5    The Hands first came to Hawaii in 1988.  They saved up

6    frequent flyer miles that Mr. Hands accumulated with his

7    job and they were allowed to go anywhere in the United

8    States on TWA Airlines.  They're from England where it's

9    usually cold and foggy and rainy and they came to

10   Hawaii.

11           And ever since, um, they came here in 1988

12   they fell in love with Hawaii and especially the Big

13   Island.  And it was always, um, the Hands' dream,

14   particularly Mr. Hands' dream, that if he ever had the

15   money he would like to buy a place here, maybe retire

16   here, and take the family vacations here, which they

17   have done over and over and over again.  They've got

18   four children and they've brought them out to Hawaii

19   many many times because they liked Hawaii so much.  And

20   Mr. Hands and Mrs. Hands in particular, if they were

21   going to buy home they wanted one thing more than

22   anything else, they wanted a really really beautiful

23   coastal view, they wanted it to be like a real old

24   Hawaii look to it, and that's what they were going for,

25   and they started looking.

GERALDINE L. SAFFERY, CSR 328, RPR
Transcript Authenticated by Original Signature & Seal

1           Mr. Hands fortunately worked very hard,   14:56
2   worked for many years for a Japanese company, and he did
3   very well for himself.  And fortunately he was in the
4   position to get a very nice retirement bonus basically
5   from this Japanese company; that's [sic] basically
6   became the named plaintiff in this case Western Sunview.
7   Now Mr. Shigekane's said Western Sunview is a
8   corporation.  Well, that's sort of true, but it doesn't
9   do any business.  All it does is own this land, owns
10  this lot that we're going to talk about.
11          And what, um, the Hands started looking in
12  1999 for a lot on the Big Island when they were out here
13  on a vacation.  And then after they went back to England
14  a local realtor Debbie Au told them about, hey, there's
15  this subdivision called the Bluffs at Mauna Kea.  And
16  they heard about it.  They got sent pictures of it.  It
17  looked great.
18          And I wanna show you what the -- the area
19  that we're talking about looks like.  I'll get that
20  first exhibit here.
21          This is basically a book that Mauna Kea,
22  who was the developer, sent out to prospective buyers.
23  That's why it's kind of got that funny fold in the page
24  'cause it's a book.
25          And basically this area is, um, the Mauna

1    Kea area.  This is the Hapuna Prince Hotel.                    14:58

2                    Oh, I'm sorry, Ron.

3                    MR. SHIGEKANE:  Excuse me.  I'm sorry.

4                    MR. REVERE:  It's okay.

5                    Mr. Shigekane, sorry.

6                    The, um, this is the Mauna Kea Hotel.  And

7    this area in the middle here is the Bluffs.  And this is

8    the area that we're talking about.

9                    And the lot that my clients bought is Lot 5

10   which is located right here.  The lot next to it is Lot

11   4.  And we're going to be talking a lot about Lot 4 in

12   this case.

13                   Lot 4 is different from all these other

14   lots because it had a fully built house and a fully

15   built pool complex.  Totally done at the time the Hands

16   were looking.

17                   And Mauna Kea, um, they're very very smart

18   cookies at Mauna Kea.  They knew that -- and when you

19   look at these lots, there's nothing to the lots

20   themselves.  They're basically flat lot -- lots.

21   There's grass on them.  There's kiawe trees.  But

22   there's one thing that made these lots very very very

23   very valuable and that one thing is the view, the

24   beautiful coastal views that these lots provided.

25                   And so Mauna Kea wanted to sell these lots

1    but they knew nobody's going to buy in here if you buy        14:59

2    your lot and then some guy builds something that kind of

3    ruins the view, so Mauna Kea issued these things called

4    covenants.  And what covenants are it's a, like you've

5    heard of it in other context, like biblical context and

6    things like that, but what the word covenant means is

7    important promise.  And these neighbor -- neighborhoods

8    like this that are planned, they have these things

9    called covenants which are basically the promises that

10   every owner makes to each other.

