**EXHIBIT 158**

Page 1

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

|  |  |
|---|---|
| _____ ) | CIVIL NO. 04-1-0212 |
| WESTERN SUNVIEW PROPERTIES, ) | |
| LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| LEONE-PERKINS FAMILY TRUST; ) | |
| BLUFFS AT MAUNA KEA COMMUNITY ) | |
| ASSOCIATION; DOUGLAS LEONE AND ) | |
| PATRICIA LEONE, INDIVIDUALLY ) | |
| AND AS TRUSTEES OF THE ) | |
| LEONE-PERKINS FAMILY TRUST, ) | |
| JOHN DOES 1-100, JANE DOES ) | |
| 1-100, DOE PARTNERSHIPS 1-100 ) | |
| AND DOE CORPORATIONS, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

TRANSCRIPT OF PROCEEDINGS

held in connection with the above-entitled cause

before the Honorable Greg K. Nakamura, First Division

Judge, presiding on the 10th day of February, 2006.

APPEARANCES:

TERRANCE M. REVERE, AAL    For Plaintiffs
BRIANNE ORNELLAS, AAL
1000 Bishop Street
#801
Honolulu, HI 96813

RONALD SHIGEKANE, AAL    For Defendants Bluffs at
GAIL KANG, AAL            Mauna Kea Community
1001 Bishop Street        Association
2500 Pauahi Tower
Honolulu, HI 96813

REPORTED BY: Geraldine L. Saffery, CSR 328, RPR

Page 3

1   options, um, either now or after closing argument,          10:07

2   whether he wants to --

3              THE COURT:  Okay.

4              MR. SHIGEKANE:  Yeah.

5              THE COURT:  Okay.

6                   (Bench conference concluded.)

7              THE COURT:  Okay, so Mr. Ah Sing, um,

8   because of your test this afternoon the parties have

9   agreed that you could be excused.  Okay?  The question

10  is do you want to be excused now or would you wait until

11  after the closing arguments?  In any case you will not

12  get lunch.

13             JUROR AH SING:  But I can stay.

14             THE COURT:  Oh, okay.  All right.

15             So at this time the attorneys will -- would

16  proceed with, um, closing arguments.  Um, plaintiff will

17  go first and then defense will follow.  Plaintiff will

18  have a chance for rebuttal argument -- rebuttal closing

19  arguments.  What the attorneys will attempt to do is to

20  show to you why a verdict should be entered in, um, his

21  respective client's favor.  And please remember that

22  what the attorney say is not evidence.  Closing

23  arguments are intended to assist you in reaching a

24  verdict.

25             Mr. Revere?

1    the real rules.  They can't win upon the 30-inch rule          10:16

2    that they made up so they go to the Q&A.  And I'll show

3    you later that the Q&A doesn't even help them.

4              Now the other thing that you folks were

5    asked to do as jurors is apply the rules that are given

6    to you.  Judge says, hey, these are the rules you are

7    suppose to follow.  I'm sure you folks are going to do

8    that, but obviously when you, um, look at what these

9    folks did they didn't follow the rules.

10             And I think that what's really important

11   here also is that you go back to page 20.  Something

12   that's very important.  This is a long instruction, kind

13   of goes to the heart of the case.  In the middle

14   paragraph it reads:

15             "In determining whether or not

16        the decision was unreasonable, you are to

17        take into consideration both the process

18        used in reaching the decision and the

19        consequences of the decision."

20             And going back to, again, at the beginning

21   of this case we know that just when you compare what you

22   folks were asked to do compared to what this committee

23   was asked to do, the process that this committee used

24   did -- was not fair.

25             What the judge is telling you here is you

1          MR. SHIGEKANE:  I think I probably have,          10:48

2    um, half an hour or so.  I -- Maybe better just to take

3    a short break.

4          THE COURT:  Take a recess.

5               (A recess was taken.)

6          THE COURT:  Mr. Shigekane?

7          MR. SHIGEKANE:  Thank you, Your Honor.

8          On behalf of my partner Gail Kang and I,

9    I'd, um, also like to thank you very much for your

10   paying attention throughout this entire trial.  It's

11   been a long two weeks; especially yesterday.  Yesterday

12   was really bad 'cause we had to -- 'cause we had to read

13   those transcripts.  And I know it's really tough to

14   listen to those things, but it was something that had to

15   be done to get the evidence in.

16          Now at the very beginning of this, um, this

17   whole proceeding when we had the jurors -- the jury

18   selection, remember when everybody came in here, um, one

19   of the, um, things that happened was that when the judge

20   said, hey, you know, does anybody have a problem, there

21   was a whole bunch of people that came up to the mike

22   ready to say I've got problems.

23          Now the judge asked, you know, why didn't

24   you say something earlier?  And the response was, well,

25   the questionnaire said if you have a physical disability

1  or if you -- if you have a mental disability mark this.          11:05

2  It didn't have anything else in there.  So the rule was

3  everybody serves on the jury unless you have a mental

4  disability or a physical disability.  That's the rule.

5          Now did the Court break that rule when it

6  allowed that guy who was taking care of his parents and

7  had his wife, um, work to earn the money so he could

8  take care of the parents when -- when the court released

9  him?  Or when the Court released the -- the woman who

10 had those two children, and she did arrange for her

11 sister to watch one day, her mother to watch the other

12 day, um, but she didn't have anybody else to -- to -- to

13 take care of -- of her children the rest of the days,

14 did the Court break the rule when it allowed that woman

15 to leave?  No.  The Court exercised its common sense,

16 just like we all do in every day life.  And as long as

17 the Court interprets that rule, the rule about serving

18 on the jury, fairly and consistently, that's all we ask.

19 The same thing with the rules here.

20          And what I'd like to do is turn to that,

21 um, CCR's, the covenants and restrictions.  That's a

22 basic document that was handed to you in the very

23 beginning; Exhibit 9.  Now that is a huge document

24 that's [sic] governs the whole development.  And on that

25 8.8 which is on page 31, it talks about the design

Page 40

1    committee.  And basically it says if you going to build                11:07

2    anything here, you gotta submit it to the design

3    committee because the design committee is that committee

4    for the association.  It says, okay, this is good, this

5    is good, this is bad, you can't do that, or make it a --

6    a different color, so that the whole community benefits.

7                    Now the last sentence of that rule says:

8                    "Notwithstanding anything to the

9            contrary contained in this Article VIII,

10           the Design Committee may approve plans,

11           specifications, and other materials

12           submitted to it for buildings or

13           improvements which are not in strict

14           compliance with the applicable design

15           requirements if any such building or

16           improvement is suitable to the area in

17           which it is located."

18                    Suitable to the area in which it's located.

19    What are we talking about?  We're talking about a

20    swimming pool.

21                    Now in the CCR's -- I mean that isn't the

22    entire documents.  We have included within that by

23    incorporation, by reference, the design and building

24    requirements which is Exhibit 8, which was also handed

25    to you, and that's the one that Mr. Revere keeps showing

12bcfd80-16c5-40ce-bfab-049074c20f22

1    you.  He cites a rule:                               11:09

2              "Special setbacks have been

3         placed on the individual home sites to

4         protect views and to preserve hillsides.

5         No building or structure shall be placed

6         within the special setback areas as shown

7         in Exhibit A."

8              So from the CCR's we have

9         incorporated by reference the design and

10        construction requirements which talk

11        about -- which set up the special setbacks.

12             Now within the design requirements

13   themselves there's another rule which gives the

14   committee, in addition to that rule that we just looked

15   at in CCR's, a basic document, it has another provision

16   which allows the committee the discretion to allow

17   buildings, if things are suitable.

18             On page 12 of Exhibit 8, Article VI, it's

19   entitled Variations.

20             "Individual solutions at

21        variance with the general design

22        requirements will be considered on their

23        architectural merit and their contribution

24        to the overall purposes set forth in

25        Article I with [sic] the specific

Page 42

1    objectives stated in Article IV above.  The          11:11

2    Design Committee through the Design Review

3    Procedure as authorized in Article V above,

4    shall be the sole judge of the suitability

5    of such variations in relation to the

6    established objectives."

