**LOVE & NARIKIYO**
A Limited Liability Law Company

CHAD P. LOVE  1617-0
CHUCK T. NARIKIYO  4823-0
BARBARA J. KIRSCHENBAUM  5825-0
1164 Bishop Street, Ste. 1105
Honolulu, Hawaii  96813
Tel. No. 546-7575
Fax. No. 546-7070

**MOTOOKA YAMAMOTO & REVERE**
A Limited Liability Law Corporation

TERRANCE M. REVERE  5857-0
JACQUELINE E. THURSTON  7217-0
1000 Bishop Street, Suite 801
Honolulu, Hawaii  96813
Tel. No. (808) 532-7900
Fax No. (808) 532-7910

Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> LEONE-PERKINS FAMILY TRUST; et al, <br><br> Defendants. | Civil No. 04-1-0212 <br> (Declaratory Judgment; Other Civil Action) <br><br> MEMORANDUM IN OPPOSITION TO DEFENDANTS DOUGLAS LEONE AND PATRICIA PERKINS-LEONE'S MOTION FOR SUMMARY JUDGMENT; FILED 10/01/04; EXHIBITS 1 THRU 24; DECLARATION OF CHAD P. LOVE; CERTIFICATE OF SERVICE <br><br> HEARING SET: <br> DATE:  FRI., 11/12/04 <br> TIME:  11:00 a.m. <br> JUDGE:  Greg K. Nakamura |

FILED
2004 NOV -4  PM 3:16
C. OKAWA, CLERK
THIRD CIRCUIT COURT
STATE OF HAWAII

# EXHIBIT 37

**MEMORANDUM IN OPPOSITION TO DEFENDANTS DOUGLAS LEONE
AND PATRICIA PERKINS-LEONE'S MOTION FOR
SUMMARY JUDGMENT, FILED 10/01/04**

## TABLE OF CONTENTS

A.    Overview and Summary ................................................................ 1

    1.    There are numerous "questions of fact" which bar summary judgment; these questions of fact must be sent to the jury ............... 1

    2.    Federal case irrelevant ................................................... 2

    3.    Abandonment ................................................................ 2

    4.    Leones' construction will consume over 50% of setback ................... 2

    5.    Violation of § 4.10.3 ...................................................... 3

    6.    The 19 foot wall .......................................................... 3

    7.    Collateral estoppel ...................................................... 3

    8.    Continuance ............................................................... 3

B.    Leones' Construction Will Black Plaintiff's Views of Ocean/ Coastline ................................................................ 3

C.    Plaintiff has not abandoned § 4.17 of the Covenants, Conditions and Restrictions ("CCRs"); the Design Committee Cannot Waive Plaintiff's Right to Enforce § 4.17; Plaintiff Has Standing to Sue to Enforce § 4.17 ................................................................ 4

D.    Leones' Variance for the Pool and Other Construction is Improper Because:  (1) Contrary to the Governing Documents; (2) Admission by Design Committee; (3) Unfair ................................................ 9

E.    The Hands' Hands are Clean ................................................ 12

F.    Leones Rely Upon Inadmissible Evidence (And Taken Out of Context) ................................................................ 13

G.    Leones' Plans Were in Direct Violation of § 4.10.3 of the Design
      Requirements; Yet the Design Committee -- Friends of Leones --
      Approved.................................................................................... 15

H.    § 4.17 (As Interpreted by the Design Committee) Prohibited
      Construction Which Took Up More Than 50% of the No-Build
      "Special Setback Area" -- Leones Still Exceeds that 50%........................... 16

I.    Leones' Construction of a 19' Concrete Wall Does Not "Preserve
      Hillsides" .................................................................................. 17

J.    Collateral Estoppel (Issue Preclusion) Does Not Apply................................ 17

K.    Double Standard:  Design Committee Would Not Allow Plaintiff to
      Have Vertical Plantings That Would Hurt Neighbor's Views ......................... 18

L.    Rule 56(f) Continuance ................................................................. 19

## A. Overview and Summary

One of the reasons Plaintiff paid the premium price of $3.25 million for Lot 5 in 1999 was because the governing documents (§4.17 and other sections) promised that they would have pristine views -- not only directly makai from its lot to the ocean but also over the backyards of their neighbors' lots.  The governing documents expressly set out *"Special Setback Areas"* on the makai side of the ocean lots for exactly this purpose. When Plaintiff's managers visited the site before the purchase, it confirmed what was in the governing documents.  The model house to the left (Defendant Leones on Lot #4) was completely erected and there was no pool or other construction in their/Leones' *"Special Set back Area"*.  And the lots to the right of Plaintiff's lot had no construction whatsoever. (In fact, the photos taken in May 2001, Ex. 3 and 4, show that even up through May 2001 there was no construction in the *"Special Setback Areas"*.)

However, Defendants are arguing that at some point in time, *without any notice to Plaintiff*, without asking for any input from Plaintiff, this very important protection (§4.17) somehow became "abandoned".  As shown by the photos (Ex. 3 and 4) this valuable protection was still in place as of May 2001.  It is patently unfair to Plaintiff, after it paid $3.2 million for the lot (and much more for construction) to take away this valuable protection that it relied upon.  Defendant Leone already has a swimming pool -- which is not in his *"Special Setback Area"*.  However, he wants to build a *bigger* one with other structures and plantings -- in his no-build zone *("Special Setback Area")*.  The construction and plantings will block Plaintiff's view of the ocean.  The concrete retaining wall for this bigger pool will be 19 feet high, as viewed from trail below.  (See rendering Ex. 18) This construction should not be permitted.  Equity and the law protect Plaintiff's right to preserve what it paid for.

This Court should deny Defendants Leones' Motion for Summary Judgment because:

1. *There are numerous "questions of fact" which bar summary judgment; these questions of fact must be sent to the jury.*  E.g., Is Plaintiff's architect correct that Leones' pool/terrace/raised planters in the "*Special Setback Area*" will "significantly" block Plaintiff's view of the ocean/coastline [Ex. 1 ¶5.3.1]?  Or is Leones' architect correct that Leones' construction will have "minimal" impact on Plaintiff's view?  [Char declaration ¶11

attached to Leones' Memo]. Did *Plaintiff* abandon the no-build rule of §4.17? Can the Association abandon §4.17 on behalf of Plaintiff? Did the Association abandon the no-build rule of §4.17, and if so, did it abandon §4.17 only if the construction took up less than 50% of a lot's "Special Setback Area"? Did the Plaintiff and the Association abandon the protection of **views**? Does Leones' pool, massive filled area, or trees block Plaintiff's view of the ocean? (N.B. Even Judge Ezra ruled, in the Federman case ("Federal case") that blocking of the **ocean** view was a violation of §4.17.)

   **2. *Federal case irrelevant*.** Leones' planned construction is **apples-and-oranges** different from neighbor Federmans' construction. In the Federal/Federman case, Judge Ezra ruled:

> "Section 4.17 [which bars construction in the Setback Area] was effectively abandoned to the extent that it disallowed structures that <u>did not block views</u> <u>in the special setback area</u>." [Ex. 2; emphasis added.]

