# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3       ----------------------------------

 4    WESTERN SUNVIEW PROPERTIES, LLC,  )

 5    et al.,                           )

 6           Plaintiffs,                ) Civil No.

 7           vs.                        ) CV03-00463 DAE LEK

 8    IRWIN FEDERMAN; CONCEPCION S.     )

 9    FEDERMAN, et al.,                 )

10           Defendants.                )

11       ----------------------------------

12

13                 DEPOSITION OF DAVID STRINGER

14

15    Taken on behalf of the Defendants at the offices of

16    Chun, Kerr, Dodd, Beaman & Wong, 9th Floor, 745 Fort

17    Street, Honolulu, Hawaii, commencing at 9:09 a.m.,

18    Tuesday, August 3, 2004.

19

20

21

22

23

24    BEFORE:  CHARI L. POSSELL, CSR NO. 414

25             Certified Shorthand Reporter
```

Page 98

1  BY MR. REVERE:
2  Q. As you are sitting here today, you are not
3  sure how 4.10.2, which discourages palm trees,
4  transmogrified into a committee policy to actually
5  encourage palm trees in the special setback area?
6  A. I'm sorry. Transmogrified?
7      MR. BEAMAN: Object to the form of the
8  question.
9      MR. SHIGEKANE: Objection.
10 BY MR. REVERE:
11 Q. That it changed from a policy of -- a
12 written policy discouraging palm trees to a de facto
13 policy of encouraging palm trees?
14     MR. BEAMAN: Object to the form of the
15 question. Misstates evidence.
16     MR. SHIGEKANE: Same objection.
17     MR. KANG: Join.
18     THE WITNESS: I can tell you in a
19 general sense that it definitely did not encourage
20 palm trees.
21 BY MR. REVERE:
22 Q. When you say "it," you mean the rules, or
23 design committee, or something else?
24 A. The decision to accept what Gunderson had,
25 that's what I am assuming, did that affect the

Page 99

1  decision to encourage? And, A, I don't think any
2  position was taken, but it definitely didn't
3  encourage the decision to allow.
4  Q. I believe you testified earlier that palm
5  trees are okay as long as they weren't clustered to
6  block views?
7  A. They weren't clustered, right.
8      MR. BEAMAN: Well --
9  BY MR. REVERE:
10 Q. Isn't there a cluster of palm trees located
11 on the Lot 5 side of the Federman swimming pool?
12 A. That's a subjective question as to what
13 cluster is, and how tight. People will take palm
14 trees and put them five or six feet apart so that
15 their head forms create one giant ball. So it is a
16 matter of judgment as to how far apart those things
17 want to be before they are a cluster.
18     What we have attempted to do is make sure
19 they were, at least hopefully, far enough part that
20 the head forms of cocos don't join to form a broad
21 occlusion.
22 BY MR. REVERE:
23 Q. But if they do form a broad occlusion, like
24 a continuous occlusion, you would consider that to be
25 a cluster, correct?

Page 100

1      MR. BEAMAN: Object to the form of the
2  question. Vague and ambiguous. Object to -- again,
3  the term "cluster" is subjective.
4      THE WITNESS: It's subjective.
5  BY MR. REVERE:
6  Q. Did the Federmans have a landscape plan
7  that's approved or not?
8      MR. BEAMAN: Object to the form of the
9  question.
10 BY MR. REVERE:
11 Q. For Lot 6 of The Bluffs at Mauna Kea?
12 A. My general recollection is that the
13 Federman landscape plan has gone through a flux of
14 approvals and denials. And it started, I think, when
15 we came aboard, and I am trying to be as clear as I
16 can. When we came aboard, there was a submission to
17 put pavilions and raised elements down by the pool.
18     We were apprised of what had taken place
19 prior, and we, after reading the open space
20 requirements, felt that those man-made improvements
21 definitely shouldn't go there.
22     And then there was some discussion about
23 whether or not they had approval to do that from
24 Mielcke before. And then there was a letter from
25 Mielcke that I had heard about, never seen, that

Page 101

1  rescinded this approval. And so it was always this
2  sort of vague process.
3      Final approval on all of the landscape
4  documents I don't, in my mind, think was ever
5  achieved.
6      Terry Tusher could probably enlighten you
7  more on that.
8  Q. With regard to Mr. Gunderson, again, is the
9  committee -- let me ask a more general question.
10     Are you aware of Gunderson planting palm
11 trees even past his property line, out on Lot 29 that
12 Mauna Kea owns?
