**EXHIBIT 16**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC, et al., | ) Case No. CV03-00463 DAE/LEK ) |
| Plaintiffs, | ) DECLARATION OF IRWIN FEDERMAN ) |
| vs. | ) ) |
| IRWIN FEDERMAN, et al., | ) ) |
| Defendants. | ) ) ) |

DECLARATION OF IRWIN FEDERMAN

1. I am IRWIN FEDERMAN. I have personal knowledge of the following facts.

2. My wife CONCEPCION FEDERMAN and I live, and have lived at all relevant times, in Atherton, California. My wife and I own Lot 6 of The Bluffs at Mauna Kea.

3. For many years, my wife and I have dreamed and spoken of building a second home on the island of Hawaii. After spending a few years looking at various sites, we finally purchased Lot 6 at the Mauna Kea Bluffs in February 1999, with the intention of building a home in consonance with the spirit of the islands.

4. We visited the Four Seasons Resort at Hualalei, admired the architecture of its public spaces, sought out the architect, Robert Glazier, and engaged him to design our home for Lot 6 at the Bluffs. His firm, Hill Glazier Architects, and our local architect, Joel Laber of Laber Architects in Kailua-Kona, were responsible for getting the design of our home approved by

81784.2

the Design Committee. Hill Glazier recommended, and we retained, a number of other design professionals who helped to prepare the plans for our property. We retained one of the most respected of San Francisco's quality builders, Ryan Associates, to build our home.

    5. We were advised that the Design Committee for the Bluffs at Mauna Kea had allowed the construction of terraces and swimming pools within the special setback areas on other oceanfront lots within the Bluffs. During the time that William Mielcke and James Bell served on the Bluffs Design Committee, our architects submitted preliminary plans to the Committee showing a terrace and swimming pool within the special setback area of Lot 6.

    6. By letter to Hill Glazier dated August 18, 2000, the Committee gave preliminary approval of those plans, subject to the comments and concerns noted therein. A true and correct copy of the August 18, 2000 preliminary approval letter is attached hereto as **Exhibit 38**.

    7. After receiving that preliminary approval, our architects revised the plans to reduce the elevation of the terrace in the setback area (among other things). By letter dated May 23, 2001, a true and correct copy of which is attached hereto as **Exhibit 39**, Mr. Mielcke gave a second preliminary approval of our plans, as follows:

> The Design Committee has reviewed the revised
> configuration of the structures proposed
> within the special setback area of the
> Federman residence -- two trellis pavilions,
> swimming pool, retaining walls, terrace, and

81784.2                                       2

walkways . . . . Generally, the concepts shown in the May 17 plans are acceptable to the Committee, subject to review of a revised Preliminary Plan package, including the landscape submittal and detailing of the proposed pool area.

8. Thereafter, our architects made further revisions to the architectural and landscaping plans, including the deletion of the trellised pavilions on the terrace, which the new Design Committee did not approve.

9. On February 7, 2002, we received a letter from Dennis Krueger, counsel for the Design Committee, granting final approval to start construction, including a variance to permit construction of a terrace and a swimming pool in the special setback area, and stating that "the Design Committee of The Bluffs at Mauna Kea has granted its approval for commencement of construction." A true and correct copy of that letter is included in **Exhibit 40** attached hereto. We commenced construction of our home on Lot 6 in late February or early March 2002, in reliance upon the final construction approval we received from the Design Committee on February 7, 2002.

10. After Ryan Associates started construction, certain changes were made to our plans, and our architects sought approval of those changes from the Committee. By letter from Mr. Krueger dated March 3, 2003, certain plan changes were approved. In particular, the Design Committee approved "[e]nlargement of the approved swimming pool and adjacent lanais along with the associated structural changes, bar finishes and planter wall around the North and West faces of the pool." The document

attached hereto as *Exhibit 41* is a true and correct copy of Mr. Krueger's March 3, 2003 letter.

11. By letter dated July 7, 2003, the Design Committee granted our request for a change to the plans to permit installation of a railing along the terrace. The document attached hereto as *Exhibit 46* is a true and correct copy of the July 7, 2003 approval letter.

12. Our architects further revised the plans, and again submitted the revisions to the Design Committee for approval. By letter dated August 14, 2003, the Design Committee granted our request for modification of the planned boulder rock retaining wall west of the pool/spa terrace. The document attached hereto as *Exhibit 47* is a true and correct copy of the August 14, 2003 approval letter.

13. As construction progressed, our architects made additional minor changes to the plans. On January 30, 2004, our attorneys submitted a cumulative set of drawings and bulletins showing all such modifications, including minor modifications to the landscaping plan. The document attached hereto as *Exhibit 43* is a true and correct copy of the January 30, 2004 submission letter to the Design Committee from our attorneys. By letter dated April 9, 2004, the Design Committee approved the plan revisions, with the exception of the revised landscaping within the special setback area. The document attached hereto as *Exhibit 68* is a true and correct copy of the April 9, 2004 approval letter from the Design Committee.

14. After a design review process that spanned two different committees and took more than a year and a half, we received all approvals required for the construction of our home.

15. In April of 2003, more than a year after our construction intentions were physically evident, Ms. Ronda Kent, an attorney at Ashford & Wriston representing Western Sunview Properties LLC, first expressed her client's concerns about three palm trees, located as indicated on the approved landscape plan. The first written notice that Western Sunview Properties, LLC had a problem with our construction was dated May 2003.

16. Construction of our home on Lot 6 is complete.

17. If we are forced to remove our terrace and swimming pool, such an order would impair our use and enjoyment of our property, something that we could never get back. It has been more than four years since we first purchased our lot. We are no longer young, and time is precious to us. We eagerly anticipate enjoying our new home with our children and grandchildren.

18. We have been informed by our contractor, Ryan Associates, that removal of the terrace and relocation of the pool could cost more than $1,000,000.

19. To the best of my knowledge, my wife and I have not violated any provision of law or of the project documents in the design and construction of our home.

20. Neither the Design Committee nor any of its attorneys, consultants, or other representatives has ever suggested to us that our project does not conform to the

Declaration of Protective Covenants, Conditions and Restrictions, to the Design Requirements, or to the approved plans.

21. At all times the construction on our property has been available to the Design Committee and its consultants for inspection.

22. We have instructed our design and construction team that all improvements are to be carried out in strict compliance with the approved plans. To the best of my knowledge, our construction and landscaping is in strict compliance with the plans and revisions submitted to and approved by the Design Committee.

23. Our plans originally included a limited kitchenette in the guest quarters. That feature was later removed from the plans, and we are not building a kitchenette in the guest quarters.

24. We rejected the idea of a temporary "set" on the terrace a long time ago. We have no intentions of installing any such "set."

25. To the best of my memory, I never reported the purchase price for Lot 6 to any realtor or Multiple Listing Service. I have never spoken to Guy Hands, Julia Hands, or any other representative of Western Sunview Properties LLC, regarding the price my wife and I paid for Lot 6.

26. Robert Gunderson, a Bluffs homeowner and a member of the Design Committee, is an attorney who has performed legal services for USVP Partners, in which I am a General Partner. I have known Mr. Gunderson for over ten years. Attached hereto as

*Exhibit 89* is a true copy of a letter from me to David Stringer, dated November 14, 2001, in which that relationship was disclosed to the Design Committee. To the best of my knowledge, the relationship did not affect Mr. Gunderson's consideration, as a member of the Design Committee, of our construction plans.

I, IRWIN FEDERMAN, do declare under penalty of law that the foregoing is true and correct.

DATED: Atherton, California, July 15, 2004.

_____
IRWIN FEDERMAN