# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC, et al., | ) Case No. CV03-00463 DAE/LEK ) |
| Plaintiffs, | ) DECLARATION OF ROBERT GLAZIER ) |
| vs. | ) ) |
| IRWIN FEDERMAN, et al., | ) ) |
| Defendants. | ) ) ) |

DECLARATION OF ROBERT GLAZIER

1. I am ROBERT GLAZIER. I have personal knowledge of the following facts.

2. I am a principal in the firm of Hill Glazier Architects ("Hill Glazier") of Palo Alto, California. I am duly licensed as an architect in the State of Hawaii and in the State of California. I am a member of the American Institute of Architects. A true copy of my curriculum vitae listing my professional qualifications is attached hereto as *Exhibit 44*.

3. Some years ago, Irwin and Concepcion Federman retained Hill Glazier to design their home on Lot 6 of the Bluffs at Mauna Kea. I am, and at all times have been, the representative of Hill Glazier who has had primary responsibility for that project. In that capacity, I have reviewed and am familiar with the Declaration of Protective Covenants, Conditions and Restrictions for the Bluffs at Mauna Kea, (the "Declaration") the Design and Construction Requirements for Homes - the Bluffs at Mauna Kea (the "Design Requirements"), and other applicable

85883.2

**EXHIBIT V**

project documents. I am familiar with the project documents for the Bluffs. I have also worked on other projects with similar restrictions. For example, I have designed homes at Kukio Resort in Kaupulehu, Hawaii, which also has a declaration of protective covenants, conditions and restrictions and architectural controls. We also designed the Four Seasons Hotel there and were responsible in part for preparation of the design guidelines for Kaupulehu Resort.

4. The document attached hereto as *Exhibit 3* is a true copy of the Declaration, which Hill Glazier obtained at the outset of our engagement by the Federmans. Section 2.8 of the Declaration states, that "[n]o new improvements . . . shall be constructed, placed or made on any Lot . . . except in accordance with plans, specifications and other materials approved by the Design Committee." At all times, Hill Glazier has acted in conformity to the requirements of the Declaration as set forth in *Ex. 3*.

5. Section 8.11 of the Declaration gives the Design Committee authority to promulgate design requirements which govern and serve as a standard for the construction of buildings within the Bluffs. The document attached hereto as *Exhibit 4* is a true copy of the Design Requirements, which Hill Glazier obtained at the outset of our engagement by the Federmans. At all times, Hill Glazier has acted in conformity with the Design Requirements set forth in *Ex. 4*.

85883.2

2

6. Section 8.8 of the Declaration (*Ex. 3*) gives the Design Committee authority to grant variances from the Design Requirements, as follows:

> Notwithstanding anything to the contrary contained in this Article VIII, the Design Committee may approve plans, specifications and other materials submitted to it for buildings or improvements which are not in strict compliance with the applicable Design Requirements if any such building or improvement is suitable to the area in which it will be located.

7. The Design Requirements (*Ex. 4*) provide, at section 4.17, that "[n]o building or structure shall be placed within the special setback areas as shown in Exhibit A." Exhibit A to the Design Requirements is a map showing special setbacks along the seaward (or makai) boundary of Lots 1-12, the oceanfront lots.

8. Article VI of the Design Requirements (*Ex. 4*) gives the Design Committee authority to approve variations from the other requirements:

> Individual solutions at variance with the general design requirements will be considered on their architectural merit and their contribution to the overall purposes set forth in Article I and the specific objectives stated in Article IV above. The Design Committee through the Design Review Procedure as authorized in Article V above, shall be the sole judge of the suitability of such variations in relation to the established objectives.

9. Under section 8.2 of the Declaration (*Ex. 3*), Mauna Kea Properties, Inc. ("MKP") had the sole power to appoint members of the Design Committee for 20 years. When Hill Glazier began working on the Federman project, we were informed that MKP

85883.2

3

had appointed its president, William Mielcke, and James R. Bell of Belt Collins & Associates as the members of the Bluffs Design Committee.

10. Mr. Mielcke and/or Mr. Bell advised us that the Bluffs Design Committee had granted variances for, and approved construction of, terraces and swimming pools within the special setback areas along the makai boundaries of the oceanfront properties, Lots 1-12. I have visited the Bluffs at Mauna Kea and personally seen the homes which have been and are being built there. Many other oceanfront properties have terraces and swimming pools, which are either complete or under construction, within the special setback areas along the makai boundaries of the lots.

