**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC; GUY HANDS; and JULIA HANDS, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| IRWIN FEDERMAN; CONCEPCION S. FEDERMAN; THE BLUFFS AT MAUNA KEA COMMUNITY ASSOCIATION; MAUNA KEA PROPERTIES, INC.; MAUNA KEA DEVELOPMENT CORP.; COUNTY OF HAWAII; JOHN DOES 1-100; JANE DOES 1-100; DOE PARTNERSHIPS 1-100; and DOE CORPORATIONS 1-100, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

CIVIL NO.  03-00463 JMS/LEK

ORDER DENYING APPEAL FROM AMENDED ORDER ADOPTING SPECIAL MASTER'S DISCOVERY ORDER FILED OCTOBER 24, 2005

ORDER DENYING APPEAL FROM AMENDED ORDER ADOPTING SPECIAL MASTER'S DISCOVERY ORDER FILED OCTOBER 24, 2005

I. INTRODUCTION

Defendants Mauna Kea Properties, Inc. and Mauna Kea Development

Corporation ("MK Defendants") appeal from Magistrate Judge Leslie E.

Kobayashi's order adopting a discovery order entered by Special Master John

McConnell.  Based on the following, the MK Defendants' appeal is hereby DENIED.

## II. BACKGROUND

In this extremely litigious matter, plaintiffs Western Sunview Properties, LLC, Guy Hands, and Julia Hands ("plaintiffs") claim that MK Defendants engaged in fraud that misled plaintiffs in the purchase of land at the Bluffs of Manua Kea, a Big Island development.  Specifically, plaintiffs claim that the MK Defendants sold other lots below asking price by offering a landscaping credit and requiring the purchaser to execute a confidentiality agreement cloaking the landscaping credit in secrecy.  Plaintiffs further allege that they were unaware of the landscaping credits provided to others, and that they relied on the falsely reported sales prices (that is, the sales price before applying the landscaping credit) in determining how much to offer for the purchase of a lot.

A Honolulu law firm assisted the MK Defendants in drafting the confidentiality agreements.  At issue is whether communications between the MK Defendants and that law firm are subject to discovery under an exception to the attorney-client privilege.  Reviewing this matter de novo, the court finds that the documents are not protected from disclosure pursuant to the crime-fraud exception to the attorney-client privilege.

2

This matter comes to this court on an appeal from an order issued by Magistrate Judge Leslie E. Kobayashi adopting a discovery order entered by a Special Master. By order dated February 22, 2005, and pursuant to Federal Rule of Civil Procedure 53(a), Judge Kobayashi appointed John McConnell as a Special Mater re Discovery ("Master") in this matter.[1] The Master is empowered to "issue rulings on all matters involving discovery issues in the above-entitled action." Any appeal from the Master's discovery order requires submission to Judge Kobayashi for adoption. Once adopted, an appeal must be taken within eleven days after the issuance of Judge Kobayashi's order.

On May 16, 2005, the Master held a telephonic hearing on plaintiffs' motion for an order that the MK Defendants produce documents being withheld as privileged. The plaintiffs argued that these documents were discoverable based on a claim of waiver and application of the crime-fraud exception to the attorney-client privilege. Plaintiffs sought documents relating to: 1) the landscaping credits given to the purchasers of land at the Bluffs at Mauna Kea; and 2) the confidentiality agreements entered into between the MK Defendants and such purchasers.

---

[1] John McConnell was likewise appointed by the order as a Special Master in a state case involving overlapping discovery disputes.

3

On October 14, 2005, the Master ruled that "it plainly appears that the confidentiality and landscape credit agreements are at issue with respect to Plaintiff's fraud and misrepresentation claims and that the crime/fraud exception to the privilege is applicable." The Master thus ordered the production of documents "between Mauna Kea and its attorneys related to confidentiality agreements and landscape credits. . . ."[2] Exhibit B to MK Defendants' Appeal.

On October 24, 2005, Judge Kobayashi entered an Amended Order Adopting Special Master's Discovery Order. Pursuant to the terms of the Order appointing the Master, Judge Kobayashi adopted the Master's discovery order without review, thus allowing the parties to appeal to this court. The MK Defendants filed a timely notice of appeal on November 1, 2005.[3]

## III. DISCUSSION

## A.    The Crime-Fraud Exception to the Attorney-Client Privilege

Federal Rule of Evidence ("FRE") 501 provides that in civil actions "with respect to an element of a claim or defense as to which State law supplies the

---

[2] Because the court ultimately agrees with the Master's conclusion that documents relating to the landscaping credit and confidentiality agreements are not protected by the attorney-client privilege, the court is not addressing the Master's other finding that the documents are "at issue" in the litigation and thus subject to disclosure.

[3] Plaintiffs filed a Memorandum in Opposition to the MK Defendants' Appeal on November 10, 2005. On February 13, 2006, plaintiffs filed an Amended Memorandum in Opposition to the Appeal. The Amended Memorandum includes Exhibit 9a, a deposition transcript of Byron Gangnes, which was inadvertently not attached to the original filing.

4

rule of decision, the privilege of a witness . . . shall be determined in accordance with State law." Hawaii law on privilege thus controls the current appeal.   Hawaii Rule of Evidence ("HRE") 503 adopts a standard formulation of the attorney-client privilege.  The codified crime-fraud exception to the privilege exempts communications from protection "[i]f the services of the lawyer were sought, obtained, or used to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." HRE 503(d)(1).[4]

The Supreme Court of Hawaii recently explained the relationship between the attorney-client privilege and its crime-fraud exception:

> Although the underlying rationale for the privilege has changed over time, ... courts long have viewed its central concern as one to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.... That purpose, of course, requires that clients be free to make full disclosure to their attorneys of past wrongdoings, ... in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice[.] The attorney-client privilege is not without its costs.... [S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.... The attorney-

---

[4] A lawyer need not know of client's wrongful purpose for the crime-fraud exception to apply.  *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996).

5

> client privilege must necessarily protect the confidences
> of wrongdoers, but the reason for that protection--the
> centrality of open client and attorney communication to
> the proper functioning of our adversary system of justice-
> -ceas[es] to operate at a certain point, namely, where the
> desired advice refers not to prior wrongdoing, but to
> future wrongdoing.... It is the purpose of the crime-fraud
> exception to the attorney-client privilege to assure that
> the seal of secrecy, ... between lawyer and client does not
> extend to communications made for the purpose of
> getting advice for the commission of a fraud or crime...

