# EXHIBIT 3

# DEPOSITION OF WILLIAM MIELCKE TAKEN ON 04-29-05

*Page 1 to Page 185*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

MAY 1 2 2005

### Page 53

(1) MR. ING: Well, object to the form of the question,
(2) vague and ambiguous.
(3) THE WITNESS: By "requirement" do you mean that
(4) there was some additional agreement that said, "Okay. We're
(5) giving you a credit for X amount of money, and you have to
(6) spend that on landscaping or we get – something awful happens
(7) and ten lawyers are going to be screaming," no, there was no
(8) requirement.
(9) However, I would hasten to say that the cost of
(10) landscaping and grading, which normally includes rock walls
(11) and other features in landscape, bushes, usually exceeded the
(12) amount of the landscape and grading for the house.
(13) BY MR. REVERE:
(14) Q. Okay. When Mr. Stifler presented this idea to you,
(15) did he mention that it would be kept confidential so that
(16) subsequent buyers wouldn't know about these credits?
(17) A. As I recall, the recommendation was that the
(18) landscape credit should be -- Tom's recommendation was he
(19) wanted to project the sale, the list sales prices, and the
(20) recommendation was that the landscape credit be covered by a
(21) confidentiality agreement.
(22) Q. Okay. And by "protect" the list sales prices, what
(23) that meant was that Mr. Stifler wanted -- and his salespeople,
(24) I guess, he wanted -- well, let me back up.
(25) That Mr. Stifler wanted to be able to represent to

### Page 54

(1) subsequent purchasers, "Hey, we got our list price for these
(2) other lots that were already sold," correct?
(3) MR. ING: Object to the form of the question, calls
(4) for speculation.
(5) MR. COLOMBE: Join.
(6) THE WITNESS: (Witness shakes head.) I think that
(7) he wanted to represent that these are our list prices. These
(8) are the sales prices.
(9) BY MR. REVERE:
(10) Q. Yeah, the list prices were the actual sales prices?
(11) MR. ING: Object to the form of the question.
(12) THE WITNESS: I don't think I said that. And if I
(13) did say that, I think that we -- we had a sales price --
(14) BY MR. REVERE:
(15) Q. Um-hum.
(16) A. -- list, and this was our sales price list, and Tom
(17) wanted to maintain the sales price list.
(18) Q. And do you recall seeing that sales price list
(19) before?
(20) A. Sure.
(21) Q. And do you recall that at certain occasions after
(22) lots were sold that there would be a stamp put on that would
(23) say "sold" on that sales price list?
(24) A. If you show me one, I could take a look at it, be
(25) more than happy to take a look at it.

### Page 55

(1) Q. Okay. Well, isn't it fair to say that basically
(2) what Mr. Stifler wanted to do was to cause subsequent
(3) purchasers to believe, "Hey, Mauna Kea got their sales, their
(4) list price for these earlier lots that they sold"?
(5) A. I think you'd have to ask Mr. Stifler that.
(6) Q. Okay. Wasn't that the impression that you got as to
(7) what he was trying to do?
(8) A. I think Mr. Stifler wanted to maintain the original
(9) sales prices, and in a market that we were hopeful of would
(10) improve, and we'd been through a really difficult period of
(11) time. The goal was to try to accelerate the sales of The
(12) Bluffs. We wanted to provide buyers with an incentive to
(13) close, and as we moved forward with the project and sales
(14) progressed, our goal was hopefully to be able to sell those
(15) lots for the sales prices that were listed, or more.
(16) Q. Okay. In your answer you used the word "maintain"
(17) the -- you used the phrase "maintain the sales."
(18) What do you mean by the word "maintain"?
(19) A. The printed, the printed sales, and if we had one
(20) around I could look at it. We had a printed sales. It was
(21) that handout.
(22) Q. You wanted to maintain that printed sales list
(23) handout?
(24) A. Yes.
(25) Q. Okay. When did you get your real estate license?

### Page 56

(1) A. I don't know.
(2) Q. More than ten years ago?
(3) A. A long time ago.
(4) Q. Okay. All right. Have you ever heard of the phrase
(5) "comparables" before?
(6) A. Comparables?
(7) Q. Yeah.
(8) A. Yes.
(9) Q. What's the word "comparables" mean to you?
(10) A. Usually used by appraisers when they are looking at
(11) other pieces of property for appraisal purposes.
(12) Q. And basically similar properties to determine the
(13) value of the property in question?
(14) A. Generally speaking.
(15) Q. Okay. Did Mr. Stifler -- do you know if Mr. Stifler
(16) ever sought legal advice as to whether his plan for the
(17) landscape credit, using landscape credits was legal or not?
(18) A. The matter was discussed with Bettina Lum at Price
(19) Okimoto Himeno & Lum. Ms. Lum also drafted the
(20) confidentiality agreement.
(21) Q. Okay. So is it your testimony that Ms. Lum approved
(22) of the use of these landscape credits?
(23) MR. ING: Object to the form of the question,
(24) misstates the witness' testimony.
(25) THE WITNESS: This matter was discussed with Ms.

