**EXHIBIT 4**



**PACIFIC REALTY CONSULTANTS**

Real Estate Consulting Services
1021 Smith Street, Suite 225
Honolulu, HI 96817
Tel • 808 • 524 • 1505    Fax • 808 • 524 • 1367

April 21, 2005

Chad P. Love, Esq.
1164 Bishop St, Ste. 1105
Honolulu, HI 96813

Re: **Western Sunview Properties, et al vs. Federman et al.**

Dear Mr. Love:

I am in receipt of the following documents which you sent me on March 28, 2005:

- Wendelin Campbell's report, dated March 22, 2005;
- Jan Medusky's appraisal, dated March 8, 2005; and
- Byron Gangnes' report, dated March 23, 2005.

Based on my review of these documents, I offer the following observations and rebuttal statements:

### A.    CAMPBELL

1. While Campbell (p.2), states she does "not believe that Federman made a conscious misrepresentation of the sales price" on the Conveyance Tax Certificate ("CTC"), I respectfully disagree. I think it is more reasonable to believe that Federman, an experienced and astute businessman, knew what he was signing, the purpose served, and that he was aware it stated the sales price was $3,000,000 even though he knew he was actually paying $2,550,000 for Lot 6. The document was clearly entitled a "State of Hawaii Department of Taxation Conveyance Tax Certificate" and, like Transfer Tax Certificates in other states, the CTC served to memorialize the <u>actual</u> price paid for the property being conveyed. I would also assume that, as a reasonably prudent individual, Federman would at least look at item 1 (sales price) to see if the figure shown comported with his understanding of what he was paying for this property. I further believe that he was aware of the discrepancy but did nothing to correct it, even though disclosure of the actual sales price to tax authorities would not have violated his confidentiality agreement. Finally, it is my opinion that when Federman signed the document, he was fully aware he was declaring that he had examined it and that it stated the actual and full consideration he paid on the conveyance. Above the

Chad P. Love, Esq.
April 21, 2005
Page 2

signature line, in capital letters, was the heading "DECLARATION" followed by words describing exactly what he was declaring.

2. That the Escrow Company may have prepared the CTC and presented it to him for his signature -- or that he may not have read what he signed -- does not excuse or justify the consequence of his act. Federman could have required that the CTC be corrected because the sales price, commonly understood to mean what one actually pays for a property and not the listing, asked or gross price, was incorrect. But he didn't do so, he signed it "as is", and he allowed the transaction to go on record as a $3,000,000 instead of a $2,550,000 sale. Even though the amount was overstated, it was nevertheless a false declaration of the actual consideration and misleading to those who rely on such data. It is as much a wrongful declaration as a seller saying the sales price was $3,000,000 if buyer is also required, under a confidentiality agreement, to give seller a promissory note for an additional $450,000 at closing.

3. I believe that what gives further credence to the fact that Federman knew the CTC he signed was incorrect was his later request to the tax authorities to correct the CTC error, which he claimed was due to an "accounting artifice". This request was not spurred by pangs of conscience but to lower the assessed valuation and thereby his real property taxes. In short, having already received his $450,000 "landscaping credit" and no longer concerned about its confidentiality, he later retracted the overstated sales price to get the benefit of lower property taxes. I believe Federman knew all along the $3,000,000 sales price on the CTC was not an accounting artifice but a marketing artifice, a ploy to sustain higher sales prices mainly for the benefit of MKP and that his reward for cooperating was a significant discount in his purchase price. He must have known the credit had nothing to do with landscaping since the initial and final sales prices were $2,550,000 notwithstanding an amendment. The latter simply increased the price by $450,000 but credited Federman the same amount at closing.

4. On page 3, Campbell states that the purpose of the CTC is to verify the accuracy of the tax being paid and obtain the new owner's mailing address. However, these are very minor reasons. Following repeal of the Federal Revenue Tax on Conveyances on December 31, 1967, Hawaii, like most other states, enacted a conveyance or transfer tax law to continue tracking the prices of properties sold. According to John W. Reilly in his book, "The Language of Real Estate in Hawaii", 1975, "one purpose of the tax is to acquire reliable data on the fair market value of property to help establish more accurate real property tax assessments." This, to me, is the law's major purpose and the CTC is a means of achieving that purpose by gathering "full and accurate" sales data and ensuring that the conveyance tax based on the sales price is properly computed and collected. Thus, the CTC is more than a revenue producing device. The tax generated (originally $.05 per $100, now $.10) is modest and intended mainly to support the cost of a recording system.

