# EXHIBIT 9

# Architectural Diagnostics Ltd.

Building Diagnostics • Failure Analysis • Remedial Architecture • Architecture

5 April 2005

Chad Love  
Love & Narikiyo  
lovec001@hawaii.rr.com

Terry Revere  
Motooka Yamamoto and Revere  
reveret001@hawaii.rr.com

**PROJECT:** Western Sunview Properties v Federman  
**SUBJECT:** Review and Response to Knox Report

Dear Mr. Love and Mr. Revere:

At your request, I have reviewed the 23 March '05 report by David Knox on the conduct of the Design Committee of the Bluffs at Mauna Kea Community Association with respect to the design reviews of the plans submitted by homeowners pursuant to the Design and Construction Requirements for Homes (the Design Requirements) and, in particular, with respect to their approval of construction within the Special Setback Area.

A summary of my opinions about the issues raised by Mr. Knox is:
- The Design Committee is obligated by the CC&R's to follow the standards established in the Design Requirements and that the statement "No building or structure shall be placed within the special setback areas" requires and permits no interpretation.
- The Design Committee was did not comply with the Design Requirements in allowing construction within the Special Setback Areas.
- The construction allowed by the Design Committee is a clear violation of the intent and plain English meaning of the Design Requirements.

The following discussion uses the same paragraph numbers as Mr. Knox's report.

1. In his first paragraph, Mr. Knox summarizes the background of the Design Committee. I don't take issue with Mr. Knox's summary. It should be noted, however, that Mr. Mielcke, the most active member of the Committee until his resignation in July 2001, had direct personal and business conflicts between his role as an impartial Committee member and his roles as the head of Mauna Kea Properties, the developer of the Bluffs subdivision, and the head of Mauna Kea Realty, the exclusive sales agent for the development. Both organizations profited by the sales of the lots. In his roles as developer and real estate agent, Mr. Mielcke had the opportunity to make "special approvals" as incentives to prospective lot purchasers which, in his role as a member of the Design Committee, he could then approve.

   Of the 9 waterfront lots which required design review (Lots 1 & 2 are effectively one lot and the improvements on Lots 3 and 4 already existed), All of the Lots were sold during Mielcke's tenure with Mauna Kea Properties and Mauna Kea Realty. The design for the homes proposed for at least 6 of the lots were reviewed and approved during Mielcke's tenure on the Design Committee.

2. Mr. Knox states, "It is customary for community association design committee members to use their own discernment, based on the professional abilities of their members and/or engaged professionals, in determining the compliance of any homeowner submittal with the intent of the associations applicable design and construction requirements."

Queen's Court, Suite 500 • 800 Bethel Street • Honolulu, Hawaii 96813 • Phone (808) 532-2000 • FAX 532-2009

Love & Revere: Western Sunview Properties v. Federman                    5 April 2005
Review of Knox Report                                                                Page 2

I do not agree with that assertion. Paragraph 8.12 of the CC&R's states "The Design and Construction Requirements for Homes - The Bluffs at Mauna Kea', dated February 19,1997, are hereby adopted as the Design Requirements which govern and **serve as the standard for the construction of all buildings and improvements** to be constructed and maintained within The Bluffs." [Emphasis added] Article 8.5 of the Protective Covenants, Conditions and Requirements (CC&R's) requires the Committee "to require that any such building, landscaping or other improvements to be constructed within The Bluffs **comply with this Declaration and applicable Design Requirements.**" [Emphasis added]

Section 2.8 of the CC&R's states "no new improvements or material alterations in existing improvements shall be constructed, placed or made on any Lot of any classification, except in accordance with plans, specifications, and other materials approved by the Design Committee, and **in accordance with the applicable Design Requirements.**" [Emphasis added]"

Section 8.8 of the CC&R's, Standards of Review, requires the Committee, in their review of submitted plans, specifications and other materials, to **"consider their compliance with any applicable Design Requirement;** the suitability of the proposed building or other improvement for the area in which it will be located; the quality of the materials to be used in construction; and the effect of the proposed building or other improvement on the Bluffs..." [Emphasis added]

In reviewing designs submitted to it, the Committee must use the Design Requirements as the standard. Of course the members of the Committee must use their own judgement and discretion, but the standard for the review is compliance with the Design Requirements and interpretation is required only when direct application of the Design Requirements is clearly unreasonable, ambiguous or produces a result which is not in keeping with the overall goals of the CC&R's.

