# EXHIBIT

# H

# DEPOSITION OF JEANNE BUBOLTZ TAKEN ON 01-27-05

*Page 1 to Page 50*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

## Page 1

(1) IN THE UNITED STATES DISTRICT CIRCUIT
(2) FOR THE DISTRICT OF HAWAII
(3) WESTERN SUNVIEW      ) CASE NO. CV03-00463 DAE/LEK
(4) PROPERTIES, LLC, et al., )
(5)     Plaintiffs,  )
(6) vs.              )
(7)                  )
(8) IRWIN FEDERMAN, et al.,  )
(9)     Defendants.  )
(10) _____)
(11)
(12)     DEPOSITION OF JEANNE BUBOLTZ
(13)
(14) Taken on behalf of Plaintiffs at the offices of Ralph
(15) Rosenberg Court Reporters, Incorporated, Suite D212,
(16) 75-170 Hualalai Road, Kailua-Kona, Hawaii, commencing
(17) at 9:00 a.m. on January 27, 2005, pursuant to Notice.
(18)
(19) **REPORTED BY:**
(20)    DEBORAH A. NG, CSR 336
(21)    Registered Professional Reporter
(22)    Notary Public, State of Hawaii

## Page 2

(1)         APPEARANCES
(3) For Plaintiffs       TERRANCE M. REVERE, ESQ.
(4) Western Sunview      Suite 801
(5) Properties, LLC:     1000 Bishop Street
(6)                      Honolulu, Hawaii 96813
(8) For Defendants       LEROY E. COLOMBE, ESQ.
(9) Irwin Federman,      JOSHUA WISH, ESQ.
(10) et al.:             Chun, Kerr, Dodd, Beaman
(11)                     & Wong
(12)                     9th Floor
(13)                     745 Fort Street
(14)                     Honolulu, Hawaii 96813
(16) For Defendants       J. DOUGLAS ING, ESQ.
(17) Mauna Kea Properties,  First Hawaiian Center
(18) et al.:              23rd Floor
(19)                      999 Bishop Street
(20)                      Honolulu, Hawaii 96813
(22) For Defendant        JOSEPH P. KAMELAMELA, ESQ.
(23) County of Hawaii     Department of Corporation
(24) (By phone):          Counsel
(25)                      Suite 325

## Page 3

(1) Hilo Lagoon Centre
(2) 101 Aupuni Street
(3) Hilo, Hawaii 96720
(5) Also present:      Kathrin Kohler

## Page 4

(1)          I N D E X
(3) **EXAMINATION BY:**                        PAGE
(5)    Mr. Revere                           5
(7)       EXHIBITS FOR IDENTIFICATION
(9) Deposition Exhibit 1
(10) Letter, 9/16/99.                       33
(12) Deposition Exhibit 2
(13) Price list.                            34
(15) Deposition Exhibit 3
(16) Questions/Answers.                     38
(18) Deposition Exhibit 4
(19) Letter, 10/19/99.                      40

### Page 5

(1) JEANNE BUBOLTZ
(2) called as a witness at the instance of the Plaintiffs,
(3) being first duly sworn to tell the truth, the whole
(4) truth and nothing but the truth, was examined and
(5) testified as follows:
(6) EXAMINATION
(7) BY MR. REVERE:
(8) Q. Can you state your name for the record, please?
(9) A. Jeanne Buboltz, B-u-b-o-l-t-z. It was
(10) misspelled in the cover sheets throughout.
(11) Q. And it's Buboltz?
(12) A. Yes, B-u-b-o-l-t-z.
(13) Q. I was just wondering more about the phonetics.
(14) A. Actually, Cha Cha would be able to pronounce it
(15) more correctly than I do.
(16) Q. Is it a German name?
(17) A. Uh-huh, yes.
(18) Q. Do you mind if any of us call you Jeanne here?
(19) A. Jeanne is fine, Jeanne.
(20) Q. That's just easier. Jeanne, where are you
(21) employed?
(22) A. Mauna Kea Realty.
(23) Q. And how long have you been employed there?
(24) A. Nine years this January.
(25) Q. And are you a realtor?

