# EXHIBIT

# I

DEPOSITION OF KATHRIN KOHLER TAKEN ON 01-27-05

*Page 1 to Page 107*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

Case 1:03-cv-00463-JMS    Document 665-11    Filed 09/07/2006    Page 2 of 17

## Page 1

(1) IN THE UNITED STATES DISTRICT CIRCUIT
(2) FOR THE DISTRICT OF HAWAII
(3) WESTERN SUNVIEW     ) CASE NO. CV03-00463 DAE/LEK
(4) PROPERTIES, LLC, et al., )
(5)     Plaintiffs,   )
(6)   vs.        )
(7)            )
(8) IRWIN FEDERMAN, et al.,  )
(9)     Defendants.  )
(10) _____ )
(11)
(12)     DEPOSITION OF KATHRIN KOHLER
(13)
(14) Taken on behalf of Plaintiffs at the offices of Ralph
(15) Rosenberg Court Reporters, Incorporated, Suite D212,
(16) 75-170 Hualalai Road, Kailua-Kona, Hawaii, commencing
(17) at 10:15 a.m. on January 27, 2005, pursuant to Notice.
(18)
(19) **REPORTED BY:**
(20)   DEBORAH A. NG, CSR 336
(21)   Registered Professional Reporter
(22)   Notary Public, State of Hawaii

## Page 2

(1)         APPEARANCES
(3) For Plaintiffs      TERRANCE M. REVERE, ESQ.
(4) Western Sunview     Suite 801
(5) Properties, LLC:    1000 Bishop Street
(6)                     Honolulu, Hawaii 96813

(8) For Defendants      LEROY E. COLOMBE, ESQ.
(9) Irwin Federman,     JOSHUA WISH, ESQ.
(10) et al.:            Chun, Kerr, Dodd, Beaman
(11)                    & Wong
(12)                    9th Floor
(13)                    745 Fort Street
(14)                    Honolulu, Hawaii 96813

(16) For Defendants     J. DOUGLAS ING, ESQ.
(17) Mauna Kea Properties,  First Hawaiian Center
(18) et al.:            23rd Floor
(19)                    999 Bishop Street
(20)                    Honolulu, Hawaii 96813

## Page 3

(1) For Defendant       JOSEPH P. KAMELAMELA, ESQ.
(2) County of Hawaii    Department of Corporation
(3) (By phone):         Counsel
(4)                     Suite 325
(5)                     Hilo Lagoon Centre
(6)                     101 Aupuni Street
(7)                     Hilo, Hawaii 96720

## Page 4

(1)           I N D E X
(3) **EXAMINATION BY:**                          PAGE
(5)   Mr. Revere                                  8

(7)      EXHIBITS FOR IDENTIFICATION

(9) Deposition Exhibit 1
(10) Partial transcript of Kathrin Kohler's
(11) deposition, 5/29/03.                         15

(13) Deposition Exhibit 2
(14) Sales contract.                              36

(16) Deposition Exhibit 3
(17) Declaration of Kathrin Kohler.               38

(19) Deposition Exhibit 4
(20) Fax cover sheet, 3/19/00.                    55

(22) Deposition Exhibit 5
(23) Memo, 5/1/00.                                56

Page 5

(1) Deposition Exhibit 6
(2) Letter, 5/11/00.                               56
(3)
(4) Deposition Exhibit 7
(5) Letter, 5/20/00.                               57
(6)
(7) Deposition Exhibit 8
(8) Declaration of Kathrin Kohler.                 60
(9)
(10) Deposition Exhibit 9
(11) Letter, 6/19/98.                              64
(12)
(13) Deposition Exhibit 10
(14) Dual agency consent agreement.                64
(15)
(16) Deposition Exhibit 11
(17) Note.                                         70
(18)
(19) Deposition Exhibit 12
(20) Letter, 9/15/98                               72
(21)
(22) Deposition Exhibit 13
(23) Letter, 9/21/98.                              73
(24)
(25)

Page 6

(1) Deposition Exhibit 14
(2) Handwritten note, 12/21/98.                   75
(3)
(4) Deposition Exhibit 15
(5) Note, 12/22 and 12/27.                         77
(6)
(7) Deposition Exhibit 16
(8) Sales contract, Federmans.                     78
(9)
(10) Deposition Exhibit 17
(11) Letter, 12/28/98.                             81
(12)
(13) Deposition Exhibit 18
(14) Escrow instructions.                          82
(15)
(16) Deposition Exhibit 19
(17) Letter, 2/1/99                                83
(18)
(19) Deposition Exhibit 20
(20) Handwritten letter, 3/99.                     83
(21)
(22) Deposition Exhibit 21
(23) E-mail, 5/10/01.                              85
(24)
(25)

Page 7

(1) Deposition Exhibit 22
(2) Sales contract, Reddys.                        86
(3)
(4) Deposition Exhibit 23
(5) Notes re Federmans.                            88
(6)
(7) Deposition Exhibit 24
(8) Conveyance tax certificate.                    89
(9)
(10) Deposition Exhibit 25
(11) Handwritten letter from Mr. Federman.         91
(12)
(13) Deposition Exhibit 26
(14) Handwritten letter from Mr. Federman.         93
(15)
(16) Deposition Exhibit 27
(17) Partial transcript of Yoichi Asari.           102
(18)
(19) Deposition Exhibit 28
(20) Letter, 1/7/97.                               104
(21)
(22)
(23)
(24)
(25)

Page 8

(1)         KATHRIN KOHLER
(2) called as a witness at the instance of the Plaintiffs,
(3) being first duly sworn to tell the truth, the whole
(4) truth and nothing but the truth, was examined and
(5) testified as follows:
(6)            EXAMINATION
(7) BY MR. REVERE:
(8) Q.  Could you state your name for the record,
(9) please?
(10) A.  Kathrin Kohler.
(11) Q.  And Mrs. Kohler, do you go by Cha Cha on
(12) occasion?
(13) A.  Most people call me Cha Cha. It's my nickname.
(14) Q.  And where are you currently employed?
(15) A.  Mauna Kea Realty.
(16) Q.  And you are the principal broker?
(17) A.  I am now, yes.
(18) Q.  And when did you become principal broker?
(19) A.  June 6, 2001.
(20) Q.  And I know you were here for the deposition of
(21) Jeanne a few minutes ago, correct?
(22) A.  Yes.
(23) Q.  And according to Jeanne, you took over for Tom
(24) Stifler?
(25) A.  I did.

### Page 9

(1) Q. There was no one in between you folks?
(2) A. No.
(3) Q. What is your understanding as to why
(4) Mr. Stifler left Mauna Kea Realty?
(5) A. As far as I know, he retired. He was 67 years
(6) old and he retired.
(7) Q. Do you have any licenses in the real estate
(8) field?
(9) A. I have a broker's license.
(10) Q. Any others?
(11) A. No. That's the only license I have. I have
(12) other designations.
(13) Q. And what are the other destinations?
(14) A. CRS and GRI.
(15) Q. Mrs. Kohler, what we're doing today is a
(16) deposition. And have you been deposed before?
(17) A. Yes.
(18) Q. On how many occasions?
(19) A. Three occasions.
(20) Q. And what were the three occasions, if you can
(21) recall?
(22) A. It dealt with the Robertson, Gifford, Fogelsong
(23) matter.
(24) Q. And all three depositions involved that
(25) situation?

