# EXHIBIT

# J

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF HAWAII
 3   WESTERN SUNVIEW PROPERTIES,    ) Civil No.
     LLC; GUY HANDS; AND JULIA      ) CV03-00463 DAE LEK
 4   HANDS,                         )
                                    ) (Contract; Injunction;
 5            Plaintiffs,           )  Other Non-Vehicle
                                    )  Tort; Declaratory
 6   IRWIN FEDERMAN, CONCEPCION S.  )  Judgment; Other
     FEDERMAN; THE BLUFFS AT MAUNA  )  Civil Action)
 7   KEA COMMUNITY ASSOCIATION;     )
     MAUNA KEA PROPERTIES, INC.;    )
 8   MAUNA KEA DEVELOPMENT CORP.;   )
     COUNTY OF HAWAII; JOHN DOES    )
 9   1-100; JANE DOES 1-100; DOE    )
     PARTNERSHIPS 1-100 AND DOE     )
10   CORPORATIONS 1-100,            )
                                    )
11            Defendants.           )
                                    )
12   _____
13
14              DEPOSITION OF YOICHI ASARI
15
16   Taken on behalf of Plaintiffs Western Sunview Properties,
17   LLC; Guy Hands; and Julia Hands at Motooka Yamamoto &
18   Revere, 1000 Bishop Street, Suite 801, Honolulu, Hawaii,
19   commencing at 9:00 a.m. on February 11, 2005, pursuant to
20   Notice.
21
22   Transcribed by:  WILLIAM T. BARTON, RPR, CSR #391
                      Court Reporter, State of Hawaii
23
                    PACIFIC REPORTING SERVICES UNLIMITED
24                       Suite 1470, Makai Tower
                             733 Bishop Street
25                        Honolulu, Hawaii 96813
                              (808) 524-PRSU
```

Page 2

APPEARANCES:

For Plaintiffs Western Sunview Properties, LLC;
Guy Hands; and Julia Hands
   TERRENCE M. REVERE, ESQ.
   Motooka Yamamoto & Revere
   1000 Bishop Street, Suite 801
   Honolulu, Hawaii 96813

For Defendants Irwin Federman and
Concepcion S. Federman
   LEROY COLOMBE, ESQ.
   Chun Kerr Dodd Beaman & Wong
   Fort Street Tower, Topa Financial Center
   745 Fort Street, 9th floor
   Honolulu, Hawaii 96813

For Defendant The Bluffs at Mauna Kea
Community Association
   RONALD SHIGEKANE, ESQ. (a.m. session)
   Ayabe Chong Nishimoto Sia & Nakamura
   1001 Bishop Street, 2500 Pauahi Tower
   Honolulu, Hawaii 96813

For Defendants Mauna Kea Properties, Inc. and
Mauna Kea Development Corp.
   DOUGLAS ING, ESQ.
   Watanabe Ing Kawashima & Komeiji, LLP
   999 Bishop Street, 23rd floor
   Honolulu, Hawaii 96813

Interpreter
   Paul Cobbett
   PO Box 25312, Honolulu, Hawaii 96825

Page 3

INDEX

EXAMINATION                             Page
By Mr. Revere                              4

YOICHI ASARI
Deposition Exhibits                    Marked
1   Deposition Transcript                 53
2   Deposition Transcript                 61
3   Addendum to sales contract            68
4   Handwritten document                  73
5   Handwritten letter                    73
6   Design and construction               81
    requirements for homes document
7   The Bluffs at Mauna Kea sales         84
    contract
8   Letter                                96
9   July 30, 2001 letter                 110
10  July 13, 2001 letter                 112

(Note: Exhibit 10 is to be placed under
       seal by agreement of counsel)

Page 4

1  (Disclosure presented to Counsel.)
2         YOICHI ASARI,
3  Called as a witness by Plaintiffs Western Sunview
4  Properties, LLC; Guy Hands; and Julia Hands, having been
5  first duly sworn, was examined and testified as follows:
6         EXAMINATION
7  BY MR. REVERE:
8    Q.  Could you state your name for the record, please.
9    A.  Yoichi Asari.
10   Q.  And do you have any middle name?
11   A.  No.
12   Q.  Mr. Asari, you were deposed before; is that
13 correct?
14   A.  Yes, I was.
15   Q.  And I note that you were deposed on two occasions
16 in the Federman case -- excuse me -- in the Robertson case.