11          And one of those promises that we'll be

12   talking about a lot in this case is Rule 4.17.  And what

13   this rule is, it's called the special setback area rule,

14   and the rule reads:

15          "Special setbacks have been

16       placed on the individual home sites to

17       protect views and to preserve hillsides.

18       No building or structure shall be placed

19       within the special setback area as is shown

20       in Exhibit A."

21          Now, what's Exhibit A?

22          This is the next exhibit.

23          And what Mauna Kea did to make it very very

24   clear to all the buyers is they said look, basically

25   within reason, you buy into this neighborhood, you can

1  build what you want to in this area mauka of this                15:00

2  special setback line, but this dotted line which we've

3  shaded in green is called the special setback area which

4  they note here.  And this map here is actually built

5  right into the rules.  It's not for like a, well, like a

6  road map to be able to show what it looks like.  It's

7  built right into the rules, you're not suppose to do

8  that.  And as the rule says, the reason why we don't

9  want you to build in there, we wanna preserve these

10 hillsides, we want to protect each other's views, so

11 don't build behind that line.  Then Mauna Kea did

12 something else.  Mauna Kea set up a watchdog committee

13 and that watchdog committee's job was to enforce this

14 rule, as well as some other rules, but we're mostly

15 concerned with this special setback area rule.

16          And so it all sounded very good to my

17 clients.  They got a very nice neighborhood.  They got

18 rules that would protect their views.  And that, you

19 know, the Hands from England are dreaming about having

20 this beautiful coastal view.  So it all sounds good.

21 And so my clients, um, buy a lot, that Lot 5, which is

22 the lot right here, and they enter into construction

23 contracts and start building, um, building their home

24 there.

25          Now, then what went wrong was a Mr. Leone

1    entered the scene.                                                    15:01

2              Now again, Lot 4, which is this lot right

3    here next door, already had a house, already had a pool,

4    and it had this rule that says, hey, don't cross that

5    line.

6              And the evidence is gonna show you that the

7    makai part of Mr. Leone's lot is this ravine that flows

8    down to a public trail, public access trail, and then

9    down to the ocean.  And it's a real, um, it's a real

10   depression that goes down to this public access trail

11   and the ocean beyond.

12             So Mr. Leone moves in and he says, you know

13   what, I'm gonna build out in that area and I'm gonna

14   build a pool complex.  And not just any pool complex.

15   I'm gonna build a pool complex that requires that we

16   take out the natural terrain that's there.  We're gonna

17   dump a lot of fill in there.  And we're gonna build huge

18   walls there to hold up my swimming pool.  Now the

19   problem of course is my clients are in this area, we're

20   like, we aren't suppose to be building beyond that line,

21   so that's a real problem.

22             Mr. Leone goes up to the committee and the

23   evidence will show, uh, and, uh, that actually at first

24   the committee did their job.  And what happened was a

25   guy from New Jersey on the committee, a guy from New

1    Jersey is on the committee and said, what is this guy    15:03

2    doing?  He had a fully built house, a fully built pool,

3    a clear rule.  Why does he think we should approve this?

4    He -- this guy knew exactly what he was buying into.

5              And the committee hired an architect.  The

6    architect there helped the committee figure out these

7    rules, if there's any question.  The architect says

8    basically the same thing.  He says you should not

9    approve this pool in this area.  It's their architect.

10   It's not somebody that we hired.  It's the association's

11   own architect says don't do it.

12             And he says, have the rules been bent

13   before?  Yeah, but this is like nothing we've ever

14   approved before.  And he's saying not only are they

15   gonna have to dump fill into this natural ravine, we're

16   gonna have to have fifteen foot walls to hold up this

17   guy's swimming pool.  And so he recommends against it.

18             Mr. Leone fiddles with the plans a little

19   bit.  The committee again says, no, you can't do this.

20   This is where the case gets very interesting because the

21   committee changes its mind.  And why does the committee

22   change its mind?  I think the evidence is going to show

23   the following:

24             Mr. Leone, while he's in the midst of

25   trying to get his pool approved, joins the committee.