7         The overall purposes that it refers to

8    you'll find on page 1.  Second paragraph, page 1, it

9    says:

10        "Recognizing the inherent

11   natural beauty of the Hapuna Resort and The

12   Bluffs area, and the sensitive approach

13   that has been used in the development of

14   the Hapuna Beach Prince Hotel and the

15   Hapuna Golf Course, the following design

16   requirements and review procedures have as

17   their purpose the development of resort

18   residential homes to harmonize with the

19   existing environment."

20        Suitable to the area.  Resort residential

21   homes.  A swimming pool.  All of these -- all of these

22   homes at The Bluffs have beautiful swimming pools.  I

23   mean it's something that probably most of us will --

24   will never get a -- a chance to live in, but these homes

25   are beautiful.

1       They have a design committee which looks                11:12

2   over all of the -- the applications and makes their

3   recommendations and gives approvals to things that will

4   be nice.  That's all they want.

5       So the last point within those rules,

6   again, is that the committee "shall be the sole judge of

7   the suitability."  Really, it shouldn't be

8   second-guessed.  People shouldn't be able, each time

9   they have a problem, to bring it in to court and say,

10  Hey, what do you think?  Do you think that's reasonable

11  or not?

12      In fact the Court gave you an instruction

13  and that's the -- in the twenty-first page.  I had to

14  number these, too.  But it's right after the one that,

15  um, Mr. Revere read, the long one; but this is a very

16  short instruction.  It says:

17          "When construing instruments

18          containing restrictions and pro --

19          prohibitions as to the use of property, all

20          doubts shall [sic] be resolved in favor of

21          the free use of the property for lawful

22          purposes."

23          "...all doubts shall be resolved in favor

24  of the free use of property for lawful purposes," that

25  means, when you have restrictions on property, if you

Page 44

1  want to keep that person from doing anything that he          11:14

2  wants to his property you gotta really be, um, be very

3  clear on that.  And if there's any doubt as to what that

4  person can or can not do with his property, courts are

5  told let 'em do it.

6        Mr. Leone wanted to build a pool in the

7  special setback area.  He made an application to the

8  committee.  And the committee treated it just like all

9  the other applications that came before it.  They

10  approved his pool just like they approved all the other

11  requests for pools in all the other setback areas.

12        Now, Mr. and Mrs. Hands say that a big part

13  of their reason for buying lot 4 or lot 5 was the view

14  of the natural beauty.  And they expected that

15  everything would stay the same while they build their

16  house.  It's not reasonable.  They knew that it was a

17  development.  And not only would they build their house

18  to something that they would like but all the other

19  people would build their houses to something that they

20  would like.

21        Now they bought the lot site unseen.  One

22  of the, um, photos that they were sent, too, by Debbie

23  Au -- and again, they were in England.  They bought the

24  property site unseen.  They were only given photographs.

25  Now this is the site that they have, uh, one of the

12bcfd80-16c5-40ce-bfab-049074c20f22

Page 45

1    photos that Debbie Au sent.  And this is, um, Exhibit,    11:16

2    um, 213, okay.  And it's one of those photos that Debbie

3    Au sent.  And that shows that -- the -- the perspective

4    from Lot 5 over to Lot 4.  This wall gives you an idea

5    of where it was 'cause we don't see that in the next

6    picture.  They expected it to be just kiawe trees and

7    lots.  Now let's compare that with the present day view.

8              At best as we can do this is one of their,

9    um, Plaintiff's exhibits, uh, 285C.  You can see that

10   Mr. Hands raised his lot a few feet and now he's looking

11   down.  Same sort of view.  The pool isn't done yet.  But

12   I'll bet you when that pool is done it'll be beautiful.

13   It doesn't obstruct views.  And it's something that

14   everybody else has.

15             Well they talk about that 18-foot --

16   18-foot retaining wall.  Yes.  He had to put an 18-foot

17   retaining wall in order to build that pool.  But if you

18   look from his side and you -- if you look from

19   everyone's angle, it's not that tall.  It's only that

20   tall if you go from -- from the trail side.  And not

21   many people will go from the trail side.  And if you see

22   that wall, that wall is nothing compared to the homes

23   behind that wall.  Eighteen foot, nothing.  These

24   palaces are really -- I mean that will overwhelm

25   whatever you see if you're looking from the ocean, but

Page 46

1  from their perspective it's not an 18-foot wall.                    11:18

2           Now they say that they read the CCR's and

3  the design requirements and they thought just based on

4  that nobody will be able to build a pool.  Well let's go

5  back to what was happening and, um, when they first

6  bought the property.

7           Debbie Au sent them a bunch of materials in

8  addition to the photos, and Exhibit 508 is one of those,

9  um, faxes that Debbie Au sent; that's the Q&A, question

10 and answer thing.  In this fax she says, Guy, Question

11 16 in the attached Bluffs' information discussed

12 building a pool in the setback area.  Question 4

13 clarifies the setbacks for construction.

14           You remember when I was cross-examining

15 Mr. Hands he said, well, you know, it's not even worth

16 the paper it's written on and it doesn't apply to -- to

17 my situation because it talks about everything else.

18 Was -- the question really was, Question 16, can a pool

19 be built in the special setback on the makai side of the

20 residences on Lots 3 and 4 of The Bluffs?  He was buying

21 lot 5.  Lot 4 is the Leone lot.  It already had a house.

22 It already had a pool.  But why would it say, "Can a

23 pool be built?"

24           Well Mr. Gunderson finally explained that.

25 He said, Well, as far as I'm concerned that was a

Page 47

1    dipping pool.  It was kind of cold, was close to the,       11:20

2    uh, house, too small, and we were thinking about that,

3    too.  But the point is this told whoever was buying that

4    Lot 5 or whoever was buying that, that pools could be

5    built in the special setback.

6                    And the -- and the last part is,

7    accordingly, it appears that a pool or other structure

8    that does not block views can be built in the special

9    setback area.  That's the guiding principle.  That's the

10   guiding principle that you've seen the committee use all

11   throughout this case.

12                   We have submitted exhibits, and -- and

13   you'll see the exhibits, 503, 504, 502, a stack of

14   materials that the committee looked at or -- or was

15   related to this.  This is the materials that, um, was --

16   Mr. Stringer's office had collected dealing with the

17   Leone property.

18                   Now if they just wanted to say, okay, you

19   just build a pool or if they were really good friends

20   with him would they make him go through the hoops that

21   they made him go through?  You heard about all the

22   frustrations that he had.  At one point in time he says,

23   hey, guys, he was even a committee member, and he says,

24   hey, guys, come on, I've done this, I've done that, you

25   guys, please vote.

Page 48

1       Um, the point of this question and answer      11:22

2    thing is that that told the Hands that look, pools can

3    be built.  If that was an important thing for them, it

4    was something that they would have checked out.  Now why

5    didn't they check it out?  Why didn't they check it out

6    just like they checked out the thing about their

7    membership at the club?  That was important to them so

8    they had their attorney check out whether or not they

9    could still get that membership.  Um, sent a letter to

10   the committee and we have written confirmation 'cause,

11   you know, the rules look kind of, um, unclear and we

12   wanna make sure that when we buy this property we can be

13   members of The Bluffs.  If the view in the special

14   setback area was so important to them why did [sic] they

15   do that?

16            Now part of the -- the, um, theme that I --

17   I've presented is that these are people, the Hands,

18   these are people who want to tell their neighbors what

19   the neighbors can do to their property; and we've seen

20   that.  They're telling or they're trying to tell

21   Mr. Leone you shouldn't put that pool in there 'cause we

22   don't like it.  You can't plant hao trees -- even if

23   they're ugly -- we don't want you to plant hao trees in

24   your property.

25            They told the Federmans the same thing.

12bcfd80-16c5-40ce-bfab-049074c20f22

Page 49

 1    Federman's on the right-hand side.  We don't want you to          11:24

 2    put a pool in your property.  And they even sued them

 3    just like they sued Mr. Leone; they're neighbors.

 4             They complained about the Federmans,

 5    their -- their plumeria trees.  Again, it doesn't block

 6    views but yet their concern is -- is over what the

 7    neighbors are doing.

 8             They're concerned about the Federmans even

 9    inside their house, you can't have a second kitchen in

10    your house.  They even complain to the committee when

11    somebody else was building a house that looked too much

12    like their own house because their architect was -- was

13    doing the same thing.