As shown by the architect Jim Reinhardt's report [Ex. 1 ¶5.3.1], Leones' pool/plantings WILL *significantly* block Plaintiff's view of the ocean and the coastline.

   **3. *Abandonment*.** Plaintiff did not "abandon" its right to an ocean view (a view provided for by the governing documents). At the time of Plaintiff's purchase (1999) and at least for the following two years (2000 and 2001) there was absolutely no construction in the no-build zones ("**Special Setback Areas**") of either of Plaintiff's neighbors [Exs. 3 and 4]. The Association has no power to abandon *Plaintiff's* right to the protection of the no-build zone. Furthermore, under the facts and even Judge Ezra's ruling, at best, the Association abandoned the no-build zone only to the extent that the improvement *did not block views*. There is no evidence that the Association, or anyone else, abandoned the protection of views.

   **4. *Leone's construction will consume over 50% of Setback*.** When Leones first applied for the variance to build a pool in the Setback, the Design Committee rejected Leones' plans because, inter alia, it consumed more than 50% of their no-build area. However, after the Committee fired their architect and Mr. Leone became a Committee member, Leones' planned construction -- which still consumed over 50% of the "**Special Setback Area**" -- was approved by the Design Committee. These facts clearly raise questions of fact as to the Design Committee's reasonableness and good faith: they have

ignored the advice of their own consultant and approved plans by Leone, a committee member, whose company is another committee member's client.

**5. Violation of §4.10.3.**  Design Requirement §4.10.3  (regarding view blockage) requires that plans be submitted with information as to the height of trees when they are fully grown.  Leones' plans never contained this information.  Therefore, the approval process must be redone.

**6. The 19 foot wall.**  Leones are constructing a 19 foot retaining wall.  This is a violation of §4.17's rule to "preserve hillsides".  See rendering Ex. 18.

**7.Collateral estoppel.**  Leones' reliance on collateral estoppel is erroneous. Collateral estoppel does not apply until the judgment is final.  There has been no final judgment in the Federal case.  There is also no identity of issues.

**8. Continuance.**  At the very least this Motion should be continued.  There are various depositions that should be taken and documents to be produced.

**B.  Leones' Construction will Block Plaintiff's Views of Ocean/Coastline**

If Judge Ezra's ruling were final and applicable to this case, it would, by its express language, _defeat_ Leones' motion on the view claim.  This is because Judge Ezra ruled that §4.17 still prohibits blockage of views and Leones' planned construction will block Plaintiff's view.

As stated by Leones on page 11 of their Memo, Judge Ezra held that §4.17 was abandoned only to the extent that _"it prohibited structures which do not interfere with view planes"_.

In his written Order [Ex. 2 at 13], Judge Ezra held:

> "Section 4.17 was effectively abandoned to the extent that it disallowed structures that <u>did not block views</u> in the special setback area."  [Emphasis added.]

Judge Ezra further stated [Ex. 2 at 15-16] that:

> "Section 4.17 has been effectively abandoned as it pertains to structures built in the setback area that <u>do not block views</u>.  **Defendants'** [Federman's] pool, through its alleged glare alone, <u>does not 'block' Plaintiffs' view</u>."  [Emphasis added; footnote omitted.]

Unlike what Leones would have this Court believe, Judge Ezra did **not** say that *all* pools and *all* terraces do not, and never could, block views. Judge Ezra held that in the Federal case, the *Federmans'* pool and the *Federmans'* terrace did not block views. Judge Ezra certainly made no ruling on Leones' plans. And, as shown by the expert opinion of architect Jim Reinhardt, Leones' proposed improvements will significantly impact Plaintiff's view of the ocean and coastline. [See Ex. 1 ¶¶5.3.1, 5.3.2.]

Leones, without support, state in their Memo at 13 that Leones' pool will not block Plaintiff's view. The declaration of Leones' own architect directly refutes this where he admits that, while "minimal" or the result of Plaintiff's own fault, Plaintiff's views will be affected. [Char declaration ¶¶10 - 12.] Moreover, Leones ignore the landscaping issues and nowhere deny that their landscaping will block Plaintiff's view. Accordingly, there is at least a question of fact that Leones' plans for the "*Special Setback Area*" and plans for landscaping will block Plaintiff's view.

Accordingly, even under Judge Ezra's present ruling, Leones' variance is in violation of the governing documents. At the very least, it would be a question of fact calling for the denial of Leones' "Motion for Summary Judgment".

C.   **Plaintiff Has Not Abandoned §4.17 of the Covenants, Conditions and Restrictions ("CCRs"); the Design Committee Cannot Waive Plaintiff's Right to Enforce § 4.17; Plaintiff Has Standing to Sue to Enforce §4.17.**

Leones argue that the "no-build" rule for the "*Special Setback Area*" has been **abandoned**. As discussed below, there is no collateral estoppel effect of Judge Ezra's partial abandonment ruling -- the ruling is not final, has not been certified, and is currently before Judge Ezra pursuant to Plaintiff's "Motion for Reconsideration".

Therefore, Leones must establish on the basis of the record properly before this Court that there is no genuine issue of material fact regarding abandonment. Leones do not succeed.

Leones state that building in the "*Special Setback Area*" has been "universal". At the very least, there is a factual issue regarding the accuracy of this specious argument. The Bluffs (as is relevant here) consists of 22 lots, each with their own "*Special Setback Area*" [Ex. 5].

-4-

Leones introduce no evidence that the other 21 "*Special Setback Areas*" universally have/will have improvements that obstruct/will obstruct views of the ocean. The closest Leones come is a statement that all the *ocean front* lots have or will have improvements within their "*Special Setback Area*". The oceanfront lots comprise only 12 of the 22 of the lots at The Bluffs. How can Leones claim that proves universal and <u>complete</u> abandonment of §4.17? Not even Judge Ezra held this.

In addition, the record shows that at the time Plaintiff bought Lot 5 in 9/99 (in reliance upon the "No Build in Setback Rule") neither of Plaintiff's next door neighbors (Lots 6 and 4) had built anything in their "*Special Setback Areas*". [Exs. 3-4, photos of area in 2001.] Moreover, at least 6 of the 22 lots had not even been sold at that time. [Ex.24] How can it be said that Plaintiff "abandoned" its rights when: (a) at the time its purchased Lot 5 the "*Special Setback Areas*" on the neighboring lots were preserved/natural and other lots had not even been sold yet; (b) there is nothing in the record showing that Plaintiff had knowledge that the Design Committee had allegedly approved plans for other owners to build in their "*Special Setback Areas*"; and (3) there is nothing in the record to show when those lots started *visible* construction?