13 A. I personally don't know that in fact
14 happened, but that assertion has been made.
15 Q. Do you know -- not whether he did it or
16 ordered somebody to do it, but do you know one way or
17 the other that there are palm trees between
18 Mr. Gunderson's lot and the ocean?
19 A. You know, I never really considered where
20 the line was.
21 Q. Do you know one way or the other as to
22 whether or not Mr. Gunderson caused the shoreline
23 trail that is between the homes located at The Bluffs
24 at Mauna Kea and the ocean, if he caused that to be
25 moved?

## Page 170

1  BY MR. REVERE:
2  Q. The next sentence says, "Jerry Elder had a
3  conflict of interest and Bob Gunderson due to a
4  personal" -- "due to personal interest regarding the
5  Elder residence also had conflict of interest, and
6  both should be excused from review of the Elder
7  residence." Do you see that?
8  A. I do.
9  Q. Did you agree with what Krueger was saying?
10        MR. BEAMAN: Same objections.
11        THE WITNESS: Personally, yes. I
12  didn't have any official capacity, so.
13  BY MR. REVERE:
14  Q. And the reason Gunderson had a conflict is
15  because he had a disagreement with his next-door
16  neighbor about what should or should not be approved
17  on each other's lots, correct?
18        MR. BEAMAN: Objection for lack of
19  foundation.
20        THE WITNESS: They had a running
21  dispute. How is that?
22  BY MR. REVERE:
23  Q. Do you know if those were ever mediated or
24  arbitrated, that dispute?
25  A. Do I know it? No. Did I hear of it? Yes.

## Page 171

1  Q. Which was it? Did they mediate the dispute
2  or arbitrate?
3  A. I am not sure.
4  Q. Do you know who the mediator was, or
5  arbitrator was?
6  A. No.
7  Q. Do you know the company Dispute Prevention
8  and Resolution, DPR, if they are involved in that?
9  A. I don't know.
10  Q. Do you know if AAA was?
11  A. I don't know that either.
12  Q. Did you appear at any mediation or
13  arbitration?
14  A. I think that was before my time.
15  Q. Going to page -- before we leave that
16  topic, do you think that a lawyer should be allowed
17  to sit on a committee and judge the plans of his
18  clients?
19        MR. BEAMAN: Object to the form of the
20  question. Incomplete hypothetical. Calls for
21  speculation. Lacks foundation. The question calls
22  for a legal conclusion.
23        MR. SHIGEKANE: Same objection.
24        THE WITNESS: I have no basis by which
25  I -- I couldn't give you an opinion.

## Page 172

1  BY MR. REVERE:
2  Q. I'll give you hypothetical. Let's say
3  there's a lawyer who had a client with submissions
4  for design review approval, and the lawyer is sitting
5  on the committee. And assuming that the lawyer was
6  involved in a multi-million-dollar deal as a result
7  of his connection with a particular client, do you
8  think that could tend to influence the lawyer to
9  approve whatever the client wanted him to approve?
10        MR. BEAMAN: Object to the form of the
11  question. Incomplete hypothetical. Misstates
12  evidence. Calls for speculation. Lacks foundation.
13  Calls for a legal conclusion.
14        MR. SHIGEKANE: Same objection. Also
15  not reasonably calculated to lead to the discovery of
16  admissible evidence. This is just argumentative.
17        You can make your arguments to the court.
18  BY MR. REVERE:
19  Q. You can answer, Dave.
20  A. In that hypothetical situation, would I
21  think it appropriate?
22  Q. Yes.
23  A. I would need to know more.
24  Q. What else would you want to know?
25  A. The circumstances surrounding it.

## Page 173

1        MR. BEAMAN: Excuse me. Same
2  objections. Let the record note a continuing running
3  objection to this line of argument.
4  BY MR. REVERE:
5  Q. Dave, what else would you want to know?
6  A. You are asking for an ultimate decision,
7  but I don't think I would make a decision based on
8  just the fact you gave me.
9  Q. Is there a construction bond requirement at
10  The Bluffs at Mauna Kea, the owners post a
11  construction bond?
12  A. My recollection is that -- frankly, I don't
13  know.
14  Q. Could you go to page 43, which is the
15  second page of the July 1, 2003 meeting minutes.
16  Referring to the Gifford residence, that item in the
17  middle of the page. Do you see that?
18  A. Mm-hmm.
19  Q. It says, "There currently is a stair for
20  beach access being built on the Gifford property for
21  which there has been no approval application