11. For a period of several months when we were first engaged by the Federmans, we and other design professionals worked with the Federmans to prepare a design for their home. Hill Glazier recommended, and the Federmans retained, Joel Laber of Laber Architects in Kailua-Kona, Hawaii, to serve as local architect for the Federman project. At Hill Glazier's recommendation, Belt Collins was retained for the civil engineering on the project, because Belt Collins was the civil engineer for the Mauna Kea resort and the Bluffs subdivision, and therefore seemed like the logical choice. Hill Glazier also recommended, and the Federmans retained, various landscape architects, mechanical engineers, electrical engineers, interior designers, and other design professionals and consultants for the Federman project.

85883.2

4

12. In July 2000, our design team submitted preliminary design plans, including a conceptual design and related materials for the Federmans' home, to the Design Committee for its preliminary approval under Section 5.2.2 of the Design Requirements. The preliminary plans showed a swimming pool, spa, terrace and two "palapas" (pavilions) within the makai special setback area of Lot 6. By letter dated August 18, 2000, James R. Bell, acting for the Design Committee, preliminarily approved the plans, subject to 10 listed comments and concerns. Comment number 3 states: "[t]he pavilions and the pool in the special setback are approved . . . ." The document attached hereto as *Exhibit 38* is a true copy of Mr. Bell's August 18, 2000 letter. A copy of this letter was received by my office on or about August 18, 2000.

13. It is my understanding that James Bell resigned in December 2000, leaving Mr. Mielcke as the sole remaining member of the Design Committee. Belt Collins continued to serve as technical consultants to Mr. Mielcke.

14. On December 22, 2000, the Design Committee wrote to the Federmans. The document attached hereto as *Exhibit 29* includes a true copy of Mr. Mielcke's December 22, 2000 letter. A copy of this letter was received by my office on or about December 22, 2000.

15. At the Design Committee's request, the Federmans' contractor erected poles at various points on Lot 6 to show the outline and elevation of the planned improvements. The "stakeout" was viewed by Mr. Mielcke and the Design Committee's

85883.2                                    5

architectural consultant in April 2001 and again in May 2001. To satisfy concerns about the view planes from neighboring lots, our design team lowered the elevation of the pool and terrace area by approximately eight feet.

16. By letter dated May 23, 2001, Mr. Mielcke approved those revised plans. His letter states in part:

> The Design Committee has review the revised configuration of the structures proposed within the special setback area of the Federman residence -- two trellis pavilions, swimming pool, retaining walls, terrace, and walkways . . . . Generally, the concepts shown in the May 17 plans are acceptable to the Committee, subject to review of a revised Preliminary Plan package, including the landscape submittal and detailing of the proposed pool area.

The document attached hereto as **Exhibit 39** is a true and correct copy of Mr. Mielcke's May 23, 2001 letter. A copy of this letter was received by my office on or about May 23, 2001.

17. Hill Glazier was informed, by letter dated July 11, 2001, that Mr. Mielcke had resigned from the Design Committee. The document attached hereto as **Exhibit 25** is a true copy of Mr. Mielcke's July 11, 2001 letter. A copy of this letter was received by my office on or about July 11, 2001. Hill Glazier was later informed that the owners' association had appointed its board of directors to serve on the Design Committee and had engaged Stringer, Tusher & Associates as its consultants. Hill Glazier was informed that attorney Dennis Krueger of Ashford & Wriston represented the association and the Design Committee.

18. In September 2001, the Federmans asked the new Design Committee (the board of the homeowner's association) to

85883.2

6

grant a variance for the improvements that had been approved by the previous Design Committee (Mr. Mielcke). In November 2001, the new Design Committee advised the Federmans that it would not grant a variance for construction of the two trellised pavilions. Attached hereto as *Exhibit 45* are true copies of two letters dated November 30, 2001 from Dennis Krueger to Mr. and Mrs. Federman, with copies to Joel Laber and others, and a fax transmittal dated December 3, 2001 from Joel Laber to Mr. and Mrs. Federman, with a copy to me and others. These documents were received by my office on or about December 3, 2001.