*State v. Wong*, 97 Haw. 512, 518, 40 P.3d 914, 920 (2002) (alterations in original),

*quoting United States v. Zolin*, 491 U.S. 554, 562 (1989).

While the initial burden of establishing the attorney-client privilege

falls upon the client, "the burden of establishing the crime fraud exception to the

attorney-client privilege falls upon the proponent of the exception." *Id.* at 520.

The Hawaii Supreme Court has also clarified that HRE 104, requiring that

"[p]reliminary questions concerning ... the existence of a privilege ... shall be

determined by the court," applies to determinations concerning the applicability of

the privilege and its exceptions. *Id.* (alteration in original).

The United States Supreme Court has established a two-step process

for courts to follow in ruling on the crime-fraud exception:

> Before engaging in *in camera* review to determine
> the applicability of the crime-fraud exception, the judge
> should require a showing of a factual basis adequate to
> support a good faith belief by a reasonable person that *in*

6

*camera* review of the materials may reveal evidence to
establish the claim that the crime-fraud exception applies.

Once that showing is made, the decision whether
to engage in *in camera* review rests in the sound
discretion of the district court. The court should make
that decision in light of the facts and circumstances of the
particular case, including, among other things, the
volume of materials the district court has been asked to
review, the relative importance to the case of the alleged
privileged information, and the likelihood that the
evidence produced through *in camera* review, together
with other available evidence then before the court, will
establish that the crime-fraud exception does apply.

*Zolin,* 491 U.S. at 572 (citation and internal quotations signals omitted).[5]

The exact burden that applies to prove the crime-fraud exception is

not clear.  In the Ninth Circuit, although mere suspicion or allegations are not

sufficient, the burden only requires proof of "'reasonable cause to believe that the

attorney's services were utilized in furtherance of the ongoing unlawful scheme.'"

*United States v. Chen,* 99 F.3d 1495, 1503 (9th Cir. 1996), *quoting In re Grand*

---

[5] The Master's Discovery Order, Judge Ezra's summary judgment order (Western
Sunview Properties, LLC v. Federman, 338 F. Supp. 2d 1106 (D. Haw. 2004)), as well as
plaintiffs' memorandum in opposition to the MK Defendants' appeal provided the court with an
ample factual basis to support a good faith belief that material sought and claimed to be
privileged may support application of the crime-fraud exception.  As a result, the court requested
that the documents be provided to the court *in camera.*  Neither party objected to this request.
The first set of documents provided by the MK Defendants appeared to be unrelated to the
landscaping credit and confidentiality agreements.  The court thus held a status conference, after
which the MK Defendants provided the court with more documents *in camera.*  The court is not
relying on the documents submitted *in camera* in reaching its ultimate conclusion affirming the
discovery order.

*Jury Proceedings (The Corporation)*, 87 F.3d 377, 381 (9th Cir. 1996). This standard is more than suspicion but less than a preponderance of the evidence. *Id.*

Hawaii courts have not articulated a standard to apply to HRE 503 exceptions to the attorney-client privilege. *Wong* held that HRE 104 applies to a determination of the crime-fraud exception; Rule 104 determinations are based on a preponderance of the evidence in Hawaii courts. *State v. McGriff*, 76 Haw. 148, 157-58, 871 P.2d 782, 791-92 (1994). Therefore, when confronted directly with the issue of the burden placed on the proponent of the crime-fraud exception, the Hawaii Supreme Court may very well apply a preponderance of the evidence standard.

This court need not resolve the standard that the Hawaii Supreme Court would apply. Whether the court applies a "reasonable cause" or a preponderance standard, plaintiffs have met their burden to pierce the privilege.

**B.     Plaintiffs Have Met Their Burden to Prove that the Crime-Fraud Exception Applies to Documents Relating to the Landscaping Credits and Confidentiality Agreements**

Reviewing this matter de novo,[6] the court finds that plaintiffs, under either a "reasonable cause" or preponderance standard, have shown that the

_____

[6] Pursuant to Fed.R.Civ.P. 53(g)(3), a de novo review is applied to both findings of fact and conclusions of law by the Master, unless the parties stipulate, with consent of the court, to a clear error standard to review factual findings. Because no standard of review stipulation was entered in this case, this court applies a de novo standard of review to both the facts and the law.

services of lawyers were used "to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." HRE 503(d)(1).

The MK Defendants claim that plaintiffs have failed to present any evidence of fraud beyond a "sneaking suspicion" that the MK Defendants sought legal advice to further a fraud.[7] The MK Defendants argue that the landscaping credits did not involve misrepresentations and were simply offered to purchasers "to be used for necessary landscaping and grading." MK Defendants' Appeal at 12. The evidence presented to the court shows otherwise.

The former President of Mauna Kea, William Mielcke, testified in a deposition that the landscaping credit was "a form of discounting the selling price," and that a subsequent purchaser "might not" know the actual price of a previously sold lot given the landscaping credit because "[the credits] were also covered by a confidentiality agreement." Exhibit 4 to Plaintiff's Memorandum in Opposition to MK Defendants' Appeal ("Memo in Opposition"). Mr. Mielcke explained further during his testimony the relationship between the landscaping credit and the listing price of the property:

---

[7] The MK Defendants do not dispute that they sought legal advice from a Honolulu law firm regarding the landscaping credits and confidentiality agreements. Instead, the MK Defendants argue that plaintiffs have failed to carry their burden to prove the applicability of the crime-fraud exception.

Question: When you say Mr. Stifler [Mauna Kea Realty's principle broker] wanted to do this to maintain the integrity of the price, it was so you could tell the next purchaser that, hey, the selling price is the listing price, correct?

Mielcke: Correct.

*Id.* Jeanne Buboltz, a realtor with Mauna Kea Realty, likewise testified in her deposition that the landscaping credit was a confidential discount. Exhibit 7 to Memo in Opposition.

The MK Defendants' expert, Byron Gangnes, after having read a portion of Mr. Mielcke's deposition explaining the confidential discounts, testified that, "[i]t sounds to me to be deliberately misleading." Exhibit 9a to Memo in Opposition.