### Page 77

(1) A. Any other Mauna Kea development?
(2) Q. Yes.
(3) A. I think I just heard recently that Kauna'oa is
(4) offering landscape credits, that Kauna'oa project.
(5) Q. Okay. And who told you that?
(6) A. Ah, I recall that was Cha Cha I spoke to.
(7) Q. Okay.
(8) A. When you asked me about that it didn't click, but
(9) that was a telephone conversation I had with Cha Cha.
(10) Q. Okay. Was it only you and Ms. Kohler on the phone,
(11) or was somebody else on the phone?
(12) A. I don't remember.
(13) Q. Okay. Well, the reason I ask is I don't want to go
(14) into it if was there someone from Mr. Ing's office that was on
(15) the phone, or was it just you two?
(16) THE WITNESS: I can't remember. Doug, were you
(17) there? Oh, Wray Kondo was there.
(18) MR. REVERE: Okay. Who is Wray Kondo? Is that one
(19) of your associates?
(20) MR. ING: One of my partners.
(21) MR. REVERE: Okay.
(22) MR. ING: And if he was, then I'm not going to
(23) instruct him not to --
(24) MR. REVERE: Okay. Well, that's why I was --
(25) MR. ING: -- reveal the content of that discussion.

### Page 78

(1) MR. REVERE: All right. Okay.
(2) Q. Did you have any conversation with Cha Cha about
(3) landscape credits other than the one in which Wray was on the
(4) phone?
(5) A. No.
(6) Q. Okay. Were landscape credits given at any other
(7) project, like Mauna Kea Fairways?
(8) A. Not that I can remember.
(9) Q. Okay. Did you ever speak with an individual named
(10) Yoshio Goto?
(11) A. Sure. I used to work with him.
(12) Q. Okay. Was he aware of the fact that landscape
(13) credits were being used at The Bluffs in Mauna Kea?
(14) A. I haven't got the faintest idea.
(15) Q. Okay. To your knowledge did any executive from
(16) Japan -- well, let me back up.
(17) Mr. Asari was aware of the fact that landscape
(18) credits were being used, correct?
(19) A. Yes, Mr. Revere, he was aware. As I've testified to
(20) earlier today and reading his deposition, yes, he was
(21) certainly aware of it.
(22) Q. Okay. Do you recall if any other executive from
(23) Japan was aware of landscape credits?
(24) A. Only as I stated earlier in my deposition today that
(25) I think at different times on the board of directors of Mauna

### Page 79

(1) Kea Development Corp. would have been one of the Japanese
(2) national representatives.
(3) Q. Okay. And I recall your earlier testimony was that
(4) Bettina Lum drafted up the form for the addendum regarding
(5) landscape credits, correct?
(6) A. Yes.
(7) Q. Okay. Do you recall if Ms. Lum or anyone from her
(8) office expressed any concerns about the legality of the
(9) landscape credits?
(10) MR. ING: Object to the form of the question.
(11) Don't answer that. It's a privileged communication.
(12) MR. REVERE: Okay. All right. Well, Doug our offer
(13) is, one, I think he already testified about the subject of the
(14) communications, but also that there is a crime/fraud exception
(15) to the attorney/client privilege which we think would be
(16) applicable, but I understand if we have to talk to Judge
(17) McConnell or somebody about it, but in any event, you're not
(18) going to allow any more discussion with him and Bettina Lum?
(19) MR. ING: If you're going to ask him about his
(20) discussions with Tina or other attorneys in that office, then
(21) the answer is, yes, I'm going to instruct him not to answer.
(22) MR. REVERE: Okay. All right.
(23) Q. Was Governor Ariyoshi involved with Mauna Kea
(24) Properties in any fashion?
(25) A. Gee, I'd have to go back and again look at the DCCA

### Page 80

(1) filings on officers and directors and see if he was involved
(2) in any of the corporations at different times. May have been.
(3) Q. Okay. Do you recall at any time what his role was
(4) during any period at the time with regard to either Mauna Kea
(5) Properties or Mauna Kea Development Corp.?
(6) A. I -- geez, you know, as I recall he was president of
(7) Prince Resorts Hawai'i or something like that.
(8) Q. Okay. All right. And do you recall what the
(9) relationship was between Prince Resorts Hawai'i and Mauna Kea
(10) Development Corp. or Mauna Kea Properties?
(11) MR. ING: Object to the form of the question, vague
(12) and ambiguous as to time.
(13) THE WITNESS: Um, want me to answer?
(14) MR. ING: Yeah, you can answer.
(15) THE WITNESS: Oh, okay.
(16) May -- I'm sorry, would you restate the question for
(17) me, please?
(18) (The record was read.)
(19) THE WITNESS: Prince Resorts Hawai'i operated the
(20) four Prince Hotels, Mauna Kea, Hapuna, Maui Prince and Hawai'i
(21) Prince, and again, I know I keep repeating this, the duties
(22) and responsibilities changed over time. And the golf courses,
(23) sometimes the golf courses were developed were managed by the
(24) development side, sometimes they were managed by the hotel
(25) side. And so Governor Ariyoshi, former Governor Ariyoshi

Page 185

(1) CERTIFICATE
(2) STATE OF HAWAII )
(3)                  )ss.
(4) CITY AND COUNTY OF HONOLULU )
(5)     I, B. KANOELANI COCKETT, CSR, Notary Public,
(6) State of Hawai'i, do hereby certify;
(7)     That on April 29th, 2005, at 9:08 a.m. appeared
(8) before me WILLIAM F. MIELCKE, the witness whose deposition is
(9) contained herein; that prior to being examined he was
(10) by me duly sworn;
(11)    That the deposition was taken down by me in
(12) machine shorthand and was thereafter reduced to
(13) typewritten form under my supervision; that the foregoing
(14) represents, to the best of my ability, a true and correct
(15) transcript of the proceedings had in the foregoing matter.
(16)    I further certify that I am not an attorney for
(17) any of the parties hereto, nor in any way concerned with
(18) the cause.
(19)    Dated this 12th day of May 2005 in Honolulu,
(20) Hawai'i.
(21) _____
(22) B. KANOELANI COCKETT,
(23) HI CSR NO. 379, CA CSR No. 7995
(24) Notary Public, State of Hawai'i
(25) My commission expires: February 19th, 2009