Chad P. Love, Esq.
April 21, 2005
Page 3

5. Campbell also states "There is no reason for Federmans to have assumed that prospective buyers would rely on the information contained in the document." I disagree. It is common knowledge, at least among those who frequently buy and sell property, what the primary function of the conveyance or transfer tax system is. What I just quoted from Reilly's book is true not only in Hawaii, but in all states that base their real property taxes on the value of comparable properties and currency of data. I believe it is also common knowledge for those with Mr. Federman's level of sophistication that the data obtained at the time of a conveyance is publicly accessible to appraisers, property owners, lenders, realtors, sellers and buyers -- all of whom use the data to establish values for loans, selling prices, offering prices and tax appeal purposes. Therefore, I find it incredulous that Federman had no reason to assume a prospective buyer would use the data in his declaration in considering what price to offer. If Federman has never relied on such information, which is unlikely, I believe his broker or lender probably has. Finally, I believe Mr. Federman understood that the integrity of the entire conveyance tax system and what it is intended to accomplish is at stake if false declarations are allowed to proliferate. The system is dependant on accurate and current data. Without this all stakeholders, such as the buyer in this case, will be deprived. Both overstatements as well as understatements of prices are a fraud and deception against the public. The former inflates market value, prompting buyers to pay too much, lenders to lend too much, and property owners to pay too much tax. Understating prices lowers the tax base and unjustly deprives the County of revenue. So, Federman knew or should have known: a) that prospective buyers would rely on the data, b) what the data would be used for, and c) the integrity of the system hinged on the accuracy of the data furnished by declarants.

6. I also disagree with the comment that the CTC is not a tool for Realtors and appraisers. While it may be true that they don't use the CTC's themselves, they very much use the data contained in them, since the data is furnished to the various counties for tax assessment purposes and also made available to the public. The county tax offices, I believe, are the <u>primary</u> and thus superior sources of information, as sales prices shown there and in the Hawaii Information Service (HIS) website all come from the CTCs the Bureau of Conveyances receives when sales are recorded -- not from MLS nor developers. While it is true that sometimes there is a time lag of as much as two months before prices are "posted", this is the exception rather than the rule. And while there are sometime inaccuracies due to reasons such as false declarations, again these are rare exceptions. Also while more current data may be available through the MLS system, developers, and Realtors, the data is likely to be as much if not more flawed than the data at the tax office because 1) the information attained is not under a declaration subject to penalty; 2) sales are sometimes not reported or incorrectly reported under MLS (not all real estate companies and agents are members of MLS), and 3) developers sometimes overstate the number and/or prices of homes or lots recently sold. For these reasons, the tax office or HIS data is considered by most Realtors, appraisers, developers and countless homeowners, as well as county tax assessors, as the "initial" or "primary" source of sales data. This information, accessed

Chad P. Love, Esq.
April 21, 2005
Page 4

by most real estate practitioners via HIS, originates from the CTCs filed at the Bureau of Conveyances. They presumably cover every transfer since Hawaii Law requires the filing of a CTC within 90 days of any conveyance, even those transfers which may be exempt from a conveyance tax. I am certain that both Jan Medusky and Byron Gangnes relied on information originating from CTCs in doing their reports. Likewise, Au and her client, like most Realtors and buyers, relied to some extent on recently recorded sales prices to determine an appropriate offering price.

7. While Au, Buyer's agent, did obtain and confirm sales prices with MKR (as Campbell points out), she also checked with the Tax Office (see p. 89 of her 1/29/04 deposition). She therefore relied, as did her client to whom she had reported her findings, on certain recorded sales data as well (obtained from the CTCs for the sales involved). Au reported to her client on September 20, 1999 that she had confirmed, presumably through the tax office and/or MKP, the following oceanfront lot sales:

| Lot | |
|---|---|
| 6 | 3,000,000 |
| 9 | 3,250,000 |
| 10 | 3,250,000 |
| 11 | 3,500,000 |
| 12 | 2,750,000 |

Of the five, only two (lots 6 and 11) were sales made within the last year. Lot 6 closed on February 1, 1999 and Lot 11 on March 18, 1999. Generally, sales over a year old are not considered good comparables. The more recent, the better. However, since lot 6 was right next to lot 5 and had closed around the same time as Lot 11, about seven months earlier, it made sense for Buyer to focus on lot 6 as the best comparable. Curiously, two sales made about 30 and 60 days before the Lot 5 sale were not on the list. These were lots 7 and 8 respectively and both supposedly sold for $2,750,000. Certainly MKR knew about them and should have disclosed the sales to Au at the time Au inquired about oceanfront sales. If Au had been told about them, there is no reason why she wouldn't have disclosed these sales to the Buyer. It should be noted that since these sales did not close until after September 20, 1999, Au would not have been able to find out about these two transactions via the Tax Office -- only via MKR or MLS if the properties were in the MLS system. The point is that Au and her client were entitled to reasonably rely on recorded date and what MKP represented to them.