I acknowledge that paragraph 8.8 allows the Committee to approve designs "which are not in strict compliance with the applicable Design Requirements...", but it is my opinion, based on my own experience in drafting Design Requirements, administering them and dealing with committees who review them, that approval of deviations from the strict requirements must be based on some unusual factor, something that could not have been envisioned by the drafters of the Design Requirements. Design requirements are, if effect, like a zoning or building code specific to the particular subdivision and they must be applied with the same respect and consistency that would be used for an statutory code. Mr. Knox acknowledges the need for and expectation of consistency.

If the Committee finds some aspect of the Design Requirements to be a persistent problem, given the goals of the CC&R's, the land on which the development occurs, and the market for the homes, Paragraph 8.11, Design Requirements Adopted by Design Committee, allows the Committee to "from time to time amend and adopt Design Requirements which govern and serve as a standard for the construction of buildings and improvements to be constructed and maintained within The Bluffs..." The Committee has not made or recommended changes to the Design Requirements. They have simply ignored them.

In his defense of the Committee's actions, Mr. Knox refers to the "engaged professionals"

Love & Revere: Western Sunview Properties v. Federman  5 April 2005
Review of Knox Report  Page 3

who advise the Committee. It is interesting to note that in the Leone design review, the Committee's engaged professionals, Stringer-Tusher Architects and, later, David Stringer Associates, consistently recommended against approval of the proposed design but, overriding their recommendations, the Committee approved it with only minor revisions.

Mr. Knox defends the consistency of the Committee's actions, noting that it has approved placement of swimming pools and other "near grade" improvements within the Special Setback Area for most of the oceanfront lots at The Bluffs. In fact, the Committee has approved every request to construct improvements within the Special Setback Area which was submitted to it. The Federman pool protrudes about 5' above the grade. The Leone pool retaining wall will be about 130' long and will protrude 18' above the natural grade. The wall along the makai edge of the Robertson terrace is about 120' long and extends 7' above grade. The walls adjacent to the Gifford pool extend about 9' above grade. These are not "near grade" improvements.

3. Mr. Knox states, "Design Committees are made up of individuals whose purpose is to interpret applicable design and construction requirements..." and "that the interpretation of a design may vary somewhat between individuals due to each individuals' design sense, which is subjective in nature" and "It can also be said that precise definition of terms, unless set forth in applicable design and construction requirements, may be subject to interpretation." He then claims that the terms "building and "structure" as used in section 4.17 Special Setbacks of the Design Requirements are not defined.

Section 4.17 Special Setbacks reads, "Special setbacks have been placed on the Individual Homesites to protect views and to preserve hillsides. No building or structure shall be placed within the special setback areas as shown in Exhibit A." This language requires and permits no interpretation which "may vary somewhat between individuals due to each individuals' design sense".

Contrary to Mr. Knox's assertion, the wording "No building or structure" is clear and unambiguous. The terms "building" and "structure" are terms of common usage. Webster's Encyclopedic Unabridged Dictionary, 1989, defines "building ", used as a noun, as 1. a relatively permanent essentially boxlike construction having a roof and often windows and enclosing within its walls space, usually on more than one level, for any of a wide variety of activities, as living, entertaining manufacturing, etc. 2. Anything built or constructed. "Structure", used as a noun, is defined as "1. mode of building, construction or organization; arrangement of parts, elements or constituents; *a pyramidal structure.* 2. something built or constructed, as a building, bridge or dam, etc. 3. A complex system considered from the point of view of the whole rather than of any single part; *the structure of modern science.*

The Dictionary of Architecture and Construction, Harris 1975, defines "building" as "a more or less enclosed and permanent structure for housing, commerce, industry, etc., distinguished from mobile structures and those not intended for occupancy." "Structure" is defined as "1. A combination of units constructed and so interconnected, in an organized was, as to provide rigidity between the elements. 2. Any edifice."

The Hawaii County Zoning Code defines "building" as "any structure used or intended for use supporting or sheltering any use of occupancy." "Structure" is defined as "anything above existing grade constructed or erected with a fixed location on the ground, or requiring

Love & Revere: Western Sunview Properties v. Federman                    5 April 2005
Review of Knox Report                                                    Page 4

a fixed location on the ground, or attached to something having or requiring a fixed location on the ground. The term 'structure' includes the term 'building'."

It is my opinion that the swimming pools and recreation decks are unquestionably structures.