### Page 6

(1) A. Yes.
(2) Q. So you hold a realtor's license?
(3) A. Realtor, broker, uh-huh.
(4) Q. And what's the difference between a realtor and
(5) a broker?
(6) A. More education.
(7) Q. They make brokers go through more?
(8) A. Oh, yes.
(9) Q. And how long have you been a broker?
(10) A. Well, 9, 10, 11 -- about 11 years.
(11) Q. And how long have you been a realtor?
(12) A. About 20 years.
(13) Q. Did you work before that time?
(14) A. Yes, at Mauna Lani Realty.
(15) Q. In what capacity?
(16) A. Realtor.
(17) Q. What about before you were a realtor?
(18) A. I was an appraiser.
(19) Q. Oh, you were. And were you an appraiser on the
(20) Big Island or somewhere else?
(21) A. No, in Seattle.
(22) Q. And when did you come to Hawaii?
(23) A. I have to stop and think. It was our 7th
(24) wedding anniversary, 1987.
(25) Q. Other than as a realtor or broker and an

### Page 7

(1) appraiser, did you work in any other capacity in the
(2) real estate business?
(3) A. No.
(4) Q. I understand that you're a realtor.
(5) Realtor/broker, is that the term of art they use to
(6) describe your title?
(7) A. Uh-huh, yes.
(8) Q. Have you held any other titles or certificates
(9) in the real estate field?
(10) A. CRS, GRI, whatever; CRS is Certified
(11) Residential Specialist and GRI -- it's just further
(12) education, is Graduate of Real Estate Institute.
(13) Q. What is your position at Mauna Kea?
(14) A. Sales.
(15) Q. Is it just sales associate?
(16) A. No. Associate is when you don't have your
(17) broker's license. So I'm just selling the real estate
(18) there.
(19) Q. There is no title that comes with it like vice
(20) president of sales or something like that?
(21) A. No, no.
(22) Q. And how many people currently work in the sales
(23) department for Mauna Kea Realty?
(24) A. There are three, four, five. There is five
(25) agents with Cha Cha as principal broker. That would

### Page 8

(1) make six total.
(2) Q. And Cha Cha is the principal broker?
(3) A. Yes.
(4) Q. Who was the principal broker before Cha Cha?
(5) A. Tom Stifler.
(6) Q. And when did Cha Cha take over for Mr. Stifler?
(7) A. I don't remember four, five years ago, I guess,
(8) four years ago maybe.
(9) Q. I can check with her. What we're doing is a
(10) deposition and I'm not entitled to know anything that
(11) you may have discussed with Mr. Ing. So throughout
(12) the course of this, don't tell me anything you
(13) discussed with Mr. Ing.
(14) But generally, did you have a chance to discuss
(15) the deposition process before we started today?
(16) A. Yes.
(17) Q. Have you ever been deposed before?
(18) A. Yes.
(19) Q. On how many occasions?
(20) A. Two times, one case.
(21) Q. Twice in one case?
(22) A. Well, two different locations.
(23) Q. And what case was that?
(24) A. Mauna Kea with Fogelsong and I don't
(25) remember -- it wasn't the Federman.

Page 9

(1) Q. Giffords?
(2) A. It wasn't Gifford either. It was Fogelsong and
(3) the next door neighbor.
(4) Q. Robertson?
(5) A. Robertson, that's it.
(6) Q. You haven't been deposed on any other
(7) occasions?
(8) A. No.
(9) Q. Do you understand that this is a recorded
(10) interview and you're under oath?
(11) A. Yes.
(12) Q. And are you aware of any reason that would
(13) prevent you from giving honest, straightforward
(14) testimony, like you're on medication that has you
(15) mentally goofed up or anything like that?
(16) A. No.
(17) Q. If you have any questions as we go along, if my
(18) question is not clear, could you please let me know or
(19) let Mr. Ing know?
(20) A. Yes.
(21) Q. Have you ever heard of the phrase landscape
(22) credit before?
(23) A. Yes.
(24) Q. When did you first hear that term?
(25) A. I don't remember. Precisely --