### Page 10

(1) A. Yes.
(2) Q. And Mrs. Kohler, did you have a chance to speak
(3) with Mr. Ing before this deposition about the
(4) deposition process?
(5) A. About this particular one?
(6) Q. Just about depositions, in general.
(7) A. Yes, yes.
(8) Q. Did you do anything to prepare for today's
(9) deposition?
(10) A. Yes.
(11) Q. What did you do?
(12) A. I spoke with our attorney yesterday.
(13) Q. Someone from Mr. Ing's office?
(14) A. Yes.
(15) Q. Anything else?
(16) A. No.
(17) Q. Do you recall for how long you spoke with the
(18) attorney?
(19) A. It was about two, two and a half hours.
(20) Q. You've met Mr. Colombe today. Have you spoken
(21) with anyone else from his office about this
(22) deposition?
(23) A. No.
(24) Q. Did you review any documents to prepare
(25) yourself for this deposition?

### Page 11

(1) A. Yes, I did.
(2) Q. What did you review?
(3) A. I reviewed various documents pertaining to the
(4) sales at The Bluffs at Mauna Kea.
(5) Q. Are there any documents in particular that you
(6) can recall reviewing?
(7) A. Sales documents, sales contracts, and some
(8) relating correspondence.
(9) Q. Do you know Dodie MacArthur?
(10) A. Yes, I do.
(11) Q. How long have you known her?
(12) A. I have known Dodie for about 20 years.
(13) Q. Do you have any opinion as to her honesty?
(14) A. An opinion to her honesty, I think she's an
(15) honest person, yes.
(16) Q. Do you know Debbie Au?
(17) A. Yes, I do.
(18) Q. Do you believe she's an honest person?
(19) A. She's working very hard and yes, I do.
(20) Q. And do you believe both Dodie and Debbie are
(21) competent realtors?
(22) A. I wouldn't want to give an opinion on that. I
(23) have not worked with them really.
(24) Q. You have not what?
(25) A. I have not worked with them very often so I

### Page 12

(1) cannot judge that.
(2) Q. And I'll apologize, this might be somewhat
(3) boring because you just sat through a deposition.
(4) A. That's fine.
(5) Q. And you'll say, hey, you already asked the
(6) other person that, why are you asking me. But I have
(7) to get your testimony, so I'll apologize in advance
(8) for that.
(9) Have you ever heard the term comparables,
(10) correct?
(11) A. Yes.
(12) Q. What is your understanding as to what the
(13) phrase comparable means when used in the real estate
(14) context?
(15) A. Comparable properties, comparable sales.
(16) Q. And in your opinion are comparable sales
(17) important to most buyers?
(18) A. Yes.
(19) Q. And they need those to make an educated buying
(20) decision as to what type of offer they would be
(21) making, correct?
(22)    MR. ING: Object to the form of the question,
(23) vague and ambiguous.
(24)    MR. COLOMBE: Join.
(25) A. That's one facet.

Page 13

(1) BY MR. REVERE:
(2) Q. What are the other facets of the use of
(3) comparables?
(4) A. The use of comparables or to make a decision?
(5) Q. Well, is there any other point of comparables,
(6) other than giving buyers and sellers ideas about where
(7) they should price their properties?
(8) A. Another comparable is to visit the property,
(9) whether it's a house or vacant parcel because each of
(10) them is different.
(11) Q. If you wanted to learn about comparables in a
(12) particular neighborhood, what would you do?
(13) A. I would go to the tax records.
(14) Q. Are those tax records for properties on the Big
(15) Island located online?
(16) A. Yes.
(17) Q. Do you have an understanding as to whose
(18) responsibility it is to report information to the tax
(19) record, to the tax office?
(20) A. Yes.
(21) Q. Is it the buyer's responsibility?
(22) A. No.
(23) Q. Whose is it?
(24) A. It's escrow.
(25) Q. As far as your understanding is concerned,

Page 14

(1) where does escrow get the information on what to
(2) report to the tax authorities?
(3) A. From the sales contract.
(4) Q. At The Bluffs at Mauna Kea who filled out the
(5) sales contracts?
(6) A. The agent.
(7) Q. Would that be the agent employed by Mauna Kea
(8) Realty or the outside realtor?
(9) A. Depends.
(10) Q. What about in the case of a sale where there is
(11) an outside realtor involved?
(12) A. It depends. Sometimes it would be -- the
(13) realtor would want to fill it out, him or herself.
(14) Sometimes it would be the outside broker asking for
(15) help and have the Mauna Kea agent fill out the sales
(16) contract.
(17) Q. And Mrs. Kohler, I didn't go over all the
(18) deposition ground rules, but you're doing fine --
(19) A. Thank you.
(20) Q. So it's probably not necessary. In any event
(21) the one thing I did want to let you know is usually we
(22) take a break every 50 minutes or so. But if at any
(23) time you'd like a break, let me know and we'll stop it
(24) immediately, okay?
(25) A. Okay.

Page 15

(1) Q. Were you involved in the sale of the Lot 6 to
(2) the Federmans?
(3) A. Yes.
(4) Q. Do you recall who filled out that sales
(5) contract?
(6) A. I did.
(7) MR. REVERE: Mark this as Exhibit 1.
(8) (Deposition Exhibit 1
(9) marked for identification.)
(10) Q. Mrs. Kohler, what I've handed you and what
(11) we've marked as Exhibit 1 is your deposition from that
(12) Robertson case that was taken on May 29th, 2003, and
(13) specifically pages 37, 38, 39, 40 and the reporter's
(14) certificate on page 73 who is coincidentally with us
(15) today.
(16) If you could read this over and just let me
(17) know when you're done.
(18) A. Okay, I glanced at it.
(19) Q. Do you recall giving the testimony that's
(20) reflected on these pages?
(21) A. Yes.
(22) Q. And Mr. Beaman was the attorney who was asking
(23) you questions. Do you recall Mr. Beaman?
(24) A. Yes, I do.
(25) Q. Could you go to the page that's marked 37 in

Page 16

(1) the top right-hand corner? On line 20 Mr. Beaman
(2) asked you this question: Are you aware of the fact
(3) that landscaping credits have been given to certain
(4) purchasers and the answer was yes.
(5) Do you see that?
(6) A. Yes.
(7) Q. And that's still your testimony today?
(8) A. Yes.
(9) Q. How did you first become aware of the fact that
(10) certain purchasers were given landscape credits?
(11) MR. ING: Could you repeat the question, again?
(12) MR. REVERE: Sure, can you read it back?
(13) (Record read by the reporter.)
(14) A. I knew of one case and that was the Gifford
(15) case.
(16) Q. And how did you become aware of the Gifford
(17) case?
(18) A. I was an assist in that particular transaction.
(19) Q. And again, I know that Jeanne has already said
(20) this, but what do you mean by the term assist?
(21) A. When there was an outside broker involved in
(22) the transaction, one of the agents at Mauna Kea Realty
(23) became the assist; sometimes by request of the outside
(24) broker for a particular one. If they did not request
(25) a particular one, then Tom Stifler would have assigned

Page 17

(1) one of us to be the assist, due to the fact that we
(2) had specific sales contracts for that project and also
(3) if realtors and their clients have questions about the
(4) hotel, the club. Many questions arose about the club
(5) situation. We were able to help them.
(6) Q. And how would the commissions work for
(7) assisting realtors?
(8)     MR. ING: Object to the form of the question,
(9) vague and ambiguous. As related to whom?
(10) BY MR. REVERE:
(11) Q. Let's say for that Gifford sale you were just
(12) talking about.
(13) A. Rephrase that question, please.
(14) Q. How were you compensated as an assist for the
(15) Gifford sale?
(16) A. I received a portion of the commission.
(17) Q. And was the commission based upon the actual
(18) consideration that was paid or the actual
(19) consideration that was paid, plus the landscaping
(20) credit?
(21) A. The net proceeds.
(22) Q. So the landscaping credit would not be a factor
(23) in calculating the commission, correct?
(24) A. Not as far as I know, no.
(25) Q. Would Gifford have an outside realtor involved?