17       Were you ever deposed in any other matter?
18   A.  I don't think so.
19   Q.  When you were deposed, I believe one time it was
20 by Mr. Colombe, who is to my left, and one time by
21 Mr. Beamer, did you use a translator during that
22 deposition?
23   A.  No, I didn't.
24   Q.  You understand that there's a translator here
25 today, Mr. Cobbett?

Page 5

1    A.  Yes, I do.
2    Q.  So if you do believe that you need a translator,
3  you can just let us know. Okay?
4    A.  Thank you.
5    Q.  Also, what we're doing here is a deposition.
6        You understand that your answers are under oath,
7  correct?
8    A.  Uh-huh, yes.
9    Q.  And you understand that you have to say yes or no?
10   A.  I understand that.
11   Q.  All right. Are you on any medications or
12 suffering from any illness that would prevent you from
13 giving honest, straightforward testimony today?
14   A.  No, I'm not.
15   Q.  And also, as your counsel is trying to indicate,
16 it may take me or the other attorneys a while to get our
17 questions out. It's just important that you let us ask the
18 question first and then respond.
19       Do you understand that?
20   A.  Yes, I do.
21   Q.  Thank you.
22       You attended Harvard University; is that correct?
23   A.  Yes, I did.
24   Q.  For what type of degree?
25   A.  The Master's Degree.

### Page 10

1  BY MR. REVERE:
2  Q. Mr. Asari, as Makena Resort, does it have any
3  contracts with any subdevelopers, as we sit here today?
4  A. We just made sale and purchase agreement, not
5  contract.
6  Q. With who?
7     MR. ING: There is a contract in negotiation
8  right now. I don't want him to disclose.
9  BY MR. REVERE:
10 Q. Okay. Mr. Asari, if your attorney instructs you
11 not to answer something, you're going to follow your
12 attorney's instructions, I take it?
13 A. Right.
14 Q. All right. Okay. Other than Mauna Kea
15 Properties -- let me ask you this question.
16    Prince Hotels, does it have any relationship with
17 Lokelani Corp.?
18 A. No.
19 Q. What is your understanding as to who ultimately
20 owns Prince Hotels?
21    MR. ING: Objection to the form of the question.
22 Vague and ambiguous.
23 A. Prince Hotel in Japan or in Hawaii?
24 Q. In Hawaii.
25 A. In Hawaii? Assets? Seibu Railway.

### Page 11

1  Q. Seibu Railway?
2  A. Company, yes.
3  Q. What about in Japan, the Prince Hotels in Japan?
4  A. It's so complicated --
5     MR. ING: Objection to the form of the question.
6  Vague and ambiguous.
7  BY MR. REVERE:
8  Q. I'm sorry it's complicated, but ultimately Seibu
9  Railway owns it?
10 A. No.
11 Q. Who owns this?
12 A. I'm not sure.
13 Q. Who is your secretary?
14 A. Rhonda Willis.
15 Q. Is Rhonda Willis from Hawaii, originally?
16    MR. ING: Objection to the form of the question.
17 Vague and ambiguous.
18 A. I think she's from California, originally.
19 Q. When you communicate, does Ms. Willis speak
20 Japanese or English?
21 A. She doesn't speak Japanese.
22 Q. Do you know who Tom Stiffler is?
23 A. Yes, I do.
24 Q. Does he speak Japanese?
25 A. No, he doesn't.

### Page 12

1  Q. What about Katherine Kohler? Does she speak
2  Japanese?
3  A. She doesn't.
4  Q. What about Bill Mielcke? Does he speak Japanese?
5  A. No, he doesn't.
6  Q. How long have you been in Hawaii? As far as not
7  maybe for vacation, but how long have you been living in
8  Hawaii?
9     MR. ING: Objection to the form of the question.
10 Vague and ambiguous.
11 A. I've been on the Big Island for ten years.
12 Q. Did you ever live in any other parts of Hawaii?
13 A. Uh-huh, yes.
14 Q. What other parts?
15 A. Maui and Honolulu.
16 Q. And where do you live, currently?
17 A. On Big Island.
18 Q. And when did you live on Maui?
19 A. 1976 to '79.
20 Q. What were you doing there from '76 to '79?
21    MR. ING: Objection to the form of the question.
22 Overly broad. Vague --
23 Q. As far as employment --
24 A. Excuse me?
25 Q. As far as employment, what were you doing from

### Page 13

1  '76 to '79?