1   And that architect, who's name is Terry Tusher, who                    15:04

2   recommended against putting this pool in, he sort of

3   goes away.  The committee sort of reassigns him so he

4   won't be looking at owners' plans anymore.  Now then,

5   after that occurs, Mr. Leone joins the committee.  The

6   architect who said don't build this is sent away.  The

7   committee approves his plan.

8           Now this was disturbing enough, and, um,

9   then there's the next thing that really needs to be

10  looked at.  There's a man on the committee, a lawyer

11  from Silicon Valley named Bob Gunderson.  Mr. Gunderson

12  is, um, from Silicon Valley.  Mr. Leone is from Silicon

13  Valley.  Mr. Gunderson has known Mr. Leone for many many

14  years.  Mr. Gunderson and Mr. Leone lived right around

15  the -- the corner from each other in a town called

16  Atherton, California.  Mr. Gunderson acts as an attorney

17  for Mr. Leone's company.  And the evidence will show

18  Mr. Leone is a very big businessman, a very big player

19  in Silicon Valley, and too, um, they also, uh,

20  Mr. Gunderson represents companies that Mr. Leone's

21  companies invest in.

22          Also, Mr -- despite all this, Mr. Gunderson

23  votes and according to the association cast the deciding

24  vote in favor of what Mr. Leone wants to do.  The only

25  dissenting vote was this guy from New Jersey who said,

1    you know, no this shouldn't happen.                        15:05

2              Now the interesting thing is also that

3    Mr. Gunderson, this lawyer whose known Leone for years,

4    is the very guy that sold him this lot.  Mr. Gunderson

5    use to own Lot 4.  He sells it to his friend, his

6    client, Mr. Leone, and then miraculously he figures that

7    the rules should be broken in favor of Mr. Leone.

8              And the evidence is gonna show that this

9    committee has zero respect for their own rules, the ones

10   that they're suppose to be enforcing, or the rights of

11   my clients.

12             And I want to show you a few more pictures.

13             If you'd show the next one?

14             This area, um, this is basically called the

15   back of Mr. Leone's lot use to look like.  You can't

16   really tell from this photo but this area trails down

17   into this gulch that goes out to the ocean beyond.  And

18   Kona coast view, view south towards the Kona coast, is

19   the exact same thing that Mr. Hands, Mrs. Hands were

20   looking at and what was discussed with the realtor.  She

21   said, hey, this lot, your lot, Lot 5, it's gonna have

22   this great view of this Kona direction.

23             And, um, could we see the next one?

24             This one, again, it doesn't show it all the

25   way, but this is how the lot -- Mr. Leone's lot use to

12

1   be.  Again, it was a -- you can only get a little bit of    15:07
2   it, but it's this ravine or gulch that went down to the
3   ocean.
4           And Brie, the next one.
5           Now, this is what Mister, um, Mr. Leone's
6   lot looks like now.  And bear in mind, over here, I've
7   got the laser light on it, this is a doorway.  And
8   this -- when you measure this thing from the top to the
9   bottom, these things are 18 feet tall.
10          Now the committee will tell you plaintiff
11  has it all wrong.  Initially Mr. Leone had different
12  plans and the plans changed a little bit, and that's
13  certainly one way of putting it; but the evidence will
14  show you that at the time the committee's own architect
15  is saying don't approve this Mr. Leone had 15 foot
16  walls.  Well it's changed.  They're -- they're -- they
17  are now 18 foot walls.  And they'll say, oh, well,
18  the -- the square footage changed.  Again, that's true,
19  but it's gone 6 feet more makai than it was to start
20  with.  So things have changed but not for the better.
21          And here's another, um, photograph that
22  shows kind of what -- uh, this is the in-progress
construction photo which is similar to the one I've
shown you earlier with the naupaka going down to the
ocean.