14             That's the kind of people that we're

15    dealing with.  People who are use to getting what they

16    want.  I mean, yeah, they're rich and we shouldn't

17    begrudge them from that.  You know, the whole community

18    is rich.  But when you start pushing your weight around

19    using that against other people that's wrong.  They have

20    the resources, not like everybody else, to get what they

21    want, or at least try to get what they want.

22             Now even though the natural beauty of the

23    kiawe trees or the lava was so important to them, and

24    that's why they're arguing about the Leone pool, even

25    though that was important why did they hire an architect

Page 50

1   to prepare a study and say, you know, you should remove          11:25

2   some of these kiawe trees, trim some of these kiawe

3   trees in the special archaeological zone?  They didn't

4   want that.  That -- that was interfering with their

5   view.  But they had the resources to hire an

6   archeologist to say, hey, let's cut that down.

7           They're able to hire an appraiser who comes

8   before you and who is able to say with a straight face,

9   yes, the pool blocks views.  You can see for yourself.

10  It doesn't block views.  And yet they can also hire an

11  architect who charged $80,000 to come in here and also

12  say, yes, the pool blocks view.  They're able to hire

13  lawyers to file lawsuits to try to get what they want.

14  These are people who try to tell neighbors what they

15  should do with their property and these are people who

16  want special treatment.

17          They're saying nobody should be able to

18  build in the special setback area because it's against

19  the rules, but it's okay for them to break the rules.

20  They got an approval from the committee to build within

21  the special setback area and they're saying, well,

22  it's -- it's not that big a deal because it's just a --

23  a rock wall.  Right, it's not a big deal.  But the point

24  is that they're coming from the point of view, we can

25  break the rules and if somebody -- and -- and we think

1    that that is not good but we got approval, and if                    11:28

2    somebody has a problem with that they can sue us just

3    like we can sue anybody else who breaks the rules.

4             Not only in the special setback area, but

5    also in the design requirements there's a whole bunch of

6    things that they -- they really should follow but

7    they've asked for variations and they got it.  They got

8    a patina cooper roof.  They got a single pit -- uh,

9    pitch, uh, Bermuda's, uh, style roof instead of a

10   double-pitch.  I mean there's a whole bunch of -- of

11   things.  They got the grass paved, um, instead of

12   asphalt concrete.  What they asked for they got.  And

13   it's not that they were given special treatment.  They

14   were given treatment just like everybody else, as long

15   as whatever is being asked for is suitable for the

16   environment, suitable for the -- the development, the

17   committee will approve it.

18            Now in our opening statement I asked you

19   to -- to please wait until all the evidence is in before

20   you made a - a decision because he gets to go first, I

21   get to go second.  His witnesses go first; mine go

22   afterwards.  But then after all the evidence is in, then

23   you can figure for yourself who's telling the truth and

24   who's giving the full story.

25            The very beginning Mr. Revere talked about

Page 52

1    the fact that after Mr. Leone joined the committee Terry        11:29

2    Tusher, the architect consultant who recommended against

3    Leone's pool mysteriously was shunted away and then the

4    committee approved the pool after Leone joined, saying

5    that for some reason because Tusher made these

6    recommendations he was canned and Leone joined and --

7    and made sure of that so that he could get his pool.

8    Well what was the evidence that was given?  Mr. Stringer

9    testified.  We had to read his deposition.

10               First of all, Mr. Stringer made clear that

11    it was he who was hired by the committee to be the

12    architect consultant and he in turn hired Tusher first

13    and then Mr. Ayer to help him do the nitty-gritty

14    day-to-day things.  They knew more about the development

15    than Mr. Stringer.  But it was really Mr. Stringer who

16    the committee hired.

17               Well the basic question, did Mr. Tusher's

18    leaving Stringer Architects have anything to do with The

19    Bluffs?  And according to Mr. Stringer in his deposition

20    testimony no, nothing, and not according to Mr. Tusher

21    himself when he testified through his deposition

22    testimony, and not according to Mr. David Ayer who

23    continued to help Mr. Stringer after Mr. Tusher left.

24               And what about the Tusher recommendations?

25    I mean he said don't -- he recommended don't, um,

Page 53

1    approve this pool because of all of these things or                    11:31

2    until all of these things are satisfied.  Mr. Ayer

3    testified that after this long drawn out process, after

4    the give and take, the modifications, after the

5    modifications, which took more than a year, almost two

6    years, after all of that was done everything that

7    Mr. Tusher had recommended has been satisfied to allow

8    Mr. Leone to put in his pool.

9                They also claimed -- I mean this -- this is

10   a theme that has gone on throughout the -- this case,

11   that -- that Mr. Leone, Mr. Gunderson, Mr. Federman are

12   all good friends.  They lived next door.  They have

13   business relationships so they take care of each other

14   at The Bluffs.

15               Well what's the evidence?

16               When I asked Mr. Hands, um, and Mrs. Hands

17   what they knew about these people's relationships they

18   said, well, not much, except from the deposition.  Um,

19   Mr. Reinhardt who criticized the fact that these guys

20   are all together, when I asked him what do you know

21   about it?  Really, what do you know about these guys?

22   He said, I don't know.

23               Well Mr. Revere had a chance to ask

24   Mr. Gunderson and asked him point blank in his

25   deposition, Do you consider Mr. Leone a friend?

Page 54

1    Mr. Gunderson said, no.  I represent his companies          11:33

2    sometimes, but just as often I represent people who are

3    against his company.  We're not social friends.  We

4    don't go on vacations together.  I've never had a meal

5    together with him.  I don't go to his house.  He doesn't

6    come to my house, except at The Bluffs, Christmas, maybe

7    once he did, with a whole bunch of other people.

8              And when he asked, um, Mr. Leone this same

9    thing, Are you friends with -- with Mr. Gunderson, the

10   answer was the same, no, I'm not.  I know him.

11   Sometimes he represents -- his firm represents my

12   company, but....

13             There is no special, um, treatment given to

14   these people just because he's on the committee, just

15   because they come from the same place.  And that's

16   really what we have to look at in the Leone approval.

17             Now the plaintiffs claim that they had no

18   opportunity to make an oral presentation, were not

19   notified of any meetings, saying these meetings are

20   secret.  Well that's what the committee does.  The

21   committee is there to do the work for the association

22   and so they set up the -- the committee meetings and --

23   and they give each other notice, but it's not something

24   that anybody else is really interested in.  If they were

25   interested in it they could just pick up the phone and

Page 55

1    say, hey, tell me when the meeting is, let me submit          11:34

2    something.  I can't give an oral presentation?  How

3    about writing?  Can I write something to you?

4              From the very beginning in June 2003 the

5    Hands has told their attorney object to Mr. Leone's

6    plans.  That's what the attorney did.  So the committee

7    knew way back in June of 2003 that they were objecting.

8    Well just because somebody objects doesn't mean they

9    have to stop everything.  I mean you look at, Is the

10   objection reasonable?  What's going on?  I mean you look

11   at the -- the improvements that are being requested and

12   also look at the objection, and -- and determine which

13   side is reasonable.  That's what the committee was for.

14             Mr. Krueger testified.  That's the

15   committee's attorney.  And basically he gave you the

16   history of the committee:  Started with three; went all

17   the way up to eight; and with -- with the recent

18   resignation of one there's seven.  But basically anybody

19   who is asked to become a member of the committee has

20   been one.  All they have to do -- I mean there's only 22

21   lots.  There's 20 owners.  All they have to do say, I

22   wanna join.  I wanna do something for this community or

23   even for myself.  I wanna know what's going on.  And

24   they can become a committee member, a board member.

25             It's not anything special.  Plaintiffs

Page 56

1    didn't do that when they bought in 1999, the year 2000,        11:36

2    2001, 2002, 2003, 2004, 2005.  They had all this

3    opportunity to join.  Never once did they ask.

4            The thing about oral presentations, again,

5    from its history, a committee had never allowed oral

6    presentations because that's not what is done.  I mean

7    all these are are architectural plans being submitted,

8    and a lot of it is behind-the-scenes work.  The

9    architects talk to each other and they say, hey, what

10   about this?  Can't you take the -- the committee would

11   agree to this?  Yeah, I think the committee will agree

12   to this, or no, I don't think the committee will agree

13   to this.  And then it's submitted to the committee and

14   the committee takes a look at it.  Um, it's not

15   something where the owner comes in and says, well, I

16   think this is a good plan.  I think we should approve

17   this because, um, I'm complying with all the rules.  The

18   architects have already done that.