*The fact that the Design Committee may have abandoned §4.17 is irrelevant; Plaintiff never abandoned.* The issue of whether the Design Committee may have abandoned §4.17 is separate and distinct from the issue of whether <u>Plaintiff</u> abandoned §4.17. Restatement (Third) of Servitudes at §7.4 makes it clear that:

"A servitude benefit is extinguished by abandonment when *the beneficiary* relinquishes the rights created by the servitude."

The commentary to this section states:

"Abandonment is normally used to describe a situation in which servitude has terminated because <u>all beneficiaries have relinquished</u> their rights . . . to enforce a particular covenant or general plan of covenants."

Plaintiff is a beneficiary of §4.17 and has not relinquished its rights. <u>Disputes Between Adjoining Landowners: Easements</u>, §1.05, see also §3.01 (Matthew Bender and Co. 2003) states (emphasis added):

*[B]efore the courts will recognize abandonment, they will require proof of <u>the easement owner's intent</u> to abandon in addition to the non-use. . . . In order to establish abandonment of an easement, it must be shown that <u>the holder</u>*

_of the easement_ acted _voluntarily and in such a decisive manner as to show unequivocal intention to abandon the easement._

Additionally the commentary to Restatement (Third) of Servitudes at §8.3 of Restatement provides that:

> _Fairness to the complaining party requires recognizing that a servitude beneficiary need not take steps to prevent violations that do not have present negative impact on the beneficiary's use or enjoyment. Thus, a servitude beneficiary who fails to seek enforcement against one violation does not waive the right to enforce against violations that have a different or greater impact on the beneficiary's interests._

Under _McNamee v. Bishop Trust_, 62 Haw. 397, 408-09 (1980), as long as an owner receives _any benefit_ from the continued enforcement of the restriction, it is enforceable by an individual owner.

Leones rely on _Sandstrom v. Larsen_, 59 Haw. 491 (1978), to support their abandonment argument. However, _Sandstrom_ relied upon _Gibbs v. Cass_, 431 S.W.2d 662, 668 (Mo. App. 1968), which held that a restriction will not be deemed to be abandoned unless the restriction would "seem to have become of no value whatever," and when enforcing it would "confer no substantial benefit on other property owners or the plaintiffs." (Emphasis added.)

In _Witmer v. McCarty_, 566 S.W.2d 102, 104 (1978) (emphasis added), the Court held that restrictive covenants were enforceable even where the plaintiffs had failed to object to other violations:

> In _Stephenson v. Perlitz_, 537 S.W.2d 287, 288-89 (Tex.Civ.App. Beaumont 1976, writ ref'd n. r. e.), quoting _Cowling v. Colligan_, 158 Tex. 458, 312 S.W.2d 943, 945 (1958), the Court states there are two circumstances where courts have refused to enforce residential-only restrictions:
>
> > (1) "(B)ecause of the acquiescence of the lot owners in such substantial violations within the restricted area as to amount to an abandonment of the covenant or a waiver of the right to enforce it."
> > (2) "(B)ecause there has been such a change of conditions in the restricted area or surrounding it that it is no longer possible to secure in a substantial degree the benefits sought to be realized through the covenant."

**An important exception to this rule is that the owner "is not precluded from enforcing a restriction against an owner whose violation of it**

> *materially affects him, by failing to complain of another's violation which does not materially affect him in the enjoyment of his property or which is merely trivial."* Stephenson v. Perlitz, supra at 289, quoting Stewart v. Welsh, 142 Tex. 314, 178 S.W.2d 506, 508 (1944).
>
> *A real estate expert witness testified that having a mobile home in the subdivision would lower the value of the property in the subdivision. There was no evidence that any outbuildings or any other matters complained of would affect property values. Therefore, the plaintiff owners were not precluded from enjoining the violations that materially affect them while not complaining of any other alleged violations.* [Witmer at 104 (emphasis added.)]]

And, in *La Place v. Ruehl*, 206 A.D. 761, 762 (1923), the court held:

> *The plaintiffs are not estopped from maintaining this action because there are other garages on the restricted property. They may ignore inoffensive violations of the restrictions, and still restrain others that are offensive to them.* Chesebro v. Moers, 233 N. Y. 75, 134 N. E. 842, 21 A. L. R. 1270; Rowland v. Miller, 139 N. Y. 93, 34 N. E. 765, 22 L. R. A. 182.

Here, Leones' plans, unlike all of the others that Plaintiff knows of (with the exception of the Federmans' of Lot 6), are offensive in that Leones' plans obstruct Plaintiff's view. Therefore, unlike whatever violations that may exist in the other *"Special Setback Areas"* that do not affect Plaintiff, the violations by Leones (and Federmans) directly and adversely affect Plaintiff. Accordingly, Plaintiff would continue to receive a benefit -- protection of the promised view -- from the enforcement of the "no build" restriction of §4.17. The Design Committee cannot waive or abandon Plaintiff's rights. Plaintiff had no obligation to discover and sue every time the Design Committee granted a variance that had no impact on Plaintiff.

*Plaintiff has standing to enforce, regardless of whether the Design Committee abandoned or not.* Section 12.5 CCRs expressly allows individual owners to protect their rights to enforce the governing documents as written. The Design Committee cannot waive Plaintiff's rights simply because it decided it would not pursue the violation itself.

Numerous cases have held that an association/committee cannot waive a homeowners' rights contained in the governing documents, even where the association has retained the "sole discretion" to grant variances. *Cohen v. Kite Hill Community*

*Association*, 191 Cal. Rptr., at 211, 213-216 (Cal. App. 1983) involved a variance to a setback rule and held:

> *The Kite Hill Community Association's approval of a fence not in conformity with the Declaration is analogous to the administrative award of a zoning variance.* **In the zoning context as well as here, a departure from the master plan in the Declaration stands to affect most adversely those who hold rights in neighboring property.** *Hence, what the California Supreme Court has stated with regard to judicial review of grants of variances applies equally well to the Association's actions herein: "[Courts] must <u>meaningfully review grants of variances in order to protect the interests of those who hold rights in property nearby the parcel for which a variance is sought</u>. A zoning scheme, after all, is similar in some respects to a contract; each party foregoes rights to use its land as it wishes in return for the assurance that the use of neighboring property will be similarly restricted, the rationale being that such mutual restriction can enhance total community welfare. If the interest of these parties in preventing unjustified variance awards for neighboring land is not sufficiently protected, the consequence will be subversion of the critical reciprocity upon which zoning regulation rests."* **For nearly identical reasons, we conclude that the courts must be available to protect neighboring property interests from arbitrary actions by homeowner associations.**
>
> . . . .
>
> *Similarly, plaintiffs' suit here turns on the <u>good faith and lack of</u> arbitrariness of the Committee's approval, assessed in the light of all of the provisions of the Declaration. . . . [T]he fence in question was not in conformity with the provisions of the Declaration . . . inasmuch as the codefendants placed a solid stone fence on a side yard with a view, whereas exhibit C clearly requires a wrought iron open fence.* **Although the Declaration vests "sole discretion" in the Committee and allows for reasonable variances, their decisions <u>must</u> be "in keeping with the general plan for the improvement and development of the Project," and of course, must be made in good faith and not be arbitrary.** [Emphasis added.]