22  submitted to the committee."
23        Do you see that?
24  A. Yes.
25  Q. And then it talks about three numbered

Page 174

1  items. Then goes on to say, quote, "A letter is to
2  be issued to the Giffords to have them stop work on
3  the construction of the staircase as well as make
4  them aware that they are also in violation due to the
5  landscape growth in the special setback area."
6         And my question to you -- I have a couple
7  of questions. One is what is the vegetation that's
8  being referred to? Do you know what is being
9  referred to in this minutes?
10     A.  The vegetation, I am trying to find that
11 specific term.
12     Q.  It is in the sentence I just read,
13 paragraph Number 3.
14     A.  Referring to landscape growth?
15     Q.  I am just trying to figure out, it says,
16 "Plant material in the setback area exceeds the
17 30-inch approved height." What is it? Is it trees,
18 grass --
19     A.  Okay. I was looking for the word trees.
20         No, it's usually ground covers that have
21 grown out of control.
22     Q.  Do you know what the ground cover is -- do
23 you know what the vegetation is that's being referred
24 to in this paragraph?
25     A.  Generally, I believe it's naupaka.

Page 175

1      Q.  There's a question here about sending a
2  letter to the Giffords about their staircase that
3  goes down to the ocean; is that correct?
4      A.  Yes.
5      Q.  How big is the staircase? How many square
6  feet?
7          MR. BEAMAN: Is this material in some
8  way, Terry?
9          MR. REVERE: Absolutely.
10         THE WITNESS: The width and the
11 length?
12 BY MR. REVERE:
13     Q.  Yes. If you can tell us roughly how big it
14 is.
15     A.  Roughly, I would say it's 60 to 80 square
16 feet.
17     Q.  So can you tell me why it is that a letter
18 is being sent to the Giffords for 60 to 80 square
19 feet, yet the committee has done nothing about 3,500
20 square feet on the Federman lot?
21         MR. SHIGEKANE: Objection.
22 Argumentative.
23         MR. REVERE: I am trying to figure out
24 the answer.
25         MR. SHIGEKANE: You will find it when

Page 176

1  the court rules. This is pure argument.
2         MR. REVERE: It is not pure argument.
3         I am trying to figure out what the
4  difference is between the Giffords, having 60 to 80
5  square feet, that they get a letter sent to them, and
6  Federman has 3,500 square feet, gets no letter and
7  full support by the association.
8         MR. BEAMAN: Oh, God, Terry. This is
9  just -- I object that this is abusive. I think this
10 is absolutely ridiculous, Terry.
11        MR. SHIGEKANE: We have been going
12 quite a long time. We have allowed you to ask a heck
13 of a lot of questions. Some of them are pertinent,
14 but clearly some of them are not.
15        MR. REVERE: You guys can have it one
16 way, but not both ways. Either everything that's
17 happened on every other lot is not relevant or
18 everything is not relevant.
19        MR. SHIGEKANE: We have said our
20 piece. Keep on asking questions.
21        MR. BEAMAN: Let's find a breaking
22 point when we can.
23        MR. REVERE: After this gets answered,
24 that's fine.
25        THE WITNESS: I think the distinction

Page 177

1  is that Federmans had before us and it was an ongoing
2  approval process. They submitted documents. They
3  went through the due procedures. And Gifford,
4  somewhat cavalierishly, decided to do it without
5  going through those procedures.
6         So I think that -- I don't think in
7  anyone's mind on the committee the Federman issue had
8  totally been resolved. But the Federmans did, when
9  we asked them for documents, whether we liked the
10 documents or not, they provided them in advance.
11        Gifford had a tendency just to do, as I
12 said, somewhat cavalierishly, just do things on his
13 own. So we felt that that needed some form of
14 recognition.
15        MR. REVERE: Do you want to take a
16 break now?
17        MR. BEAMAN: Yes.
18 (Discussion off the record 3:28 p.m. to 3:41 p.m.)
19 BY MR. REVERE:
20     Q.  Dave, if you could go to page 44. This is
21 a meeting July 1, 2003, the last page.
22     A.  Page 44, I have it.
23     Q.  Now, it says that Doug Leone was present,
24 on the first page, which is 42, and then there's
25 discussion of the Leone residence. There's no

45 (Pages 174 to 177)

Page 206

1  Q. What is said here about clusters of coco
2  palms not be allowed in the special setback area,