19. In or about January 2002, at the request of the Design Committee's consultants, the landscaping plan for Lot 6 was changed, including, among other things, a reduction in the total number of coconut trees and relocation of certain of them. By letter dated February 7, 2002, Mr. Krueger stated that "the Design Committee of The Bluffs at Mauna Kea has granted its approval for commencement of construction." Mr. Krueger's letter of February 7, 2002 also expressly granted the Federmans' request for a variance permitting construction of the terrace and swimming pool within the special setback area. The document attached hereto as *Exhibit 40* includes a true copy of the February 7, 2002 letter. A copy of this letter was received by my office on or about February 7, 2002.

20. As is typical for construction projects, we and the owners made changes to the plans during construction. As required by Section 7.2.2.d of the Design Requirements, we and Mr. Laber submitted the changes for approval by the Design

85883.2

7

Committee. By letter from Mr. Krueger dated March 3, 2003, certain of these changes were approved. In particular, the Design Committee approved "[e]nlargement of the approved swimming pool and adjacent lanais along with the associated structural changes, bar finishes and planter wall around the North and West faces of the pool." The document attached hereto as *Exhibit 41* is a true copy of Mr. Krueger's March 3, 2003 letter. A copy of this letter was received by my office on or about March 3, 2003.

21. We revised the plans yet again, and submitted the revisions to the Design Committee for approval. By letter dated July 7, 2003, the Design Committee granted our request for a change to the plans to permit installation of a railing along the terrace. The document attached hereto as *Exhibit 46* is a true copy of the July 7, 2003 approval letter. A copy of this letter was received by my office on or about July 7, 2003.

22. We further revised the plans, and again submitted the revisions to the Design Committee for approval. By letter dated August 14, 2003, the Design Committee granted our request for modification of the planned boulder rock retaining wall west of the pool/spa terrace. The document attached hereto as *Exhibit 47* is a true and correct copy of the August 14, 2003 approval letter. A copy of this letter was received by my office on or about August 14, 2003.

23. We made additional changes to the plans and submitted the proposed revisions to the Design Committee for approval on January 30, 2004. The document attached hereto as *Exhibit 43* is a true and correct copy of the January 30, 2004

85883.2                                8

letter to the Design Committee from our attorneys. A copy of this letter was received by my office on or about January 30, 2004. The letter accurately describes the changes to the plans enclosed therewith. The Design Committee approved the plan revisions, by letter dated April 9, 2004, with the exception of the revised landscaping within the special setback area. The document attached hereto as *Exhibit 68* is a true and correct copy of the April 9, 2004 approval letter from the Design Committee.

24. At all times, we and the Federmans have made the construction on Lot 6 available for inspection by the Design Committee and its consultants. To the best of my knowledge, neither the Design Committee nor any of its members, consultants, attorneys, or representatives has ever taken the position that there is anything improper about any of the improvements being built on Lot 6.

25. The Federmans have instructed their design and construction teams that all improvements on Lot 6 are to be carried out in strict compliance with the approved plans. To the best of my knowledge, the construction and landscaping on the Federmans's lot is in strict compliance with the plans and revisions submitted to and approved by the Design Committee.

26. The plans for the Federman residence originally included a limited kitchenette in the guest quarters. That feature was later removed from the plans, and a kitchenette will not be built in the guest quarters.

27. The idea of a temporary "set" on the terrace was rejected a long time ago. No such "set" will be installed.

28. I am familiar with the area and topography in the immediate vicinity of Lots 5 and 6. Lot 6 is situated to the north of Lot 5, and the terrace on Lot 6 is at an elevation approximately 19 feet lower than the terrace on Lot 5. Therefore, the Federmans's pool and terrace will neither obstruct WSP's views nor cause glare onto Lot 5.

29. At my direction, our firm caused certain renderings to be prepared, using electronic ("CAD") files for the Federmans' property and CAD files provided through Lucky Bennett, the architect for Western Sunview Properties, showing the house now under construction on Lot 5. In my professional opinion, the renderings are true and accurate depictions of what the improvements shown therein will look like after construction is finished. The rendering attached hereto as *Exhibit 48* is a true copy of a rendering of the view from the northwest corner of Lot 5, looking toward the sunset, at summer solstice; attached hereto as *Exhibit 49* is a true copy of a plan of Lots 5 and 6 which indicates the viewpoint from which *Ex. 48* is shown.

I, ROBERT GLAZIER, do declare under penalty of law that the foregoing is true and correct.

Dated: Palo Alto, CA , July 16, 2004.
       (place)

_____
ROBERT GLAZIER

85883.2                         10