Plaintiffs also claim that Judge Ezra's September 15, 2004 Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Counter Motion for Summary Judgment supports their position. *Western Sunview Properties, LLC v. Federman*, 338 F.Supp.2d 1106 (D. Haw. 2004). The court agrees. Although ruling on a motion as to the Federmans (Plaintiffs' neighbors who obtained a landscaping credit and signed a confidentiality agreement) and not as to the MK Defendants, the court nonetheless found that the plaintiffs "submitted conclusive proof that Defendant Irwin Federman knew that the landscaping credit was an artifice. . . ." *Id.* at 1120 n.6. If

10

Defendant Irwin Federman, the purchaser of a lot, knew that the landscaping credit was an artifice, then it naturally follows that the MK Defendants (the creators of the landscaping credit) also knew it was an artifice.   Based on the evidence presented by plaintiffs, the court finds that the MK Defendants used the services of lawyers to enable them to commit what the MK Defendants "knew or reasonably should have known" to be a fraud.  Coupling the landscaping credits with the confidentiality agreements cloaked the true selling price of the lots in secrecy. Future buyers would be misled.

        The court also notes that although plaintiffs have the burden to prove the crime-fraud exception applies, the MK Defendants have failed to provide any explanation as to why they required buyers to enter into a confidentiality agreement.  Instead, the MK Defendants simply argue that the landscaping credit was legitimate.  Although a credit standing alone may be legitimate, a substantial credit coupled with a continuing obligation to maintain confidentiality is not legitimate in the court's view.

## III. CONCLUSION

        The MK Defendants Appeal From the Amended Order Adopting Special Master's Discovery Order is DENIED.  The MK Defendants cannot rely on the attorney-client privilege to refuse to provide plaintiffs with documents relating

to landscaping credits or confidentiality agreements that are otherwise subject to discovery in this matter.

      IT IS SO ORDERED.

      DATED:  Honolulu, Hawaii, March 6, 2006.



                     J. Michael Seabright
                     United States District Judge

*Western Sunview Properties, et. al. v. Federman, et al.*, Civ. No. 03-00463 JMS/LEK, Order Denying Appeal From Amended Order Adopting Special Master's Discovery Order Filed October 24, 2005

**EXHIBIT 2**

**From:**        "Terry Revere" <Terry@myrhawaii.com>
**To:**          "Douging@Wik. Com (E-mail)" <douging@wik.com>, "Brian Kang (E-mail) (E-mail)"
<bkang@wik.com>
**Date:**        7/18/2006 10:53:30 AM
**Subject:**     wsp v federman et al

Dear Doug and Brian:

This is to confirm that we met and conferred on Monday, July 10, 2006 at
your office to discuss allowing us to take the depositions of Terry
Yamamoto, Bettina Lum and Tom Stifler.  To summarize, Ms. Dixon-Thayer and
I strongly believe that our clients are entitled to these depositions and
that they are clearly appropriate and necessary based on Judge Seabright's
rulings on the motions for summary judgment as well as the documents that
were produced after his discovery order that were not previously made
available.  It has been one week so I assume that your client is still
unwilling to allow these depositions to proceed.  Therefore, we will file a
motion to compel.  Please contact me immediately if a motion to compel will
not be necessary for these depositions to proceed.

Thanks,

Terry

**CC:**          <ddixon-thayer@flk.com>, <elode@flk.com>

**EXHIBIT 3**

DEPOSITION OF WILLIAM MIELCKE TAKEN ON 04-29-05

*Page 1 to Page 185*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI  96813
Phone:  (808) 524-2090
FAX:  (808) 524-2596

MAY 1 2 2005

## Page 53

(1)      MR. ING: Well, object to the form of the question,

(2) vague and ambiguous.

(3)      THE WITNESS: By "requirement" do you mean that

(4) there was some additional agreement that said, "Okay. We're

(5) giving you a credit for X amount of money, and you have to

(6) spend that on landscaping or we get -- something awful happens

(7) and ten lawyers are going to be screaming," no, there was no

(8) requirement.

(9)      However, I would hasten to say that the cost of

(10) landscaping and grading, which normally includes rock walls

(11) and other features in landscape, bushes, usually exceeded the

(12) amount of the landscape and grading for the house.

(13) **BY MR. REVERE:**

(14)      Q. Okay. When Mr. Stifler presented this idea to you,

(15) did he mention that it would be kept confidential so that

(16) subsequent buyers wouldn't know about these credits?

(17)      A. As I recall, the recommendation was that the

(18) landscape credit should be -- Tom's recommendation was he

(19) wanted to project the sale, the list sales prices, and the

(20) recommendation was that the landscape credit be covered by a

(21) confidentiality agreement.

(22)      Q. Okay. And by "protect" the list sales prices, what

(23) that meant was that Mr. Stifler wanted -- and his salespeople,

(24) I guess, he wanted -- well, let me back up.

(25)      That Mr. Stifler wanted to be able to represent to

## Page 54

(1) subsequent purchasers, "Hey, we got our list price for these

(2) other lots that were already sold," correct?

(3)      MR. ING: Object to the form of the question, calls

(4) for speculation.

(5)      MR. COLOMBE: Join.

(6)      THE WITNESS: (Witness shakes head.) I think that

(7) he wanted to represent that these are our list prices. These

(8) are the sales prices.

(9) **BY MR. REVERE:**

(10)      Q. Yeah, the list prices were the actual sales prices?

(11)      MR. ING: Object to the form of the question.

(12)      THE WITNESS: I don't think I said that. And if I

(13) did say that, I think that we -- we had a sales price --

(14) **BY MR. REVERE:**

(15)      Q. Um-hum.

(16)      A. -- list, and this was our sales price list, and Tom

(17) wanted to maintain the sales price list.

(18)      Q. And do you recall seeing that sales price list

(19) before?

(20)      A. Sure.

(21)      Q. And do you recall that at certain occasions after

(22) lots were sold that there would be a stamp put on that would

(23) say "sold" on that sales price list?

(24)      A. If you show me one, I could take a look at it, be

(25) more than happy to take a look at it.

## Page 55

(1)      Q. Okay. Well, isn't it fair to say that basically

(2) what Mr. Stifler wanted to do was to cause subsequent

(3) purchasers to believe, "Hey, Mauna Kea got their sales, their

(4) list price for these earlier lots that they sold"?

(5)      A. I think you'd have to ask Mr. Stifler that.

(6)      Q. Okay. Wasn't that the impression that you got as to

(7) what he was trying to do?