8. Little did Au and her client know that the recorded sales prices for lots 6 and 11, which totaled $6,500,000, were overstated by $950,000! Had they known this, I believe it is reasonable they would have offered less than $3,250,000 for lot 5. After all, the average of the two recorded sales was actually only $2,775,000, not $3,250,000 as might first appear. While the fact that lot 5 was the last oceanfront lot, it did not necessarily follow that it justified a premium, especially since more than six months had elapsed since lot 11 sold and lots 7 and 8 had sold just 30 and 60 days before lot 5 at a reported $2,750,000 each. Of course, unknown to Au and her client, each of the last

two sales, which occurred when the market was supposedly heating up in July and August, also had confidential "landscaping credits" equal to about 8.4% of the indicated sales price notwithstanding the fact that both lots were over 10,000 square feet larger than lot 5! In summary, I believe Buyer offered as much as he did only because he relied on false information provided by CTCs on at least two recorded sales and/or on false or incomplete data provided by MKP. Had Buyer known the truth, I believe he would have offered less and still have had a reasonable likelihood of Seller's acceptance in view of the lower prices and "flat" market that lasted from July to October 1999. I found no credible evidence of any other bonafide offers on Lot 5 in September (as MKP claimed) and no sales of any type of lots in October. I did note that the next sale (ocean-view lot 16 in November 1999) also involved a 10% "landscaping credit". Why so if the market had truly heated up by September? I believe the turning point was at the end of **December 1999**.

9. On the issue of damages, I disagree that buyer suffered none. Regardless of how much lot 5 appreciated in value over time, the Buyer would have been damaged by the amount he overpaid for the property at the time of purchase due to false representations by MKP and misinformation provided by an earlier buyer in his CTC declaration (Federman, who closed on the adjoining property about seven months before). Buyer had a right to rely on both in determining what comparable properties had sold for and what to offer.

### B.    MEDUSKY

1. I note that Medusky's Market Value Conclusion was $3,800,000 as of January 12, 2000. However, this is irrelevant. I think the more relevant question is what was the market value on September 20, 1999, the date Buyer made a decision by offering to purchase lot 5.

2. I note that on p. 1 of Exh. 1 "Limiting Conditions and Assumptions," item 4 on Relied Upon Information states "informed local sources, such as governmental agencies, Realtors, Sellers, and others." This presumably includes the Bureau of Conveyances and Tax Offices. It also states the information "was weighed in the light in which it was supplied...(and) it is believed the information is true and correct." I have no problem with this. The point is that Realtors and their clients, such as Au and Buyer, are also entitled to use the same sources of information as Medusky and believe such information is true and correct based on oral and written representations of such sources.

### C.    GANGNES

1. I disagree with Gangnes' first conclusion, that the higher net price paid for Lot 5 was consistent with the market's tightening on high-end Big Island real estate in general and

Chad P. Love, Esq.
April 21, 2005
Page 6

the Bluffs in particular in the late 1990's. I believe the tightening did not come until the last week of December 1999, over three months after the contracted sale of Lot 5. That is when the 4 remaining ocean-view (or bluff or back) lots sold without discount. The next month, January 2000, Buyer supposedly received an offer of $4,500,000 from Leone, lot 10 (oceanfront) resold for $5,000,000 and lot 13 (ocean view) resold for $3,000,000. The difference of three months can a mean a world of difference in market conditions. During the three months preceding the "boom", there was no sale in October, one sale (Lot 16) for $2,000,000 less a $200,000 credit on November 3, 1999, and one sale (lot 20) for $1,750,000 on December 2, 1999. This period can hardly be characterized as a market tightening. Neither sales prices nor sales volume were rising.

2. Gangnes' summary states that there was a tightening of the market near the end of the last decade. More accurately, this occurred only in the last week of the decade. Therefore, I do not agree that the purchase of lot 5 occurred "during a period when a convergence of factors was propelling Big Island real estate prices higher." The purchase occurred three months before, when there were only 4 sales in the prior nine months, all induced by confidential "landscaping credits" ranging from $212,500 to $500,000 per sale. The Buyer of Lot 5 received no credit but the person who bought lot 16 almost two months later, in November 1999, received a credit equal to 10% of his indicated sales price.

I reserve the right to add or amend my report based on any additional information furnished.

Sincerely,

*Kenneth Chong* (signature)
Kenneth Chong