Another issue arises from Mr. Knox's paragraph 3. While he discusses the purpose of design committees and the individuality of the interpretations they make, he overlooks the potential for conflict-of-interest or the appearance of conflict, where one of more of the individuals making up the committee may have interests other than that of strict enforcement of the Design Requirements. The Design Committee prior to July 2001 and Mr. Mielcke's conflicts were discussed earlier. After Mielcke's resignation, the Design Committee was reformed. One of the members of the new Design Committee was Robert Gunderson, a partner in a large California law firm which represents the companies with which Mr. Leone and Mr. Federman are associated. It would not have been in Mr. Gunderson's personal interest to deny approval to requests by Leone and Federman.

4. In his paragraph 4, Mr. Knox explains that the purpose of the Design Requirements, as set forth in Article I, is to require "the development of resort residential homes to harmonize with the existing environment", that the general and specific requirements follow, and asserts "Because design possibility is infinite, it is unreasonable to infer that all requirements as delineated can be strictly applied without interpretation." He goes on to say, "is it the general practice of a design committee to provide that interpretation."

I agree with all of that. I do not, however, agree with the implication that every requirement is subject to interpretation. The statement "No building or structure shall be placed within the special setback areas " does not require or permit interpretation.

Mr. Knox claims that the improvements which the Committee approved within the Special Setback Area were "designed and constructed in close proximity to the existing grade and of materials that blend with the natural environment". It must be noted that the Federman pool protrudes about 5' above the grade. The Leone pool retaining wall will be about 130' long and will protrude 18' above the natural grade. The wall along the makai side of the Robertson terrace is about 120' long and extends 7' above grade. The walls adjacent to the Gifford pool extend 9' above grade. These are not "near grade" improvements.

5. In his paragraph 5, Mr. Knox quotes the language of the second sentence of section 4.17, "No building or structure shall be placed within the special setback areas as shown on Exhibit A." and goes on to say, "the second sentence was not intended to preclude the construction of improvements customarily allowed within setback areas of this type." The plain English meaning of this sentence is perfectly clear- "no buildings or structures shall be placed within the special setback areas." The obfuscation "setback areas of this type" does not change the meaning.

In his attempt to justify the Committee's actions, Mr. Knox goes on to say that a "structural element that is higher than some minimum height above grade, such as thirty (30) inches" would be allowed" in some types of setbacks. While it is true that there are various types of "setbacks" in building and zoning codes, each code and each setback has its own requirements. It is not possible to generalize about the types of improvements which might be allowable in "a setback of this type." If Mr. Knox wants to compare the Special Setback

Love & Revere: Western Sunview Properties v. Federman             5 April 2005
Review of Knox Report                                                                                                    Page 5

Areas of the Bluffs Design Requirements with other setbacks, the closest comparable would be the Shoreline Setback requirements of both the State and County of Hawaii. No construction of "any structures" is allowed within the designated Shoreline Setback area. Both the Costal Zone Management Act (HRS 205A), Part III, Shoreline Setbacks, and the Rules of Practice and Procedure of the Hawaii County Planning Department, Rule 11, Shoreline Setback, define "structure" as including "any portion of any building, pavement, road, pipe, flume, utility line, fence, groin, wall, or revetment."

As noted previously, the Federman pool deck wall protrudes about 5' above the natural grade and is about 50' long. Including the pool deck areas on each side of the pool, the makai wall is about 107. The proposed Leone wall will be about 130' long and will protrude 18' above the natural grade. These are not "near grade" structures as Mr. Knox suggests.

Mr. Knox attempts to relate what he calls "the shortcoming of the literal reading of Section 4.17" to the requirements of other subdivisions. The Bluffs is not another subdivision. It has its own Design Requirements, which were part of the Sales Package given to prospective purchasers and agreed to by each owner at the time of purchase. The requirement for the additional setback from the shoreline for The Bluffs goes back to an increased shoreline setback suggested in the 1986 Shoreline Management Permit. The increased setback appears in the Planning Department's 1991 comments in review of the proposed design submitted by Mauna Kea Property's architect, WATG, and in WATG's memo about their meeting with the Planning Department. The only "shortcoming" of a literal reading of section 4.17 is that it would not allow the actions taken by the Design Committee.

6. In his paragraph 6, Mr. Knox quotes Article VI Variations, which gives the Design Committee the authority to make certain judgements and discusses the Design Committee's authority to use its judgement in matters of variance between submitted design plans and general design requirements.

    As discussed in detail in paragraph 2 above, the standards for the Committee's review of submitted designs are established by the Design Requirements and that the Committee is obligated to work within those standards. While the language quoted by Mr. Knox gives the Committee the authority to approve design submittals which are "at variance with the general design requirements" and to make interpretations of the Design Requirements, it does not allow the Committee to ignore the Design Requirements, which they did in permitting construction in the Special Setback Areas.