Page 10

(1) Q. Not precisely like January 3rd, 1994 on a
(2) Thursday, but just generally, if you can recall.
(3) A. Four, five years ago, I guess.
(4) Q. Was it in connection with The Bluffs at Mauna
(5) Kea that you first heard this term?
(6) A. That particular term landscape -- what did you
(7) say.
(8) Q. Credit.
(9) A. Credit, I suppose that would be spelled out in
(10) such a way about then, yes.
(11) Q. And it was in connection with The Bluffs or
(12) another project?
(13) A. With The Bluffs.
(14) Q. Is it your understanding that a landscape
(15) credit is, basically, a confidential discount?
(16) A. Oh, yes.
(17) Q. And do you know whose idea it was to first
(18) employ landscape credits?
(19) A. I have no idea, probably the principal broker.
(20) Q. Mr. Stifler?
(21) A. Stifler, yes.
(22) Q. Do you know why Mr. Stifler left Mauna Kea?
(23) A. No. I'm not privy to things like that.
(24) Q. Were you involved in any sales of properties at
(25) The Bluffs at Mauna Kea?

Page 11

(1) A. Yes.
(2) Q. Do you recall what properties you were involved
(3) in the sale for?
(4) A. 4, 8, 9, 10 as a resale; 13 two times, first
(5) time in a resale; 14 and a resale of 14; then it was
(6) 22 and a resale. I don't think there were any other
(7) ones.
(8) Q. And the numbers you've given are lot numbers?
(9) A. Yes, I'm sorry.
(10) Q. Not Mr. 4 or Mr. 8?
(11) A. No, no. I have to go down by lot number.
(12) Q. That's fine. These landscape credits, do you
(13) recall Mr. Stifler or anybody else explaining to you
(14) why they were being used?
(15) A. Not particularly, sometimes it was a case of
(16) Lot 22 is close to the hotel and there was an
(17) allowance, the credit made for shielding it from the
(18) hotel, additional screening perhaps or -- in other
(19) words, working with additional landscaping for getting
(20) more privacy. There are usually particular reasons.
(21) Q. Do you know, as you sit here today, if there is
(22) any paperwork documenting what the particular reasons
(23) were for any credit that was given?
(24) A. Not that I'm aware of.
(25) Q. The buyers were not required to use the amount

Page 12

(1) of the discount for landscaping, correct?
(2) A. I have no idea what they were going to be
(3) doing. I don't know, no.
(4) Q. It's, basically, just money that they're
(5) saving, they can do whatever they want to with it,
(6) correct?
(7)      MR. COLOMBE: Objection, asked and answered.
(8) She said she didn't know.
(9) A. They had to be for landscaping because there
(10) were mounds in the front, some of them, and I just
(11) assumed they would be taking care of the landscaping,
(12) additional.
(13) BY MR. REVERE:
(14) Q. Are you aware of any documentation that would
(15) require a buyer to use the amount of a discount for
(16) landscaping?
(17) A. No.
(18) Q. Did you ever hear of the phrase home office
(19) being used around the office at Mauna Kea Realty?
(20) A. Home office?
(21) Q. Yes.
(22) A. Well, we are the main office and there is a
(23) site. At times when we're working with a developer,
(24) we have our little trailer, something or other. So I
(25) would suppose somebody would say this is the home

Page 13

(1) office, but we're the main office.
(2) Q. Did you ever hear of the phrase home office
(3) being used to refer to an office in Japan?
(4) A. Oh, no, I don't remember anything like that.
(5) Q. If you recall, can you tell me what the -- I
(6) guess the pecking order was in 1999? I understand
(7) that Mr. Stifler was the principal broker for Mauna
(8) Kea Realty, but did Mr. --
(9)    (Off the record.)
(10)    MR. REVERE: Jeanne, we're back on the record,
(11) and Mr. Kamelamela has joined us from the county and
(12) there was a technical problem with the phone but I
(13) think we got it straightened out now.
(14)    MR. ING: Terry, before we continue, Jeanne
(15) wants to correct her background and provide you with
(16) an additional place where she worked.
(17) BY MR. REVERE:
(18) Q. Go ahead.
(19) A. I forgot, in between Mauna Lani Realty and
(20) leaving there, I was with MacArthur & Company for
(21) about six weeks or so until I could slide into Mauna
(22) Kea. There was a transition time period. And so I
(23) hung my license up at MacArthur & Company for the
(24) interim.
(25) Q. Thank you for that clarification. And I guess