Page 18

(1) A. Yes.
(2) Q. And who was that realtor?
(3) A. That was Diana Paulson and she was with
(4) MacArthur & Company.
(5) Q. And was Ms. Paulson's commission based upon the
(6) actual consideration paid or the actual consideration
(7) paid, plus the landscape credit amount?
(8) A. I don't really remember and I wouldn't know
(9) because that was handled by somebody else.
(10) Q. That would be handled by Mr. Stifler?
(11) A. Yes.
(12) Q. And your counsel has objected to the phrase
(13) pecking order, but as far as the -- I don't know if
(14) chain of command would sound better or what.
(15)     Mr. Stifler was the principal broker in 1999,
(16) correct?
(17) A. Yes.
(18) Q. And under him were yourself and the other
(19) realtors in the Mauna Kea Realty office, correct?
(20) A. Yes.
(21) Q. And Mr. Stifler's bosses were Mr. Asari and
(22) Mr. Mielcke, correct?
(23) A. Yes.
(24) Q. Who had the authority to negotiate prices in
(25) 1999 of lots that were for sale at The Bluffs?

Page 19

(1) A. I'm sure it was Mr. Mielcke and Mr. Asari.
(2) Q. And so even Mr. Stifler didn't have control
(3) over the amounts that the lots would be sold for,
(4) correct?
(5) A. I don't think so, no.
(6) Q. I asked the question of Jeanne and I'll ask it
(7) of you. Do you ever recall the phrase home office
(8) being used to describe an office in Japan?
(9) A. No, I haven't heard it in the real estate
(10) office, no.
(11) Q. Do you recall if Mr. Mielcke or Mr. Asari ever
(12) called people in Japan to discuss the prices at which
(13) lots would be sold?
(14) A. I wouldn't know. I wouldn't be privy to
(15) something like that.
(16) Q. When did you first hear the phrase landscape
(17) credit?
(18) A. Around the time when we started to sell those
(19) first lots.
(20) Q. And do you know who was the originator of the
(21) idea of using landscape credits?
(22) A. No.
(23) Q. Do you know if Mauna Kea Properties ever sought
(24) a legal opinion as to whether or not landscape credits
(25) should be used?

Page 20

(1) A. No.
(2) Q. You don't know one way or the other?
(3) A. No.
(4) Q. As far as you know -- well, let's back up.
(5)     First of all, a landscape credit, as they were
(6) used at The Bluffs at Mauna Kea, was, basically, a
(7) confidential discount, correct?
(8)     MR. ING: Object to the form of the question.
(9) A. It was an incentive.
(10) BY MR. REVERE:
(11) Q. And the incentive was a lower price that would
(12) be kept confidential, correct?
(13)     MR. ING: Object to the form of the question.
(14)     MR. COLOMBE: Join.
(15)     MR. ING: Vague and ambiguous.
(16) A. It was an incentive to purchase during very
(17) difficult times in the market.
(18) BY MR. REVERE:
(19) Q. And it was basically a discount, though?
(20)     MR. ING: Object to the form of the question.
(21) A. It's a credit. It's a credit that was given.
(22) BY MR. REVERE:
(23) Q. And Jeanne mentioned the difficult times. What
(24) time period are you talking about as far as being
(25) difficult?

Page 25

(1) got our list prices for these subsequent purchases,
(2) you should be paying us the list price also?
(3) A. I do not know the purpose.
(4) Q. The understanding that you did get would have
(5) come from Mr. Stifler or Mr. Mielcke?
(6)    MR. ING: Wait. Could you repeat the question?
(7)    MR. REVERE: I'll strike that. I'll just ask a
(8) new question.
(9) Q. Did you ever have any discussions with
(10) Mr. Stifler about why it was that landscaping credits
(11) were being employed?
(12) A. No.
(13) Q. Did you ever have any discussions with
(14) Mr. Asari about landscape credits?
(15) A. No.
(16) Q. Same question with regard to Mr. Mielcke?
(17) A. No.
(18) Q. Did you ever have any discussions with other
(19) realtors inside Mauna Kea Realty about landscaping
(20) credits?
(21) A. No.
(22) Q. Before these landscape credits were made part
(23) of sales contracts at The Bluffs at Mauna Kea, were
(24) you at all familiar with their usage?
(25) A. Not with that particular one, but I know that

Page 26

(1) developers give incentives to stimulate sales. And it
(2) can be in the form of club memberships, it can be in
(3) the form of furniture packages, it can take any form
(4) to stimulate sales in a down market.
(5) Q. When did the market for homes at The Bluffs at
(6) Mauna Kea stop, in your opinion, being a down market?
(7) A. I cannot pinpoint the time, I'm sorry. I
(8) cannot pinpoint it. I just know that all of a sudden
(9) the market took off.
(10) Q. If you could go down to, again, to page 38,
(11) line 20, you and Mr. Beaman had the following exchange
(12) which continued onto line 4 on the next page.
(13)    Mr. Beaman asked you the following, line 20, it
(14) says: And the reason for the landscaping credits was
(15) so that Mauna Kea Realty could, in your words,
(16) maintain the integrity of the pricing? Answer:
(17) Uh-huh. Question: Meaning that you would be able to
(18) tell prospective buyers that all of the lots had been
(19) sold for full price? Answer: Well, after a sale
(20) closes it becomes public knowledge of what the lot
(21) sold for and this credit, obviously, was not
(22) reflective in the tax records.
(23)    Do you recall giving those responses to
(24) Mr. Beaman's questions?
(25) A. Yes.

Page 27

(1) Q. So then Mr. Beaman asks you on page 5 and you
(2) gave the response -- this goes from page 39, line 5 to
(3) line 10. Question: I see. So the purpose of the
(4) landscaping credit was for you to be able to give
(5) discounts below the purchase price to buyers but to be
(6) able to continue to tell later purchasers that the
(7) lots had all sold for full price? Answer: It was
(8) basically a discount, yes.
(9)    Do you see that question in response?
(10) A. Yes.
(11) Q. Is that still your testimony today?
(12) A. Today I would call it different. I would call
(13) it most probably an incentive and/or a discount. I
(14) would phrase it differently today.
(15) Q. So today you would call it a discount -- an
(16) incentive, not a discount?
(17) A. Yes.
(18) Q. And by the use of the word but what the
(19) incentive would really be, would be a discount,
(20) correct?
(21) A. It's a wordplay, I think, at this moment, so I
(22) would call it an incentive.
(23) Q. What would the incentive be?
(24) A. For people to buy those particular properties.
(25) Q. Right, right. I understand it would be a

Page 28

(1) motivator, in other words.
(2) A. Absolutely.
(3) Q. But the nature of the motivator was a reduced
(4) sales price, correct?
(5)    MR. ING: Object to the form of the question,
(6) vague and ambiguous.
(7) BY MR. REVERE:
(8) Q. Reduced lower than the list price, correct?
(9) A. It goes for credit for landscaping and grading.
(10) Q. Now, in any of the written contracts at The
(11) Bluffs at Mauna Kea there was no requirement that
(12) anybody use the amount of their credit for
(13) landscaping, correct?
(14) A. I don't believe so.
(15)    MR. ING: Object to the form of the question,
(16) vague and ambiguous, and overly broad. You say in any
(17) of the sales documents. You're including the CC&Rs?
(18) BY MR. REVERE:
(19) Q. Any of the sales contracts -- let me back up.
(20)    None of the sales contracts required a
(21) landscape credit to be used for landscaping, correct?
(22) A. I don't believe so.
(23) Q. So the amounts that buyers saved on their
(24) purchase they could spend on peanut butter, they could
(25) throw it in a bank account, they could do whatever