2  A. I was involved with the Makena Golf Course
3  development.
4  Q. Is that the only time period that you lived on
5  Maui?
6  A. Also, I lived on Maui from '85 and '86.
7  Q. What were you doing on Maui as far as employment
8  in '85 to '86?
9  A. I was working on the Maui Prince Hotel
10 conception.
11 Q. Any other time period that you lived on Maui?
12 A. No.
13 Q. What about in Honolulu? When did you live in
14 Honolulu?
15 A. It was in '79.
16 Q. Just part of 1979?
17 A. Right.
18 Q. And what were you doing as far as employment in
19 '79 in Honolulu?
20 A. I was working on the Maui project in Honolulu.
21 Q. The Makena Golf Course?
22 A. Right, uh-huh.
23 Q. For the last ten years, you have lived on the
24 Big Island?
25 A. Yes.

Page 22

1   A. Yesterday.
2   Q. Did you read your deposition yesterday, the
3   former deposition?
4   A. Just a part of it.
5   Q. What part?
6   A. The part talking about the landscape credit.
7   Q. Any other documents that you can recall reading
8   yesterday?
9   A. I read Cha-Cha's, Mrs. Kholer's, depo.
10  Q. The one she just took a few weeks ago?
11  A. Yes.
12  Q. Anything else that you read?
13  A. I think that's it.
14  Q. When did you first hear the phrase "landscape
15  credit"?
16      MR. ING: Objection to the form of the question.
17  Vague and ambiguous, overly broad.
18  A. I don't remember.
19  Q. As you sit here today, you're not sure who first
20  used the phrase "landscape credit"?
21  A. I am not sure. I don't know.
22  Q. Do you know if Mauna Kea Properties used
23  confidential credits on any other properties?
24      MR. ING: Objection to the form of the question.
25  Vague and ambiguous.

Page 23

1   A. I don't know.
2   Q. There's a development called Mauna Kea Fairways;
3   is that correct?
4   A. Excuse me?
5   Q. Mauna Kea Fairways?
6   A. Fairways, yes.
7   Q. Do you know if confidential landscape credits
8   were used to sell lots at Mauna Kea Fairways?
9       MR. ING: Objection to the form of the question.
10  Lacks foundation, overly broad, vague and ambiguous.
11  A. I don't know.
12  Q. Do you know if confidential credits have been
13  used as part of the sales for any properties that were sold
14  at the Makena Resort?
15      MR. ING: Objection to the form of the question.
16  Vague and ambiguous.
17  A. Nothing is developed there yet.
18  Q. So as far as you know, as you sit here today, the
19  only project that Mauna Kea Development Corp. was involved
20  with that used landscape credits was The Bluffs at Mauna
21  Kea?
22  A. I think so.
23  Q. Were any confidential credits used at the High
24  Bluffs?
25  A. I don't know.

Page 24

1   Q. As far as you know, who would be in the best
2   position to answer that question about the High Bluffs?
3   A. Bill Mielcke and Tom Stiffler.
4   Q. Could you explain to me, it's my understanding
5   that until he resigned, Mr. Mielcke was the president of
6   Mauna Kea Properties; is that correct?
7   A. Yes.
8   Q. And did Mr. Mielcke have any role or position
9   with Lokelani?
10  A. No, I don't think so.
11  Q. Before Mr. Mielcke retired, I understand that he
12  was the president of Mauna Kea Properties. You were the
13  vice president, correct?
14  A. Yes.
15  Q. But in any of the corporations that were between
16  Mauna Kea Properties and Seibu Railway, did you hold any
17  positions in those at the time that you were vice president
18  of Mauna Kea Properties?
19      MR. ING: Objection to the form of the question.
20  Vague and ambiguous and overly broad with respect to time.
21  A. I think I had something with Lokelani Resort
22  Corp. at the time. I don't remember.
23  Q. During the time that you were vice president of
24  Mauna Kea Properties and Mr. Mielcke was president, is it
25  fair to say that he was your boss, or were you really his

Page 25

1   boss?
2   A. He was my boss.
3   Q. Okay. Did Tom Stiffler fit into that equation at
4   all for Mauna Kea Properties? Were you Stiffler's boss or
5   was he a superior to you?