13

1       If we could have one more?                          15:08

2       These next two, again, this shows the

3   area -- this is my client's, um, lot.  This is the

4   archeological site right here.  And this area here which

5   is where there was naupaka going down to the shoreline

6   trail.  And there's a shoreline trail that runs right

7   along here, public access trail.  And this area where it

8   was green is now where the swimming pool complex is

9   going to be.

10      If you can show the next photo, please?

11      This next photo shows, again, a partial

12  view of -- that's where the naupaka was going down.  And

13  this is the area where the fill and the walls were

14  placed by Mr. Leone, all in this area where there's not

15  suppose to be anything built, that dotted line I showed

16  you to begin with.

17      Now the -- the -- another problem, and

18  that's what -- what leads us to our next photos, in

19  addition to building this pool complex Mr. Leone did

20  something else.  He gets the rules broken for himself

21  and he's built out in this area that was this natural

22  ravine and now that he's out there he says, gee, now

23  that I'm out here I can look and I can, in his words, I

24  don't want Guy Hands seeing me, quote, running naked

25  into my swimming pool.  And now he says, well, I don't

14

1    have any privacy.  Now that the pool's out here I have    15:09

2    no privacy.  So now he goes back to his friends on the

3    committee and says, well, now what I wanna do is plant a

4    row of trees to block the Hands' view.

5              And this is from a site visit that we did.

6    This gentleman here is David Knox.  He's one of

7    Mr. Shigekane's experts.  And we're out there on the

8    site visit.  This is the -- he's standing on the Hands'

9    lanai looking out at the swimming pool.

10             Now is this still, when this pool gets

11   completed, a nice view?  We would all love it perhaps,

12   but it is not what these people paid for.  They wanted

13   the natural area.  They didn't wanna see Mr. Leone in

14   his pool, having pool, you know, umbrellas, etc.  That

15   is not what they paid for.  That's not what the rules

16   were.  That's not the deal all these folks entered into

17   when they bought into this neighborhood.

18             Furthermore, I think this was very

19   interesting.  They put a dust screen up 'cause they were

20   doing construction.  And this sort of creates a perfect

21   picture frame almost of what's going to be lost once

22   Mr. Leone puts in his trees.

             Now the association will tell you, well,

the trees, it's not really that big a deal, but the

evidence is very clear that people pay a lot of money

for these coastal views.  They don't pay a lot of money

to have a view two feet away of a row of trees that

obliterate the view.

        And the evidence is going to be very clear

that, well, the association says that I don't know what

we approved.  I mean literally some of the witnesses

will say, don't worry, the trees only going to be thirty

inches.  And then you ask Mr. Leone, he says, oh no, no,

they're not going to be thirty inches.  And then you

gonna hear from experts who'll say the plans are:  He's

allowed to put in trees; there's no height limit

involved; they can grow as thick as they want to; they

can grow as tall as they want.

        And I think the next photo really

demonstrates that -- this was when the construction guys

were in the course of putting this up, and it's kinds of

an interesting, uh, thing, because if you take this dust

screen and you turn it green that's what's going to be

lost.  They're just gonna lose this whole view here once

these trees go in.  So that's just not right.

        So the other thing that's very interesting

about this case is that if you look at the process, if

you look at what this committee did, I think by the end

of this case you will be shocked.

        For example, Mr. Gunderson, who's the de

15:10

16

15:11

1   facto, the sort of leader of these folks, says that if

2   you're on the committee you get more benefits than if

3   you're not on the committee.  And those benefits

4   include, you get to orally lobby the fellow committee

5   members to break the rules.  You also get to lobby

6   against your neighbors to hold their properties down --

7   property values down while you increase yours.

8          And the evidence will show that over and

9   over again this committee gave exceptions to their

10  friends and their buddies and themselves.

11         Now there's a lot of discussions, by some

12  folks anyway, where they say, well, you know, and it

13  sounds good, why don't they just work this out?  Well

14  the problem is, you know like Doctor Phil says, it

15  takes, uh, two to say yes and one to say no.  Mr. Hands

16  asked this committee, said wait a minute, you guys have

17  heard from Leone over and over again.  Can I present my

side of the case?  Will you listen to me?  And the

answer was a flat out no.  They wouldn't even talk to

him.  They wouldn't even let him in on the meeting

minutes or, uh, excuse me, in on their meetings.