19           And remember, this is all by

20   teleconference.  Some of these people have never met

21   each other, strange as it may seem.  All go through

22   teleconference meetings so it's very difficult to

23   control.  Somebody picks up the phone they can stay on

24   the phone and they can start talking and it -- and

25   it's -- it's hard.  So they're -- they've never allowed

Page 57

11:38

1    oral presentations by owners, much less have they

2    allowed oral presentations by a neighbor saying, I

3    object to this.

4            They know his objections.  They know the

5    reasons for his objections.  And the fundamental thing

6    is looking at their view planes, even before they

7    objected, the records will show that -- and that's when

8    Terry Tusher had made his original, um, recommendations

9    back in 2002, even before the Hands knew about this, the

10   primary consideration which the committee took was, How

11   does it affect the views of the neighboring lots.

12   That's without any objections 'cause that's what the

13   committee is for.  They're doing their job.

14           They complain that they weren't given a

15   chance to give their side of the case and they talk

16   about their request for reconsideration.  Well let --

17   let's look at the context.

18           There's an Exhibit 155.  It's my letter to

19   them.  That letter, remember that from the very

20   beginning in 2003, June 2003, their attorney had already

21   sent a letter to the committee saying we object.

22   Committee knew about this.

23           In 2005, after these lawsuits were filed

24   against the Federmans and against Leone, they were given

25   a chance.  Well, I mean they were saying we didn't have

Page 58

11:40

1    a chance, we did not have a chance, give us chance to --

2    to -- can we reconsider, so they were given a chance to

3    reconsider.

4            And the questions that they -- they came

5    back with when they were given a chance by the

6    committee, committee said okay, we're in lawsuit, but

7    you want us to reconsider, we can take that up if you

8    want us to.  The question that they came up with was,

9    one, Has the design committee notified Leone that the

10   previous (alleged) approval is suspended pending the

11   outcome of the design committee's reconsideration?  If

12   not, why not?

13           Committee gave them chance, many a chance

14   for reconsideration, and now they're saying, so did you

15   tell Leone you gotta stop?  And the answer was, the

16   design committee has not suspended its previous

17   approach, uh, a -- approval as to Mr. Leone's

18   submittals.  Please review my letter of December 17,

19   2004, in which I informed you that, quote, the design

20   committee of The Bluffs at Mauna Kea has agreed to

21   entertain your client's request for reconsideration of

22   the approvals given to the Leone-Perkins Family Trust

23   for Lot 4 regarding proposed improvements.  All we said,

24   we say if you want us to reconsider we can reconsider;

25   they come back with, So have you told them they gotta

Page 59

1   stop?                                                  11:41

2              The second thing they asked was will

3   Mr. Gunderson be permitted to participate in any part of

4   the reconsideration process?  If so, please explain his

5   role?  As previously discussed, it does not seem proper

6   for him to be involved.  They maintain that

7   Mr. Gunderson cannot be a part of this because of his

8   conflict.

9              Well, response was Mr. Gunderson will

10  participate in the reconsideration process if he so

11  chooses.  There is no reason for him not to be involved.

12  As previously discussed in our lawsuit finding the

13  allegations made regarding Mr. Gunderson's conflict of

14  interest are without merit.  It's something that the

15  committee had to make a stand on.

16              There's several other things that -- that

17  they asked for, and finally the oral presentation.  They

18  asked for the oral presentation, um, and their request

19  was declined.  They're attorney submitted a bunch of

20  things for the reconsideration arguments and exhibits,

21  but they were not given an oral opportunity, which is

22  consistent with what the committee has done throughout

23  its history.  'Cause it's not something like this.  It's

24  not a formal process.  It's a committee of homeowners

25  trying to do something for their community.

Page 60

1          The running around naked thing, you have          11:43

2    heard that throughout this case.  And when Julia Hands

3    testified she's talked about being concerned that

4    Mr. Leone would be running around naked at his pool and

5    that she was concerned about her two daughters.  And

6    Mr. Revere kept asking witnesses about privacy issues,

7    what about Mr. Leone running around naked by his pool.

8    It wasn't until we had a chance to read the actual

9    deposition transcript you found out where that notion of

10   running around naked came about.  And again I -- I just

11   want to read that -- that portion to you again.

12          "Question.  Do you have any

13      concerns about the privacy, for both lots

14      frankly, as far as the swimming pools are

15      concerned?"

16          The answer given by Mr. Leone at that time

17   at his deposition was:

18          "I don't want Guy Hands to look

19      down and see me playing in my backyard.  I

20      may have said something of the sort, I may

21      have said kiddingly to him that I may not

22      want to be a pleasant sight -- I may not be

23      a pleasant sight naked running in my yard

24      in an e-mail someplace."

25          That's -- that's where they get it from.

Page 61

1    And to take that and to twist that and to say that he's          11:44

2    some sort of a pervert that they're concerned about,

3    that he's going to be running around naked all the time,

4    I mean that's not fair.  That's not right.  But at least

5    you have a chance to see where that came from.

6              The hao trees recently became an issue;

7    first it was a pool.  But that hao trees, you take a

8    look at Exhibit 168, there's a bunch of e-mails that --

9    um, don't have the e-mails.  There's an e-mail, October

10   22, 2005, and let's see, Mr. Leone says to Guy Hands:

11             "I just spoke to the landscaper.

12        We're approved for variegated hao bush, not

13        a tree.  I have no interest in blocking

14        your views and will do the sensible thing.

15        My main concern is not -- is to not see

16        your house from my lawn.  As a result I

17        will do the neighborly thing once the job

18        is finished and keep the bush to a height

19        that makes sense.  I have no interest in

20        driving you nuts and blocking your views."

21             E-mails between Mr. Leone and Mr. Hands.

22             And Mr. Hands' response to Mr. Leone,

23   October 24, 2005:

24             "Thank you very much for your

25        response.  Julia and I are most relieved

12bcfd80-16c5-40ce-bfab-049074c20f22

Page 62

11:46

1     for you to confirm that you will not

2     further block our view and that there are

3     no trees being planted in this special

4     setback area, and that any bushes being

5     planted will be kept trimmed in order that

6     our views of the ocean and coastline are

7     not further impacted."

8          This is something that just recently

9     developed.

10          Um, let's see, in December 6th, 2005, um,

11     the Hands -- Guy Hands sends a letter to Mr. Stick --

12     Stingle, who's with Augustine Realty, which is the

13     property manager for The Bluffs, and he sends it to the

14     property manager and says:

15          I was provided a copy of the

16     August 2005 Design Committee meeting

17     minutes.  I note based on the minutes that

18     the board decided to delay the vote on the

19     landscaping plans submitted by owners of

20     Lot 4.

21          We would like to express our

22     grave concern that the landscaping proposed

23     for the special setback area in Lot 4 will

24     have a dramatic negative effect on the view

25     from Lot 5.  It appears from the plans that

Page 63

11:48

1          Mr. Leone, the owner of Lot 4, seeks to

2     install hao trees in the special setback

3     area of Lot 4.

4          Um, you've heard Mr. Ayer testify that

5   based on his experience there's no way that the

6   committee will allow hao trees to grow ten feet, fifteen

7   feet, twenty feet, like plaintiffs has now been saying.

8   There's a wall there and to say that he should limit his

9   hao trees to thirty inches when there is a wall right in

10   front of it, that's not reasonable.  But the committee

11   really hasn't acted on that yet; they will though.

12          On the -- I'm almost done.  On the -- the

13   question of whether the design committee was fair and

14   reasonable, again, I'd like to point out that every

15   single lot owner who has asked to put a swimming pool in

16   the setback area, or whatever in the special setback

17   area, has been allowed to do so as long as it didn't

18   block views, lanais, portions of concrete, or swimming

19   pools, as long as it didn't block views, consistent with

20   the Q&A and consistent with the rules.  Lot 5 wasn't

21   treated any differently from any other lot.  That's

22   basic fairness.

23          Now the stuff about notice, opportunity to

24   be heard, friendship, regarding running naked, these are

25   all things that really don't impact upon the fact that

Page 64

1    the committee acted reasonably when it approved the, um,    11:49

2    pool.