*Cohen* has been followed by numerous other courts and others have independently reached the same conclusion: Owners have standing to enforce written restrictions regardless of the exercise of "sole discretion" by a committee to waive *its* rights by ignoring a written rule. *See, e.g., Leonard v. Stoebling*, 102 Nev. 543, 728 P.2d 1358 (Nev. 1986); *Wright v. Cypress Shores*, 413 So.2d 1115, 1123 (Ala. 1982); *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So.2d 665 (Fla. App. 1974); *Johnson v. The Pointe Community Association*, 73 P.3d 616 (Ariz. App. 2003).

Thus, there is no conflict between Hawaii's *McNamee* and cases such as *Cohen supra* and *Leonard supra* which hold that an aggrieved owner can bring an action to enforce a written setback rule regardless of a variance by a design committee.

*Cohen*, unlike what Leones might argue, is valid law. It has been <u>expressly adopted and followed by the California Supreme Court</u> in *Lambden v. La Jolla Shores*, 980 P.2d 940, 952 (Cal. 1999). *Lambden* also relied upon *Cohen* (at 980 P.2d 950) for the "<u>settled rule of law</u> that homeowner associations <u>must</u> exercise their authority to approve or disapprove an individual homeowner's construction or improvement plans <u>in conformity with the declaration of covenants and restrictions,</u> and in good faith") (Emphasis added).

The cases simply recognize that those most likely to be hurt by a variance (to a view protecting setback) are the next door neighbors, who ought to (a) receive a modicum of fairness before a variance is given; and (b) have the right to enforce the covenants as written.

The plain language of the document limits the Association's power to grant certain very narrow/minor variances. Any other reading would lead to absurd results. Instead of pages of detailed Design and Construction Requirements, there need be only one sentence:

> The Design Committee can do whatever it feels like, and can waive enforcement rights belonging to other owners.

If Leones' argument were adopted, it vitiates the whole point of buying into, literally and figuratively, a *planned development* such as The Bluffs.

*Actions speak louder.* Leones state (p. 12) that *"the Setback requirement was abandoned from the start."* If §4.17 had been "abandoned" why did Leones bother to ask for approval to build in the "*Special Setback Area*"? And, again, even if the Design Committee had abandoned §4.17, this would not affect Plaintiff's right to enforce.

**D.    Leones' Variance for the Pool and Other Construction is Improper Because:
(1) Contrary to the Governing Documents; (2) Unfair.**

Leones state (pp. 14-15) that it is undisputed that the Design Committee has authority to grant variance for construction in the "*Special Setback Area*"; that Plaintiff is only complaining about the process by which it was granted. This is untrue. On page 7 of

its Memorandum in Support of its Motion for Partial Summary Judgment (p. 7), Plaintiff expressly reserved "its position that the Board/Design Committee did not have the power to grant any variances whatsoever to build in the *Special Setback Area*".

(1) *Governing Documents*. **Section 2.8**:  In order to construct a legally defensible structure at The Bluffs, CCRs §2.8 stated that all construction must be approved by the Design Committee **and** must conform to the "Design Requirements":

> No new improvements, or material alterations in existing improvements shall be constructed, placed or made on any Lot of any classification, except in accordance with plans, specifications, and other materials approved by the Design Committee, **and** **in accordance with the applicable Design Requirements**.  The Design Committee **shall not** **approve** any work or improvements for a Lot or portion of a Lot for use which is inconsistent with the provisions of this Declaration.  [Emphasis added].

When Plaintiff decided to purchase Lot 5, it relied upon the governing documents that said its neighbors could not build in the "*Special Setback Area*".  [Ex. 6 at 73-75, Ex. 7 at 25-27, Ex. 20¶4].  It thought that this would protect its views.

Section 4.17 of the "Design Requirements" [Ex. 5] stated:

> *§4.17 Special Setbacks*
> *Special setbacks have been placed on the individual Homesites* *to* *protect views* *and to preserve hillsides.* *No building or structure shall be* *placed within the special setback areas as shown on exhibit A*.
> [Emphasis added]

Exhibit A was a map at the end of the "Design Requirements" showing with clear markings where the "*Special Setback Area*" was for each lot.  [Ex. 5.]

Also, the first page of the "Design Requirements" [Ex. 5] stated in part:

> *Article I Purpose*
> *Recognizing the inherent natural beauty of . . . The Bluffs area . . . . the* *following design requirements and review procedures have as their purpose* *the development of resort residential homes* *to harmonize with the existing* *environment.*
>
> *Each homesite, . . . all developed under a series of protective design* *requirements.*
>
> *The homesites are located where they can take maximum advantage of* *ocean views* *. . .* [Emphasis added.]

Wouldn't the average reasonable purchaser -- based upon the above -- be justified in thinking that his neighbor could not build in the "*Special Setback Area*" -- and he would have an unimpaired view of the sunsets?  *If a person paid $3,250,000 for the Mona Lisa painting, would he be justifiably upset if the bottom third of the painting had graffiti on it?*

**Section 8.8**:  Leones argue that CCRs §8.8 [Ex. 8] empowers the Design Committee "to grant variances from **_any and all_** Design Requirements" and build in the "*Special Setback Area*".  However, even a non-lawyer can quickly see that §8.8 was never meant to give the Design Committee such unbridled power -- for "**_any and all_**" variances. That provision obviously applies to **_minor_** encroachments -- e.g., if the corner of a house encroached into the "*Special Setback*" by <u>one</u> or <u>two inches</u> then the Design Committee could allow it.

**Article VI**:  Leones claim that Article VI of the "Design Requirements" authorizes the variance.  But that language does not support Leones' position because:

(1)  That vague language directly conflicts with the express/clear NO BUILD language in §4.17.  The Hawaii Supreme Court has adopted the well established law in *Kaiser v. Murray,* 49 Haw. 214, 227 (1966), which held:

> *And in case of inconsistency between general and specific provisions, the specific controls the general.*  [Accord, Restatement (Second) Contracts §203]

(2)  Article VI expressly states that it only allows variances to the "**_general design requirements_**" -- i.e., Article II of the Design Requirements (p. 3).  Section 4.17 is not in that section, the General Requirements.  It is in the "Special Requirements" (p. 4 of the Design Requirements).

Therefore, this Court needs not delve into the reasonableness of the process.  The governing documents show that the alleged variance was illegal in the first instance.