3  that's your understanding of what the committee's
4  position is?
5  A. Yes.
6  Q. Do you recall if you met with Andy Beaman
7  at all in this year of 2004?
8  A. If I recall meeting with Andy.
9  Q. Other than today's deposition.
10  A. He was in our office one day.
11  Q. When was that?
12  A. Tempus fugit.
13     Sometime in the last six months.
14  Q. Do you recall what he was doing in your
15  office?
16  A. He was poring through documents.
17  Q. Do you recall what documents he was looking
18  through?
19  A. No. Not specifically.
20  Q. Were they Federman files, or were they for
21  other owners?
22  A. I stepped in the conference room, and Andy
23  was a complete surprise. He was there, and he was
24  poring over some documents.
25  Q. And do you know what they were?

Page 207

1  A. No.
2  Q. Did you call security?
3  A. No, I think Dave Ayer let him in.
4  Q. Did you ever have any discussion with Dave
5  as to why Andy was doing that?
6  A. In general, he was going over documents,
7  and I am not sure if he clearly explained which
8  documents.
9  Q. I want to show you page 138 of the same
10  records deposition, and looks like it is an e-mail.
11  The bottom portion I am referring to is an e-mail
12  from John Reid to Bob Gunderson, Bob Acree, Doug
13  Leone, Jerry Elder, John Reid, Mike Hartley. And the
14  cc is Dennis Krueger, David Stringer, and Randy
15  Stingel.
16     This is a reference to a discussion that
17  Reid reported on that he had with Guy Hands, and in
18  the second-to-last paragraph, he closes with this
19  sentence, which is, quote, "Perhaps someone can go
20  and see for themselves what the impact of the
21  Federmans' building has on his view to see if this is
22  material," end quote.
23     If you could just read what I just referred
24  you to over. Let me know when you are done.
25  A. Okay.

Page 208

1     The question again, please?
2  Q. Well, my first question is if I read that
3  sentence correctly, about what Reid wrote?
4  A. Yes.
5  Q. Do you recall if any addressees to that
6  Reid e-mail took him up on his suggestion to go out
7  there and see for themselves the impact of the
8  Federman construction on Lot 5?
9     MR. BEAMAN: Object for lack of
10  foundation. Calls for speculation.
11     MR. SHIGEKANE: Same. Go ahead.
12     THE WITNESS: I only know of one party
13  that did, and that would be Jerry Elder.
14  BY MR. REVERE:
15  Q. And when did Jerry Elder do that?
16  A. Frequently. He has a keen interest in this
17  property, and for better or worse, Jerry has been
18  there in the field -- been the field operative, so to
19  speak.
20  Q. Where does Jerry -- where does he live?
21  A. He lives in La Jolla.
22  Q. Do you know how much time he spends at the
23  Mauna Kea?
24  A. Since he's been building his home, I would
25  say as much as 25 percent of his time.

Page 209

1  Q. And is his home built out now, the
2  residence, is that built?
3  A. Just roofed out.
4  Q. Did Jerry tell you what -- did Jerry say he
5  went to Lot 5 and looked down to Lot 6?
6  A. No.
7  Q. Did Jerry ever report to you that he went
8  to Lot 5 and informed you of what he observed about
9  the construction and the special setback area in
10  Lot 6?
11  A. We had conversations.
12  Q. What did he say?
13  A. In general or specifically?
14  Q. As much as you can recall.
15  A. Most of Jerry's comments went to the issue
16  of ground cover and the relative occlusion of
17  landscaping in the area.
18  Q. Did Jerry have any discussions or other
19  communications with you regarding the palm trees in
20  the special setback area of the Federman lot?
21  A. Not that I can clearly recall.
22  Q. Is there any that you generally recall?
23  A. I think the subject has come up.
24  Q. And what --
25  A. Specifics, I can't tell you.

Page 210

1  Q. Did he ever say anything about the
2  hardscape, the pool and the deck and the stairs or
3  any other structures that are in the Federman special
4  setback area? Did he ever give you have any comment
5  on that?
6  A. I think that Jerry's general position on
7  that, the issue of the pool, is that it was a Mauna
8  Kea Properties issue, but we shouldn't necessarily
9  perpetuate any more improvements. And I think that's
10 why we stopped the trellises, as I recall.
11      And I think Jerry's main concern about
12 policing the shoreline was to make sure that no
13 vegetation got -- he understood hardscape. That's