(8)      A. I think Mr. Stifler wanted to maintain the original

(9) sales prices, and in a market that we were hopeful of would

(10) improve, and we'd been through a really difficult period of

(11) time. The goal was to try to accelerate the sales of The

(12) Bluffs. We wanted to provide buyers with an incentive to

(13) close, and as we moved forward with the project and sales

(14) progressed, our goal was hopefully to be able to sell those

(15) lots for the sales prices that were listed, or more.

(16)      Q. Okay. In your answer you used the word "maintain"

(17) the -- you used the phrase "maintain the sales."

(18)      What do you mean by the word "maintain"?

(19)      A. The printed, the printed sales, and if we had one

(20) around I could look at it. We had a printed sales. It was

(21) that handout.

(22)      Q. You wanted to maintain that printed sales list

(23) handout?

(24)      A. Yes.

(25)      Q. Okay. When did you get your real estate license?

## Page 56

(1)      A. I don't know.

(2)      Q. More than ten years ago?

(3)      A. A long time ago.

(4)      Q. Okay. All right. Have you ever heard of the phrase

(5) "comparables" before?

(6)      A. Comparables?

(7)      Q. Yeah.

(8)      A. Yes.

(9)      Q. What's the word "comparables" mean to you?

(10)      A. Usually used by appraisers when they are looking at

(11) other pieces of property for appraisal purposes.

(12)      Q. And basically similar properties to determine the

(13) value of the property in question?

(14)      A. Generally speaking.

(15)      Q. Okay. Did Mr. Stifler -- do you know if Mr. Stifler

(16) ever sought legal advice as to whether his plan for the

(17) landscape credit, using landscape credits was legal or not?

(18)      A. The matter was discussed with Bettina Lum at Price

(19) Okimoto Himeno & Lum. Ms. Lum also drafted the

(20) confidentiality agreement.

(21)      Q. Okay. So is it your testimony that Ms. Lum approved

(22) of the use of these landscape credits?

(23)      MR. ING: Object to the form of the question,

(24) misstates the witness' testimony.

(25)      THE WITNESS: This matter was discussed with Ms.

## Page 77

(1) A. Any other Mauna Kea development?

(2) Q. Yes.

(3) A. I think I just heard recently that Kauna'oa is

(4) offering landscape credits, that Kauna'oa project.

(5) Q. Okay. And who told you that?

(6) A. Ah, I recall that was Cha Cha I spoke to.

(7) Q. Okay.

(8) A. When you asked me about that it didn't click, but

(9) that was a telephone conversation I had with Cha Cha.

(10) Q. Okay. Was it only you and Ms. Kohler on the phone,

(11) or was somebody else on the phone?

(12) A. I don't remember.

(13) Q. Okay. Well, the reason I ask is I don't want to go

(14) into it if was there someone from Mr. Ing's office that was on

(15) the phone, or was it just you two?

(16) THE WITNESS: I can't remember. Doug, were you

(17) there? Oh, Wray Kondo was there.

(18) MR. REVERE: Okay. Who is Wray Kondo? Is that one

(19) of your associates?

(20) MR. ING: One of my partners.

(21) MR. REVERE: Okay.

(22) MR. ING: And if he was, then I'm not going to

(23) instruct him not to --

(24) MR. REVERE: Okay. Well, that's why I was --

(25) MR. ING: -- reveal the content of that discussion.

## Page 78

(1) MR. REVERE: All right. Okay.

(2) Q. Did you have any conversation with Cha Cha about

(3) landscape credits other than the one in which Wray was on the

(4) phone?

(5) A. No.

(6) Q. Okay. Were landscape credits given at any other

(7) project, like Mauna Kea Fairways?

(8) A. Not that I can remember.

(9) Q. Okay. Did you ever speak with an individual named

(10) Yoshio Goto?

(11) A. Sure. I used to work with him.

(12) Q. Okay. Was he aware of the fact that landscape

(13) credits were being used at The Bluffs in Mauna Kea?

(14) A. I haven't got the faintest idea.

(15) Q. Okay. To your knowledge did any executive from

(16) Japan -- well, let me back up.

(17) Mr. Asari was aware of the fact that landscape

(18) credits were being used, correct?

(19) A. Yes, Mr. Revere, he was aware. As I've testified to

(20) earlier today and reading his deposition, yes, he was

(21) certainly aware of it.

(22) Q. Okay. Do you recall if any other executive from

(23) Japan was aware of landscape credits?

(24) A. Only as I stated earlier in my deposition today that

(25) I think at different times on the board of directors of Mauna

## Page 79

(1) Kea Development Corp. would have been one of the Japanese

(2) national representatives.

(3) Q. Okay. And I recall your earlier testimony was that

(4) Bettina Lum drafted up the form for the addendum regarding

(5) landscape credits, correct?

(6) A. Yes.

(7) Q. Okay. Do you recall if Ms. Lum or anyone from her

(8) office expressed any concerns about the legality of the

(9) landscape credits?

(10) MR. ING: Object to the form of the question.

(11) Don't answer that. It's a privileged communication.

(12) MR. REVERE: Okay. All right. Well, Doug our offer

(13) is, one, I think he already testified about the subject of the

(14) communications, but also that there is a crime/fraud exception

(15) to the attorney/client privilege which we think would be

(16) applicable, but I understand if we have to talk to Judge

(17) McConnell or somebody about it, but in any event, you're not

(18) going to allow any more discussion with him and Bettina Lum?

(19) MR. ING: If you're going to ask him about his

(20) discussions with Tina or other attorneys in that office, then

(21) the answer is, yes, I'm going to instruct him not to answer.

(22) MR. REVERE: Okay. All right.

(23) Q. Was Governor Ariyoshi involved with Mauna Kea

(24) Properties in any fashion?

(25) A. Gee, I'd have to go back and again look at the DCCA

## Page 80

(1) filings on officers and directors and see if he was involved

(2) in any of the corporations at different times. May have been.

(3) Q. Okay. Do you recall at any time what his role was

(4) during any period at the time with regard to either Mauna Kea

(5) Properties or Mauna Kea Development Corp.?

(6) A. I -- geez, you know, as I recall he was president of

(7) Prince Resorts Hawai'i or something like that.

(8) Q. Okay. All right. And do you recall what the

(9) relationship was between Prince Resorts Hawai'i and Mauna Kea

(10) Development Corp. or Mauna Kea Properties?

(11) MR. ING: Object to the form of the question, vague

(12) and ambiguous as to time.

(13) THE WITNESS: Um, want me to answer?

(14) MR. ING: Yeah, you can answer.