7. In his paragraph 7, Mr. Knox argues that the Design Committee has done its job, that it was thorough in its review of proposed Federman plans as illustrated by their involvement as far back as August 2000, and that it disallowed certain proposed features and required modifications to others. He also argues that the Committee acted consistently in that it had also approved construction within the Special Setback Area for Lots 1, 2 and 8 prior to Federman's initial submittal, and for Lots 7, 9, 10, 11 and 12 subsequent to that.

    Contrary to Mr. Knox's argument about the Committee's consistency, their standards for approval of construction within the Special Setback Area change over time. At one point, there are references to some percentage of land coverage of the Special Setback Area which might be allowable, but that never became a part of the Design Requirements. At

Love & Revere: Western Sunview Properties v. Federman        5 April 2005
Review of Knox Report                                         Page 6

another point, there is reference to a 30" limit on the height of structures which might be allowed within the Special Setback Area, but that too never became a part of the Design Requirements, and is clearly not consistent with the pattern of the approvals. The extent of the coverage and the nature of the construction approved within the Special Setback Area varies widely among the Lots, from Lot 4 (Leone) where the construction approved within the Special Setback Area will cover 41% of the area with a wall about 130' long and 18' above grade, to Lot 6 (Federman) where the construction covers 22.3% and is about 5' above grade, to Lot 5 (Western Sunview) where the construction covers 3.5% and is about 3' above grade.

While it is true the Committee considered the proposed Federman improvements from August 2000 thru August 2003 as noted by Mr. Knox, it must also be noted that during the first 11 months of that period, the Committee consisted of primarily of Mielcke with technical support from Jim Bell. As noted earlier, Mielcke had his own reasons for approving variance requests. In November of 2001, Director and Design Committee member Gunderson wrote, in an e-mail exchange between board members and the Board's attorney, Dennis Krueger "this is yet another example of the mischief worked by Mielcke. **I do not think it an exaggeration to say that every submittal that Mielcke touched has (or had) a similar problem**... This is Robertson's problem. This was our problem. It is Federman's problem." [Emphasis added] In January 2001, the Directors of the Bluffs Community Association wrote the Homeowners, saying, "It is the boards feeling that **many of the design conflicts that have occurred at The Bluffs could have been minimized with a closer adherence to the original intent of the CC&R's**." [Emphasis added] In the 4 June '02 meeting of the Design Review Committee, member Reid stated that "the Committee was trying to be unbiased and move in the direction away from **Mauna Kea Properties' arbitrary decisions**." [Emphasis added] In their January 2001 letter, the Board said, "based on some things homeowners have pointed out to us we are also going to tighten up the CC&R's **to remove as much ambiguity and interpretation from the process as possible**", [Emphasis added] and that they "have started a process that we hope will lead to a more effective design review process going forward."... "unlike the complete autonomy that the previous design review committee had, our committee will report directly to the Board ".

While it is true that the Committee requires modifications to the proposed Federman improvements within the Special Setback Area, in the end, they allowed construction of about 3,500 sf of structures in an area where, according to the Design Requirements, no structures are allowed.

8. Mr. Knox, in his paragraph 8, misrepresents the events that occurred in 1999. Prior to purchasing the lot, Guy Hand asked if swimming pools could be built in the Special Setback Area. He asked because he was concerned about the potential for neighbors doing so, not because he planned to do so. The response he received from an unidentified author was ambiguous, informal, and unrecorded. Mr. Knox incorrectly implies that the Hands contemplated building a pool in the Special Setback Area. Asking about the options and actually proceeding with construction are not the same thing and cannot be represented as such.

9. In his paragraph 9, Mr. Knox discusses a "wall and gate" constructed in the Special Setback Area by Western Sunview Properties. I have examined the approved plans and visited the site. If such structures exist, I have not seen them. The only construction within the Special Setback Area of Lot 5 is a the 3' high rock garden wall. The only gate that I am aware of is well outside of the Special Setback Area.

Love & Revere: Western Sunview Properties v. Federman  
Review of Knox Report

5 April 2005  
Page 7

This report is based on the information available and known to me at this time. Should additional information become known to me, the opinions expressed could be subject to change.

Sincerely,

ARCHITECTURAL DIAGNOSTICS, LTD.

Jim Reinhardt, AIA, CSI  
Its President