Page 14

(1) the principal broker for MacArthur & Company is Dodie
(2) MacArthur?
(3) A. Yes.
(4) Q. So I take it you must know her?
(5) A. Yes.
(6) Q. How long have you known her?
(7) A. Oh, 15 years, I suppose, or when she was just a
(8) salesperson herself.
(9) Q. Dodie MacArthur in your opinion, is she an
(10) honest person?
(11) A. I have no opinion of that.
(12) Q. One way or the other?
(13) A. One way or the other.
(14) Q. What about, do you know Debbie Au?
(15) A. I know Debbie Au.
(16) Q. Do you have any opinion as to her honesty?
(17) A. I have no opinion on that, hard worker.
(18) Q. And do you believe that both Dodie MacArthur
(19) and Debbie Au are competent realtors?
(20) A. No opinion.
(21) Q. When we left, I was asking you questions about
(22) Mr. Stifler and the pecking order and I was wondering
(23) if you could tell me -- in 1999 I understand that
(24) Mr. Stifler was the principal broker for Mauna Kea
(25) Realty.

Page 15

(1) And my question to you is if you could tell me
(2) who other people were in the office and what positions
(3) they held in 1999?
(4)    MR. ING: Let me just object to the form of the
(5) question as being vague and ambiguous as to the use of
(6) the term pecking order.
(7) A. Mr. Mielcke was president, Mr. Asari was vice
(8) president of Mauna Kea Properties, and Tom Stifler was
(9) Mauna Kea Realty principal broker.
(10) BY MR. REVERE:
(11) Q. And Mauna Kea Realty is a dba of Mauna Kea
(12) Properties?
(13) A. Yes.
(14) Q. So is it fair to say that Mr. Mielcke was
(15) Mr. Stifler's boss?
(16) A. Yes.
(17) Q. Did Mr. Mielcke also have his real estate
(18) license under Mauna Kea Realty?
(19) A. I don't know. He wasn't a realtor, but I don't
(20) know what the president of a company needs to have to
(21) have a real estate office. That's why they have a
(22) principal broker.
(23) Q. So as you sit here today, you're not aware one
(24) way or the other whether --
(25) A. One way or the other I don't know.

Page 16

(1) Q. Just let me finish the question for the record.
(2) You're not aware one way or the other as to whether
(3) Mr. Mielcke had a real estate license, correct?
(4) A. Correct.
(5) Q. Do you know who Mr. Mielcke would report to?
(6) A. I have no idea. I'm not clear on that.
(7) Q. Did you -- working as a realtor in sales, did
(8) you have the authority to negotiate prices in 1999?
(9) A. No.
(10) Q. Who did have that authority?
(11) A. It went to the developer. We wrote up the
(12) contract, whatever the buyer suggested that they would
(13) make a price on. We wrote up the contract, submitted
(14) it to Tom Stifler. He in, turn, turned it over to the
(15) developer, as far as I know. That's the chain.
(16) Q. Thank you. And by the developer, who do you
(17) mean?
(18) A. Mr. Asari and Mr. Mielcke.
(19) Q. And did they have the authority to negotiate
(20) prices, or would they have to get clearance from
(21) Japan?
(22) A. That, I don't know. All I was interested in
(23) was finding the buyer, locating the buyer.
(24) Q. Do you recall if you ever had any discussions
(25) with anybody about landscape credits?

### Page 17

(1) MR. ING: Let me just object to the form of the
(2) question as being overly broad.
(3) A. Discussion with them?
(4) BY MR. REVERE:
(5) Q. Yes.
(6) A. If the buyer would say, oh, price is, say,
(7) $3,000,000, can I pay less, I say you can submit
(8) whatever you want, I'll write up the offer and -- not
(9) necessarily.
(10) In other words, there was no such thing as the
(11) landscaping credit, you know.
(12) Q. It was just the normal back and forth
(13) bargaining, correct?
(14) A. That's correct.
(15) Q. Then after the bargaining is over, then the
(16) landscaping credit would be added, correct?
(17) MR. ING: Object to the form of the question.
(18) A. If that was part of the contract what they
(19) wanted or whatever they wanted to have me submit.
(20) BY MR. REVERE:
(21) Q. Well, going back to any of these sales that you
(22) listed 4, 8, 9, 13, 14, and 22 -- I'm not talking
(23) about resales, just original developer to buyer sales.
(24) Was the landscaping credit something that was
(25) suggested by any buyer to put in, or was it always