Page 29

(1) they wanted to with it, correct?
(2) A. I would not speculate on that. I would not.
(3) Q. But there was no requirement that they spend
(4) these amounts on landscaping, correct?
(5) A. Because they were vacant parcels and because
(6) they were not graded, it made sense that the credits
(7) were given for grading because each lot has to be
(8) graded and also each lot has to be landscaped. That
(9) was a requirement of the CC&Rs.
(10) So it makes sense to give such a credit rather
(11) than a roof credit or a club membership. And besides
(12) a club membership is not that important because these
(13) people are people of means. That was not an
(14) incentive.
(15) Q. At one time The Bluffs were supposed to be
(16) developed as a condominium, correct?
(17) A. Yes.
(18) Q. And then it was changed into a duplex concept?
(19) A. No.
(20) Q. Weren't Lots 3 and 4 a duplex concept?
(21) A. A condominium.
(22) Q. Duplex condominium, correct?
(23) A. Yes.
(24) Q. And weren't all the lots at The Bluffs graded
(25) before sales of the single family houses occurred?

Page 30

(1) A. For the duplexes which meant that they had a
(2) difference in elevation.
(3) Q. And when would this landscape credit or the
(4) idea of calling the difference between the actual
(5) price and the list price, calling that gap a landscape
(6) credit, when would that, typically, come up in the
(7) conversations with the buyers?
(8) MR. ING: Object to the form of the question,
(9) vague and ambiguous, misstates the witness' prior
(10) testimony.
(11) A. It wouldn't come up with the agents at all.
(12) The buyer would ask us to write a contract for a
(13) certain amount, for a price. And as a realtor, you
(14) have to draw up a contract the way the buyer wants it.
(15) We would submit it to the principal broker who
(16) then would take the contract that was not for full
(17) price to Mr. Mielcke and Mr. Asari and they would make
(18) their decision. We would get it back in the form of
(19) an addendum that quoted a certain amount for a
(20) landscaping, grading credit.
(21) We would take that, in turn, to the buyer who
(22) then had the choice to either say okay or no, I don't
(23) want to have this kind of discount or incentive
(24) because you cannot force anybody to buy. He could
(25) just walk away.

Page 31

(1) But if that incentive, that landscape credit
(2) was good enough for him, he would sign the contract
(3) and then we would submit it to escrow.
(4) BY MR. REVERE:
(5) Q. And so the landscape credit would only become
(6) part of the discussion after the negotiations over the
(7) actual price to be paid were already completed,
(8) correct?
(9) A. Would you rephrase that, please?
(10) MR. ING: Object.
(11) BY MR. REVERE:
(12) Q. Sure. Let's take the example of the Federman
(13) lot. The actual price for the Federman lot was
(14) 2,550,000, correct?
(15) A. I don't recall the number.
(16) Q. Well, just assume for me for purposes of this
(17) question it was 2.55 and the list price was 3,000,000.
(18) Do you recall that at all, the list price for
(19) Lot 6?
(20) A. I don't recall. I know there was a difference.
(21) Q. Is it accurate to say that there was bargaining
(22) back and forth between the Federmans and Mauna Kea
(23) over the price?
(24) A. Because I handled that sale, I remember that
(25) Mr. Federman asked me to write a contract the way it

Page 32

(1) was written. I handed it to Mr. Stifler who then took
(2) it to Mr. Mielcke and Mr. Asari and they came back
(3) with the addendum.
(4) I gave it to the Federmans and they accepted
(5) it.
(6) Q. So it was Mr. Mielcke or Mr. Asari who said
(7) include this addendum about the landscape credit, it
(8) wasn't that Irwin Federman said, gee, I want to have a
(9) landscape credit, correct?
(10) A. That's correct, no, he didn't ask for it.
(11) Q. Going back to page 39 here, after you gave the
(12) response that it was basically a discount, yes,
(13) Mr. Beaman asked you the question: But it was a
(14) discount that was given in a way that it could be --
(15) that it would not have to be reflected in the public
(16) records? Answer: I don't recall exactly how it
(17) worked, but I'm sure it was given at the beginning,
(18) mainly to get this project up and running because
(19) times were not that great in those years as you might
(20) recall. The '90s were pretty rough. And I'm sure
(21) that the powers that were then decided to do it that
(22) way to kick start this project.
(23) Did I read that testimony correctly?
(24) A. Yes, did you.
(25) Q. And is that still your testimony today?

Page 37

1  A. Yes, that's Somogye.
2  Q. And it's kind of hard to make out here, but it
3  looks like the date of the sales contract, what's
4  clear on the second page was November 3rd of 1999?
5  A. Yes, I see that.
6  Q. And do you recognize Eileen Lacerte's signature
7  there?
8  A. Yes.
9  Q. It says approved by -- does that look like
10 Mr. Stifler's signature?
11 A. Yes, it is.
12 Q. If you could go back to the second to last
13 page, please. Are you there, where it's titled
14 seller's counteroffer at the top?
15 A. Yes.
16 Q. Under the purchase price there is a listing
17 that says less credit for landscaping, $200,000.
18    Do you see that?
19 A. Yes.
20 Q. So was it your understanding that at least as
21 late as November 3rd, 1999 that landscaping credits
22 were available for lots at The Bluffs?
23 A. This was a back row lot, and obviously, this
24 was given at that time.
25 Q. Do you know if there were ever any other

Page 38

1  landscape credits that were given after November 3rd,
2  1999?
3  A. I'm not sure, but I don't think so.
4     MR. REVERE: Number 3.
5     (Deposition Exhibit 3
6     marked for identification.)
7  Q. Mrs. Kohler, did you have a chance to read over
8  the third exhibit which is a declaration?
9  A. Do you want me to read it right now?
10 Q. Yeah, if you could just read it over,
11 familiarize yourself with it.
12 A. Okay.
13 Q. This was a declaration that you filled out for
14 this case, correct?
15 A. Yes.
16 Q. Did you type up this declaration yourself, or
17 did somebody else prepare it and you signed it?
18 A. Counsel prepared it and I read it and signed
19 it.
20 Q. If you could go to paragraph number 5, please.
21 Paragraph 5 reads as follows: To stimulate sales,
22 while maintaining the exclusive nature and integrity
23 of prices at The Bluffs, it was suggested that Mauna
24 Kea provide landscaping credits to certain early
25 purchasers as an incentive. Incentives similar to

Page 39

1  this are commonly utilized in new subdivisions and
2  developments.
3     Did I read that correctly?
4  A. Yes.
5  Q. Now, you've signed this declaration which says
6  that it was suggested that Mauna Kea provide
7  landscaping credits.
8     Who did the suggesting?
9  A. I don't know.
10 Q. Well, what did you mean then by saying: It was
11 suggested that Mauna Kea provide landscape credits?
12 A. Somebody had to suggest it because --
13 Q. It happened?
14 A. It happened, exactly.
15 Q. The second sentence, you write: Incentives
16 similar to this are commonly utilized in new
17 subdivisions and developments.
18    And my question is what did you mean by the
19 word similar?
20 A. Incentives, to stimulate sales. Like I stated
21 before, it can be anything. It can be for
22 landscaping, for grading, for furniture packages,
23 whatever.
24 Q. So the incentives that you were referring to
25 don't necessarily have anything to do with reducing

Page 40

1  prices, correct?
2  A. No, an incentive is an incentive.
3  Q. And you write: Commonly utilized in new
4  subdivisions and development. What did you mean by
5  commonly utilized?
6  A. That it is utilized in many new subdivisions
7  and developments.
8  Q. And can you give me some examples of other
9  subdivisions and developments that use incentives
10 similar to the ones that occurred at The Bluffs at
11 Mauna Kea?
12 A. Well, right now I know that Kauna'oa at Mauna
13 Kea incentives are used. I know at the Villages at
14 Mauna Lani certain incentives are used for people to
15 purchase or to approve the public support before the
16 30 day recision to expedite the sales.
17    I remember from way, way, way back when, when
18 we started first to develop at Mauna Kea, that our
19 first purchasers received five years of free club
20 membership at the club at Mauna Kea.
21    These are the ones that I recall right now.
22 Q. Any others that you can recall?
23 A. No, not right now.
24 Q. Well, let's talk about the Villages at Mauna
25 Lani.