6       MR. ING: Objection to the form of the question.
7   Vague and ambiguous and overly broad with respect to time.
8   You may answer if you understand.
9   A. Tom was reporting to Mr. Mielcke and myself.
10  Q. And what was Tom Stiffler's position? He was
11  principal broker; is that correct?
12  A. Yes.
13  Q. Did Mr. Stiffler ever hold any other titles with
14  Mauna Kea Properties, as far as you know?
15  A. I don't think so.
16  Q. What was your understanding as to what
17  Mr. Stiffler's job was with Mauna Kea Properties?
18  A. He was in charge of the real estate sales.
19  Q. Was it Mr. Stiffler's idea to use confidential
20  landscape credits to sell lots at The Bluffs at Mauna Kea?
21  A. I don't know.
22  Q. Was it Mr. Mielcke's idea?
23  A. I don't know.
24  Q. Was it someone in Japan's idea?
25  A. I don't think so.

Page 34

1  A. He does. But not good enough to make
2  communication.
3  Q. Any other executives at Seibu Railway that you
4  would speak with regarding sales at The Bluffs at Mauna
5  Kea?
6  A. No, he was the only one.
7  Q. Why did you have conversations with Mr. Goto
8  regarding sales at The Bluffs at Mauna Kea?
9      MR. ING: Objection to the form of the question.
10 Vague and ambiguous.
11 A. Because he was representing the shareholder,
12 Seibu Railway.
13 Q. Representing what shareholder? Seibu Railway?
14 A. Seibu Railway, yes.
15 Q. Okay. Thank you. And basically, it's because
16 Seibu Railway ultimately owned --
17 A. Right.
18 Q. -- The Bluffs -- excuse me. Seibu Railway
19 ultimately owned the Mauna Kea Resort, correct?
20 A. That's right.
21 Q. As far as the price at which lots sold for, is
22 that something that would ultimately have to be approved by
23 Seibu Railway?
24     MR. ING: Objection to the form of the question.
25 Vague and ambiguous.

Page 35

1  A. Generally speaking, yes. Because we make annual
2  budget, which includes all the projects.
3  Q. As far as an individual sale would occur, let's
4  say that -- let me ask you this.
5      Who set the initial list prices for properties
6  that were offered for sale at The Bluffs at Mauna Kea?
7      MR. ING: Objection to the form of the question.
8  Vague and ambiguous, overly broad with respect to time.
9  A. Mr. Mielcke and myself talked on that.
10 Q. Was Mr. Stiffler consulted on that?
11 A. I think so.
12 Q. And was the process such that you and Mr. Mielcke
13 worked on a price list, and then it was sent to Japan for
14 approval?
15     MR. ING: Objection to the form of the question.
16 A. For information --
17     MR. ING: Vague and ambiguous.
18 A. -- not for approval.
19     MR. ING: Wait. You may answer if you
20 understand.
21 BY MR. REVERE:
22 Q. So your testimony was that it was developed and
23 sent to them for their information, but not necessarily
24 their approval?
25 A. Right.

Page 36

1  Q. How was the decision made -- excuse me -- let me
2  strike that.
3      If a buyer wanted to pay less than the list
4  price, who had the authority to agree or disagree with the
5  buyer's suggested price?
6  A. Mr. Mielcke and myself had the authority to do
7  that.
8  Q. Have you ever heard the expression "home office"
9  being used in the offices of Mauna Kea Properties?
10 A. Excuse me?
11 Q. The phrase "home office," have you ever heard
12 that phrase being used in the offices of Mauna Kea
13 Properties?
14 A. Home office? Yes, I have heard of that.
15 Q. Was it your understanding that when people would
16 use the phrase "home office," they meant Seibu Railway in
17 Japan?
18 A. I think so.
19 Q. Do you know if anyone on behalf of Mauna Kea
20 Properties ever sought legal advice regarding the use of
21 landscape credits?
22 A. I don't know.
23 Q. Do you know an attorney named Bettina Lum?
24 A. Yes, I do.
25 Q. Do you know if anyone ever asked her any

Page 37

1  questions about confidential landscape credits?
2  A. I don't know.
3  Q. So is it your testimony that as far as you know,
4  nobody in Japan knew about landscape credits at The Bluffs
5  at Mauna Kea?
6      MR. ING: Objection to the form of the question.
7  Vague and ambiguous, calls for speculation.
8  A. I don't think they knew anything about that.
9  Q. Did anyone from Japan ever ask -- let me back up.
10     These budgets that you were referring to earlier,
11 would they reflect income that came in from the sale of
12 lots at The Bluffs?