       He also asked for an explanation.  Hey,

just tell me, because sometimes you guys say nothing is

suppose to be in this area, sometimes you say thirty

inches or less is okay, and now you're letting Mr. Leone

1   put in trees in an area where there's suppose to be a                15:13
2   protected view.

3              And they're very, very, very, inconsistent.
4   For example, the very Mr. Leone who demands and gets 18
5   foot walls in an area where he's not suppose to be
6   building anything filed or passes a motion with his
7   fellow committee members to go after another guy named
8   Mr. Gifford for just putting simple stairs or a
9   staircase in his special setback area.  He wasn't on the
10  committee.  He wasn't the most popular guy with some
11  committee members.  So they said, yeah, we should sue
12  them.  Meanwhile, they're doing the same thing, and even
13  worse.

14             Now, what will the association say?

15             Well, first of all they're going to say,
    gosh, we're a committee.  We're just hard working
    volunteers.  That is not true.  Volunteers are people
    like Mother Theresa, they are people like you when you
    donate, uh, to the Blood Bank.  What this committee is
    is -- is in it for themselves.

               MR. SHIGEKANE:  Objection, Your Honor;
    argumentative.

               THE COURT:  Okay.

               Why don't you, um, state what you believe
    the evidence will show at trial?

18

MR. REVERE:  Okay.  Thank you, Your Honor.  15:14

What we believe that the evidence will show is that these folks were not volunteers in the true sense of the word.  They are looking out for themselves and their buddies, and they don't care about the rules that they were charged with enforcing.

The other thing that they're going to say is that this is no big deal.  What's the big deal?  He let him build the pool.

Well, if it's not that such a big deal why not just tell Mr. Leone what the guy from New Jersey said, which is, he knew exactly what he was buying into, he knew where the line was he wasn't suppose to cross, and he already had a pool, he already had a house.  So it's not a big deal, wouldn't have been a big deal to keep Mr. Leone behind the line.

Now they also say that, hey, we did bend the rules and the evidence will show that this committee did bend the rules for other people.  But their own architect -- and they'll even say, hey, we bent the rules for you -- you folks because on Lot 5 we let you build something in the special setback area.  The evidence is going to show what my clients were allowed to build was a ditch.  And a ditch was specifically built to protect the views, not to harm them, which was

19

1   what a fence would've done.  It was there to protect the    15:15

2   archaeological site that borders on it and to meet the

3   county requirement that you have a -- a barrier so

4   little kids don't walk into your pool.

5           They will also -- their own architect will

6   also again say, no, no, no, no, we have never done

7   anything like this before.  That was what Mr. Tusher

8   said.

9           They also will say, hey, we're the

10  committee.  We're allowed to give variances if we feel

    like it.  That's not right.  There's written rules that

    everybody abided by when they bought into this

    neighborhood and you're not allowed to give variances,

    the evidence is going to show, when you don't even talk

    to Mr. Hands, you don't talk to Mrs. Hands, and the

    effect of violating the rules to increase your buddy's

    property while hurting somebody else's property value.

            And the other thing, the way the committee

    runs its meetings is just extraordinary.  They don't

    tell other owners when they are meeting.  They don't

    tell other owners what are they meeting about.

            There's another lady who owns a, um, lot in

    the neighborhood, Mrs. Wayman [phonetic].  She found

    out, I don't know how, about a meeting was taking place.

    She called into the meeting and was told get off the

20

1  phone you're not on the committee.  And that is                    15:16
2  absolutely wrong.