3                I have fifteen minutes remaining.  Thank

4    you.  And I should be done in five; I hope to.

5                Finally, you know, the great thing about

6    the United States is -- is that, um, um, everybody has

7    access to the courts.  They feel that they've been

8    wronged they have access to the court.  They have their

9    day in court.  And the point is anybody can sue for

10   anything.  But one of the bad things about the United

11   States is that anybody can sue for anything.

12               This is one of those situations.  Really

13   shouldn't have been in court.  We have someone who is

14   concerned that his neighbors, um, have built a pool and

15   it blocks his view or impacts his view.  That is a

16   unfortunate use of everybody's time, the Court's time,

17   your time.  They've had their day in court.  And you'll

18   have a chance in just a few minutes to start

19   deliberating on that.

20               Um, I just want to point out to you the

21   Court's instruction, and that's the one we looked at

22   earlier just before, the one about "...all doubts should

23   be resolved in favor of the free use...."  The primary

24   instruction that the Court gave you is there right

25   before that.

Page 65

1                    "In order to recover damages in              11:51

2          the case -- in this case, Plaintiffs [sic]

3          Western Sunview Properties...has the burden

4          of proving, by a preponderance of the

5          evidence...that the decision made by the

6          Design Committee of Defendant The

7          Bluffs...was unreasonable -- unreasonable

8          or made in bad faith, and...that the

9          decision was the [sic] legal cause of

10         injury or damages to Plaintiff.

11                    "Now in determining whether or

12         not the decision was unreasonable, you are

13         to take into consideration both the process

14         used in reaching the decision and the

15         consequences...."

16                    The process, what the committee did.  All

17         the things that the committee did in determining whether

18         or not the Leone pool was suitable for the area.  And

19         the consequences.  What does the pool look like?  Does

20         it block the views?

21                    And they also define -- the Court also

22         defines, uh:  "The decision was made in bad

23                    faith if it was a conscious act of

24                    wrongdoing because of a

25                    dishonest purpose."

1          Nothing like that.  Nothing like that in          11:52

2     this entire case.  It was just that the Hands were

3     treated same as everybody else, not any differently.

4     They weren't treated specially like they wanted to.

5          Finally, and this is my last opportunity to

6     talk to you, and again, thank you very much for being so

7     patient.  Um, this is my one and only chance to talk to

8     you.  Mr. Revere has a chance to rebut whatever I say.

9     'Cause he was plaintiffs he gets to go first and he gets

10    to go last.  Um, but in my final comments, the Court

11    will give you a special verdict form and this is what

12    we're here for, and it will ask you three questions.

13    After you delib -- uh, get into the room there you gonna

14    pick a foreperson and start deliberating.

15          "Question No. 1.

16          "Do you find by a preponderance

17      of the evidence that the decision made by

18      the Design Committee of Defendant The

19      Bluffs at [sic] Mauna Kea was unreasonable

20      or made in bad faith?

21          "Unreasonable or made in bad faith."

22          We've gone through what the committee has

23    done.  It's not unreasonable.  It was not done in bad

24    faith.

25          If you have answered no, end of story.

12bcfd80-16c5-40ce-bfab-049074c20f22

Page 67

1    Sign and date and turn it in and we all go home.        11:54

2    Plaintiffs had their day in court.

3              They have tried to twist things and we've

4    tried to present the whole story.  And I submit to you,

5    when you go in that jury room, look at the jury verdict

6    form, look at all the questions, but I think that the

7    following questions have -- have really no relevance

8    because the answer to the first one, Did The Bluffs at

9    Mauna Kea -- was -- was the decision made by Bluffs

10   unreasonable or made in bad faith, the answer's got to

11   be no.

12             Thank you.

13             THE COURT:  Mr. Revere?

14             MR. REVERE:  You want me to proceed right

15   now?

16             THE COURT:  Yes.

17             MR. REVERE:  Okay.

18             THE COURT:  Okay.

19             MR. REVERE:  Okay.

20             Thank you.

21             Folks, um, again, this is my last

22   opportunity to talk.

23             Um, Mr. Shigekane a few minutes ago just

24   said something that, you know, nearly made me fall out

25   of my chair; that was, he said this committee doesn't

Page 68

1    allow oral presentations.  Doesn't allow oral          11:56

2    presentations.

3                In black and white, and bear in mind they

4    have tapes, they destroy the tapes, then they write

5    minutes, and then if they don't like the way that they

6    look they -- they rewrite them.  But even after going

7    through all that, look at Exhibit 90.  The committee --

8    this is in dealing with Mr. Hartley back in 2003.

9    Committee approved letting Mike Hartley remain on line

10   during the discussion of his residence's construction

11   modification requests.

12               Going down the page, black and white, also

13   discussed with the presence of committee members whose

14   residence was being reviewed, it was agreed that the

15   member would be granted a five-minute presentation.

16   Black and white.

17               Go to Exhibit 101 about Mr. Leone; same

18   thing.  Doug Leone is allowed to present his position

19   during the meeting.

20               The only thing they have ever -- as I said

21   in my initial closing -- one thing that they've been

22   consistent upon, if you're on the committee, you get to

23   make presentations on your own plans, you get to

24   criticize your neighbor's plans.

25               Something else I thought was extraordinary,

Page 69

1  what I just heard.  He said everybody who wants to build        11:57

2  something in the special setback area gets to build

3  something in the special setback area.  Not true.  How

4  do we know it's not true?  Bob Gunderson admitted.

5  David Stringer admitted.  Hey, Reddy wanted to build

6  something in special setback area and Gunderson beat it

7  back so now when you look at that map of his it's not

8  there.  He wanted to build stuff and it's not there.

9           So you say, oh, we don't allow oral

10  presentations; not true.

11           The other thing he says is, well, they've

12  got the money to hire architects, all this other stuff,

13  and they're doing stuff in the special setback area for

14  their own purposes.  Again, flat out not true.

15           Exhibit 107, um, again, you guys can't see

16  it but there's a seal on this thing you might be

17  familiar with.  This is the seal of the State of Hawaii.

18  The State of Hawaii said -- basically thanking these

19  people for fixing this thing.  And why were the kiawe

20  trees being removed?  Because they're growing in and

21  causing damage to Feature 1 of site 5630, that's why.

22  And State -- it's from the State of Hawaii.  It's not

23  from them.  It's not something they made up.  It's in

24  black and white, it's from the State on the State's

25  letterhead.

1          Now Mr. Shigekane also told you something                11:58

2    else which is -- you've gotta -- which I'll state you

3    have to read what he actually said very carefully.   He

4    said, oh, resolve all doubts in favor of the guy who

5    wants to do whatever he wants.   That's not what the

6    judge's instructions says, but this construction [sic]

7    says is when you're reading the rules con -- construe

8    in -- it in that light if there's anything ambiguous.

9    But look at this.   Is there anything ambiguous about

10   this?   It says, special setbacks in place on individual

11   home sites to protect views and to preserve hillside.

12          This is not ambiguous.   No building or

13   structure shall be placed within the special setback

14   area as shown in Exhibit A.   There's nothing ambiguous

15   about that.

16          He also says, gee, this Doug Leone was only

17   kidding.   Well that's not true.   Doug Leone said in his

18   deposition when I'm talking to him in San Francisco, oh,

19   I might have kiddingly said something.   That's his

20   attempt to explain it away.   Again, he never took the

21   witness stand so we can't really judge his credibility.

22   Also, he told Mr. Hands, see me naked in the swimming

23   pool or worst.   I don't even know what "or worst" is,

24   but, um, we leave that to your imagination.   That's what

25   he told Mr. Hands.

1        He said, oh, Hands raised their lot; not        12:00

2    true again.  Mr. Gunderson said or Mr. Stringer said,

3    their architect, the Hands didn't violate any rules

4    regarding, um, height of their lot.

5        But in any event, I mean big picture of

6    things that I asked you folks to look at is look at the

7    process which is not fair.  They give themselves breaks

8    and they say, oh, everyone's treated the same.  Why is

9    it, if everybody's treated the same, that since this

10    committee took over a lawyer and his two clients are the

11    only ones with their pools in the special setback area?