Hawaii Courts have long recognized that an entity that is given the power to be sole judge of something does not grant the entity the absolute discretion to do whatever it wishes.  The entity still must actually use judgment and exercise its power reasonably. *See Rawlins v. Honolulu Soap Works Co.,* 9 Haw. 262, 266 (1893) ("[T]he fact that one is sole judge does not authorize him to act whimsically or in bad faith.  The very term 'judge'

implies fairness of action and the exercise of one's judgment, not mere whim or will.")
Additionally Courts have recognized that whenever a private association is legally required
to refrain from arbitrary action, the association's action must be substantively rational and
procedurally fair. _Pinsker v. Pacific Coast Society of Orthodontists (1974) 12 Cal. 3d 541,_
_550 [116 Cal. Rptr. 245, 526 P.2d 253]._

(3)  Process was unfair.  Hawaii law mandates that the _first_ step is to analyze
whether a specific rule in the governing documents controls.  If it does, the rule serves as
the standard for the Court in judging a committee, not an analysis of the reasonableness of
the committee.  _McNamee v. Bishop Trust_, 62 Haw. 397, 403 (1980) held:

> **[A]bsent specific written restrictions**, [an association's] judgment in
> deciding whether to approve or disapprove [an owner's] plans must be
> measured against the standards of good faith and reasonableness."

In _McNamee_ there were no written standards, so the Court properly went into the
reasonableness of the process.  Here, there _is_ a specific written restriction, §4.17 of the
"Design Requirements".  However, if a "good faith" analysis is necessary, it should first be
pointed out that Courts have recognized that whenever a private association is legally
required to refrain from arbitrary action, the association's decisions must be substantively
rational and procedurally fair.  _Pinsker v. Pacific Society of Orthodontists_, 12 Cal. 3d 541,
550, 116 Cal. Rptr. 245, 526 P.2d 253 (1974).  Here Leones' variance process was not
rational/fair but was secret, tainted, misleading and rife with conflicts of interest.  Mr. Leone
and his firm's lawyer sit on the Committee and ignored their own architects advice.  This is
discussed in detail in Plaintiff's Memo in Support and will be discussed in Plaintiff's Reply
Memo re its Motion for Partial Summary Judgment.

### E.  The Hands' Hands Are Clean.

Leones argue (Memo at 13-14) that Plaintiff's variance claims should be dismissed
because Plaintiff has "unclean hands" -- i.e., Plaintiff built a small ditch/barrier near the
mauka edge of the "_Special Setback Area_".  This argument fails because:

(1)  The minor ditch/barrier (aka "ha ha") complained about does not block any
views and will not be visible [Exs. 9 & 10].  In fact, it was designed to preserve views.  This
is not a violation of §4.17 which talks about "**protecting views.**"

-12-

(2)  The ditch/barrier (ha ha) was necessary for security/protection and built pursuant to the recommendations of an archaeologist with State approval to help protect an archeological site [Exs. 9-12].

(3)  The doctrine of "'unclean hands will not be invoked when to do so would work injustice and wrong[.]"  *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 232 (1976).

*Republic Molding Corporation,* 319 F.2d 347 (9th Cir. 1963):

> *In the interests of right and justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right.  The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck.*

*Nelson v. Emmert,* 105 S.W.3d 563, 568 (Mo.App. S.D. 2004):

> *Stated another way, the doctrine of unclean hands requires that a party coming into a court of equity must have acted in good faith as to the subject matter of the lawsuit.  The doctrine is not one of absolutes, however, but can be utilized in the discretion of a court of equity.  The doctrine " 'does not apply to every unconscientious act or inequitable conduct on the part of a plaintiff.'*
>
> *As such, the doctrine should be applied when it promotes right and justice by considering all of the facts and circumstances of a particular case.  In some instances, the "hoary and murky doctrine" of unclean hands was held inapplicable when the alleged misconduct did not injure the party defendants.  Osterberger v. Hites Const. Co., 599 S.W.2d 221, 229[19] (Mo.App.1980); see also Price, 373 S.W.2d at 62 (holding "wrong must have been done to the defendant himself and not to some third party"); Simcox v. Obertz, 791 S.W.2d 440, 443 (Mo.App.1990) (holding doctrine inapplicable where alleged misconduct did not affect defendants).  In other instances, the doctrine was not invoked in the presence of exceptional circumstances because to do so would work an injustice and a wrong.  Smith v. Holdoway Const. Co., 344 Mo. 862, 129 S.W.2d 894, 902 (1939).  [Some citation omitted.]*

**F.  Leones Rely Upon Inadmissible Evidence (And Taken Out Of Context).**

In support of their motion, Leones rely on evidence that is not properly before the Court. This is fatal to Leones' motion.  As held by the Hawaii Supreme Court, **only admissible evidence may be considered in deciding a Motion for Summary Judgment**. See e.g., *Takaki v. Allied Machinery Corp.*, 87 Hawaii 57, 69 (App. 1998) (emphasis added)

(*"These 'papers' must be admissible in evidence, for a motion for summary judgment may be decided only on the basis of admissible evidence."*).

Here are some of Leones' exhibits that may not be considered by the Court:

(i) **Leones' Ex. 20:  "Questions and Answers For the Bluffs."**  Inadmissible hearsay and offered for the truth of the matter stated therein.  It is unauthenticated; there is no information on who authored the documents when it was written or why.  Contrary to what Leones claim, Deborah Au did not authenticate this.

(ii) **Leones Ex. 6:  E-Mails to and from Leones and Hands.**  Leones rely on e-mails to and from the Leones and Guy Hands (one of Plaintiff's managers).  The statements made in these letters were made in the course of compromise negotiations.  [See e.g. Leones Ex. 6 at AW00834 and AW00835.]  Leones rely upon the e-mails in an attempt to prove invalidity of Plaintiff's claims.  This is expressly prohibited by Hawaii Rules of Evidence Rule 408, stating in relevant part that "*[e]vidence of conduct or statements made in compromise negotiations or mediation proceedings is likewise not admissible.*"  (Emphasis added).

Leones' use of the e-mails is so out of context that Plaintiff feels compelled (even though they are inadmissible) to "set the record straight."  E.g., Leones state that the e-mails show that Plaintiff's managers (Guy and Julia Hands) would be "happy to provide" a letter approving the Leones' construction as long as Plaintiff received Leones' plans and advice from counsel.  [Memo at 8-10.]  Here is what Guy Hands' August 13, 2003, e-mail really said:

> *Based on our conversation at the Mauna Kea **it did not appear** that the work you intended to do would have any substantially negative effects to our view planes and, indeed, there were possible benefits with regard to a shared party wall.*
>
> ***In order for us to have confidence in this regard we really do need full copies of the plans that you have submitted or intend to submit to the Design Committee along with appropriate other documentation.*** *I am happy for you to send these directly by email or, alternatively, by FedEx to my office [address omitted] in order for me and Julia to study them.*
>
> *However, while I understand you do not want lawyers involved, we would possibly get a quicker solution if Ronda Kent was copied as clearly what you are wanting is a letter of non-objection to your construction proposal to be*

*provided to the Design Committee by Western Sunview Properties.  **Clearly, that is not a letter that Western Sunview Properties will be able to provide without first obtaining legal advice.**  However, **it is a letter that, <u>provided there are no negative consequences for Western Sunview Properties</u>** with regard to your improvements and the Design Committee understand that such approval is in reference to your plot and not in any way a comment as to the meaning of the special setback zone, **<u>then it is something which, subject to the comfort as to the effects of construction not being negative on Western Sunview Properties</u>, in the spirit of neighbourliness, both Julia and I in our capacity as Managers of Western Sunview Properties would be happy to provide.*  [Emphasis added.]