14 fixed. What he was really very sincere about
15 enforcing was that vegetation wasn't allowed to grow
16 up and block people's view with time. And that is
17 almost an obsession with him. He will read this and
18 kill me, but that's all right.
19  Q. Have you walked along the shoreline trail
20 any time in the last year?
21  A. Just from Gunderson's to probably Mauna Kea
22 beach.
23  Q. Has anyone told you that there's vegetation
24 that is over six feet tall towards the other end of
25 the property that's actually forcing the trail out

Page 211

1  makai?
2  A. You are talking about Gifford's end?
3  Q. Yeah, I don't know if it's the Giffords'
4  house, but there's vegetation that's growing out to
5  the trail, and it's over six feet tall?
6  A. The only vegetation with that kind of
7  growth that I recall is at the Gifford end.
8  Q. Is the committee doing anything about that
9  vegetation?
10 A. As I recall, they cited him. What they are
11 doing about it, I don't know.
12 Q. What do you mean cited, like sent him a
13 letter?
14 A. That's what I understand. I think I
15 have -- to make it clear, I am the advisor. I am not
16 the enforcer. So they get the information, and they
17 are free to enforce it any way they want to.
18 Q. You don't know what steps, if any, they are
19 taking to enforce the removal of that vegetation?
20 A. I know they have -- I do know they have
21 contacted him, and I believe it was in letter form.
22 Q. After that, you don't know if they took any
23 steps one way or the other?
24 A. That gets into Dennis Krueger's territory.
25 Q. But again, as you sit here today, you can't

Page 212

1  recall anything that Jerry Elder said about the
2  structures that are within the special setback area
3  of the Federman lot; is that correct?
4  A. What I am trying to grope with is in what
5  sense.
6  Q. Any sense?
7  A. He's recognized they are there, and
8  somebody else put them there, and that we shouldn't
9  perpetuate any additional improvements there.
10 Q. Did he ever say anything like, "This
11 shouldn't have been approved by Mauna Kea"?
12 A. I can't specifically say yes.
13 Q. Is that the feeling that you got from
14 Jerry?
15      MR. KANG: Objection. Calls for
16 speculation. Lacks foundation.
17      MR. BEAMAN: Same objections.
18      MR. SHIGEKANE: Same.
19      THE WITNESS: I would agree, I would
20 be speculating.
21 BY MR. REVERE:
22 Q. I am not asking what he intended. I am
23 asking you is that the impression you received? I am
24 not asking you to speculate what he -- what his
25 intentions are, et cetera, but I am wondering if

Page 213

1  that's the impression that you received.
2       MR. BEAMAN: Same objections.
3       MR. KANG: Join.
4       MR. BEAMAN: Asked and answered.
5       THE WITNESS: My recollection is that
6  the subject always went to vegetation, and that was
7  his primary concern.
8  BY MR. REVERE:
9  Q. If I could have that back, please.
10      On page 159, here, looks like there was a
11 January 7th meeting with Andy Beaman, Hod Greeley,
12 Don Vita, David Stringer and David Ayer. Do you
13 recall a meeting in January 2004?
14 A. I do.
15 Q. And this appears to be a meeting over
16 landscaping issues. Do you recall that?
17 A. Generally, yes.
18 Q. Was anyone from the Reddys' designers or
19 the Reddys, were they invited to this meeting?
20 A. I can't even remember the subject matter.
21 Q. You can read this over.
22 A. Thank you.
23      I am not convinced that I was in attendance
24 at this meeting through its entirety or whether I
25 just stopped in.

```
                    C E R T I F I C A T E

STATE OF HAWAII            )
                           ) SS:
CITY AND COUNTY OF HONOLULU )
```

          I, CHARI L. POSSELL, Notary Public, State of Hawaii, do hereby certify:

          That on Tuesday, August 3, 2004, at 9:09 a.m., appeared before me DAVID STRINGER, the witness whose deposition is contained herein; that prior to being examined he/she was by me duly sworn;

          That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

          I further certify that I am not attorney for any of the parties hereto, nor in any way concerned with the cause.

          DATED this 3rd day of August, 2004, in Honolulu, Hawaii.


                              _____
                              CHARI L. POSSELL, CSR NO. 414
                              Notary Public, State of Hawaii
                              My Commission Exp: 7-25-2007