(15) THE WITNESS: Oh, okay.

(16) May -- I'm sorry, would you restate the question for

(17) me, please?

(18) (The record was read.)

(19) THE WITNESS: Prince Resorts Hawai'i operated the

(20) four Prince Hotels, Mauna Kea, Hapuna, Maui Prince and Hawai'i

(21) Prince, and again, I know I keep repeating this, the duties

(22) and responsibilities changed over time. And the golf courses,

(23) sometimes the golf courses were developed were managed by the

(24) development side, sometimes they were managed by the hotel

(25) side. And so Governor Ariyoshi, former Governor Ariyoshi

Page 185

(1)         C E R T I F I C A T E

(2)    STATE OF HAWAII           )

(3)                             )ss.

(4)    CITY AND COUNTY OF HONOLULU   )

(5)         I, B. KANOELANI COCKETT, CSR, Notary Public,

(6)    State of Hawai'i, do hereby certify;

(7)         That on April 29th, 2005, at 9:08 a.m. appeared

(8)    before me WILLIAM F. MIELCKE, the witness whose deposition is

(9)    contained herein; that prior to being examined he was

(10)   by me duly sworn;

(11)        That the deposition was taken down by me in

(12)   machine shorthand and was thereafter reduced to

(13)   typewritten form under my supervision; that the foregoing

(14)   represents, to the best of my ability, a true and correct

(15)   transcript of the proceedings had in the foregoing matter.

(16)        I further certify that I am not an attorney for

(17)   any of the parties hereto, nor in any way concerned with

(18)   the cause.

(19)        Dated this 12th day of May 2005 in Honolulu,

(20)   Hawai'i.

(21)   _____

(22)   B. KANOELANI COCKETT,

(23)   HI CSR NO. 379, CA CSR No. 7995

(24)   Notary Public, State of Hawai'i

(25)   My commission expires:  February 19th, 2009

# EXHIBIT 4

<u>MEMORANDUM</u>

TO:       Charles G. Rigg, Esq.
FROM:     Terence S. Yamamoto, Esq.
DATE:     November 10, 1997
RE:       The Bluffs at Mauna Kea - Gifford Investments, L.P.

---

        Per our client's request, I called you to inquire if you had reviewed the draft Confidentiality Agreements that had been prepared.  It was our understanding that you were going to provide us with suggested changes.  It is my understanding that you have not reviewed the drafts, and still assumed we were discussing the standard NDA that was previously provided.

        The standard NDA is <u>not</u> acceptable.  Please review the enclosed draft Confidentiality Agreements and advise us as soon as possible if these draft Agreements are acceptable to your client, or if any changes are necessary.  These Confidentiality Agreements would be attached as Exhibits A and B to the Addendum "A" To Sales Contract, and must be executed before escrow is opened.

        In addition, I have also enclosed the revised Addendum "A", which incorporates most of the changes requested.  Please note, however, that in paragraph 3 thereof, we have not changed the word "completed" to "started" as requested.  If the revised Addendum is acceptable, we will need to have the Addendum "A" re-executed once the Confidentiality Agreements (Exhibits A and B thereto) have been agreed to.

        As I mentioned to you, unless we can agree to the final form of the Addendum "A" and the Confidentiality Agreements, and receive executed copies thereof by facsimile (originals to follow) by Wednesday, 5:00 p.m. Hawaii time, our client will pursue another buyer.  Closing of this sale has been delayed for a substantial period of time, and a further delay will not be acceptable.

        Please advise.

MKR 05416

**EXHIBIT 5**

*Law Offices of* **ROGER V. MEEKER**

*Location:  Mamalahoa Highway*
*across from Canada-France-Hawaii*
*Telescope Corporation, Kamuela*

*Address:  Post Office Box 596*
*Kamuela, Hawaii 96743*
*Phone:  (808) 885-9696*
*Fax:  (808) 885-1771*

18 December 1997

Tom Stifler, Broker-in-Charge
Mauna Kea Realty
62-100 Kaunaoa Drive
Kamuela, Hawaii 96743

Re:    Mauna Kea Bluffs, Lot 12 transaction
       <u>Mauna Kea Properties / Gifford Investments transaction</u>

Dear Mr. Stifler:

I represent MacArthur & Company (formerly known as MacArthur, Worrall & McCarter) in connection with their representation of Jack Gifford in his purchase of the Mauna Kea Bluffs Lot 12 property.  As you know, the transaction closed earlier this month.  However, no commissions have yet been paid as you have instructed Title Guaranty Escrow to withhold all commissions pending resolution of the alleged dispute as to the amount owed MacArthur & Company.

A simple reading of the applicable agreements shows that there should not be any dispute as to the amount of the commission owed to my client.  The fully-executed Sales Contract indicates dated October 30, 1997 quite clearly that the "Total Purchase Price" is "$2,500,000". Equally straight-forward is the fully-executed Cooperating Broker's Separate Agreement dated October 30, 1997 between Mauna Kea Properties and MacArthur, Worrall & McCarter, which states that *"Listing Broker agrees to pay a commission at closing to Cooperating Broker in the following amount: 3% of sales price."* Finally, your own fax transmission to Diane Paulson dated November 14, 1997 states specifically that *"The sale is at $2,500,000."* In other words, <u>all</u> of applicable documentation signed by you indicates that a cooperating broker's commission in the amount of $75,000 is due MacArthur & Company (3% of $2,500,000).

As you know, there were extensive negotiations between the parties, and the parties' counsels (myself included), regarding the Closing Credit and the Confidentiality Agreement. Mauna Kea Properties was insisting that my client not only sign the Confidentiality Agreement, but also agree to significant financial exposure in the event that the Confidentiality Agreement were ever breached.  At no time during these negotiations was it ever discussed that the agreed-upon cooperating broker's commission would be reduced because of the Closing Credit.  Only <u>after</u> my client executed the Confidentiality Agreement -- agreeing to potential liability -- were they informed by you of your desire to lower the cooperating broker's commission to $60,000. My client never would have agreed to sign the Confidentiality Agreement if the sales commission were to be reduced.

**MKR 05369**

Tom Stifler
Mauna Kea Properties
Page 2
18 December 1997

Based upon the fact chronology and the controlling documentation connected with this transaction, your instructions to Escrow that the sales commission not be paid to MacArthur & Company have clearly not been made in good faith. I hereby request that you immediately instruct Title Guaranty Escrow to pay my client the $75,000 cooperating broker's commission due them. If you do not do so immediately, my client will be forced to seek all legal remedies available to them, including the filing of a grievance with the Hawaii Real Estate Commission.