### Page 18

(1) coming from the developer's side?
(2) A. It was never coming from the developer's side.
(3) And it was not a large issue or anything. It was
(4) something that evolved, one, because in the initial
(5) stages it was a rather slow start for our properties.
(6) And so they -- the buyer thought perhaps they could
(7) make a deal. They always want to have a deal.
(8) And so there would be the suggestion of, well,
(9) what can we do, let's get it less. And this is what
(10) evolved into it, just as an incentive in the initial
(11) stages.
(12) Q. And let's break that down a little bit. What
(13) do you mean by initial stages of the project?
(14) A. Beginning of the sales efforts. We were just
(15) through a very low time of sales and -- to get things
(16) going, make it attractive.
(17) Q. I know you used initial period. In your mind
(18) was there an initial period, a middle period, an end
(19) period or just the initial and then the end?
(20) A. This was right on the cusp of the Gold Coast
(21) being discovered, Hualalai had opened, people were
(22) coming in and there had been that 1990s slow time,
(23) nothing was happening.
(24) All of a sudden, within months, weeks even, it
(25) started getting more and more active. And people

### Page 19

(1) rediscovered all of a sudden, my gosh, there are
(2) oceanfront lots at Mauna Kea, prime, prime property,
(3) and the market was changing. But at the initial
(4) stages it was very slow.
(5) Q. And I'm just trying to figure out when did this
(6) change occur?
(7) A. I don't know exactly when, but it's kind of
(8) like, just recently we've had this -- since 9/11, we
(9) can almost tell from 9/11 the market changed in Kona
(10) along the coast. And it's just the way the market
(11) goes. It's like the stock market. You never know.
(12) Q. And going back just to clarify one of my
(13) earlier questions, I asked you about the landscaping
(14) credit and we talked about the normal bargaining back
(15) and forth. I think your testimony was there would be
(16) these -- let me strike that.
(17) There would be list prices that Mauna Kea would
(18) offer properties for, correct?
(19) A. Absolutely.
(20) Q. And buyers would come in and naturally want to
(21) pay less if they could, correct?
(22) A. That's usually the case.
(23) Q. And on some of these lots bargaining occurred
(24) back and forth and then a number was agreed upon?
(25) A. Not necessarily back and forth. The developer

### Page 20

(1) had some firm numbers and that's what we were trying
(2) to get, obviously. So these very astute buyers would
(3) come in, say, well, we'll pay such and such. We'll
(4) say fine, we'll write that up. And then we would turn
(5) it over to Tom Stifler. And then whatever came back,
(6) that's what they would reply; sometimes in an
(7) addendum, sometimes written on the contract. But if
(8) they said no, no, that's what it was. It was firm.
(9) Q. Let's say that there is a list price of, let's
(10) say, $3,000,000. The buyer comes back one time after
(11) a process of negotiation and the buyer and the
(12) developer say okay, we'll agree, it's 2,500,000,
(13) that's what we're going to pay you for this property.
(14) Do you recall situations like that occurring?
(15) MR. ING: Object to the form of the question,
(16) incomplete hypothetical, you may answer.
(17) A. I don't recall any --
(18) MR. COLOMBE: I'm sorry, join in the objection,
(19) vague and ambiguous as to time.
(20) A. Say the question again now.
(21) BY MR. REVERE:
(22) Q. Let's say in early stages of the development
(23) the list price is $3,000,000. After the bargaining
(24) occurs the developer and the buyer agree that the
(25) buyer will pay 2,500,000. It's just a hypothetical

Page 29

(1) information on the tax certificate would be filled out
(2) by the escrow officer and signed by the buyer?
(3) A. Uh-huh, yes.
(4) Q. And so Mauna Kea Properties was not involved in
(5) that tax certificate?
(6) A. That's correct.
(7) Q. Do you know one way or the other if Mauna Kea
(8) Properties or Mauna Kea Development ever sought any
(9) legal advice as to whether it should be employing
(10) landscape credits?
(11) A. I have no idea.
(12) Q. Were you involved in the sale of -- I know it
(13) wasn't one that you listed so I just want to
(14) double-check.
(15)    Were you involved at all in the sale of the
(16) Federman lot, which is Lot Number 6?
(17) A. No.
(18) Q. Do you recall having any involvement in the
(19) sale of Lot 5 to Guy and Julia Hands?
(20) A. I was the assist for Debbie Au.
(21) Q. What do you mean by the assist for Debbie Au?
(22) A. Kind of the gofer, because there is a need for
(23) someone in the real estate office, us, for an outside
(24) broker, if she needed documents -- you know, like the
(25) CC&Rs packaged together and sent to her or if she had