Page 57

(1) A. Yes.
(2) Q. And in this letter, there is a reference to a
(3) $6,500,000 offer, correct?
(4) A. Yes.
(5) Q. And part of that offer is a $5,000,000
(6) exchange, correct?
(7) A. Yes.
(8) Q. That number, $5,000,000, where did that come
(9) from?
(10) A. I don't remember.
(11) Q. Did it come from Mr. Leone?
(12) A. It might have, but I honestly don't remember
(13) that.
(14)     (Deposition Exhibit 7
(15)     marked for identification.)
(16) Q. Going down to the next exhibit which is
(17) Number 7 which is dated May 20th, 2000, do you see
(18) that?
(19) A. Yes.
(20) Q. In the first paragraph, you mention that you're
(21) angry with Mr. Engels. Who is Mr. Engels?
(22) A. Mr. Engels was the first owner of Lot Number
(23) 10, and Mr. Leone very much wanted to have that parcel
(24) but he didn't get it. Mr. Fogelsong got it.
(25)     So you can see how valuable and coveted these

Page 58

(1) oceanfront properties were. I would have liked to
(2) make that sale.
(3) Q. Now, going back to the next paragraph, you
(4) write -- you're talking about the Maui property. You
(5) state, the last sentence: It must be beautiful, even
(6) though I've heard in the meantime it is not without
(7) the typical challenges of beachfront properties in
(8) Hawaii.
(9)     Do you see that?
(10) A. Yes.
(11) Q. What were the challenges that you became aware
(12) of regarding that lot on Maui?
(13) A. I don't remember, specifically, but I know that
(14) beachfront properties had high waves at that time --
(15) wasn't that the time, and I don't pinpoint the time,
(16) with the gathering rights law that was all in
(17) discussion and all this and beachfront access. But I
(18) really do not recall exactly what I meant at that
(19) moment.
(20) Q. Did Mr. Leone ever talk to you about the fact
(21) that one of his neighbors attempted to build something
(22) on Maui and was prevented from doing so by the county?
(23) A. No.
(24) Q. Do you know if Mr. Leone ever sold that
(25) property on Maui?

Page 59

(1) A. I think so. I think he told me later on that
(2) he had sold it.
(3) Q. Did he tell you what he sold it for?
(4) A. No.
(5) Q. At the bottom of this letter you write: It
(6) would be so wonderful to have you become part of this
(7) community. I know you would love it. You know most
(8) of the players there already.
(9)     Do you see that?
(10) A. Yes.
(11) Q. And again, do you know who it is that you're
(12) referring to when you say you know most of the
(13) players?
(14) A. No, but he told me that he knew a lot of people
(15) that had bought already.
(16) Q. And it's your understanding that several of the
(17) purchasers at The Bluffs at Mauna Kea are Silicon
(18) Valley residents who all know each other?
(19) A. They're not Silicon Valley residents. A lot of
(20) them are Venture Capitalists.
(21) Q. Who all know each other and live in the same
(22) area of California?
(23) A. It seems to be a very small community.
(24) Q. So that's a yes; is that correct?
(25) A. Yes.

Page 60

(1) Q. Did Joy Jemmet ever have any discussions with
(2) you about any actions she took with regard to -- if
(3) any, with regard to the sale of Lot 5 at The Bluffs?
(4) A. I don't remember.
(5) Q. Did Mr. Stifler ever discuss with you any
(6) actions or conversations that he had with regard to
(7) the sale of Lot 5 at The Bluffs?
(8) A. No.
(9)     (Deposition Exhibit 8
(10)     marked for identification.)
(11) Q. Mrs. Kohler, if you could look over this
(12) declaration and the accompanying handwritten notes and
(13) just let me know when you're done.
(14) A. Yes, I read it.
(15) Q. Are the statements that are contained in the
(16) declaration, those four paragraphs, are they true and
(17) accurate?
(18)     MR. ING: Why don't you read through them.
(19) A. Yeah, I read it.
(20) BY MR. REVERE:
(21) Q. Are the statements that are contained in the
(22) declaration that you signed true and accurate?
(23) A. The seller, says only one seller. That's the
(24) only thing I can see.
(25) Q. So just the word, the letter s should be

### Page 65

(1) A. Yes.
(2) Q. Except for the information that's specific to
(3) the Federmans and yourself, is this form a form
(4) document that Mauna Kea Properties would use?
(5) A. Yes.
(6) Q. When it would enter into dual agency
(7) agreements?
(8) A. Yes.
(9) Q. Thank you. Going to the bottom of the first
(10) page it says: What Mauna Kea Realty and its sales
(11) agents can do for seller and buyers when acting as a
(12) dual agent, do you see that?
(13) A. Yes.
(14) Q. And underneath that there is a list of things
(15) that, basically, Mauna Kea Realty is promising to do
(16) for the seller and the buyer, correct?
(17) A. Yes.
(18) Q. And it says here, the first thing it says: We
(19) will treat the seller and buyer honestly. Do you see
(20) that?
(21) A. Yes.
(22) Q. Do you recall if during your representation of
(23) the Federmans if the fact that landscape credits were
(24) given to other owners before the Federmans was ever
(25) disclosed to them?

### Page 66

(1) A. Could you say that again?
(2)    MR. REVERE: Sure, could you read it back,
(3) please?
(4)    (Record read by the reporter.).
(5) A. No, I don't remember that.
(6) Q. Did the Federmans -- at any time during the
(7) negotiation process did the Federmans ever tell you,
(8) look, we know that other people paid less than asking
(9) price?
(10) A. No.
(11) Q. Did you ever tell that to the Federmans?
(12) A. No.
(13) Q. Going to the second page here, among those
(14) items that Mauna Kea Realty can do for the sellers and
(15) buyers, the third one from the bottom says: "We will
(16) provide information about comparable properties so
(17) that the seller and buyer may make an educated
(18) decision on which price to accept or offer."
(19)    Did I read that correctly?
(20) A. Yes.
(21) Q. Is that something that Mauna Kea Realty would
(22) endeavor to do when it represented both parties to a
(23) transaction?
(24) A. This is a document that we use, not just for
(25) The Bluffs, but this is what we use also for resales.