13 A. Yes.
14 Q. Did anyone from Japan ever raise a question as to
15 why the numbers that would come in for lots would be less
16 than the list prices?
17 A. No.
18     MR. ING: Objection. Overly broad, vague and
19 ambiguous, particularly with respect to use of the term
20 "anyone from Japan."
21 BY MR. REVERE:
22 Q. Anyone from Seibu Railway in Japan?
23 A. No, I don't think so.
24     MR. REVERE: Looks like we've been going for 55
25 minutes. You want to take a 10-minute break?

Page 38

1   THE DEPONENT: Yes.
2   (Whereupon, a recess was taken.)
3   (Whereupon, Mr. Shigekane left the deposition.)
4   BY MR. REVERE:
5   Q. Mr. Asari, just a few more questions about your
6   English skills.
7       How long did you study English in Japan? For how
8   many years?
9   A. Junior high through university.
10  Q. And is there a school after school that you
11  attended --
12  A. No.
13  Q. -- for English?
14  A. No.
15  Q. Do you read the Honolulu Advertiser on a daily
16  basis?
17  A. Yes, I do.
18  Q. Do you read the Star Bulletin too?
19  A. No.
20  Q. That's like most people in Hawaii. So that's
21  okay. Do you read the Wall Street journal or any other
22  magazines?
23  A. Once in a while. I read the Golf Digest.
24  Q. And do you write your own business letters, or do
25  you dictate them to Ms. Willis?

Page 39

1   A. Both.
2   Q. All right. Your undergraduate degree was in
3   environmental design?
4   A. Yes.
5   Q. Is that --
6   A. Architecture.
7   Q. Architecture.
8   A. Uh-huh.
9   Q. Is that a yes?
10  A. Yes.
11  Q. And is there sort of an urban planning aspect to
12  that, too?
13  A. Yes.
14  Q. What was the name of your university in Japan?
15  A. At that time, it was called Kyushu Institute of
16  Design.
17  Q. And the Master's degree from Harvard was in
18  what?
19  A. It was Master's in Design Studies.
20  Q. Was there any particular aspect of design --
21  A. Development.
22  Q. I'm sorry?
23  A. Development.
24  Q. And did you work for a Seibu Real Estate Company
25  in Japan?

Page 40

1   A. Yes, I did.
2   Q. What did you do for them?
3   A. Actually, I was involved with Makena project
4   right after I enter into the company.
5   Q. Okay. Was the Seibu Real Estate Company running
6   the Makena project?
7   A. At the beginning, they started the project.
8   Q. And then what happened?
9   A. Then Seibu Railway took over.
10  Q. And what was the relationship of the Seibu Real
11  Estate Company with Seibu Railway? Was Seibu Real Estate
12  Company a subsidiary?
13  A. Yes.
14  Q. As far as you know, does Japan require the
15  public reporting of real estate prices?
16  A. In Japan?
17  Q. Yes.
18  A. I don't know.
19  Q. Do you know have any information about what
20  system they use to be able to value residential real estate
21  in Japan?
22      MR. ING: Objection to the form of the question.
23  Overly broad, vague and ambiguous.
24  A. I've never been involved in real estate business
25  in Japan.

Page 41

1   Q. Is it your understanding that in Hawaii, that the
2   prices for which lots sold for have to be reported
3   accurately to the Bureau of Conveyances?
4       MR. ING: Objection to the form of the question.
5   Overly broad, vague and ambiguous, lacks foundation, calls
6   for a legal conclusion.
7       MR. COLOMBE: Join. Also add assumes facts not
8   in evidence.
9   A. Yes, I know that.
10  Q. You do have that understanding, correct?
11  A. Yes.
12  Q. How did you get that understanding?
13  A. I don't know. I don't know how.
14  Q. Was that an issue you ever spoke with Tom
15  Stiffler about?
16      MR. ING: Objection to the form of the question.
17  Vague and ambiguous.
18  A. I don't remember.
19  Q. Do you know if you ever spoke with Mr. Mielcke
20  about that issue?