3          Now, the other thing, uh, the judge talked
4  about some of the things that you folks will have to do.
5  Biggest job I think for any jury is credibility, who's
6  being honest, who's being dishonest.  And that seat up
7  there is one of the worst places in the world.  It's no
8  fun being a juror sometimes, but the witness stand is
9  the worst place in the world to be.  Because there's
10 lawyers here.  They're asking you hard questions on
11 either side.  There's you, the jury, a bunch of
   strangers looking at them, saying, are they being
   honest, are they being dishonest.  There's no way to
   hide up there.  So the only way you can hide is never
   show up in the first place.  And the evidence is going
   to show that even though there's eight committee
   members, not one of them is here, not one of them will
   be here.

           Now, Mr. Shigekane's referred to
   Ms. Mireles.  I don't know her very well.  Just met her.
   Seems like a very sweet lady.  She works for the
   property manager.  You're not going to hear a peep from
   her in this trial because she is not going to be
   testifying, she had nothing to do with this case.

           MR. SHIGEKANE:  Objection, Your Honor;

21

inappropriate argument.                                          15:17

      THE COURT:  Sustained.

      MR. REVERE:  All right.

      In any event none of the, um, none of the,
committee members are going to --

      MR. SHIGEKANE:  Objection.

      MR. REVERE:  I --

      THE COURT:  To what?

      MR. SHIGEKANE:  This is an inappropriate
argument.

      THE COURT:  Overruled.  It's just dealing
with who will not testify.  That's what he's saying.

      MR. REVERE:  Yes.  You will not hear one of
these eight committee members testify.

      They also, these -- this is the same
committee that wouldn't even allow Mr. Hands to talk to
them at a committee meeting.

      And when someone, you know, is lucky enough
to work very hard to get one of their life's dreams and
that dream's taken away from them via pools and all
these other things, um, that's just not right.

      All right.  Well, to wrap this up here,
what I would like you folks, uh, to think about, um, is
we are going to prove our case.  We are the plaintiffs.
And Mr. Shigekane's saying, oh, it's harder being a -- a

1   defendant than a plaintiff.  That's not true.  We have     15:18

2   to build our case; he's just gonna poke some holes in

3   it.

4            So I think what the evidence is going to

5   show you is that this committee was not fair, was not

6   reasonable, did not enforce its own rules unless they

7   were to the benefit of the committee members themselves,

8   and it's cost a lot of money.  And we shouldn't kid

9   ourselves as to why these guys were doing this.  They

10  were doing it, the evidence is going to clearly show,

11  increase their values, and if other people got hurt,

12  well, that's life; and that's just not right.

13           And so we're gonna ask you to compensate my

14  clients for the decrease in the value to their home, the

15  loss of view, the loss of privacy.  But what's much more

16  important to my clients is that there's some principles

17  here.  They don't wanna see this happen to somebody

18  else.

19           And they also think promises should be

20  kept.  People shouldn't be bullies.  And you're going to

21  hear four of these guys on this eight member committee

22  are all from Silicon Valley, they all know each other,

23  and they are, frankly, the evidence is going to show,

24  that they have very very little respect for their

25  neighbors and the very rules that these guys signed up

GERALDINE L. SAFFERY, CSR 328, RPR
Transcript Authenticated by Original Signature & Seal

23

1   to enforce.                                                      15:20

2           I would like to thank you again for serving

3   as jurors.  Thank you.

4           THE COURT:  Mr. Shigekane?

5           MR. SHIGEKANE:  Thank you, Your Honor.

6           Good afternoon.

7           Over the course of the next two weeks

8   there's going to be a lot of evidence presented about

9   the properties at the Bluffs at Mauna Kea.  Um, we're

10  going to be talking about special setbacks, swimming

11  pools, view planes, design review committees, and

12  property rights.  When you boil things down to the very

13  essence, this case, this lawsuit, is not really about

14  any of those things.  While the evidence unfolds before

15  you you'll find that this actually is only a case about

16  the managers of Western Sunview Properties, the

17  plaintiff.  It's about what they want and it's about

18  what they think are important.  These are people who are

19  use to getting things that they want.  And this case is

20  only about their attempt to tell their neighbors what

21  their neighbors can do with their property and what they

22  cannot do with their property.