12        And in fairness to Federman and Gunderson,

13    those pools are on a grade.  This thing is 18 feet up in

14    the air.  I'm still waiting to hear what is the

15    explanation for a rule that says nothing to go in

16    special setback area, they change it to say, 'aeh,

17    thirty inches or less is okay, and Doug Leone gets 18

18    feet.  I'm still waiting for an answer to that.

19        I'm also still waiting for an answer to the

20    question of "What about the privacy issue?"  If Doug

21    Leone admits there's a privacy issue that even he's

22    concerned about what are they doing about this?

23        And Mr., um, Shigekane apologizes, well,

24    you know, I had to read all of these things into the

25    record.  Had to.  He didn't have to.  These guys are

1  sitting there in California waiting to hear the results      12:01

2  of your decision.  They could have gotten a plane and

3  come over here.  That older guy could've, instead of

4  resigning from the board, could've flown over here from

5  Oßhu.  They didn't have to read these things.  They

6  didn't want you to see them on the stand 'cause they

7  can't explain what they've been doing.

8          And the -- and the -- compare Doug Leone,

9  wanting to have these 18-foot walls and swimming pools,

10  to compare it with somebody who's gotta take care of his

11  parents is not a good analogy I think.

12          Also, we talked to you about, hey, we can

13  give exceptions, we're the sole judge, all that.  If you

14  look at Exhibits 21 and 22 they're basically telling you

15  folks they are normally suppose to be applying the rules

16  as written.  They've got no excuse for why they're

17  letting this guy do this.  And -- and as I say -- um,

18  instructions 21 and 22.  Mr. Shigekane pointed you to

19  CC&R section 8.8.  If you read what that says it says,

20  yeah, the committee can make variances for things that

21  are not strictly in compliance, and that's the type of

22  thing Mr. Reinhardt was talking about.  Like if you

23  build a roof and you goof and the roof is overhanging a

24  couple feet we're not going to make you tear down the

25  house and start over.  That's what that rule is for.

Page 73

1    Not, oh, you want to build 18-foot walls, go ahead.              12:02

2    There's a reason why that word "strictly" is in there.

3              And it's also suppose to be suitable for

4    the area that it's in.  Mr. Shigekane also talked about,

5    um, Exhibit 8 here, Exhibit 8 which is the design and

6    construction requirements, and he said this is suitable

7    for the area.  Well it can't be suitable to the area

8    when it says nothing's suppose to be in that area.

9              And also, he said, you gotta go back and

10   look at the purposes.  I love this purpose.  Exhibit 8,

11   the first page, that's -- that's -- that's what the

12   whole case is about.  'Cause look at what it says.

13   It's -- talks about -- the middle paragraph, it talks

14   about things are suppose to harmonize with the existing

15   environment.

16             Oh, and he also says, um, the slopes around

17   the home sites will retain the natural character and

18   color of the area.  Now -- now you folks tell me if you

19   think doing that retains the natural character and color

20   of the area.  That's not even close.

21             And I'm referring to Exhibit 219A.

22             Um, and it also says the home sites are

23   located where they take maximum advantage of ocean views

24   and breezes, not maximum advantage of Doug Leone doing

25   his thing in the special setback area, in his pool, lawn

1    umbrellas.  That's not the natural area.  That's not          12:04

2    retaining a natural, um, um, character.

3            Also, this variation rule, which is Article

4    VI, it says that the committee's suppose to consider

5    these variances but only if they further the purposes of

6    the -- of the -- what we just read, about natural stuff

7    and the natural coastline, and maximum of views, and if

8    they further the specific objectives contained in

9    Article IV.

10            Well the specific objective -- one of the

11   specific objectives of Article IV is this rule.

12   Building an 18-foot wall and pool and lanai in an area

13   where nothing's suppose to be built doesn't further that

14   purpose.  That's just -- that's just wrong.

15            So they don't have an unlimited power, and

16   if they did we wouldn't be here; but we've got the

17   Court's instructions that you've already talked about.

18            Um, yeah, we've already talked about the

19   committee does not treat everybody, uh -- ask Mr. Reddy

20   if he thinks that he was treated fairly when he's

21   sitting out there looking at Gunderson's pool in the

22   special setback area and Gunderson is able to force him

23   back.  Ask Mr. Gifford if he thinks everybody's treated

24   fairly when Leone's got 18-foot walls.  And please look

25   at Gifford's stairs and you tell me what you think is

1    more of a visual problem.                                    12:05

2              Also, you know, lawyers, we have a problem.

3    We can't just make stuff up.  We can't just walk in and

4    say, well, there's no evidence of this but I'm just

5    gonna make up whatever I want to today.

6              The problem is Mr. Shigekane keeps on

7    telling you folks this thing doesn't block views.  This

8    doesn't block views.  There's a problem here.  Five to

9    zero with three guys on their side and two on our side

10   all say the thing -- it does block views.  Mr. Tusher,

11   first one that looks at this says, these 14 to 15th

12   wall -- 15-foot walls are gonna block the views.  Mr.,

13   um, their guy, Knox, admits it'll block views.  Their

14   guy Ayer admits it blocks views.  And our two guys, the,

15   um, appraiser Stellmacher and Reinhardt say it blocks

16   view.  So that's why that Q&A document is completely

17   worthless, in addition to all the other reasons we

18   already talked about.

19             And Tusher says, hey, this whole void area,

20   which Mr. Shigekane says it's no big deal, that's the

21   whole point.  There's a void there.  That's what

22   provides the view out towards the Kona coast.

23             And they say, oh, this wasn't important to

24   them.  Debbie Au is a, um, is a really nice, um, realtor

25   that lives here on the Big Island.  This is something

Page 76

1    happened five years ago.  She ain't gonna lie and purger      12:06

2    herself.  There's no need to lie.  It's in black and

3    white.  She's talking about, hey, you're gonna have this

4    nice view over the, um, in the Kona coast direction.  So

5    they not making that up.  It -- it's -- it's real.

6            And they also say, oh, well, this was just

7    a dipping pool that they use to have.  Frankly, my first

8    response to that is tough.  If you didn't like it, don't

9    buy the house.  Go buy another lot somewhere else in the

10   same neighborhood or another neighborhood.  But it

11   wasn't just a dipping pool.  It's got, according to

12   Gunderson, it's 20 feet by 12 feet by 6 feet.  He calls

13   that a bathtub.  Maybe that is a bathtub everybody has

14   in California, I don't know, but it's not a dipping

15   pool.

16           Um, the, um, skip this.  We already talked

17   about it.

18           Yeah, he also says the Hands want to tell

19   their neighbors what to do.  The Hands are sue happy.

20   They love suing people.  Well when you file a lawsuit in

21   this country, or even in his country, guess what

22   happens?  It's a public document.  If Mister -- if this

23   guy ever sued anybody you don't think Mr. Shigekane

24   would know about it?  He didn't sue anybody until he

25   came to this neighborhood.

Page 77

1          And he says, oh, it's all the Hands.  How          12:07

2    does that explain the fact that Gifford and Fogelson

3    sued Robertson, Robertson sued Mauna Kea, the whole

4    neighborhood sued Mauna Kea, and everybody's suing

5    everybody?  Why?  Because they don't follow the rules.

6          And Mr. Gunderson said, you know, it's

7    really unfortunate, and he tries to blame Mauna Kea and

8    not himself.  But he says, yeah, we have a lot of

9    problems down here with these folks and these folks, and

10   lots of things going on, but up here we haven't had too

11   many problems.  I wonder why that is.  Look at Mr.

12   Shigekane's map?  They're all building within the lines

13   where they're suppose to build or they're a tiny bit out

14   there but nobody cares about it.  But that's why there's

15   a problem, they don't follow the rules.

16          And people aren't stupid.  They see,

17   Gunderson, you got your pool out here and you're telling

18   me I can't.  And it's -- it's just ridiculous.  And only

19   Gunderson's calling 'cause the pool's out there.

20          Oh, yeah, oh, that was a phrase I loved.

21   He says the Hands are pushing their weight around.  They

22   can't push their weight around these guys.  These guys

23   are, according to Mr. Gunderson, the big lawyer from

24   Silicon Valley, he admits Federman is a, quote,

25   significant player in Silicon Valley.  Give me a break.

1   The one British guy against all these guys from          12:09

2   California, that's not even close to a fair fight.  And

3   the people that are pushing their weight around are on

4   the committee in their secret meetings, doing whatever

5   they want to do.  They're the ones pushing their weight

6   around.