Guy Hands' e-mail was thoughtful and clear in expressing Plaintiff's willingness to compromise *if* there were no negative impact on Plaintiff's views.  That Plaintiff had not determined whether there would be any negative impact is abundantly clear.

G.    **Leones' Plans Were in Direct Violation of §4.10.3 of the Design Requirements; Yet the Design Committee -- Friends of Leone -- Approved.**

People who purchased lots at The Bluffs paid millions of dollars for each of their lots. Plaintiff paid $3,250,000 for a 38,262 square foot lot.  One of the most important selling points of the lots was the stunning ocean and sunset views.  Accordingly, the Developer, in the governing documents, made assurances to the purchasers that those views would be protected.  One of those provisions was §4.10.3 which states:

> **§4.10.3  Design Requirements of The Bluffs**
> The landscape plan shall indicate the **<u>expected height of trees when mature</u>** and shall be subject to design and review and approval.

However, Leones' plans showed no "expected height".  All they showed was the current size.  [See Ex. 13, Leone's planting plans.]  How could the Design Committee approve Leones' plantings if they did not know the height of the plantings?

Attached also is a rendering showing the expected blockage by Leones' plumerias and pool [Ex. 21].  This rendering shows that a substantial part of the ocean view will be blocked.

The report by architect Reinhardt also shows that there is a genuine question of fact regarding whether the trees planted by Leones will block Plaintiff's views [Ex. 1]. The plumeria trees' average height is 23 feet. Based on this alone, the Motion should be denied.

**H.    Section 4.17 (As Interpreted by the Design Committee) Prohibited Construction Which Took Up More Than 50% of the No Build "Special Setback Area"--- Leones Still Exceed That 50%.**

Despite the clear wording of §4.17, the Design Committee has allowed improvements within the Special Setback Area. However, it still imposed restrictions. One of those restrictions was that owners could not build more than 50% of the area. That is, if a lot was 20,000 square feet and the Special Setback Area of that lot was 2,000 square feet, the homeowner would not be permitted to build on more than 1,000 of that Special Setback Area.

On November 27, 2002, the Design Committee's attorney wrote a letter to Leones, rejecting their plans and telling Leones to make certain revisions:

> Dear Mr. Leone:
>                                  * * *
> To assist you in developing a renovation plan that will adequately address the Committee's concerns, the Committee has itemized the following conditions for a revised plan:
>
> 1.  Under the terms of the Design And Construction Requirements, NO construction is allowed in the Special Setback Area (SSA).
>
> The Committee will, however, consider giving you a variance for limited construction within the SSA subject to the following conditions:
>                                  * * *
> *Swimming pool, decks, walls and other improvements proposed within the SSA shall not exceed more than 50% of the SSA.*   [Ex. 15, emphasis added]

Leones' plans show that construction in the no-build zone is still in excess of 50% of the Setback Area [Ex. 1 ¶5.5.1]. Nevertheless, the Design Committee approved them.

Why would the Design Committee **reject** such a large use of the *"Special Setback Area"* in 2002 but **approve** it in 2003? And why would they approve it when two members agree that allowing structures of 30 inches in the Setback was "never an approved

condition of the CCRs" and is a "non-existent rule"? [Ex. 19]. What happened in the interim? Answer: Mr. Leone became a member of the Design Committee! [Exs. 16-17.]

The fact that the Design Committee established a rule of 50% and then let Leone violate that rule creates a "question of fact" for the jury as to whether this approval was proper and whether §4.17 has been "abandoned" entirely, or partially, or only abandoned for Committee Members and their friends.

**I. Leones' Construction of a 19' Concrete Wall Does Not "Preserve Hillsides"**

The governing documents state:

> **§4.17 Special Setbacks**
> *Special setbacks have been placed on the individual Homesites <u>to</u> protect views <u>and to preserve hillsides</u>. No building or structure shall be placed within the special setback areas as shown on exhibit A.*
> [Emphasis added]

The rendering attached hereto as Ex. 18 shows what the hillside on the makai side of Leones' lot will look like after Leones' construction. There will be a 19 foot wall of concrete on top of 9 feet of fill. This is a direct violation of §4.17 [Ex. 1 ¶5.3.1]. This is a condition that Judge Ezra never dealt with in the Federman case.

**J. Collateral Estoppel (Issue Preclusion) Does Not Apply**

Under Hawaii Law, there must be a "final judgment" in order for collateral estoppel to apply. See e.g., *Bremer v. Weeks II*, 104 Hawaii 43 (Haw. 2004). There is no "final judgment' in the Federal case.

The Federmans in the Federal case have filed a motion for 54(b) certification. Plaintiffs have filed a memorandum in opposition to Federmans' request for 54(b) certification. Plaintiffs have filed a Motion for Clarification and Reconsideration in the Federal case. The Federal Court has not yet ruled on any of these motions. Accordingly, the decision in the Federal case is far from final.

And, even assuming the Federal Court grants 54(b) certification, this does not mean that the judgment is final. Under *__Hawaii law__*, a judgment is ***not*** final until the appeal period

has run without an appeal or there is a final judgment on appeal. In *Littleton v. State of Hawaii*, 6 Haw. App. 70, 75 (1985), the Intermediate Court of Appeals held:

> The expression "final judgment" is used in different contexts in the law, but in every instance imports a meaning of conclusiveness. For appeal purposes, for instance, a final judgment is one which settles all claims of all parties to the proceeding from which review is sought. See M.F. Williams, Inc. v. City & County of Honolulu, 3 Haw.App. 319, 650 P.2d 599 (1982). It is also significant in the application of the legal doctrine of res judicata. In that context, the supreme court, in Glover v. Fong, 42 Haw. 560 (1958), held that "[a] judgment is final where the time to appeal has expired without appeal being taken." Id. at 574. It follows from Glover that where an appeal has been taken, a judgment of the trial court is not final, at least for purposes of res judicata. [Emphasis added.]

See also, *Kauhane v. Acutron Company,* 71 Haw. 458, 465 (1990) (circuit court's judgment became final for res judicata purposes once plaintiff's appeal withdrawn); *Silver v. Queen's Hosp.,* 63 Haw. 430, 440 (1981) (district court's judgment was finalized by the state supreme court's denial of certiorari).

Issue preclusion also only applies where the issue decided in the prior adjudication is <u>identical</u> to the one presented in the action in question. *Flores v. Barretto*, 99 Hawaii 270, 278 (2002). Leones and Federmans' situations are different and involve different issues. Judge Ezra <u>**did not**</u> make rulings on issues relevant to the view claim for which Leones presently seek summary judgment. For example, Judge Ezra expressly stated that he was not addressing whether the Design Committee had authority to grant a variance to built within the **"Special Setback Area"** [Ex. 2 at 13].