Thank you very much.

Sincerely,

Roger V. Meeker

cc:    Dodie MacArthur
       Diane Paulson

MKR 05370

**EXHIBIT 6**

TO: Tom Stifler                                          November 14, 1997 (7:45 am)
Mauna Kea Realty    **CONFIDENTIAL**

FROM: Diane Paulson
MacArthur Worrall & McCarter

Dear Tom:

Please see copies of Page 2 of the Contract with Jack and Rhodine's signatures
dated October 31, 1997, as well as the Receipt for Project Document Book and the
Waiver of Right to Cancel forms. Jack's office informed me that the revised
Confidentiality Agreement, signed by Jack, was faxed back directly to Terry
Yamamoto's office by Chuck Rigg's office. If you have this Confidentiality Agreement
fully executed, please transmit a copy to me at your earliest convenience. Please also call
me with the escrow number as soon as possible so that I may give Jack the green light to
wire the initial deposit into the escrow account.

I have several questions and concerns, two of which I asked of you yesterday,
that I would very much appreciate your written response.
Edie Waters, Jack's accountant, left messages for Janet Lum Won yesterday and has not
had the courtesy of a return call. She is poised, and has been for over a week now, to
expedite the exchange. Obviously she has to pull off a minor miracle and must have
escrow's full cooperation. Because Jack anticipated that this property would go into
escrow the week of November 3rd, a November 26th closing was ambitious, but realistic.
In my conversations with Janet Lum Won in mid-October, she would need a minimum of
21 days to facilitate a closing. Now that we have lost 11 days with the final
**negotiations on account of resolving the Confidentiality Agreement issue, what is
your recommendation as far as adjusting the closing date?**

With regards to the Broker Confidentiality Agreement, **What protection do I
have if a leak comes from your side? What if a MacArthur agent hears from another
party, is unaware that the information is confidential, and it is revealed? Who, from
"your" side beyond you, Cha Cha, Bill, and Mr. Asari are privy to this information?
Is it possible for you to prepare and provide me with a statement from all of you that
says you will keep this strictly confidential?** (I firmly believe that my being liable for
$45,000 certainly gives me a right to have *some* sort of assurance!)

I briefly touched on the following issues subjects your and my October 31st
conversation, in which you put me on' speaker phone' so that Mr. Mielcke and Mr. Asari
could hear...With regards to your office submitting the sales price to the Bureau of
Conveyances; **Do you expect Jack to pay property taxes on $2.5 in the event that the
tax assessors assess the value at $2.5? In the event that the government sees the
closing credit as income to Jack, do you expect Jack to be responsible to pay income
tax on the credit?**

I look forward to your response to these seven questions.

Sincerely,

*Diane*

MKR 05373

**EXHIBIT 7**

MOTOOKA YAMAMOTO & REVERE
A Limited Liability Law Corporation
TERRANCE M. REVERE  5857-0
1000 Bishop Street, Suite 801
Honolulu, Hawaii  96813
Tel. No. (808) 532-7900
Fax No. (808) 532-7910
Email Address:    terry@myrhawaii.com

LOVE & NARIKIYO
A Limited Liability Law Company
CHAD P. LOVE  1617-0
BARBARA J. KIRSCHENBAUM  5825-0
1164 Bishop Street, Suite 1105
Honolulu, Hawaii  96813
Tel. No. (808) 546-7575
Fax No. (808) 546-7070
Email Address:    love@lava.net

Attorneys for Plaintiffs
WESTERN SUNVIEW PROPERTIES, LLC,
GUY HANDS, AND JULIA HANDS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WESTERN SUNVIEW PROPERTIES, LLC; GUY HANDS; AND JULIA HANDS, <br><br>              Plaintiffs, <br><br>    vs. <br><br> IRWIN FEDERMAN; CONCEPCION S. FEDERMAN; THE BLUFFS AT MAUNA KEA COMMUNITY ASSOCIATION; MAUNA KEA PROPERTIES, INC.; MAUNA KEA DEVELOPMENT CORP.; COUNTY OF HAWAII; ET AL., <br><br>              Defendants. | Civil No. CV03-00463 DAE LEK (Contract, Injunction; Other Non-Vehicle Tort; Declaratory Judgment, Other Civil Action) <br><br> ORDER REGARDING DEFENDANT MAUNA KEA PROPERTIES, INC. AND MAUNA KEA DEVELOPMENT CORP.'S PRIVILEGE LOG <br><br> **HEARING:** <br> Date:     May 16, 2005 <br> Time:     12:00 p.m. <br> Judge:   Hon. E. John McConnell |

Order re 050516 Discovery Conf wMcConnell.doc (648-1)

OCT 17 2005

## ORDER REGARDING DEFENDANT MAUNA KEA PROPERTIES, INC. AND MAUNA KEA DEVELOPMENT CORP.'S PRIVILEGE LOG

Plaintiffs moved for an order to deal with three issues regarding Mauna Kea's privilege log: (1) that Mauna Kea specify what the undisclosed "problems" were with its privilege log; (2) that Mauna Kea produce documents marked as "redacted" on its privilege log; and (3) a request for an order that Mauna Kea produce documents being withheld as privileged based on the waiver doctrine or the crime/fraud exception to the attorney-client privilege.

The hearing was held before the Honorable E. John McConnell on May 16, 2005 at 12:00 p.m. via telephone. Brian Kang appeared on behalf of Defendants Mauna Kea Properties, Inc. and Mauna Kea Development Corp.; Andrew Beaman appeared on behalf of Defendants Irwin and Concepcion Federman; and Terrance Revere appeared on behalf of Plaintiffs Western Sunview Properties, and Guy and Julia Hands. Ronald Shigekane, attorney for Defendant The Bluffs at Mauna Kea Community Association and Joseph Kamelamela, attorney for the Defendant County of Hawaii were not in attendance.