Page 30

(1) any questions about anything regarding just the sales
(2) and marketing or whatever, she could call on me.
(3)    Most likely, though, especially in this case
(4) and with this level of funds that would be handled and
(5) prices and everything, Tom Stifler pretty well took
(6) over. I almost felt like, okay, I'm the assist, and I
(7) really didn't do very much.
(8) Q. How were realtors in the sales department at
(9) Mauna Kea Realty compensated for sales at The Bluffs?
(10) For example, I guess during what you just called the
(11) assist, would you get the --
(12) A. There was a very small percentage of the
(13) overall commission that was designated for the assist.
(14) Outside brokers have a registration form when we have
(15) a new development and this happens everywhere else
(16) pretty much, too. Then there is somebody in the
(17) office that has to help that outside broker because
(18) they don't know what's going on.
(19) Q. Do you recall if the Hands were ever sent any
(20) photographs that were taken by --
(21) A. I have no idea. I didn't meet the Hands until
(22) a year and a half later.
(23) Q. Why don't we talk about that. What was the
(24) occasion of you meeting with the Hands?
(25) A. They happened to walk in, and I said, hello.

Page 31

(1) That was it. If they walked in today, I wouldn't know
(2) what they looked like.
(3) Q. When you say they walked in, they walked into
(4) the Mauna Kea --
(5) A. The office.
(6) Q. -- Realty office?
(7) A. Yeah.
(8) Q. Do you recall specifically with regard to the
(9) Hands' sale anything that occurred?
(10) A. No, that I was just -- I know the market was
(11) changing fast because they were the last one and there
(12) was quite a flurry. I think I was a little
(13) disappointed, personally, because an outside realtor
(14) had brought in a buyer instead of -- I wanted to sell
(15) another one.
(16) Q. How would the commissions to -- well, let me
(17) back up here.
(18)    It's my understanding that normally there is a
(19) 6 percent commission for the realtors on either side
(20) of a real estate transaction?
(21) A. There is no real standard. Six percent has
(22) been used. To tell you the truth, I can't remember
(23) what we were paid. Developer sales often have
(24) different percentages because it's a different
(25) situation than being out through the Multiple Listing

Page 32

(1) where you're cooperating with outside brokers.
(2) Developers do not have to cooperate with outside
(3) brokers. In many cases they literally do not even
(4) want you around.
(5)    We are very friendly that way. We do
(6) cooperate. So there is a percentage that's set out,
(7) initially, and I don't remember what mine was, no.
(8) Q. Do you recall if it was 3 percent for the
(9) outside brokers bringing a buyer in?
(10)    MR. ING: Object to the form of the question,
(11) vague and ambiguous.
(12) A. I don't recall. I would have to look it up, to
(13) tell you the truth.
(14) BY MR. REVERE:
(15) Q. As far as the amount -- some of the sales you
(16) mentioned here that you handled at The Bluffs, they
(17) involved landscape credits, correct?
(18) A. A couple of them did.
(19) Q. Do you recall if your commission was based upon
(20) the money that actually changed hands, the actual
(21) price, or the price plus the landscape credit?
(22) A. It was the net, it was the less, less the
(23) landscape credit. I do remember that.
(24) Q. And do you recall if the outside folks, the
(25) outside brokers that brought buyers in, if their