### Page 67

(1) So, yes, this is the document that we have used for
(2) dual agency.
(3) Q. Did you provide any comparables to the
(4) Federmans?
(5) A. For the project, I don't believe so. I don't
(6) think it ever came to question.
(7) Q. Do you believe that comparables are necessary
(8) so that sellers and buyers can make an educated
(9) decision on which price to accept or offer?
(10)    MR. ING: Object to the form of the question,
(11) vague and ambiguous.
(12)    MR. COLOMBE: Join, also calls for speculation.
(13)    MR. ING: As to which property or types of
(14) sales?
(15) BY MR. REVERE:
(16) Q. Residential sales, generally, aren't
(17) comparables important?
(18) A. This particular one where vacant parcels we
(19) sold was a new project, we handed people the price
(20) list that was published, and there were many
(21) properties available.
(22)    These buyers are very sophisticated buyers,
(23) they're very successful business people, and they
(24) usually make their own decisions. And they don't ask
(25) very often about these kind of questions, especially

### Page 68

(1) not on a new project.
(2) Q. But if they were interested in finding out what
(3) prices were, actually, paid, there would be no way to
(4) tell at The Bluffs, correct?
(5) A. I'm not aware of which ones had closed at that
(6) time, too, so I'm not sure.
(7) Q. Well, assuming that there were some --
(8) Mr. Hoffee, he was the first buyer, correct?
(9) A. Yes.
(10) Q. So his sale was done and over with before the
(11) Federman sale, correct?
(12) A. I wasn't privy to any of the sales, especially
(13) not the Hoffee sale.
(14) Q. Well, let's assume the Hoffee sale closed, that
(15) there was a confidential credit that was given. How
(16) would Mr. Federman ever know about what Mr. Hoffee,
(17) actually, paid if he wanted to find out?
(18) A. I don't want to speculate on that. I certainly
(19) wouldn't have had that information.
(20) Q. So you wouldn't have that information because
(21) Mr. Stifler or whoever was involved in that sale
(22) wouldn't even give it to you?
(23) A. I was a real estate agent. I handled that
(24) particular sale. I had nothing to do with the Hoffee
(25) sale, so no, I would not be privy to that.

Page 69

1  Q. And the information that is reflected in the
2  public records, assuming Mr. Hoffee got a credit,
3  wouldn't provide any guidance to a prospective
4  purchaser other than to show information that is not
5  accurate, correct?
6      MR. ING: Object to the form of the question,
7  vague and ambiguous.
8      MR. COLOMBE: Join, also calls for speculation.
9  A. I don't understand what you say when you say
10 inaccurate.
11 BY MR. REVERE:
12 Q. Well, there is a price that's -- well, for
13 example, let's go with the Federman lot. Forget about
14 Mr. Hoffee for now.
15     The Federman lot, what's listed at the tax
16 department is $3,000,000, correct?
17 A. That's what I understand. I don't recall the
18 exact number.
19 Q. But that was not the actual consideration that
20 was paid by Mr. Federman, correct?
21 A. He got a credit which was an incentive.
22 Q. Right. So he didn't pay for the credit, it's
23 not like he wrote a separate check for the credit,
24 correct?
25 A. It was an incentive, credit given, like any

Page 70

1  other credit that could have been given. This
2  happened to be a landscape and grading credit so the
3  price was the price that was paid.
4  Q. Right, but he didn't pay $3,000,000?
5  A. He got a credit.
6  Q. I understand what you said, he's got a credit.
7  He didn't write a check for $3,000,000; he wrote a
8  check for $2,550,000?
9  A. He didn't need to write a check for $3,000,000
10 because he got a landscape and grading credit.
11 Q. So the actual consideration that was paid was
12 2,550,000 plus?
13 A. Yes, plus the credit that was given to him.
14     MR. COLOMBE: Object to the extent it calls for
15 a legal conclusion.
16     MR. REVERE: Make this the next exhibit, 11.
17     (Deposition Exhibit 11
18     marked for identification.)
19 Q. Mrs. Kohler, what we've marked as Exhibit 11 is
20 an undated handwritten note that is on Mauna Kea
21 Realty letterhead.
22     And my first question to you is was this your
23 handwriting?
24 A. No.
25 Q. Do you know whose handwriting this is?

Page 71

1  A. I'm not sure. First of all, it is not
2  letterhead. These are little pads that we have, note
3  pads. It could be Tom Stifler's, but I'm not sure.
4  Q. Are you familiar with Mr. Stifler's
5  handwriting?
6  A. His signatures I am, yes.
7  Q. Does this appear to be his handwriting to you?
8  A. That's what I just said, it looks like it, but
9  I wouldn't put my hand on the Bible for that either.
10 And this is the first time I've seen this, by the way.
11 Q. So there is these numbers -- there's the word
12 discount and it says at 10 percent, at 15 percent, at
13 20 percent.
14     Do you see that?
15 A. Yes, I do.
16 Q. The amount of the discount that the Federmans
17 ultimately received was 15 percent of the list price;
18 is that correct?
19     MR. ING: Object to the form of the question,
20 vague and ambiguous, misstates the witness' prior
21 testimony.
22     MR. COLOMBE: Join.
23 BY MR. REVERE:
24 Q. Is that correct?
25 A. This is the first time I see this piece of

Page 72

1  paper so I don't even want to comment on it.
2  Q. Well, look at the middle figure. It has
3  discount at 15 percent 450,000 and then 2,550,000
4  after it, correct?
5  A. Yes.
6  Q. And isn't that what the discount for the
7  Federman lot was?
8      MR. ING: Object to the form of the question,
9  misstates the witness' prior testimony, vague and
10 ambiguous.
11     MR. COLOMBE: Join, also asked and answered.
12 BY MR. REVERE:
13 Q. You can answer.
14 A. I know that the incentive, that the landscaping
15 credit was $450,000. I think that was the number.
16 And so this is how they might have arrived at that
17 number, but I wouldn't have been aware of it then.
18     (Deposition Exhibit 12
19     marked for identification.)
20 Q. Mrs. Kohler, if you could look at the next
21 document which we've marked which is a September 15,
22 1998 fax that appears to be from you to Mr. Federman,
23 and my first question is if you recall writing this
24 letter and sending it to Mr. Federman?
25 A. That's my signature so I must have sent it.

### Page 73

(1) Q. In this third paragraph here, it says: The
(2) response has come back from Japan and I was pleased to
(3) see that they have come off their last counteroffer by
(4) an additional 5 percent and will accept 2,600,000.
(5)    Do you see that?
(6) A. Yes.
(7) Q. So do you know who it was in Japan that was
(8) involved in this negotiation?
(9) A. I have no clue.
(10) Q. Do you recall who it was that told you that
(11) they heard back from Japan?
(12) A. It had to be Mr. Stifler because he's the one I
(13) talked to.
(14) Q. And do you recall who Mr. Stifler would be
(15) speaking with in Japan or what company he would be
(16) speaking with?
(17) A. I don't know who he speaks with, but I assume
(18) that he would speak to Mr. Asari and Mr. Mielcke.
(19) Q. And so do you know any individual in Japan that
(20) he might have consulted with about prices?
(21) A. No, I don't know any of those people.
(22) Q. Going to the second to last paragraph, it says
(23) in the second sentence: I've spoken with Angela
(24) Kingston. Who is she?
(25) A. She's Mr. Federman's assistant.

### Page 74

(1)    (Deposition Exhibit 13
(2)    marked for identification.)
(3) Q. Mrs. Kohler, did you have a chance to look over
(4) this September 21st, 1998 letter that we've marked as
(5) Exhibit 13?
(6) A. I'm looking at it right now. Yes, I saw it.
(7) Q. You mention in the second paragraph here that
(8) every time we have an inquiry about Lot Number 6 I
(9) panic!
(10)    What was your purpose in sending that
(11) communication to Mr. Federman?
(12) A. I'm a salesperson. I'm trying to make a sale
(13) here.
(14) Q. That's a very good, very honest answer. So
(15) were there any inquiries that you got regarding Lot
(16) Number 6?
(17) A. There must have been lots of showings so I
(18) panicked.
(19) Q. You have a handwritten note here that says:
(20) Tom, I hope you don't mind, Cha Cha. You hope he
(21) doesn't mind handling while you're gone?
(22) A. Exactly.
(23) Q. Do you recall anything, any discussions that
(24) you've had with Mr. Stifler regarding the Federman
(25) sale?