21  A. No, I don't.
22  Q. Why did Tom Stiffler leave Mauna Kea Properties?
23      MR. ING: Objection to the form of the question.
24  Overly broad, vague and ambiguous, calls for speculation.
25  A. I believe he retired.

Page 42

1  Q. Did anybody on behalf of Mauna Kea Properties
2  suggest that he retire, or did he just voluntarily retire?
3      MR. ING: Objection to the form of the question,
4  overly broad, vague and ambiguous, calls for speculation.
5      A. Yeah, I am sure he retired voluntarily.
6  Q. Were you involved in the decision to change The
7  Bluffs at Mauna Kea from a condominium concept to a
8  single-family concept?
9      A. Yes, I was.
10 Q. What is your understanding as to why the decision
11 was made to change from condominium to single family?
12     A. My understanding was the real estate market.
13 Q. And basically, did Mauna Kea Properties conclude
14 that there was not a market for the condominium concept,
15 but that there was for a single-family concept?
16     A. Yes.
17 Q. Who else participated in that decision, other
18 than yourself?
19     A. Mr. Mielcke.
20 Q. Anybody else?
21     A. No. That's it.
22 Q. Was that decision, was that communicated to Seibu
23 Railway?
24     A. Yes.
25 Q. And did Seibu Railway approve of the decision?

Page 43

1      MR. ING: Objection to the form of the question.
2  Calls for speculation, assumes facts not in evidence, and
3  assumes that they had to approve.
4      A. They understood.
5  Q. I apologize if I asked this earlier, but I don't
6  believe that I did.
7      Is Prince Hotels is owned directly by Seibu or
8  through Lokelani? Prince Hotels in Hawaii.
9      MR. ING: Objection to the form of the question.
10 Vague and ambiguous as to the point in time.
11     A. Prince Hotels in Hawaii the Assets are owned by
12 Seibu Railway.
13 Q. Directly?
14     A. No.
15     MR. ING: Objection to the form of the question.
16 Vague and ambiguous.
17 Q. Okay. What company is between Seibu Railway and
18 the Prince Hotels?
19     A. They are some property-holding companies in
20 between.
21 Q. What are the names of the property-holding
22 companies?
23     A. I don't remember.
24 Q. Do you serve on any board for Prince Hotels?
25     A. In Japan?

Page 44

1  Q. Here in Hawaii.
2      MR. ING: Objection to the form. Objection to
3  the form of the question. Vague and ambiguous.
4      A. No, I don't.
5  Q. What about any of the holding companies that you
6  just referred to?
7      A. No.
8  Q. Do you know former Governor Ariyoshi?
9      A. Yes, I do.
10 Q. Has he had any positions with regards to Mauna
11 Kea Properties?
12     A. No.
13 Q. What about Mauna Kea Development?
14     A. No.
15 Q. Has he had any positions with regard to any Seibu
16 Railway subsidiary in Hawaii, as far as you know?
17     A. Subsidiary in Hawaii? He was president of Prince
18 Resorts Hawaii.
19 Q. Was Governor Ariyoshi ever informed of anything
20 having to do with sales of lots at The Bluffs at Mauna Kea?
21     MR. ING: Objection to the form of the question.
22 Overly broad, vague and ambiguous.
23     A. Yes, I think so. Not, I'm sure, this project.
24 But we had a meeting to go over our business, including
25 real estate development, hotel and everything else.

Page 45

1  Q. How often would these meetings take place?
2      A. Once a month, once every two months.
3  Q. What were these meetings called?
4      A. I don't remember.
5  Q. When you said we would meet, who would be the
6  people that would be meeting?
7      A. Governor Ariyoshi and hotel general managers and
8  Mauna Kea Properties.
9  Q. Was Seibu Railway the entity that said these
10 meetings should take place?
11     MR. ING: Objection to the form of the question.
12 Vague and ambiguous, lacks foundation.
13     A. No, I don't think so.
14 Q. Well, I guess what I'm trying to figure out is:
15 Why were these meetings of these various entities taking
16 place.
17     MR. ING: There's no question asked.
18     MR. REVERE: Question mark.
19     MR. ING: I don't understand the question.
20 BY MR. REVERE:
21 Q. You said that we had these meetings, and there's
22 Governor Ariyoshi, and there's hotel managers, and Mauna
23 Kea Properties would have these monthly meetings.
24     I'm wondering why would you have monthly
25 meetings?