23          The evidence will show that every ocean

24  front owner who has ever asked for approval from the

25  committee to build something in the special setback area

1  has been granted that. No special favors. This is  15:22

2  the -- this is the way the committee acted. They have

3  the power to grant variances.

4          Let me just pull up the, uh, map of -- I

5  know it's a little difficult for you to see 'cause

6  you're far away, but Mr. Revere showed you a map of the

7  Bluffs at Mauna Kea. This is really a map of -- of how

8  all the -- the homes have been placed.

9          We're talking about the -- the ocean front.

10  There's lots 1 through 12.

11          Mr. Hands or Western Sunview Properties,

12  their property is right here, Lot #5.

13          And you'll get to see these during the

14  course of the, uh, case.

15          Before they even bought their property, Lot

16  5, Lots 1 and 2 was purchased by someone. At the time

17  that they bought their property, Western Sunview

18  Properties, there was a pool right outside the special

19  setback area in addition to buildings. That was there

20  when Western Sunview Properties bought.

21          Lots 3 and 4 were model homes, duplex

22  actually, were very expensive but nobody bought 'em for

23  a long time and that's when the developers decided let's

24  not go with duplexes. Let's go with lots. So then we

25  started selling the lots. They gave up on the ready

made duplexes.                                              15:25

Lot 3 is the one that never asked and never
built anything in the special setback area.

We have the special setback area, by the
way, with dotted lines.  That shows you the property,
the dotted lines with the special setback area, that was
imposed by the old committee, by the developer, saying,
we will deal with our property, we'll -- we'll make this
decision not to build.  I mean that's in the rules.
Aside from the special setback area are County special
setback requirements that you just cannot, you gotta go
in for, um, county approval if you wanted to build
there, but nobody has done that.

And this is the edge of the property lines.
And then this lighter green areas are the protected
areas.  There's a buffer called the archaeological site.
Right in front of the -- the Western Sunview Properties
there's a huge archaeological site before you see the
ocean.  Kiawe trees in front that they cannot and should
not cut down.

Lot 4 is the Leone property.  This is what
we're here for.  Doug Leone purchased Lot 4 and he
asked, there was a pool here, right inside here, but he
asked for the committee's approval to build his pool in
the special setback area.  The committee looked at it

1    and during the course of this, um, case you'll find all    15:26

2    of the things that the committee did to determine

3    whether that was reasonable to protect Western Sunview's

4    view plane and the Marks' view plane, to make sure that

5    it really didn't impact lots, um, 3 and lots 5.  They

6    hired -- the committee has a architect, consultant, that

7    they have the plans go over, the consultant looks it

8    over and he makes recommendations and the committee

9    decides.

10           Right next to lot 5 is Lot 6; the

11   Federmans.  The Federmans also asked for and received

12   permission to build their pool in the special setback

13   area.  A pool with stairs and everything.

14           And again, the reason for the special

15   setback area was to protect views and preserve

16   hillsides.  From the very beginning, from day one, the

17   committee has determined that it's okay to build things

18   as long as you protected the views.

19           Right next to the, um, the Federman case,

20   uh, Federman property is the Reddys.  The Reddys have a

21   putting green, two putting greens in their special

22   setback area.  They asked for and received permission to

23   build terraces that juts up against the special setback

24   area.  That was a variance also.

25           Oh, by the way, um, Lot 5, Western Sunview

1    Properties, they asked for and received approval from    15:28

2    the committee for a variance to build not only a ditch,

3    a wall that juts up against that place.  So Western

4    Sunview Properties itself has benefited from the way

5    that the committee interprets that special setback

6    requirement.

7              The next five, six, seven, eight, is owned

8    by Mr. Gunderson.  He was on the committee, yes.  His

9    pool is also in the special setback area.  He asked for

10   and received approval to build a pool, again as long as

11   it doesn't block views; and a swimming pool does not

12   block views.

13             Plaintiff's expert will come up here and

14   testify that Mr.  Leone's pool and Mr. Federman's pool,

15   both sides of them, blocks views of this ocean.  You'll

16   get a chance to look at the photos yourself.  You'll

17   make that determination.