7                 We've already talked about the

8   archaeological thing.

9                 Yeah, they talked about, oh look, they

10  violated the rules, they built a ha-ha.  Dennis Krueger,

11  association's attorney, what's the committee's policy on

12  ha-has?  We want them to be built, well....  And it --

13  Ms. Ornellas read to you the admissions that

14  Mr. Shigekane signed in this case on behalf of his

15  client.  Is the ha-ha causing any problems for anybody?

16  No.  But they want to talk about them anyway to create a

17  non-issue.

18                 And then he says, oh, well, they've had

19  grass paved.  Who cares if they have grass paved?

20  People don't stay and sit there and think, gosh, I wanna

21  buy a coastal view but I wanna make sure that my

22  neighbor has asphalt and not grass in their driveway.

23  That's not why they buy the views, they buy in this

24  neighborhood.  They buy in this neighborhood because of

25  this special setback area saying, I'm gonna have a nice

Page 79

1    view and people are going to stay behind the line and          12:10

2    I'm going to stay behind the line.  So he's trying to

3    create all this stuff, roofs and grass pavement.  It's

4    just silly.

5              And he also said, you know, what's the

6    evidence of there's business relationships?  I know it's

7    very boring listening to those depositions yesterday but

8    in those depositions they're admitting it, he's

9    saying -- Gunderson said, I am general counsel.  When

10   one -- lawyers do that, "general counsel", that means

11   it's like in-house counsel for Irwin Federman.

12   Amazingly enough Federman got what he wanted.

13             He also says, well, I represent Doug Leone

14   who lives less than a half a mile away from me from time

15   to time.  But he's a lawyer.  Lawyers want business.  He

16   wants business in Silicon Valley.  He says, yeah, these

17   two guys are significant players.  These are not people

18   that Gunderson wants to get mad at 'em.

19             And he also basically tried to tell you

20   that an oral presentation doesn't matter.  If you

21   noticed, we just listen to Mr. Shigekane for almost 50

22   minutes.  I think he knows that it matters.  And

23   Mr. Shigekane did not walk in and say, hi, I'm Ron

24   Shigekane, it's all in these documents, I'm out of here,

25   and let's me go on for a week, 'cause oral presentation

Page 80

1    does matter.  And they know it matters 'cause Gunderson      12:11

2    said this was a benefit that we got, we're allowed to

3    make these oral presentations.  And again, it's Exhibits

4    90, 101, document that they do give themselves oral

5    presentations.

6            Yeah, he says, oh, Mr. Hands is bad for

7    writing e-mails saying to Mr. Leone please don't further

8    block my view and then has the e-mail from Doug Leone

9    saying don't worry, I'm not gonna be, I'm not going to

10   drive you crazy and block views.  What happens next?

11           August 11th, 2005 meeting he's not invited

12   to.  Can't go.  Hands can't go.  Leone and his buddies

13   are there in their secret meeting.  What happens at that

14   secret meeting?  You're approved for hao trees.

15           What does Mr. Ayer say about this entire

16   situation about, you know, Mr. Shigekane says, well,

17   look -- look how thick my -- my exhibits are.  Well,

18   folks, I could give you the Honolulu phone book and call

19   it an exhibit, it doesn't mean anything.

20           And Mr. Shigekane -- Mr. Leone, excuse me,

21   Mr. Tusher said, their own architect said, Leone kept on

22   submitting the same thing over and over again.  That's

23   what Mr. Reid said, just 'cause this guy's shuffling a

24   bunch of paper he thinks he should get approved?  Who

25   cares how thick it is?

Page 81

1        If you look at Mr. Shigekane's exhibits    12:12

2   there's stuff involving lights for other properties that

3   have nothing to do with Leone.  So you can't look and

4   go, wow, there's a lot of papers here, they must've been

5   careful.  They weren't careful.  Mr. Ayer who's still on

6   the payroll said there was, quote, no heavy discourse

7   about views or about privacy when they approved this for

8   Leone.

9        And he also said, gee, Mr.  Hands was

10  allowed to express his grave concerns.  That's true.

11  He -- he said I'm gravely concerned about this.  What do

12  they do about that?  They just shined it on.  They

13  approved the hao trees, no limitation.

14        And, um, um, never mind about rent.

15        Okay.  Mr. Shigekane basically did --

16  'cause he knows you're tired, he said, oh hey, magic

17  bullet, just say no to the first question, you folks can

18  get out of here.  He's hoping that you guys will be lax

19  as that committee is.  You folks got to read over the

20  whole form, the whole instructions, and -- and deal with

21  it.  There's only three questions there and we would ask

22  that you answer all three.

23        Again, I think the, um, finally, I think

24  the big point when you folks are making your

25  deliberations, thing that I would ask you to look at is

Page 82

1    the same thing that the judge told you to look at.  Look          12:13

2    at the process that was undertaken.  Look at the

3    consequences.  And again, they've got nothing to say

4    about the privacy, nothing, 'cause their own guy Leone

5    knows it's a problem; even for him at this point.  Look

6    at the process.  Look at the consequences of that unfair

7    process.  And look at the credibility.  And I think you

8    do that, especially with these people who were too, um,

9    cowardly, frankly, to even show up here, you're gonna

10   know that it was unfair, it was unreasonable, and we

11   would ask that you return a verdict in my clients'

12   favor.

13            Thank you.

14            THE COURT:  Okay.

15            You do solemnly swear that you will take

16   this jury into your protective custody until they have

17   arrived at their verdict and you attend them throughout

18   their deliberations and allow no one not a member of the

19   jury to speak to them concerning the facts of this case?

20            THE CLERK:  I do.

21            THE BAILIFF:  I do.

22            THE COURT:  Thank you.

23            So Mr. Ah Sing, you're excused with our

24   thanks.  Good luck with your test.

25            Ms. McMichael-Herkes, you're also excused

Page 83

1    with our thanks and you free to go at this time.                    12:15

2                  Um, Ms. Apo Oleson, you'll be a member of

3    the regular jury panel, which means that you will

4    participate in deliberations.  When you come back to

5    court you'll be taking Mr. Ah Sing's place at -- on

6    chair number 4.  Okay?

7                  And you're excused to go to the jury room

8    to begin your deliberations.

9                  Thank you.

10                 Court stands in recess.

11                 (Jury in deliberations @ 12:15 p.m.)

12   (Case recalled at 2:42 p.m.:)

13                 THE CLERK:  Civil 04-1-212 Western Sunview,

14   et al., vs. --

15                 THE COURT:  State appearances.

16                 THE CLERK:  -- Leone-Perkins Family Trust,

17   et al., continued jury trial.

18                 THE COURT:  State your appearances, please.

19                 MR. REVERE:  Good morning [sic], Your

20   Honor.  Terry Revere and Brianne Ornellas for

21   plaintiffs; with us are Mr. and Mrs. Hands.

22                 MR. SHIGEKANE:  Good afternoon, Your Honor.

23   Ronald Shigekane and Gail Kang on behalf of the

24   defendant.

25                 THE COURT:  Okay.  Thank you.

Page 84

1          Afternoon.                                          14:43

2          So will the foreperson please stand and

3     identify himself or herself?

4          THE FOREPERSON:  Carrie Lapinig.

5          THE COURT:  Ms. Lapanig, is the verdict

6     forms signed and dated?

7          THE FOREPERSON:  Yes.

8          THE COURT:  Could you present it to the

9     clerk please?

10         THE FOREPERSON:  Yes.

11         THE COURT:  Actually I should have asked,

12    has the jury reached a verdict?

13         THE FOREPERSON:  Yes, we have.

14         THE COURT:  Okay.

15         Will the clerk read the verdict, please?

16         THE CLERK:  Read the whole thing?

17         THE COURT:  Just question and answers.

18         THE CLERK:  "Question No. 1.

19              "Do you find by a preponderance

20         of the evidence that the decision made by

21         the Design Committee of Defendant The

22         Bluffs of [sic] Mauna Kea was unreasonable

23         or made in bad faith?

24              "Yes.

25              "Question No. 2.

1          "Do you find by a preponderance                    14:44

2     of the evidence that the decision made by

3     the Design Committee of Defendant The

4     Bluffs of [sic] Mauna Kea was a legal cause

5     of harm or damages to Plaintiff Western

6     Sunview Properties, LLC." [sic]

7              Answer is "yes".

8              "Question No. 3.