K.    **Double Standard: Design Committee Would Not Allow <u>Plaintiff</u> to Have Vertical Plantings That Would Hurt Neighbor's Views.**

The Design Committee sent Plaintiff a letter requesting that it reconsider its vertical landscaping plans [Ex. 14]. But, it did not ask Leones to do the same and Leones' plans show vertical landscaping in the Setback [Ex. 13].

## L.  Rule 56(f) Continuance.

Plaintiff believes that the affidavits, declarations, and evidence presented herein show that there are, at a minimum, many genuine issues of material fact calling for the Court to deny Leones' motion outright.  However, if the Court will not deny it outright, Plaintiff asks for a continuance of the summary judgment hearing based on the affidavit attached hereto.  This Court should grant a continuance because:

- Plaintiff noticed Mr. Leone's deposition for November 8, 2004.  Mr. Leone could not attend the November 8th deposition and is asking that his deposition be take in early December.

- Leones' architect needs to be deposed regarding his statement that there will be minimal blockage of views and other pertinent issues.

- The members of the Design Committee need to be deposed on various issues -- e.g., why they did not ask for the mature height of the plants that Leones would be planting? why did they relax the maximum of 50% construction in the "Special Setback Area"?

- Plaintiff  attempted to obtain the "permit plans" from the Hawaii County Planning Department [see Declaration of Chad P. Love attached] without success.

- After learning of the alleged approval by the Design Committee, Plaintiff requested the final plans from the Association.  Plaintiff also asked Leones (on 8/16/04) and Association (on 7/29/04) for "all records pertaining to [Leones] and/or Lot 4[.]", via a production request which Leones and Association[1] have a containing duty to supplement.

A continuance will allow Plaintiff the opportunity to conduct the above discovery which will show that Leones' plans will block Plaintiff's ocean view; that Leones and the Association have violated the governing documents; and that Leones' plans have not been

---

[1]     The Association's agent, Stringer Architects, was originally served with a subpoena for these documents.  By agreement of the parties, this was treated as a request for production upon the Association.

properly approved.  Accordingly, based on the declaration attached hereto, Plaintiff requests a Rule 56(f) continuance if the Court is not inclined to deny Leones' motion outright.

DATED:  Honolulu, Hawaii, _NOVEMBER 4, 2004_.

CHAD P. LOVE
CHUCK T. NARIKIYO
BARBARA J. KIRSCHENBAUM
and
TERRANCE M. REVERE
JACQUELINE E. THURSTON

Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

WESTERN SUNVIEW PROPERTIES,        )    CIVIL NO. 04-1-0212
LLC,                               )    (Declaratory Judgment; Other Civil Action)
                                   )
                   Plaintiff,      )    DECLARATION OF CHAD P. LOVE
                                   )
         vs.                       )
                                   )
LEONE-PERKINS FAMILY TRUST,        )
et al.,                            )
                                   )
                   Defendants.     )
_____   )

## DECLARATION OF CHAD P. LOVE

The undersigned hereby declares that:

1.      I am an attorney licensed to practice law before all the Courts in the State of Hawaii and attorney for Plaintiff in the above-captioned proceeding and that I have personal knowledge of the matters discussed herein and am competent to testify as to the matters stated herein and make this declaration upon personal knowledge except and unless stated to be upon information and belief.

2.      Attached hereto as **Exhibit 1** is a true and accurate copy of a report done by Architectural Diagnostics Ltd., dated November 1, 2004.

3.      Attached hereto as **Exhibit 2** is a true and accurate copy of the "Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Counter Motion for Summary Judgment", filed September 15, 2004, in the case of *Western Sunview Properties, LLC, et al. v. Irwin Federman, et al.*, Civ. No. 03-00463DAE/LEK in the United States District Court for the District of Hawaii ("Federman lawsuit").

4.      Attached hereto as **Exhibit 5** is a true and accurate copy of the Design and Construction Requirements for Homes for The Bluffs at Mauna Kea, dated February 19, 1997. This document was attached as Exhibit 1 to Plaintiffs' Motion for Partial Summary Judgment filed on 09/09/04 ("MPSJ") and authenticated by Guy Hands

in his Declaration in Support of the MPSJ (the original filed with the Court on 09/14/04), both of which were filed in the Federman lawsuit.

5.     Attached hereto as **Exhibit 6** are true and accurate copies of excerpts of the condensed transcript of the oral deposition of Guy Hands, including cover page, correction sheet, and court reporter certificate, taken on November 29, 2003, in the Federman lawsuit.

6.     Attached hereto as **Exhibit 7** are true and accurate copies of excerpts of the condensed transcript of the oral deposition of Julia Hands, including cover page, correction sheet, and court reporter certificate taken on December 2, 2003, in the Federman lawsuit.

7.     Attached hereto as **Exhibit 8** is a true and accurate copy of the Declaration of Protective Covenants, Conditions and Restrictions of The Bluffs at Mauna Kea, dated February 19, 1997, and recorded at the Bureau of Conveyances, State of Hawaii, on March 17, 1997, under Doc. No. 97-034153.  This document was attached as Exhibit 9 to Plaintiff's MPSJ and authenticated by Guy Hands in his Declaration in Support of the MPSJ (the original filed with the Court on 09/14/04), both of which were filed in the Federman lawsuit.

8.     Attached hereto as **Exhibit 9** is a true and accurate copy of the Declaration of Loriann Gordon, dated June 14, 2004, the original of which was filed with Plaintiffs' "Separate and Concise Statement of Facts in Opposition to Defendants Irwin and Concepcion Federman's Motion for Summary Judgment, filed April 9, 2004" on June 18, 2004, in the Federman lawsuit.

9.     Attached hereto as **Exhibit 10** is a true and accurate representation of the ha ha (ditch and barrier).

10.     Attached hereto as **Exhibit 11** is a true and accurate copy of a letter, dated October 1, 2003, from Paul H. Rosendahl, Ph.D., to P. Holland McEldowney that was attached as Exhibit 34 to Plaintiffs' "Separate and Concise Statement of Facts in Opposition to Defendants Irwin and Concepcion Federman's Motion for Summary Judgment, filed April 9, 2004" on June 18, 2004, in the Federman lawsuit.  This document was authenticated by the Declaration of Paul H. Rosendahl, Ph.D., which was attached as Exhibit 72 to "Plaintiffs' Concise and Separate Statement of Facts in

Opposition to Defendants Federmans' Motion for Summary Judgment, filed 07/27/04 and in Support of Plaintiffs' Counter Motion for Summary Judgment", filed on August 5, 2004, in the Federman lawsuit.