After hearing the arguments of counsel, the Discovery Master rules as follows:

1.    During the hearing Mauna Kea's counsel represented that the problem regarding its privilege log was that it was overly inclusive as it included materials

Western Sunview Properties, LLC v. Federmans; Civil No. CV03-00463 DAE LEK
ORDER REGARDING DEFENDANT MAUNA KEA PROPERTIES, INC. AND MAUNA KEA
DEVELOPMENT CORP.'S PRIVILEGE LOG

2

from individual sales files, and the Magistrate previously ordered that only the actual sales contracts needed to be produced. Mauna Kea explained that the Magistrate's prior ruling is the reason why it did not produce documents listed as being redacted in its privilege log, and that all the items marked as "redacted" came from individual sales files. In light of the Magistrate's previous order regarding individual sales files and Mauna Kea's representations during the hearing it appears that no further action need be taken on the first two issues.

2.      After review of Judge Ezra's decisions, it plainly appears that the confidentiality and landscape credit agreements are at issue with respect to Plaintiff's fraud and misrepresentation claims and that the crime/fraud exception to the privilege is applicable.  Accordingly, at this time the Discovery Master orders that documents between Mauna Kea and its attorneys related to confidentiality agreements and landscape credits be produced.  However, no request was made for the depositions of attorneys and the Discovery Master is not ordering that depositions of attorneys may be taken.

DATED: Honolulu, Hawaii, _14 October 2005_

_____
Honorable E. John McConnell

Western Sunview Properties, LLC v. Federmans; Civil No. CV03-00463 DAE LEK
ORDER REGARDING DEFENDANT MAUNA KEA PROPERTIES, INC. AND MAUNA KEA
DEVELOPMENT CORP.'S PRIVILEGE LOG

3

APPROVED AS TO FORM:


_____
Andrew Beaman, Esq.

Attorneys for Defendants
Irwin Federman and Concepcion S. Federman


_____
Brian Kang, Esq.

Attorneys for Defendants
Mauna Kea Properties, Inc. and
Mauna Kea Development Corp.

Western Sunview Properties, LLC v. Federmans; Civil No. CV03-00463 DAE LEK
ORDER REGARDING DEFENDANT MAUNA KEA PROPERTIES, INC. AND MAUNA KEA
DEVELOPMENT CORP.'S PRIVILEGE LOG

4

**EXHIBIT 8**





**MAUNA KEA REALTY**

Mauna Kea Properties Inc., dba Mauna Kea Realty

November 19, 1997

To:             Diane Paulson

From:           Kathrin "Chacha" Kohler R

Re:             Commission on Lot #12

Dear Diane,

Thank you for your fax regarding the commission.

The Cooperating Broker's Agreement signed October 30, 1997 states clearly that the commission is 3% of the purchase price, and we know what the purchase price is. All commissions are being paid on the actual amounts received by the company.

Also, at the time we opened escrow, Tom sent you a copy of the Cooperating agreement with the escrow instructions. That agreement clearly stated that your commission was $60,000 i.e. 3% of the purchase price.

I am glad we got to clarify this matter right now so we will not have any surprises later on.

Diane, this is to address the commission issue only.

Sincerely,

Kathrin "Chacha" Kohler R

**MKR 05384**

**EXHIBIT 9**

<u>MEMORANDUM</u>

TO:        Charles G. Rigg, Esq.
FROM:      Terence S. Yamamoto, Esq.
DATE:      November 12, 1997
RE:        The Bluffs at Mauna Kea - Gifford Investments, L.P.

          In accordance with your letter dated October 12, 1997, and pursuant to our client's consent, enclosed for your review and client's signature are (1) a red-lined, revised draft Confidentiality Agreement, and (2) a revised Confidentiality Agreement, incorporating the changes contained in your letter of October 10, 1997 or discussed with you by telephone.

          We have incorporated the revisions specified in your letter to paragraph 1 (excluding the Broker as an agent); paragraph 2 (new termination date of 12/31/2000); paragraph 3 (payment of a fixed sum of $200,000.00 - per our telephone conversation, and providing for injunctive relief); and deleting paragraphs 4 and 5 from the prior draft.

          If acceptable, please have your client execute the enclosed copy and provide a signed copy by facsimile. Please mail an executed original for our files.

          EXECUTION OF THE CONFIDENTIALITY AGREEMENT BY GIFFORD INVESTMENTS, LTD. AND OPENING OF ESCROW IS STILL, HOWEVER, <u>SUBJECT</u> TO AND CONTINGENT UPON OBTAINING A CONFIDENTIALITY AGREEMENT ACCEPTABLE TO MAUNA KEA DEVELOPMENT CORP. FROM BUYER'S BROKER, MACARTHUR & COMPANY. As I mentioned to you by telephone, MacArthur & Company still has some concerns about the terms and conditions of the Confidentiality Agreement, although we are willing to incorporate similar revisions to the Broker's Confidentiality Agreement.

          Please call if you have any questions.

Doty /Dianne

Please Note — In order to finalize this Deal & open Escrow we need Closure on MacArthur & Co's Confidentiality Agreement. We should Do ASAP.

**MKR 04102**

# EXHIBIT 10

*FAX TO: Terry Yamamoto*
*From: Tom Stifler*

November 13, 1997 (9:00am)

TO: Tom Stifler
Mauna Kea Realty

FROM: Diane Paulson
MacArthur Worrall & McCarter

    Dodie has just shared with me the memo from Terry Yamamoto to Chuck Rigg (I believe he erroneously used "October" rather than "November" throughout the memo) I am clear that the Confidentiality Agreement between the Seller and Buyer's Broker needs to be agreed upon before we proceed to open escrow. My concern is, what protection do I have if the leak comes from your side? This is such a small town, as we all know; what if a MacArthur agent hears from another party, unaware that it is confidential information, and it is revealed? How do I know that a similar situation did not happen with the Bluffs Lot #1 and #2? What if that broker reveals something to someone? I'd love to hear your responses to these questions.

    As of 5pm yesterday, I understand that it was left that Terry Yamamoto would "sleep on" the issue of having me 'on line' for $45,000 and MacArthur Worrall & McCarter 'on line' for $5000. Dodie is understandably unwilling to be liable for more than this, a stance which I think any principal broker would take if they were even willing to sign it at all. As far as my being willing to, I am completely certain that the only MacArthur agents who know are myself and Dodie. I am completely confident that there will not be a leak from me or Dodie. I have always kept this file with me; it was with me in Europe, remains secure with me and is not even at the office. I only just shared this deal with Dodie on Monday, November 10th; I have not even given my own broker copies! It will continue to remain with me, not at the office, until such time that all your lots are sold or the two years is up. Tom, Perhaps you can assist here. Put yourself in Dodie's shoes and convince Terry Yamamoto to be satisfied with the $50,000 regardless of where it is coming from and let's get this transaction closed.