### Page 37

(1) Q. Was Mr. Stifler the person who, I guess, sort
(2) of monitored your desk while you were gone?
(3) A. Mr. Stifler was the principal broker. There
(4) was also Cha Cha Kohler and Joy Jemmet in the office.
(5) We're a small office. So when something is already in
(6) process and there was some kind of reply that would
(7) have to be made, Tom would designate and say, Cha Cha,
(8) would you answer this, take care of this for Jeanne.
(9) It's reciprocal.
(10) Q. And does Joy Jemmet still work for Mauna Kea
(11) Properties?
(12) A. She died.
(13) Q. Oh, she did. I'm sorry. When did she die?
(14) A. Oh, lordy, depends on how long Linda has been
(15) there; five years now, I think. The Bluffs were
(16) selling still, yeah.
(17) Q. Other than Joy, Cha Cha, and yourself, were
(18) there any other realtors working for Mauna Kea Realty?
(19)    MR. ING: Object to the form of the question,
(20) vague and ambiguous. At what point in time, Counsel?
(21)    MR. REVERE: 1999.
(22) A. I can't remember when Eileen Lacerte joined.
(23) She was the only one. Boy, I don't remember. I think
(24) that was it. I don't remember.
(25) Q. When did Eileen -- does Eileen still work for

### Page 38

(1) Mauna Kea Realty?
(2) A. No, no.
(3) Q. When did she leave?
(4) A. Oh, lordy, she was there during our Kamalani- [Kumulani]
(5) sales and that was about two years -- I guess she left
(6) about two years ago. Time flies so quickly.
(7) Q. Do you know where she's working now?
(8) A. She's at Pau'oa. It's another development at
(9) Mauna Lani Resort.
(10) Q. In this document that we've marked as Exhibit 1
(11) there is a document referred to called questions and
(12) answers. Do you recall that document?
(13) A. There was one that Tom Stifler put out for our
(14) own benefit primarily to keep us concise on whatever
(15) it was that he wanted to relay to us.
(16)    (Deposition Exhibit 3
(17)    marked for identification.)
(18) Q. Jeanne, is this document that we've marked as
(19) Exhibit 3, is this the questions and answers document
(20) that you referred to in Exhibit 1?
(21)    MR. ING: Let me object to the form of the
(22) question. This document may be vague and ambiguous.
(23) This one has some handwriting on it.
(24) A. I'm sorry, what was the question?
(25) BY MR. REVERE:

### Page 39

(1) Q. The question was, this document is also -- the
(2) typewritten part that says questions and answers for
(3) The Bluffs and I'm wondering if this, at least the
(4) typewritten portion of this document is the document
(5) that you referred to in your September 16th, 1999 memo
(6) that we marked as Exhibit 1?
(7)    MR. ING: Let me object to the form of the
(8) question.
(9) A. Okay. Is this the one, in other words, yes.
(10) BY MR. REVERE:
(11) Q. This was written by Tom Stifler?
(12) A. Yes.
(13) Q. And do you know where Tom Stifler obtained the
(14) information that's contained in this document?
(15) A. I have no idea.
(16) Q. Going back to Exhibit 1, you mentioned a
(17) document referred to as the big CC-R book. Is that
(18) the book that contains the CC&Rs for The Bluffs and
(19) the whole Mauna Kea development?
(20) A. Just for The Bluffs.
(21) Q. And you've also represented folks in buying and
(22) selling condominium units, correct?
(23) A. Yes. We have The Villas.
(24) Q. And is it your understanding that whether it's
(25) a condominium or a community association like The

### Page 40

(1) Bluffs, in the case of any conflict between any sales
(2) materials or the CC&Rs about what is allowed and what
(3) is not allowed, that the CC&Rs control?
(4)    MR. ING: Object to the form of the question,
(5) calls for a legal conclusion.
(6)    MR. COLOMBE: Join.
(7)    MR. ING: Vague and ambiguous.
(8)    MR. COLOMBE: Join.
(9) A. The CC&Rs are the ones that have been approved.
(10) If it's a condominium, then there is a public report.
(11) So that would, obviously, be the focus, the final word
(12) that it has been approved.
(13) BY MR. REVERE:
(14) Q. While you were on that Alaskan cruise, do you
(15) recall if you had any conversations with Debbie Au at
(16) all?
(17) A. No.
(18) Q. Most people are not even thinking about the
(19) office, basically.
(20) A. I wasn't.
(21)    MR. REVERE: Can we mark this as the next
(22) exhibit?
(23)    (Deposition Exhibit 4
(24)    marked for identification.)
(25) Q. Jeanne, did you have a chance to read this