### Page 75

(1) A. Not at this point.
(2)    (Deposition Exhibit 14
(3)    marked for identification.)
(4) Q. Mrs. Kohler, if you could look over Exhibit 14
(5) and tell me when you're ready to talk about it.
(6) A. Yes, I'm ready.
(7) Q. Is this a note that you wrote?
(8) A. Yes.
(9) Q. Are these notes something that you wrote to
(10) yourself to prepare yourself for a phone call with
(11) Ceppie Federman?
(12) A. No, it would have been -- it's hard to say -- I
(13) know when I wrote this note, but on what kind of paper
(14) it was written I really don't recall.
(15) Q. So you're not sure if it was written like after
(16) a conversation you had with Ceppie or before?
(17) A. No, I must have sent that. I must have sent it
(18) because it's not a note that one would take before or
(19) after talking to a person.
(20) Q. So you think that you wrote this down and sent
(21) it to Ceppie?
(22) A. Or they might have been at the hotel for the
(23) vacation at that time because by the date I can tell
(24) it's Christmas time, just before Christmas, but I
(25) really don't remember exactly.

### Page 76

(1) Q. The first sentence here and it's dated
(2) 12/21/98, it says: We got hold of -- I don't think
(3) it's a racial thing, but it says Jap. executive.
(4) A. It's an abbreviation.
(5) Q. Sure, an abbreviation, right. They will go up
(6) to 15 percent discount.
(7)    Do you recall writing that?
(8) A. I don't recall writing it, but I see it in
(9) front of me.
(10) Q. And the discount that was ultimately agreed
(11) upon by the Federmans was a 15 percent discount,
(12) correct?
(13)    MR. ING: Object to the form of the question,
(14) vague and ambiguous, misstates the witness' prior
(15) testimony.
(16)    MR. COLOMBE: Join.
(17) A. That's what it says in Exhibit 11, right.
(18) BY MR. REVERE:
(19) Q. Right. And that's what it says here also, in
(20) Exhibit 14?
(21) A. That's right.
(22) Q. So at least as of 12/21/98, what the Federmans
(23) and the Mauna Kea folks or at least the Japanese
(24) executive in Japan were talking about was a 15 percent
(25) discount, correct?

Page 77

(1) A. Must have.
(2)    (Deposition Exhibit 15
(3)    marked for identification.)
(4) Q. Mrs. Kohler, did you have a chance to look over
(5) this undated note?
(6) A. Yes.
(7) Q. The first sentence of the document says between
(8) December 22nd and December 27th. Do you recall if
(9) this was something that you wrote or Mr. Stifler wrote
(10) or somebody else?
(11) A. I typed that and it gives the date that this
(12) occurred, between December 22nd and December 27th.
(13) Q. Do you recall who you were writing this for?
(14) A. For myself.
(15) Q. And were you writing this for yourself, just so
(16) you could keep track of how the negotiations went?
(17) A. Yes.
(18) Q. The third line down says: I called Tom Stifler
(19) who called Mr. Asari. The answer, no, period. The
(20) bottom line is 2,550,000.
(21)    Do you see that?
(22) A. Yeah.
(23) Q. Does this help refresh your recollection if
(24) Mr. Asari was the Japanese executive that was referred
(25) to in the previous document or they might not be the

Page 78

(1) same person?
(2) A. I have no idea because I didn't deal with
(3) Mr. Asari or Mr. Mielcke directly. I always dealt
(4) with Tom Stifler.
(5) Q. Do you know if Mr. Asari has a real estate
(6) license?
(7) A. No, I don't know.
(8)    (Deposition Exhibit 16
(9)    marked for identification.)
(10) Q. Mrs. Kohler, if you could look this document
(11) over and let me know when you're ready. My question
(12) at least, initially, just will be limited to the first
(13) page, but you're free to look at the whole thing, if
(14) you want to.
(15) A. Okay.
(16) Q. There is a handwritten notation on the first
(17) page. It appears to say Cha Cha's copy of signed
(18) contract. Do you see that?
(19) A. Yes.
(20) Q. Is that your handwriting?
(21) A. No.
(22) Q. Do you know whose handwriting that is?
(23) A. That's Tom Stifler's handwriting.
(24) Q. It says Cha Cha's copy. Is there an office
(25) copy of signed contracts, as well as individual

Page 79

(1) realtor's copy?
(2) A. There was the original that went to escrow and
(3) I'm sure there was another one that went to the
(4) developer's office because they are the seller and
(5) then the agent had a copy. So this tells me that Tom
(6) gave me a fully executed copy of the contract.
(7) Q. The right-hand column here under Article III,
(8) Escrow and Purchase Price, do you see that?
(9) A. Yes.
(10) Q. Under subparagraph d, it says: Total purchase
(11) price 2,550,000, correct?
(12) A. Yes.
(13) Q. So that was the total purchase price, correct?
(14)    MR. ING: Object to the form of the question,
(15) vague and ambiguous. You may answer.
(16) A. Not necessarily. That was the price that the
(17) buyer wanted me to write in. And as I explained to
(18) you before, as an agent, that's what I have to put on
(19) the contract. And I submit it and then I hope for the
(20) best, that it will come back either accepted with a
(21) counteroffer or rejected. And this one came back,
(22) obviously, as you well know with a landscape credit.
(23) Q. But the amount that the purchaser had to pay,
(24) the 2,550,000 never changed, correct?
(25) A. He paid 2,550,000 plus getting the incentive

Page 80

(1) credit for landscaping and grading of 450,000 as I
(2) know right now so that is 3,000,000.
(3) Q. And again, as we discussed neither this
(4) contract or any other contract requires that they
(5) spend any of that 450,000 on either landscaping or
(6) grading, correct?
(7) A. It doesn't require them, but they will need to
(8) have landscaping and they certainly need to grade the
(9) property.
(10) Q. And just so we're clear here, we've been using
(11) a few terms here. The seller is the same thing as the
(12) developer at The Bluffs, correct?
(13)    MR. ING: Object to the form of the question,
(14) calls for a legal conclusion and misstates all of the
(15) documents that we've looked at thus far.
(16)    MR. COLOMBE: Join.
(17) BY MR. REVERE:
(18) Q. The seller was the developer at The Bluffs?
(19) A. The seller was Mauna Kea Development Corp.
(20) Q. Were they the developer?
(21) A. The difference -- legally, the difference, I
(22) don't know. I would call them the developer, but I
(23) don't know the legal ramifications of that question.
(24) Q. The amount of your commission for the Federman
(25) lot was based on 2,550,000, correct?

## Page 81

1. A. Yes.
2. Q. Do you recall any discussions at all with the
3. Federmans about this landscaping credit?
4. A. No.
5. Q. Do you recall if they raised to Mr. Stifler or
6. otherwise any questions about why this addendum was
7. even necessary?
8.     MR. COLOMBE: Objection, asked and answered,
9. also lack of foundation.
10.     MR. ING: Same objection.
11. A. No, I don't recall any of that. They accepted
12. the counteroffer.
13. BY MR. REVERE:
14. Q. Did Mr. Stifler ever give you instructions on
15. how to handle questions from prospective buyers about
16. landscape credits?
17. A. No.
18.     (Deposition Exhibit 17
19.     marked for identification.)
20. Q. Mrs. Kohler, if you could just let me know when
21. you've completed your review of this exhibit.
22. A. I will. All right. I read it.
23. Q. My question to you is do you recall writing
24. this letter?
25. A. I don't recall it, but I see it in front of me.