Page 70

1    A.  For the resort.
2    Q.  For the whole resort, I see.
3        Do you know if the Robertsons were ever
4    encouraged by Mauna Kea Properties to contact the
5    Maintenance Department that you just referred to?
6    A.  I don't know.
7    Q.  Do you know of any letters that were sent to the
8    Robertsons about the availability of in-house landscaping?
9    A.  I don't know.
10   Q.  Do you know if any buyer at The Bluffs at Mauna
11   Kea was ever encouraged to seek landscaping in-house from
12   Mauna Kea?
13   A.  I don't know.
14   Q.  And are you aware of any letters that were sent
15   to any buyers about landscaping at Mauna Kea?
16   A.  I'm not.
17   Q.  Okay. Paragraph 3 of this Exhibit says, "Buyer
18   agrees that the landscaping credit shall remain
19   confidential and not be disclosed to any person, except to
20   buyer's legal tax or accounting advisors, to tax
21   authorities, or as otherwise required by law."
22       Do you see that paragraph?
23   A.  Yes, I do.
24   Q.  Why did Mauna Kea require that buyers keep these
25   landscape credits confidential?

Page 71

1    A.  I have no idea.
2    Q.  Do you know who it was that drafted this form?
3    A.  I don't know.
4    Q.  Do you know if Bettina Lum's law firm was
5    involved in drafting this form?
6    A.  Yes.
7    Q.  Were they involved?
8    A.  Yes, they were.
9    Q.  Did you ever have any discussions with anyone at
10   Ms. Lum's office about these confidential landscape
11   credits?
12   A.  No.
13       MR. ING:  I'll only allow him to answer yes or
14   no.
15       MR. REVERE:  Okay.  Done.  I think he said no.
16   BY MR. REVERE:
17   Q.  Do you know if Mr. Mielcke ever had any
18   discussions with anyone from Ms. Lum's law office about
19   confidential landscape credits?
20   A.  No, I don't know.
21   Q.  Do you know if Mr. Stiffler ever had any
22   conversations with anyone in Ms. Lum's law office about
23   confidential landscape credits?
24   A.  I don't know.
25   Q.  Is it true that -- let me back up.

Page 72

1    Mauna Kea Properties issued a price list for lots
2    that were for sale at The Bluffs at Mauna Kea, correct?
3    A.  Yes, I think so.
4    Q.  Is the reason that Mauna Kea wanted to keep
5    landscape and grading credits confidential is that it
6    didn't want to change the numbers on those price lists?
7    A.  I have no idea.
8        MR. ING:  Objection to the form of the question.
9    Vague and ambiguous.
10   BY MR. REVERE:
11   Q.  You have no idea?
12   A.  No.
13   Q.  Mr. Asari, if you could turn back to Page 106 of
14   your previous deposition.  On Line 19, you were asked the
15   question, "So the sales price would actually be, in terms
16   of what the buyer actually had to pay, it would be, in this
17   case, for instance, $500,000 less than the stated sales
18   price, correct?"
19       And your answer was, "That is correct."
20       So my question to you is:  Is that still your
21   testimony today?
22   A.  I have no idea.  I don't know.
23   Q.  As far as the power to say yes or no on a buyer's
24   offer for a piece of land, would that decision in 1999 have
25   been made by Mr. Mielcke?

Page 73

1    A.  And myself.
2        (Whereupon, a handwritten document was marked as
3    Exhibit 4 for Identification.)
4    Q.  All right.  Mr. Asari, what we've handed to you
5    as Exhibit 4 to this deposition was also an Exhibit 14 to
6    Ms. Kohler's deposition from a few weeks ago.  And I will
7    represent to you that these are some notes that she wrote.
8        And the first sentence here says, "We got hold of
9    Jap. executive.  They will go up to 15 percent discount."
10   And then the notes go on.
11       My question to you is:  If you recall if anyone
12   from Mauna Kea would ever discuss the amount of discounts
13   that would be given for properties at The Bluffs at Mauna
14   Kea with executives in Japan?
15   A.  I don't recall.
16   Q.  Okay.  Do you know if any buyer of property at
17   The Bluffs at Mauna Kea ever used Mauna Kea's own in-house
18   landscapers to do work on their lots?
19   A.  I don't know.
20       (Whereupon, a handwritten letter was marked as
21   Exhibit 5 for Identification.)
22   Q.  Mr. Asari, if you could just read over the
23   document that we've handed to you, which is Exhibit 5.
24       (Pause.)
25   Q.  Just let me know when you're done reading it.