18             Five, six, seven, eight, nine.  The next

19   lot here is owned by Mr. Elder.  He's also on the

20   committee.

21             And by the way, anybody, any owner who has

22   ever asked to be on the committee, to be on the board,

23   was allowed.  All you have to do is ask to participate

24   in the committee and be a part of the decision making

25   process.  Western Sunview Properties has never asked.

1              Mr. Elder's pool is partly in the special    15:30

2   setback area.

3              Next property, the Fogelsong's, they asked

4   for and received permission to build a swimming pool

5   partly within the special setback area; just so happened

6   that in the last couple years they decided not to, so

7   theirs is inside their property so there's nothing

8   outside.

9              Next piece of property, Robertson's, Lot

10  11, also has things in the special setback area that

11  they asked for and received approval for, terraces,

12  cement terraces.

13             Again, plaintiffs are asking that or saying

14  that because there is that provision about nothing in

15  the special setback area you gotta just look at that.

16  There is a provision within the rules which allow the

17  committee to grant variances as long as the committee

18  decides it's appropriate.  All of these have been

19  determined to be appropriate by the committee.

20             The last lot, Lot 12, owned by the

21  Giffords, that also has a pool partly within the special

22  setback area.

23             The committee has been consistent and fair

24  throughout this whole process.  It's only one person who

25  is saying it's not fair, it's not fair; that's

1  plaintiff. When you listen to the evidence you'll find        15:32

2  that what the committee did was very reasonable.

3          Mr. Leone, the property we're talking

4  about, Lot 4, process for him to get approval finally

5  for his pool took two years. He spent $10,000 as a fee,

6  which everybody does, for the committee's architect to

7  look over and make recommendations to say, hey, this is

8  not right, this is not right, you should do this, you

9  should do that. A two year process. This is something

10  that is kind of outside a normal range of -- of what

11  we -- what we do, what we know, but you'll find through

12  the evidence that this is a real different community but

13  basically made up of real people who made decisions

14  which were reasonable.

15          We'll have Mr. Dennis Krueger testify.

16  Mr. Dennis Krueger is the committee's attorney and he'll

17  tell you about the history of the committee, how it was

18  made up, what their procedures are, what their practices

19  are. You'll decide for yourself after listening to that

20  evidence whether or not they treated Mr. Hands fairly.

21  I submit that the evidence will show that it did.

22          Again, what we're saying here is our

23  bird's-eye view of what we think the evidence will show

24  and what you should do is make sure that what we say

25  matches the evidence. Check out what I say, match it

1    with the evidence, and check out what Mr. Revere has    15:34

2    said and match that with the evidence, and you determine

3    who is really telling the real story.

4            Mr. David Ayer, an architect, will tell

5    you, and he is now the consultant for the committee,

6    he'll tell you about what the committee did, the

7    recommendations it did, why it made those

8    recommendations for the Leone pool.

9            Um, in the context of this case we also had

10   to go hire a -- another architect just to review what

11   the committee did to tell you that what the committee

12   did in this case is really no different from what other

13   committees has done.  After all the evidence is in I

14   believe that you will find that there is no evidence of

15   favoritism, no evidence of bias, no conspiracy, there's

16   no malice against Western Sunview.

17           Well, my time is -- is just about up but

18   I -- I wanted to say that, um, thank you again for your

19   time and it will -- will take two weeks I guess for --

20   for this trial to, um, go through, but at the end of

21   this trial I'll ask that you find in favor of the

22   defendant, the Bluffs' Association, and hold that what

23   it did was reasonable and what plaintiff is alleging

24   really has no foundation.

25           Thank you.

31

15:36

```
1                    *  *  *

2              (Remaining portions of proceedings

3         were reported but not transcribed

4         herein by request.)

5                   ---oOo---
```

GERALDINE L. SAFFERY, CSR 328, RPR
Transcript Authenticated by Original Signature & Seal