9              "State the amount of damages you

10    find by a preponderance of the evidence

11    that was suffered by Plaintiff Western

12    Sunview Properties, LLC as a result of the

13    decision of the Design Committee of

14    Defendant the Bluffs at Mauna Kea."

15             Answer "$700,000."

16             THE COURT:  Is there a request for polling

17    of the jury?

18             MR. SHIGEKANE:  Yes, Your Honor.

19             THE COURT:  Okay.

20             There's been a request for a polling of the

21    jury, and the purpose of the polling is to determine

22    whether or not the required number of jurors have agreed

23    to the verdict.

24             So what the clerk will do is ask the

25    question, state the answer -- I'm sorry -- will read the

Page 86

1    question and the answer, and will ask each juror          14:45

2    individually is this your verdict and you are to respond

3    appropriately.

4              Okay?  Any questions about that?

5              THE JURY:  (Collectively) No.

6              THE COURT:  Okay.

7              THE CLERK:  "Question No.  1.

8              "Do you find by a preponderance

9         of the evidence that the decision made by

10        the Design Committee of the Defendant -- of

11        Defendant The Bluffs of [sic] Mauna Kea was

12        unreasonable or made in bad faith?"

13             Answer to the question is yes.

14        Juror No.  1, Gentry Kanehailua, is this

15   your verdict?

16             THE JUROR:  Yes.

17             THE CLERK:  Juror No.  2, Carrie Lapinig,

18   is that your verdict?

19             THE JUROR:  Yes.

20             THE COURT:  I'm sorry?

21             THE JUROR:  Yes.

22             THE COURT:  Okay.

23             THE CLERK:  Juror No.  3, John Watkins, is

24   that your verdict?

25             THE JUROR:  Yes.

1            THE CLERK:  Juror No.  4, Judy Apo Oleson,      14:46

2   is that your verdict?

3            THE JUROR:  Yes.

4            THE CLERK:  Juror No. 5, Michelle Simmons,

5   is that your verdict?

6            THE JUROR:  Yes.

7            THE CLERK:  Juror No.  6, Lisa Hata, is

8   that your verdict?

9            THE JUROR:  Yes.

10            THE CLERK:  Juror No.  7, Carl Ferrin, is

11   that your verdict?

12            THE JUROR:  Yes.

13            THE CLERK:  Juror No. 8, Georgia Kishinami,

14   is that your verdict?

15            THE JUROR:  Yes.

16            THE CLERK:  Juror No.  9, Keith Cockett

17   Knell, is that your verdict?

18            THE JUROR:  Yes.

19            THE CLERK:  Juror No.  10, Janet Yanagi, is

20   that your verdict?

21            THE JUROR:  Yes.

22            THE CLERK:  Juror No.  11, Jane Okamura, is

23   that your verdict?

24            THE JUROR:  Yes.

25            THE CLERK:  Juror 12, Edward Andrade, is

Page 88

1    that your verdict?                                    14:46

2                THE JUROR:  Yes.

3                THE CLERK:  "Question No. 2."

4                "Do you find by a preponderance

5          of the evidence that the decision made by

6          the Design Committee of Defendant The

7          Bluffs of [sic] Mauna Kea was a legal cause

8          of harm and/or damages to Plaintiff Western

9          Sunview Properties, LLC."

10               Answer to the question is yes.

11               Juror No.  1, Gentry Kanehailua, is that

12   your verdict?

13               THE JUROR:  Yes.

14               THE CLERK:  Juror No.  2, Carrie Lapinig,

15   is that your verdict?

16               THE JUROR:  Yes.

17               THE CLERK:  Juror No.  3, John Watkins, is

18   that your verdict?

19               THE JUROR:  Yes.

20               THE CLERK:  Juror No.  4, Judy Apo Oleson,

21   is that your verdict?

22               THE JUROR:  Yes.

23               THE CLERK:  Juror No. 5 Michelle Simmons,

24   is that your verdict?

25               THE JUROR:  Yes.

Page 89

1          THE CLERK:  Juror No.  6, Lisa Hata, is          14:47

2    that your verdict?

3          THE JUROR:  Yes.

4          THE CLERK:  Juror No.  7, Carl Ferrin, is

5    that your verdict?

6          THE JUROR:  Yes.

7          THE CLERK:  Juror No.  8, Georgia

8    Kishinami, is that your verdict?

9          THE JUROR:  Yes.

10         THE CLERK:  Juror No. 9, Keith Cockett

11   Knell, is that your verdict?

12         THE JUROR:  Yes.

13         THE CLERK:  Juror No.  10, Janet Yanagi, is

14   that your verdict?

15         THE JUROR:  Yes.

16         THE CLERK:  Juror No.  11, Jane Okamura, is

17   that your verdict?

18         THE JUROR:  Yes.

19         THE CLERK:  Juror No.  12, Edward Andrade,

20   is that your verdict?

21         THE JUROR:  Yes.

22         THE CLERK:  "Question No.  3.

23             "State the amount of damages you

24      find by a preponderance of the evidence

25      that was suffered by Plaintiff Western

Page 90

1        Sunview Properties, LLC as a result of the                 14:48

2        decision of the Design Committee of

3        Defendant The Bluffs at Mauna Kea?"

4              Answer to the question is

5        $700,000.

6              Juror No.  1, Gentry Kanehailua, is that

7    your verdict?

8              THE JUROR:  Yes.

9              THE CLERK:  Juror No.  2, Carrie Lapinig,

10   is that your verdict?

11             THE JUROR:  Yes.

12             THE CLERK:  Juror No.  3, John Watkins, is

13   that your verdict?

14             THE JUROR:  Yes.

15             THE CLERK:  Juror No.  4, Judy Apo Oleson,

16   is that your verdict?

17             THE JUROR:  Yes.

18             THE CLERK:  Juror No.  5, Michelle Simmons,

19   is that your verdict?

20             THE JUROR:  Yes.

21             THE CLERK:  Juror No.  6, Lisa Hata, is

22   that your verdict?

23             THE JUROR:  Yes.

24             THE CLERK:  Juror No.  7, Carl Ferrin, is

25   that your verdict?

```
 1                THE JUROR:  Yes.                        14:48

 2                THE CLERK:  Juror No.  8, Georgia

 3   Kishinami, is that your verdict?

 4                THE JUROR:  Yes.

 5                THE CLERK:  Juror No.  9, Keith Cockett

 6   Knell, is that your verdict?

 7                THE JUROR:  Yes.

 8                THE CLERK:  Juror No.  10, Janet Yanagi, is

 9   that your verdict?

10                THE JUROR:  Yes.

11                THE CLERK:  Juror No.  11, Jane Okamura, is

12   that your verdict?

13                THE JUROR:  Yes.

14                THE CLERK:  Juror No.  12, Edward Andrade,

15   is that your verdict?

16                THE JUROR:  Yes.

17                THE COURT:  So the required number of

18   jurors have, um, indicated that they support the

19   verdict, and therefore Court will enter judgment

20   accordingly and ask that Mr. Revere submit a form of the

21   judgment.

22                MR. REVERE:  Yes, Your Honor.

23                THE COURT:  Okay.

24                In regard to the jurors, thank you very

25   much for your participation in this trial.  Thank you
```

Page 94

14:50

```
 1   COUNTY OF HAWAII      )

 2   STATE OF HAWAII       )

 3                         CERTIFICATE

 4                   I, Geraldine L. Saffery, CSR 328, RPR,

 5   Official Court Reporter of the Third Circuit Court, do

 6   hereby certify that the foregoing pages numbered 2 to

 7   93, inclusive, contain a true and accurate

 8   transcription, done to the best of my ability, of the

 9   proceedings held in connection with the aforementioned

10   cause; and

11                   To protect the transcript's integrity, this

12   certification of authenticity and accuracy is valid only

13   with an original inked signature and an unbroken

14   transcript seal.

15                   Dated this 1st day of April, 2006.

16

17

18   _____

19   GERALDINE L. SAFFERY, CSR 328, RPR

20

21

22

23

24

25
```

AUTHENTIC COPY
The original certified E-Transcript
file was electronically signed
using RealLegal technology.