11.    Attached hereto as **Exhibit 12** is a true and accurate copy of a letter, dated October 16, 2003, from P. Holland McEldowney to Paul H. Rosendahl, Ph.D., that was attached as Exhibit 35 to Plaintiffs' "Separate and Concise Statement of Facts in Opposition to Defendants Irwin and Concepcion Federman's Motion for Summary Judgment, filed April 9, 2004" on June 18, 2004, in the Federman lawsuit.  This document was authenticated by the Declaration of Alvin Tamashiro, which was attached as Exhibit 73 to "Plaintiffs' Concise and Separate Statement of Facts in Opposition to Defendants Federmans' Motion for Summary Judgment, filed 07/27/04 and in Support of Plaintiffs' Counter Motion for Summary Judgment", filed on August 5, 2004, in the Federman lawsuit.

12.    Attached hereto as **Exhibit 13** is a true and accurate copy of plans (Sheet Nos. L-1 thru L-5 dated August 2004, prepared by Wimberly Allison Tong & Goo).

13.    Attached hereto as **Exhibit 14** is a true and accurate copy of a letter from the Design Committee to Loriann Gordon, dated April 20, 2001.

14.    Attached hereto as **Exhibit 15** is a true and accurate copy of a letter from Dennis Krueger, attorney for the Design Committee, to Douglas Leone, dated November 17, 2002.  This document was produced by the Association on August 23, 2004, in the Federman lawsuit.

15.    Attached hereto as **Exhibits 16 and 17** are true and accurate copies of minutes from the Design committee meetings held on February 11, 2003, and May 6, 2003, respectively.  These documents were included among the records produced by Stringer Architects at the deposition upon written interrogatories of Blanche Allen, Custodian of Records for Stringer Architects, taken in the Federman lawsuit, on April 26, 2004, as described in the transcript attached as Ex. 19 to Plaintiff's MPSJ in the Federman lawsuit.

16.    Attached hereto as **Exhibit 19** is a true and accurate copy of e-mail messages, dated March 9 and March 10, 2004, from Jerry Elder to David Stringer, with a copy to Bob Acree, Bob Gunderson, Mike Hartley, and Doug Leone and e-mail

message, dated March 9, 2004, from Bob Gunderson to Jerry Elder. These documents were included among the records produced by Stringer Architects at the deposition upon written interrogatories of Blanche Allen, Custodian of Records for Stringer Architects, taken in the Federman lawsuit on April 26, 2004, as described in the transcript attached as Ex. 19 to Plaintiff's MPSJ in the Federman lawsuit.

17.     Attached hereto as **Exhibit 20** is a true and accurate copy of a Declaration of Guy Hands, dated June 9, 2004, the original of which was attached to Plaintiffs' "Separate and Concise Statement of Facts in Opposition to Defendants Irwin and Concepcion Federman's Motion for Summary Judgment, filed April 9, 2004" which was filed on June 18, 2004, in the Federman lawsuit.

18     Attached hereto as **Exhibit 22** is a true and accurate is a true and accurate facsimile copy of a Declaration of Fritz Johnson, Jr.; the original signed copy of the Declaration will be filed with the Court upon receipt.

19.     Attached hereto as **Exhibit 23** is a true and accurate copy of a Declaration of Chris Clever; the original signed copy of the Declaration will be filed with the Court upon receipt.

20.     Attached hereto as **Exhibit 24** is a true and accurate copy of a fax transmittal, dated September 12, 1999 6:30 HST, and Price List from Deborah Au to Mr. Hands. These documents were marked as Exhibits 4 & 5 to the deposition of Deborah Au taken in the Federman lawsuit on January 29, 2004, and was authenticated by the deponent, as indicated at 58:13-24; 59:19-25; 98:13-23 of the transcript that was attached as Exhibit 3 to "Plaintiffs' Concise and Separate Statement of Facts in Opposition to Defendants Federmans' Motion for Summary Judgment, filed 07/27/04 and in Support of Plaintiffs' Counter Motion for Summary Judgment", filed on August 5, 2004, in the Federman lawsuit.

21.     Attached hereto as **Exhibit 3** is the photo of The Bluffs subdivision authenticated by Chris Clever in his Declaration attached hereto. I have noted thereon the locations of Plaintiff's Lot 5, Leones' Lot 4, and Federmans' Lot 6.

22.     Plaintiff asks for a continuance of the summary judgment hearing if the Court will not deny Leones' motion outright. This Court should grant a continuance because:

- Plaintiff noticed Mr. Leone's deposition for November 8, 2004. Mr. Leone could not attend the November 8th deposition and is asking that his deposition be taken in early December.

- Leones' architect needs to be deposed regarding his statement that there will be minimal blockage of views and other pertinent issues.

- The members of the Design Committee need to be deposed on various issues -- e.g., why they did not ask for the mature height of the plants that Leones would be planting; why they relaxed the maximum of 50% construction in the "Special Setback Area".

- Plaintiff attempted to obtain the "permit plans" from the Hawaii County Planning Department without success.

- After learning of the alleged approval by the Design Committee, Plaintiff requested these plans from the Association. Plaintiff also asked Leones (on 8/16/04) and Association (on 7/29/04) for "all records pertaining to [Leones] and/or Lot 4[.]", via a production request which Leones and Association[1] have a continuing duty to supplement.

A continuance will allow Plaintiff the opportunity to conduct the discovery discussed above which Plaintiff believes will show that Leones' plans will block Plaintiff's ocean view; that Leones and the Association have violated the governing documents; and that Leones' plans have not been properly approved.

I CHAD P. LOVE DECLARE UNDER PENALTY OF LAW THAT THE FOREGOING IS TRUE AND CORRECT.

DATED: Honolulu, Hawaii, _____ NOV 0 4 2004 _____.

_____

CHAD P. LOVE

---

1   The Association's agent, Stringer Architects, was originally served with a subpoena for these documents. By agreement of the parties, this was treated as a request for production upon the Association.

-5-

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC, | ) ) ) | Civil No. 04-1-0212 (Declaratory Judgment; Other Civil Action) |
| Plaintiff, | ) ) ) | CERTIFICATE OF SERVICE |
| vs. | ) ) ) | |
| LEONE-PERKINS FAMILY TRUST; et al, | ) ) ) ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon the following persons via hand delivery at the addresses indicated on NOV 0 4 2004 :

ANDREW V. BEAMAN, ESQ.
LEROY E. COLOMBE, ESQ.
745 Fort Street, 9th Flr.
Honolulu, HI 96813
(Attorneys for Leone-Perkins Family Trust)

SIDNEY K. AYABE, ESQ.
RONALD SHIGEKANE, ESQ.
1001 Bishop Street, Ste. 2500
Honolulu, HI 96813
(Attorneys for The Bluffs at Mauna Kea
   Community Association)

DATED: Honolulu, Hawaii, NOV 0 4 2004 .

CHAD P. LOVE
CHUCK T. NARIKIYO
BARBARA J. KIRSCHENBAUM
and
TERRANCE M. REVERE
Attorneys for Plaintiff