    Per Dodie, Roger is awaiting a call from Terry Yamamoto for his approval of how the $50,000 is "split".

    Sincerely,

    *Diane*

CONFIDENTIAL        **MKR 04257**

# EXHIBIT 11



OCT 20 '97 08:27AM

**MAUNA KEA REALTY**
Mauna Kea Properties, Inc., dba Mauna Kea Realty

October 16, 1997
8:00am

Diane Paulson
MacArthur, Worrall & McCarter
P.O. Box 1958
Kamuela, HI 96743

By Fax to: 885-5538

Re:     Gifford Investments
        Bluffs at Mauna Kea, Lot 12

Dear Diane,

This will respond to Mr. Gifford's fax dated October 15, 1997.

1.  The purchase price is $2,500,000 with a purchaser's credit of $500,000 at
    closing. This credit is being given to your client because he has agreed to a
    cash purchase to close within 30 days of opening escrow. As stated to you in
    our first correspondence, we are unable to go below this price. It is firm.

2.  Article XVI
    17.1 We thank Mr. Gifford for accepting easements 28, 8 & 9 as defined.
    Mauna Kea Development Corporation has no control of the location of the
    fire hydrants and water easement. They were placed in strict conformity
    with the County of Hawaii subdivision code and Department of Water
    standards.
    We have no objection to the modification of the water easement or the
    relocation of the fire hydrant if the County of Hawaii and the Department
    of Water will allow such variances. Further, in order to attempt to
    accommodate Mr. Gifford's wishes, and at our expense we will make
    application to the County/Dept. of Water for the variances. If granted we
    would expect Mr. Gifford to pay for the cost of physically relocating the
    hydrant.

    With reference to paving past the cul-de-sac, we do not intend to do any
    further paving. However, there is an existing asphalt drive that goes past
    the cul-de-sac. Does Mr. Gifford wish this existing driveway removed?

**MKR 05508**

1

OCT 20 '97 08:27AM

With reference to the request to landscape and irrigate the setback and easement areas, we first have to point out that the special setback areas are proposed to be maintained in their natural state. In addition, there are to be no large plants or trees in the setbacks that might interfere with the views of the neighboring lot owners. In other words, the setbacks are designed to protect the ocean views of all the homeowners.

The drainage easement must be planted so that water may flow through it in the event of heavy rains. Whatever Mr. Gifford plants would have to satisfy this requirement.

The foregoing being said, we would have no objection to irrigating the setbacks/easements so long as the plan was approved by the design review committee as part of Mr. Gifford's general landscape plan per the CC&R's. Finally, we could not be responsible for irrigation systems put in by a homeowner. They would be his responsibility.

### 17.3 Agreed

17.4 We will agree to this paragraph except for the words: "regardless of Mauna Kea Development Corp. change in hotel or property ownership."

The possibility of a sale of the resort or portions thereof is covered in the Sales Contract in Section 15.2 (b). It states in part:
"(b) in the event of the sale of either the Mauna Kea Beach Hotel or the Hapuna Beach Prince Hotel, or both, Seller will use its best efforts to cause the purchaser of the Mauna Kea Beach Hotel and/or the Hapuna Beach Prince Hotel to assume such obligation to make available such membership to Buyer; provided, that upon such sale, Seller shall be released from all obligations to Buyer with respect to The Club and shall have no further liability under this Section 15.2."

The portion of Mr. Gifford's language with which we have agreed assures your client that he will not be treated any differently than any homeowner in the Mauna Kea Resort with regard to Club membership. He, as a homeowner in the Bluffs will have the same rights to Club membership as the homeowners in Mauna Kea Fairways North and South and the Villas.

2

MKR 05509

OCT 20 '97 08:27AM

On the other hand we cannot create a <u>preference</u> for him which would put
him in a better position than our current homeowners.  The additional
language he requested would create such a preference and would be unfair
to our present homeowners.
Accordingly, as you first requested, the included language will insure equal
treatment of all.

If Mr. Gifford is agreeable to the above please advise and we will reduce the agreement to
writing in an addendum, secure signatures and open escrow.

Aloha,

Tom Stifler
Principal Broker

3

MKR 05510

**EXHIBIT 12**

**Litigation Copy**

From:       E. John McConnell [judgemcconnell@msn.com]
Sent:       Monday, May 16, 2005 3:59 PM
To:         renee@myrhawaii.com
Cc:         abeaman@ckdbw.com; bkang@wik.com; Terry Revere (E-mail); Kelly Bryant
Subject:    Re: Western Sunview - Copies of Judge Ezra's Orders

Dear Counsel:

After review of Judge Ezra's decisions, it appears plain to me that the confidentiality and landscape credit agreements are at issue with respect to Plaintiff's fraud and misrepresentation claims and that the crime/fraud exception to the privilege is applicable. Accordingly, at this time I am ordering that documents between MK and its attorneys related to those two agreements be produced. I am not ordering that depositions of attorneys may be taken. I ask that Mr. Revere prepare an order which in addition should recite the representations made at today's discovery conference regarding undisclosed problems and redacted documents. Hopefully the form of the order can be resolved by email.
Thanks to all of you.

John McConnell---- Original Message -----

    **From:** Renee <mailto:renee@myrhawaii.com>
    **To:** judgemcconnell@msn.com <mailto:judgemcconnell@msn.com>
    **Cc:** abeaman@ckdbw.com <mailto:abeaman@ckdbw.com> ; bkang@wik.com
    <mailto:bkang@wik.com> ; Terry Revere (E-mail) <mailto:terry@myrhawaii.com>
    **Sent:** Monday, May 16, 2005 1:09 PM
    **Subject:** Western Sunview - Copies of Judge Ezra's Orders

    Dear Judge McConnell:

    Please find attached Judge Ezra's orders filed September 15, 2004 and February 22, 2005.

    Sincerely,

    Renee Catian, Legal Assistant to Terrance Revere

    Motooka Yamamoto & Revere

    1000 Bishop Street, Suite 801

    Honolulu, Hawaii 96813

    Telephone: (808) 532-7900, Ext. 521

    Facsimile: (808) 532-7910

This message and attached file(s), if any, is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution, reading attached file(s), if any, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by return email and permanently delete this email and any copy you may have.  No representation is made that this email or any attachments are free of viruses. Virus scanning is recommended and is the responsibility of the recipient.  Thank you.