## Page 82

1. Q. And you recognize your signature?
2. A. Yes.
3. Q. It has your signature on it. Do you believe
4. that you did, in fact, send this out to the Federmans?
5. A. Excuse me?
6. Q. Since it contains your signature, do you
7. believe that you did, in fact, send this letter out to
8. the Federmans?
9. A. That I -- no, it doesn't look like I faxed it
10. because usually I mark my facsimiles as such.
11. Q. Do you believe that you mailed it out to the
12. Federmans?
13. A. Yes.
14.     (Deposition Exhibit 18
15.     marked for identification.)
16. Q. Mrs. Kohler, if you can just let me know --
17. A. Yeah, I'm done.
18. Q. Do you recall who it was that typed in this
19. information on the escrow instructions?
20. A. I might have typed that in.
21. Q. Do you know anyone else at the office who might
22. have typed it in if you did not?
23. A. I'm pretty sure I typed that.
24. Q. Did Mauna Kea Properties, I guess, did they
25. give you folks any sort of secretarial or clerical

## Page 83

1. staff, or are you pretty much on your own?
2. A. At Mauna Kea Realty, yes, we were on our own.
3. The principal broker had a secretary who also was our
4. receptionist that answered phone calls and such.
5. Q. So it's your belief, as we sit here today, that
6. it was you who typed out these escrow instructions?
7. A. Yes.
8. Q. The net sales price for this property, Lot 6,
9. was 2,550,000, according to the escrow instructions?
10. A. Yes, plus the landscaping allowance adds up to
11. the sales price of 3,000,000.
12. Q. And the sales commission which is about
13. one-third of the page down, 153,000?
14. A. That's what went to Mauna Kea Realty.
15. Q. And that works out to -- that percentage --
16. that 153 is based on the net sales price, correct?
17. A. Yes, I'm very sure about that.
18.     (Deposition Exhibit 19
19.     marked for identification.)
20. Q. Mrs. Kohler, the next exhibit is a letter dated
21. February 1st, 1999. It appears to be from Tom Stifler
22. to Janet Lum Won.
23.     My only question to you is if you recognize
24. that signature as belonging to Tom Stifler?
25. A. Yes.

## Page 84

1.     (Deposition Exhibit 20
2.     marked for identification.)
3. Q. Mrs. Kohler, if you can let me know when you're
4. ready to talk about this.
5. A. I will. Okay.
6. Q. First, is this your handwriting on this
7. document?
8. A. Yes.
9. Q. Do you recall writing this note to Ceppie
10. Federman?
11. A. I don't recall it, but I see it in front of me.
12. Q. In your letter you talk about, basically, some
13. information that's going on with other lots, Numbers
14. 11, 12, and 13.
15.     Do you recall why you were writing this to the
16. Federmans?
17. A. Because they will be very much interested what
18. is going on. We are an information office, too.
19. Everyone wants to know what's happening in the
20. neighborhood.
21. Q. Do you recall any interest that was expressed
22. by Mr. and Mrs. Federman in finding out what's going
23. on, or is that something you just generally did?
24. A. We always do that because we know that people
25. are interested in that. You would be if you were

Page 97

(1) would you do anything differently regarding the sales
(2) of The Bluffs at Mauna Kea with regard to keeping
(3) confidential landscape credits confidential?
(4)     MR. ING: Object to the form of the question,
(5) vague and ambiguous, calls for speculation, incomplete
(6) hypothetical.
(7)     MR. COLOMBE: Join.
(8)     A. It would not be my decision whether I'm the
(9) principal broker now or whether I was it then.
(10) BY MR. REVERE:
(11)    Q. Say Mr. Asari said it's up to you, Mrs. Kohler,
(12) if we engage in using confidential landscape credits.
(13)       Would you say it's okay, let's do it, or would
(14) you have an objection to it?
(15)    MR. ING: Object to the form of the question,
(16) vague and ambiguous, calls for speculation, incomplete
(17) hypothetical.
(18)    MR. COLOMBE: Join.
(19)    A. I don't want to speculate on that, but knowing
(20) Mr. Asari he wouldn't have asked me a question like
(21) that.
(22) BY MR. REVERE:
(23)    Q. As a realtor, is it your understanding that
(24) realtors are obligated to treat all parties honestly?
(25)    A. Say that question again.

Page 98

(1)     MR. ING: Object to the form of the question,
(2) calls for speculation, vague and ambiguous, calls for
(3) a legal conclusion.
(4)     A. What are you referring to, please?
(5) BY MR. REVERE:
(6)     Q. I'm just wondering the standards and practices
(7) of a realtor in Hawaii. Aren't realtors supposed to
(8) treat all parties honestly?
(9)     A. They are supposed to. If they always do, I
(10) don't know, but we do.
(11)    Q. In your opinion has Mauna Kea avoided
(12) exaggeration, misrepresentation or concealment of
(13) pertinent facts relating to properties that it sold?
(14)    MR. ING: Object, vague and ambiguous, overly
(15) broad, calls for speculation.
(16)    A. I work for a very good company and we are
(17) known -- we have a good reputation and we are known to
(18) be honest people.
(19) BY MR. REVERE:
(20)    Q. Is it your understanding that realtors are not
(21) to be parties to the naming of a false consideration
(22) in any document unless it is the naming of an
(23) obviously nominal consideration?
(24)    MR. ING: I'm sorry, I didn't understand the
(25) question so I had a hard time following it, Counsel.

Page 99

(1)     MR. REVERE: Could you read it back?
(2)     (Record read by the reporter.)
(3)     MR. ING: Object to the form of the question,
(4) vague and ambiguous, also speculation, calls for a
(5) legal conclusion.
(6)     MR. COLOMBE: Join.
(7)     A. I'm not an attorney. I don't know how to
(8) answer that unless you translate that into plain
(9) English to me.
(10) BY MR. REVERE:
(11)    Q. Well, are you familiar with any code of ethics
(12) that's pertinent to realtors?
(13)    A. I most certainly am.
(14)    Q. Are you aware of any provision in the code of
(15) ethics for realtors that reads: Realtors shall not be
(16) parties to the naming of a false consideration in any
(17) document unless it be the naming of an obviously
(18) nominal consideration?
(19)    A. If it's in our code of ethics, then I know I
(20) have read it.
(21)    Q. Given that that's in the code of ethics, how do
(22) you explain the fact that landscape credits were kept
(23) confidential and not reported to the tax department?
(24)    A. It was not my decision. I didn't make that
(25) decision. I had nothing to do with that decision.

Page 100

(1)     Q. And again, if it didn't occur, you would point
(2) to escrow?
(3)     A. It was not my decision to give landscaping
(4) credits.
(5)     Q. Whose decision was it?
(6)     A. I don't know and I mentioned that before also.
(7)     Q. It was either Mr. Stifler or someone higher
(8) than him?
(9)     A. Exactly, but I don't know who it was.
(10)    Q. Were you involved in the sale of Lot 8 to
(11) Mr. Gunderson?
(12)    A. No.
(13)    Q. Do you know any -- were you involved even
(14) tangentially in that like covering for somebody?
(15)    A. No.
(16)    Q. Are you aware, as we sit here today, that
(17) Mr. Gunderson's sales contract was entered into in
(18) July of 1999?
(19)    A. I don't remember the time for the individual
(20) contracts, no.
(21)    Q. Are you aware of the fact that Mr. Gunderson
(22) received a landscape credit in July of 1999 under his
(23) sales contract?
(24)    A. I found that out yesterday.
(25)    Q. Were you involved in the sale of the Somogye