# EXHIBIT

# K

# DEPOSITION OF WILLIAM MIELCKE TAKEN ON 04-29-05

*Page 1 to Page 185*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
## 1001 Bishop Street
## 2460 Pacific Tower
## Honolulu, HI  96813
## Phone:  (808) 524-2090
## FAX:  (808) 524-2596

### Page 1

(1) IN THE UNITED STATES DISTRICT COURT
(2) FOR THE DISTRICT OF HAWAII
(3) _____
(4) WESTERN SUNVIEW PROPERTIES, LLC;
(5) GUY HANDS; AND JULIA HANDS,
(6)         Plaintiffs,
(7)                    CIVIL NO. CV03-00463 DAE LEK
(8) IRWIN FEDERMAN; CONCEPCION S.    (Contract, Injunction; Other
(9) FEDERMAN; THE BLUFFS AT MAUNA KEA Non-Vehicle Tort; Declaratory
(10) COMMUNITY ASSOCIATION; MAUNA KEA Judgment, Other Civil Action)
(11) PROPERTIES, INC.; MAUNA KEA
(12) DEVELOPMENT CORP.; COUNTY OF
(13) HAWAII; JOHN DOES 1-100; JANE
(14) DOES 1-100; DOE PARTNERSHIPS
(15) 1-100 AND DOE CORPORATIONS 1-100,
(16)         Defendants.
(17) _____
(18)      DEPOSITION OF WILLIAM F. MIELCKE
(19)   Taken on behalf of the Plaintiffs at the office of
(20) Motooka Yamamoto & Revere, 1000 Bishop Street, Suite 801,
(21) Honolulu, Hawai'i, commencing at 9:08 a.m. on April 29th,
(22) 2005, pursuant to Third Amended Notice.
(23) BEFORE:    B. KANOELANI COCKETT
(24)         Certified Shorthand Reporter
(25)     HI CSR NO. 379, CA CSR NO. 7995

### Page 2

(1) APPEARANCES:
(2) For Plaintiffs:  TERRANCE M. REVERE, ESQ.
(3)         Motooka Yamamoto & Revere
(4)         1000 Bishop Street, Suite 801
(5)         Honolulu, Hawai'i 96813
(6)         and
(7)         CHAD P. LOVE, ESQ.
(8)         BARBARA J. KIRSCHENBAUM, ESQ.
(9)         Love & Narikiyo
(10)         1164 Bishop Street, Suite 1105
(11)         Honolulu, Hawai'i 96813
(12)
(13) For Defendants:  DOUGLAS ING, ESQ.
(14) MAUNA KEA        Watanabe Ing Kawashima & Komeiji
(15) PROPERTIES, INC.  999 Bishop Street, 23rd Floor
(16) and MAUNA KEA    Honolulu, Hawai'i 96813
(17) DEVELOPMENT CORP.
(18)
(19) For Defendants:  LEROY F. COLOMBE, ESQ.
(20) IRWIN FEDERMAN   Chun Kerr Dodd Beaman & Wong
(21) and CONCEPCION   Topa Financial Center
(22) S. FEDERMAN      Fort Street Tower
(23)         745 Fort Street, 9th Floor
(24)         Honolulu, Hawai'i 96813
(25)

### Page 3

(1) For Defendant:  GARY S. MIYAMOTO, ESQ.
(2) THE BLUFFS AT    Ayabe, Chong, Nishimoto, Sia & Nakamura
(3) MAUNA KEA       Pauahi Tower, Suite 2500
(4) COMMUNITY       1001 Bishop Street
(5) ASSOCIATION     Honolulu, Hawai'i 96813
(6)
(7) For Defendant:  JOSEPH KAMELAMELA, ESQ.
(8) COUNTY OF HAWAII  County of Hawai'i
(9)         Hilo Lagoon Center
(10)         101 Aupuni Street, Suite 325
(11)         Hilo, Hawai'i 96720
(12)         (Present via telephone)

                        -oOo-

### Page 4

(1)             I N D E X
(2) EXAMINATION BY:                          PAGE
(3) MR. REVERE                                7
(4) MR. MIYAMOTO                            173
(5) FURTHER EXAMINATION BY MR. REVERE       175
(6)       EXHIBITS FOR IDENTIFICATION
(7) PLAINTIFFS'                              PAGE
(8) 1   Design and Construction Requirements For   7
(9)     Homes dated February 19, 1997
(10) 2   A letter dated April 20, 2001 to Loriann   17
(11)     Gordon from William Mielcke
(12) 3   The Bluffs at Mauna Kea Sales Contract    34
(13)     for Sanford Robertson
(14) 4   A handwritten note dated 12-21-98         43
(15) 5   Addendum 1 to Sales Contract dated        57
(16)     February 1, 1999 for Sanford R. and Jeanne
(17)     Robertson
(18) 6   A handwritten letter to Jane Grisham from  58
(19)     Irwin Federman
(20) 7   Excerpted portions of the deposition of   64
(21)     William Mielcke taken on May 29, 2003
(22) 8   Declaration of William F. Mielcke         86
(23) 9   Bluffs at Mauna Kea price list            90
(24) 10  County Planning Department Final Plan     95
(25)     Approval

Page 45

(1) BY MR. REVERE:
(2) Q. Okay. Did any executives from Japan have to approve
(3) the sales prices?
(4) MR. ING: Object to the form of the question, vague
(5) and ambiguous.
(6) THE WITNESS: If -- approve the sales prices?
(7) BY MR. REVERE:
(8) Q. Let me give you a hypothetical. Let's say that
(9) there is a lot for sale at The Bluffs of Mauna Kea and it's
(10) listed for $3 million. An offer comes in for 2.5 million.
(11) You as the president of Mauna Kea Properties think, all right,
(12) that's a good deal let's sell it for that price.
(13) Did you have to go to anyone for approval, or could
(14) you just make that decision, yourself?
(15) A. If we had an offer, the offer would be brought to my
(16) office by Tom Stifler, our principle broker. He would review
(17) the offer with Mr. Asari and myself, and Mr. Asari would talk
(18) with whomever the other director was at that time, and we
(19) would then make a -- collectively make a decision as to
(20) whether we, we the members of the board of Mauna Kea
(21) Development Corp., were going to make a counteroffer or
(22) whether we were going to accept that offer or whether we were
(23) going to totally reject that offer.
(24) Q. Okay. And when you say Mr. Asari would talk to that
(25) other executive, that could be a Japanese national in Japan,

Page 46

(1) correct?
(2) MR. ING: No. Object to the form of the question.
(3) MR. REVERE: You can't answer for him.
(4) MR. ING: Misstates the witness' prior testimony.
(5) BY MR. REVERE:
(6) Q. Okay.
(7) A. Mr. Revere, I think what I said was talk to the
(8) other member of the Mauna Kea Development Corp. board of
(9) directors who, as I recall, was a Japanese national also; that
(10) it was the members of the Mauna Kea Development Corp. board of
(11) directors who made the decision as to whether to accept the
(12) offer, counter the offer, or reject the offer.
(13) Q. Okay. All right. And as you sit here today can you
(14) think of anyone who was on the MKP board other than yourself
(15) at any time?
(16) A. Now, you said "MKP". I want to be sure you mean
(17) Mauna Kea Properties.
(18) Q. I do, right.
(19) A. On the Mauna Kea Properties board, board of
(20) directors, was myself. And, again, I'd have to go back to the
(21) Department of Commerce and Consumer Affairs reporting on that
(22) because the officers and directors changed from -- with the
(23) various companies at different times, so I don't know --
(24) Q. Okay.
(25) A. -- who was on the board of directors on the Mauna

Page 47

(1) Kea Properties board of directors at that time.
(2) Q. Okay. At any time do you recall who any of them
(3) were at any time?
(4) A. Any of them were at any time?
(5) Q. Um-hum.
(6) A. Well, certainly Mr. Asari served on the board of
(7) Mauna Kea Properties. There were other directors as well, but
(8) I can't specifically remember who they were at this time.
(9) Q. Okay. What about the MKDC board?
(10) A. Same.
(11) Q. Okay. What happened to the money from sales at The
(12) Bluffs of Mauna Kea?
(13) MR. ING: Object to the form of the question, vague
(14) and ambiguous.
(15) THE WITNESS: Sorry, what happened to the money?
(16) BY MR. REVERE:
(17) Q. Yeah.
(18) A. From the sales?
(19) Q. Yeah.
(20) A. Well, it was deposited into our bank account and
(21) used to pay the ongoing operations of Mauna Kea Properties,
(22) Mauna Kea Development Corp. and -- to the best of my
(23) knowledge.
(24) Q. Okay. And where was the bank account that you refer
(25) to, with what bank?

Page 48

(1) A. It was either with First Hawaiian or Bank of
(2) Hawai'i, one or the other, because that changed from time to
(3) time, too.
(4) Q. Okay. And do you know if any of the money from the
(5) sales of lots at The Bluffs of Mauna Kea made its way back to
(6) any of the parent companies for Mauna Kea Properties or Mauna
(7) Kea Development Corp.?
(8) A. Not to my knowledge, Mr. Revere. We were fighting
(9) to keep our heads above water.
(10) Q. Okay. Did you ever have to make any -- as president
(11) of Mauna Kea Properties, did you ever have to make any reports
(12) as to how sales at The Bluffs were going to anyone in any of
(13) the parent companies for Mauna Kea Properties?
(14) A. No. We had an annual sale -- not annual. We had a
(15) regular sales report that was prepared by Tom Stifler, and
(16) that got circulated to others, and without looking at one of
(17) those reports and seeing who the copies were, I can't tell
(18) you.
(19) Q. Okay. Do you recall individuals that you were in
(20) contact with in any of Mauna Kea's parent companies about The
(21) Bluffs of Mauna Kea?
(22) A. Mauna Kea's parent companies?
(23) Q. Yes.
(24) A. If you would show me an organization chart I --
(25) Q. Why don't you tell me an organizational chart.

Page 49

(1) A. I can't because it changed from -- there were
(2) organizations and there were reorganizations, so you'd have to
(3) show me which -- at what time frame on the organization chart
(4) and then maybe I could answer your question, but --
(5) Q. Okay.
(6) A. -- off the top of my head, I can't answer your
(7) question.
(8) Q. Okay. In 1999 can you give me the organizational
(9) chart for Mauna Kea Properties? What company was on top of
(10) it?
(11) A. Can't remember.
(12) Q. Okay. Same thing for 2000?
(13) A. 2000, '98, '97, '96.
(14) Q. Okay.
(15) A. I'm not trying to be sarcastic. I mean, I really
(16) just can't remember.
(17) Q. Okay. So is there any individual or individuals
(18) that you would communicate with from Japan about activities at
(19) The Bluffs of Mauna Kea?
(20)     MR. ING: Object.
(21) BY MR. REVERE:
(22) Q. Or would everything be done through Mr. Asari?
(23)     MR. ING: Object to the form of the question, vague
(24) and ambiguous.
(25)     THE WITNESS: Mr. Revere, Mr. Asari and I worked

Page 50

(1) together on a day-to-day basis. I did not call Japan. I
(2) don't speak Japanese. I wouldn't know who to call, although
(3) I've met a number of people from Japan who have visited the
(4) project, but I never talked to anybody about Mauna Kea
(5) Properties.
(6) BY MR. REVERE:
(7) Q. Okay. When did you first hear of the phrase "a
(8) landscaping credit"?
(9) A. Around the beginning of the sales of The Bluffs
(10) project, probably with the Hoffee and Gifford sales.
(11) Q. Okay. And who first -- how did you first -- did you
(12) first hear the phrase orally, or was it something that was
(13) written to you in a memo, or was it something that you came up
(14) with?
(15) A. I think the recommendation for landscape credits was
(16) brought to Mr. Asari and me by Tom Stifler.
(17) Q. Okay. So it's your testimony that the idea of using
(18) landscape credits was Tom Stifler's?
(19) A. Yes.
(20) Q. Okay. Now, and Mr. Stifler was the principle broker
(21) for Mauna Kea Realty?
(22) A. Yes.
(23) Q. And Mauna Kea Realty is -- basically it's just a dba
(24) of Mauna Kea Properties; is that correct?
(25) A. That's correct.

Page 51

(1) Q. Okay. And you have a real estate license, or you
(2) had a real estate license at least in 1999, correct?
(3) A. I have, I still have a real estate license,
(4) inactive.
(5) Q. Okay. And I believe from one of your earlier
(6) depositions you testified that you had your license under Mr.
(7) Stifler; is that correct?
(8) A. Well, that's the way it works. He's the principle
(9) broker. I'm just a realtor associate license and it was hung
(10) with our office, that's correct.
(11) Q. Okay. So you were Mr. Stifler's boss, but your real
(12) estate license technically was under his; is that fair to say?
(13) A. Mr. Stifler reported to me. If I were engaged in
(14) the actual sale of real estate I would have reported to him.
(15) Q. Okay. And do you recall the first time that Mr.
(16) Stifler mentioned the idea of landscape credits? Was it
(17) something that was mentioned to you orally, or was it a memo
(18) that he wrote, or was it communicated in other ways?
(19) A. As I recall, it was orally presented to Mr. Asari
(20) and myself.
(21) Q. Okay. And could you tell me about that discussion,
(22) what was said?
(23) A. At this point not really. I mean, we were launching
(24) the sales of the Bluffs. We wanted to get the project up and
(25) running, accelerate the sales, if you will, and then -- and

Page 52

(1) Tom felt in evaluating the market and where it was at that
(2) time that we should incentivise certain of the buyers, and he
(3) recommended the use of landscape credits as a way of providing
(4) that incentive for closing on sales.
(5) Q. Okay. And what were the landscape credits?
(6) A. I'm sorry, what were the landscape credits?
(7) Q. Yeah.
(8) A. The landscape, it was a credit for closing. It was
(9) a credit that was given at closing for what we thought would
(10) be used to offset the cost of landscaping, grading the lots.
(11) Q. Okay. The lots at The Bluffs at Mauna Kea were
(12) already graded before sales were made; is that correct?
(13) A. Yes, they were.
(14) Q. Okay. And all the lots at The Bluffs at Mauna Kea,
(15) except for perhaps the two model units, all needed
(16) landscaping, correct?
(17) A. They all needed grading and landscaping.
(18) Q. Okay.
(19) A. And the landscaping was an important part of how
(20) ultimately the project would look when it was finished, the
(21) landscape elements.
(22) Q. Okay. And there was no requirement that from
(23) anybody who received a landscape credit, none of them were
(24) required to spend the amount of credit on landscaping,
(25) correct?

### Page 53

(1) MR. ING: Well, object to the form of the question,
(2) vague and ambiguous.
(3) THE WITNESS: By "requirement" do you mean that
(4) there was some additional agreement that said, "Okay. We're
(5) giving you a credit for X amount of money, and you have to
(6) spend that on landscaping or we get -- something awful happens
(7) and ten lawyers are going to be screaming," no, there was no
(8) requirement.
(9) However, I would hasten to say that the cost of
(10) landscaping and grading, which normally includes rock walls
(11) and other features in landscape, bushes, usually exceeded the
(12) amount of the landscape and grading for the house.
(13) BY MR. REVERE:
(14) Q. Okay. When Mr. Stifler presented this idea to you,
(15) did he mention that it would be kept confidential so that
(16) subsequent buyers wouldn't know about these credits?
(17) A. As I recall, the recommendation was that the
(18) landscape credit should be -- Tom's recommendation was he
(19) wanted to project the sale, the list sales prices, and the
(20) recommendation was that the landscape credit be covered by a
(21) confidentiality agreement.
(22) Q. Okay. And by "protect" the list sales prices, what
(23) that meant was that Mr. Stifler wanted -- and his salespeople,
(24) I guess, he wanted -- well, let me back up.
(25) That Mr. Stifler wanted to be able to represent to

### Page 54

(1) subsequent purchasers, "Hey, we got our list price for these
(2) other lots that were already sold," correct?
(3) MR. ING: Object to the form of the question, calls
(4) for speculation.
(5) MR. COLOMBE: Join.
(6) THE WITNESS: (Witness shakes head.) I think that
(7) he wanted to represent that these are our list prices. These
(8) are the sales prices.
(9) BY MR. REVERE:
(10) Q. Yeah, the list prices were the actual sales prices?
(11) MR. ING: Object to the form of the question.
(12) THE WITNESS: I don't think I said that. And if I
(13) did say that, I think that we -- we had a sales price --
(14) BY MR. REVERE:
(15) Q. Um-hum.
(16) A. -- list, and this was our sales price list, and Tom
(17) wanted to maintain the sales price list.
(18) Q. And do you recall seeing that sales price list
(19) before?
(20) A. Sure.
(21) Q. And do you recall that at certain occasions after
(22) lots were sold that there would be a stamp put on that would
(23) say "sold" on that sales price list?
(24) A. If you show me one, I could take a look at it, be
(25) more than happy to take a look at it.

### Page 55

(1) Q. Okay. Well, isn't it fair to say that basically
(2) what Mr. Stifler wanted to do was to cause subsequent
(3) purchasers to believe, "Hey, Mauna Kea got their sales, their
(4) list price for these earlier lots that they sold"?
(5) A. I think you'd have to ask Mr. Stifler that.
(6) Q. Okay. Wasn't that the impression that you got as to
(7) what he was trying to do?
(8) A. I think Mr. Stifler wanted to maintain the original
(9) sales prices, and in a market that we were hopeful of would
(10) improve, and we'd been through a really difficult period of
(11) time. The goal was to try to accelerate the sales of The
(12) Bluffs. We wanted to provide buyers with an incentive to
(13) close, and as we moved forward with the project and sales
(14) progressed, our goal was hopefully to be able to sell those
(15) lots for the sales prices that were listed, or more.
(16) Q. Okay. In your answer you used the word "maintain"
(17) the -- you used the phrase "maintain the sales."
(18) What do you mean by the word "maintain"?
(19) A. The printed, the printed sales, and if we had one
(20) around I could look at it. We had a printed sales. It was
(21) that handout.
(22) Q. You wanted to maintain that printed sales list
(23) handout?
(24) A. Yes.
(25) Q. Okay. When did you get your real estate license?

### Page 56

(1) A. I don't know.
(2) Q. More than ten years ago?
(3) A. A long time ago.
(4) Q. Okay. All right. Have you ever heard of the phrase
(5) "comparables" before?
(6) A. Comparables?
(7) Q. Yeah.
(8) A. Yes.
(9) Q. What's the word "comparables" mean to you?
(10) A. Usually used by appraisers when they are looking at
(11) other pieces of property for appraisal purposes.
(12) Q. And basically similar properties to determine the
(13) value of the property in question?
(14) A. Generally speaking.
(15) Q. Okay. Did Mr. Stifler -- do you know if Mr. Stifler
(16) ever sought legal advice as to whether his plan for the
(17) landscape credit, using landscape credits was legal or not?
(18) A. The matter was discussed with Bettina Lum at Price
(19) Okimoto Himeno & Lum. Ms. Lum also drafted the
(20) confidentiality agreement.
(21) Q. Okay. So is it your testimony that Ms. Lum approved
(22) of the use of these landscape credits?
(23) MR. ING: Object to the form of the question,
(24) misstates the witness' testimony.
(25) THE WITNESS: This matter was discussed with Ms.

Page 57

(1) Lum. She had full knowledge of the landscape credits. It was
(2) she who drafted the confidentiality agreement.
(3) Did Mr. Stifler or I ask for a written legal opinion
(4) on that, no.
(5) BY MR. REVERE:
(6) Q. Oh, okay. All right. Let me show you the next
(7) exhibit here.
(8)         (Plaintiffs' Exhibit No. 5
(9)         was marked for identification.)
(10) BY MR. REVERE:
(11) Q. Mr. Mielcke, what we've marked as Exhibit 5 appears
(12) to be Addendum 1 to the Sales Contract for the Robertsons, and
(13) is that your signature under "Mauna Kea Development Corp."?
(14) A. Yes.
(15) Q. Okay. And do you rec --
(16) A. On the first line?
(17) Q. Yeah, right, sorry, under where it says "its
(18) secretary"?
(19) A. Yes.
(20) Q. Okay. And does this appear to be Addendum 1 to the
(21) Robertsons' sales contract?
(22) A. Well, I don't know whether it's Addendum 1 or
(23) Addendum L or Addendum I or what, but it appears to be an
(24) addendum to the sales contract, yes.
(25) Q. Okay. So is it your testimony that it was Bettina

Page 58

(1) Lum that drafted up this form?
(2) A. As I recall, yes.
(3) Q. Okay. All righty. I don't have any further
(4) questions on that.
(5)         (Plaintiffs' Exhibit No. 6
(6)         was marked for identification.)
(7) BY MR. REVERE:
(8) Q. If you could read this over, Mr. Mielcke, and let me
(9) know when you're done.
(10) A. (Witness complies.) Okay.
(11) Q. Okay. Have you ever seen this document before?
(12) A. I may have. I don't specifically remember it, but I
(13) may have.
(14) Q. Okay. Well, I'll represent to you that this is a
(15) letter that was written by Irwin Federman, who is a party to
(16) this case, and in the middle of his second paragraph there is
(17) a sentence that -- well, the middle paragraph reads as
(18) follows: "The listing price was $3 million, which we
(19) negotiated down to 2.550" -- 2.55 "million," and just stopping
(20) after that first sentence, do you recall if you were involved
(21) in the negotiations over the sales price of the Federman lot?
(22) A. I'd have to go back and look at the Federmans' sales
(23) contract, and I don't remember the exact date of the Federman
(24) contract, but if you show me the contract, I'd be happy to
(25) take a look at it.

Page 59

(1) Q. Okay. Independent of reviewing the contract, you
(2) don't have any recollection about the negotiations with the
(3) Federmans?
(4) A. I don't think I've ever met the Federmans.
(5) Q. Okay. And I'm not saying that you directly spoke
(6) with them, but you might have been talking with Cha Cha
(7) Kohler.
(8) Do you recall any discussions with Ms. Kohler about
(9) the Federman sale?
(10) A. Normally I wouldn't check with the individual
(11) realtors, Mr. Revere, when an offer came in.
(12) And we're talking about offer and acceptance now?
(13) Q. Um-hum.
(14) A. I mean, real estate is based on offer and
(15) acceptance.
(16) Q. Um-hum.
(17) A. When an offer came in or one of our realtors had an
(18) offer on for a lot, that offer would go to Tom Stifler. Tom
(19) would then bring the offer to Mr. Asari and myself, and we
(20) would discuss, we would discuss that offer, and usually Tom
(21) would have a recommendation, and Mr. Asari would discuss that
(22) with the other member of the board and we would make a -- we
(23) would come to a consensus as to whether we were going to
(24) counter the offer or whether we were going to reject the offer
(25) or whether we were going to accept the offer. And that's the

Page 60

(1) way it worked.
(2) Q. Okay. And do you recall -- thank you for the
(3) answer.
(4) Based on that process you have just described, do
(5) you recall any of that in regard to the Federman sale?
(6) A. Not specifically.
(7) Q. Okay. All right. The next sentence reads, "The
(8) discount is reflected on the statement as a landscaping credit
(9) of $450,000."
(10) Do you see that sentence?
(11) A. I do.
(12) Q. Okay. Do you believe that sentence is accurate with
(13) regard to what the landscaping credit really was?
(14) A. Well --
(15) MR. ING: I'm sorry, what's the question?
(16) THE WITNESS: What's the question?
(17) BY MR. REVERE:
(18) Q. Mr. Federman writes, "The discount was reflected on
(19) the statement as a 'landscaping credit' of $450,000," and so
(20) my question to you is: Is that basically accurate, that the
(21) landscaping credit was basically a discount?
(22) MR. ING: Object to the form of the question, vague
(23) and ambiguous, misstates the witness' prior testimony.
(24) THE WITNESS: It was a closing credit that was
(25) provided to the buyer to accelerate our sales at The Bluffs.

### Page 69

(1) and ambiguous and overly broad.
(2) THE WITNESS: Yeah, I don't know how the
(3) instructions went to Title Guaranty.
(4) BY MR. REVERE:
(5) Q. Okay. Do you know how Title Guaranty would know
(6) what to do absent information coming from Mauna Kea Realty?
(7) A. We had a contract with Title Guaranty Escrow for
(8) this project, and Tom would take the executed contract and
(9) whatever the monies to be deposited with the contract to Title
(10) Guaranty Escrow. I didn't meet with Title Guaranty at all. I
(11) may have dropped a contract off on my way home one night, but
(12) I really never talked with them about it.
(13) Q. Okay. All right. The next sentence reads, quote:
(14) "Would that landscape credit show? Answer: As I recall, the
(15) conveyance indicated the gross selling price, in Robertsons'
(16) case of 3.5 million."
(17) Do you see that?
(18) A. Would the landscape credit -- conveyance -- I'm
(19) sorry. "Would the landscape credit show? As I recall, the
(20) conveyance indicated the gross selling price."
(21) I don't know. I'd have to look at -- my answer
(22) today would be I would really want to look at the closing
(23) statement to see just exactly what it did say.
(24) Q. Okay. And the next question on page 80, line 20 of
(25) your former testimony was, quote: "So if I was the next

### Page 70

(1) purchaser in line and I wanted to see what the last guy paid
(2) and I went down to the public records and looked, I would just
(3) see the listed price, I wouldn't see the actual price the
(4) purchaser paid if he got a landscape credit?"
(5) MR. ING: I'm going to -- okay. As that question is
(6) read I'm going to object to the form of the question because
(7) it assumes that a listed price would show.
(8) MR. REVERE: Okay.
(9) MR. ING: It assumes that a price would show.
(10) BY MR. REVERE:
(11) Q. Okay. Going on in the answer is, quote: "Might not
(12) because they were also covered by a confidentiality
(13) agreement."
(14) Do you see that?
(15) A. Yes.
(16) Q. Okay. So would your response that I just read be
(17) the same to that question that I just read?
(18) A. "So if I was the next purchaser in line, wanted to
(19) see what the last guy paid and went down to the public records
(20) and looked, I would just see"...well, he'd see the price that
(21) was reported.
(22) Q. Okay. The next question begins: "The landscape
(23) credit part?" And the answer is: "Yeah, between the buyer
(24) and seller."
(25) Do you see that?

### Page 71

(1) A. Yes.
(2) Q. But that would still be your testimony today?
(3) MR. COLOMBE: Objection, vague and ambiguous.
(4) MR. ING: Let me -- yeah, let me object to the form
(5) of the question because it's difficult here to tell that there
(6) is a question asked.
(7) THE WITNESS: I --
(8) MR. ING: Question beginning at page 81, line 2 of
(9) Exhibit 7 is not a question. There's no question asked.
(10) MR. REVERE: It got a question mark.
(11) Q. Anyway, Mr. Mielcke, we'll forget about that one.
(12) That's not earth shattering.
(13) A. Okay.
(14) Q. Now, the next question on line 4 begins, quote:
(15) "But the listed selling price would not be covered by that
(16) confidentiality agreement? Answer: No, that was public
(17) record."
(18) Do you see that?
(19) A. The listed selling price would not be covered by
(20) confidentiality agreement?
(21) Q. (Attorney nods head.)
(22) A. The listed -- listed in where?
(23) Q. Well, let me back up.
(24) Do you recall giving that response to that question,
(25) first of all?

### Page 72

(1) A. I mean, it's there.
(2) Q. Okay. So would your testimony be different today if
(3) you were asked that question?
(4) A. I mean, I'd have to go back, and really the context
(5) if you're asking it was that my answer in this particular
(6) case, obviously it was. I mean, this is the deposition. I'm
(7) assuming that it's an accurate copy of the deposition at that
(8) time.
(9) Would I answer it that way today, I don't know.
(10) Q. Okay. On page 81, line 7 you were asked this
(11) question, quote: "When you say Mr. Stifler wanted to do this
(12) to maintain the integrity of the price, it was so you could
(13) tell the next purchaser that, hey, the selling price is the
(14) listing price, correct? Answer: Correct."
(15) A. That's obviously what I said.
(16) Q. Okay. And would you answer that the same way today?
(17) A. I would probably answer that it was the intent to
(18) maintain the integrity of the sales price list, yes, the
(19) sticker price, if you will.
(20) Q. Okay. And so the part of -- so you would change
(21) your testimony? You would not agree with the second half of
(22) Mr. Greeley's sentence where he says, "It was so you could
(23) tell the next purchaser that, hey, the selling price is the
(24) listing price, correct?"
(25) A. I don't think I would say that.

Page 85

1  THE WITNESS: No. There is a 40-foot -- from the
2  shoreline there is a 40-foot area.
3  BY MR. REVERE:
4     Q. Um-hum.
5     A. And within the 40-foot area is the ability to
6  traverse that -- traverse that area. Now, I can't change the
7  40-foot, and inside the 40-foot some places were dangerous
8  because they were out too far on the rocks. Other places went
9  beyond the 40-foot into the lot. The spirit and intent was to
10 have the ability to within the 40 feet to be able to traverse
11 the shoreline.
12    Q. Okay. All right. But do you recall allowing owners
13 to physically move what was then the existing trail?
14    MR. COLOMBE: Objection, asked and answered.
15    THE WITNESS: I really -- you know, first of all, I
16 don't know what trail you're talking about, really. I mean,
17 the trail as a result of the settlement is, to the best my
18 knowledge, just exactly how I described it to you. It is a
19 six feet within the forty feet, forty-foot setback, and over
20 the years and since then trees fall. God, we had a wind storm
21 at Mauna Kea where we had over four hundred trees blow down,
22 and when the trees blew down, people started going in
23 different places. Trail? Was that part of the trail or what
24 was part of the trail? You know, I don't know. The intent
25 was that the shoreline trail, the shoreline trail was within

Page 86

1  the 40-foot setback area.
2     MR. REVERE: Okay.
3         (Plaintiffs' Exhibit No. 8
4          was marked for identification.)
5         (The document was reviewed.)
6  BY MR. REVERE:
7     Q. Mr. Mielcke, did you have a chance to read over
8  Exhibit 8?
9     A. Yes.
10    Q. Okay. Is this your signature on the second page of
11 this dated 12-5-03?
12    A. Yes, it is.
13    Q. Okay. And this was a Declaration that was prepared
14 by Mauna Kea's attorneys for you, correct?
15    A. Geez, as I recall, yes.
16    Q. Okay. Let's go back to the -- well --
17    MR. ING: Let me object to that form of the
18 question.
19    MR. REVERE: Okay.
20    MR. ING: The document might have been typed up by
21 my law office, but it was at the request of Mr. Revere.
22    MR. REVERE: Well, it's not my testimony, but I'll
23 object to that.
24    Q. But in any event, going to paragraph 8 it says, "I
25 have no personal knowledge as to what was approved or not

Page 87

1  approved by the design committee after I resigned from the
2  committee."
3     Do you see that?
4     A. Yes.
5     Q. Okay. Is that true?
6     A. I really haven't got the faintest idea.
7     Q. What was approved after you left?
8     A. I -- no, once I left I haven't looked at another set
9  of plans for The Bluffs.
10    Q. Okay.
11    A. And hope to never look at another set of plans for
12 The Bluffs.
13    Q. Okay. Going through, you had a chance to review
14 this, are all the statements that are contained in this
15 declaration true and accurate?
16    MR. ING: Let me object to the form of the question.
17 This is a form of a declaration, number one, but it refers to
18 many different documents which are not before Mr. Mielcke at
19 this time.
20    THE WITNESS: I did see here in No. 6, "We did not
21 view Lot 6 from Lot 5 to the south." That would not have been
22 my -- either Lisa or my normal practice. Normally we would
23 have looked at the lot from the north, from the south, from
24 the mauka side looking makai, and from makai looking back, and
25 usually walked, walked around the lot and walked entirely

Page 88

1  around the lot.
2  BY MR. REVERE:
3     Q. Okay.
4     A. And through the lot.
5     Q. Let's go to paragraph 4 here. Paragraph 4 says, "At
6  no time while I was a member of the design review committee
7  did the committee give final approval to the Federmans, owners
8  of Lot 6, at the Bluffs the Mauna Kea, to build a pool or
9  other structures in the special setback area of that lot."
10    Is that statement true?
11    A. I don't recall ever signing an approval for the
12 Federman's lot.
13    Q. Okay. Do you know why Mr. Stifler stopped working
14 with Mauna Kea Realty?
15    A. Why he stopped working for Mauna Kea Realty, we had
16 probably reached a point in the sale of the mauka projects
17 where -- "mauka" meaning the uplands projects, where for the
18 most part we were sold out. We did not have any new projects
19 coming on.
20    Tom had always expressed a desire to relocate back
21 to the mainland. His wife was ill, and as a matter of fact, I
22 think has passed away. His son was tragically killed in an
23 accident, an innocent, in fact victim, in a shooting on the
24 mainland. And there was also an issue of a claim of sexual
25 harassment, and I think it was kind of a combination of all of

### Page 89

(1) those things that was just he felt it was just time to move
(2) on.
(3) Q. Okay. Was he -- did he -- was he asked to resign,
(4) or was he fired, or did he just voluntarily say, "You know,
(5) I'd like to leave"?
(6) A. I don't remember the circumstances right now. I'd
(7) have to go back and look at his personnel records.
(8) Q. Okay. Are you aware of any bad blood between Mr.
(9) Stifler and Mauna Kea Properties?
(10) MR. ING: Object to the form of the question, vague
(11) and ambiguous.
(12) THE WITNESS: Bad blood. The sexual harassment
(13) issue, which was resolved, I think Tom may have felt that we
(14) should have taken a more vigorous stand in his defense. I
(15) mean, clearly it was very disturbing to him, and to us, and to
(16) me, but I don't know whether it's bad -- was it bad blood? I
(17) mean, I saw him a number of times after he left and before he
(18) left for the mainland, and didn't appear to be any animosity.
(19) BY MR. REVERE:
(20) Q. Okay. Do you think that Mr. Stifler would not tell
(21) the truth under oath in order to make Mauna Kea look bad?
(22) MR. ING: Object to the form of the question, calls
(23) for speculation.
(24) THE WITNESS: I don't know how he would react, Mr.
(25) Revere, I really don't know. I don't know the circumstances

### Page 90

(1) of his life today. I don't know.
(2) MR. REVERE: Okay. Let's see what time is it? You
(3) guys want to take a break now for lunch, maybe come back at
(4) 1:00?
(5) MR. ING: Okay. That's a convenient place to stop.
(6) MR. REVERE: Okay.
(7) (Off-the-record discussion was held.)
(8) (Lunch recess was taken from 11:44 to 1:05 p.m.)
(9) (Whereupon Mr. Love and Ms. Kirschenbaum
(10) joined the deposition.)
(11) (Plaintiffs' Exhibit No. 9
(12) was marked for identification.)
(13) MR. REVERE: All right. We're going to go back on
(14) the record now, okay, Mr. Mielcke?
(15) THE WITNESS: Yes.
(16) BY MR. REVERE:
(17) Q. During the break we marked as Exhibit 9 a document
(18) that appears to be described as the Bluffs at Mauna Kea Price
(19) List.
(20) Do you see that document before you?
(21) A. I do.
(22) Q. Okay. Earlier in your testimony this morning you
(23) were referring to a price list.
(24) Is this an example of a price list that would be
(25) published by Mauna Kea Realty?

### Page 91

(1) MR. ING: Object to the form of the question, vague
(2) and ambiguous to what you mean by "publish".
(3) You may answer.
(4) BY MR. REVERE:
(5) Q. Printed out and handed out to people?
(6) A. This appears to be -- I think it was an insert in
(7) the marketing brochure for The Bluffs.
(8) Q. Okay. So this price list would be sent out to
(9) prospective purchasers at The Bluffs, correct?
(10) A. Could have been.
(11) Q. Okay. Well, does this form of this document look
(12) familiar to you?
(13) A. It's been a long time since I looked at that, but I
(14) think that this was the insert into the brochure.
(15) Q. Okay. And was this the price list that you were
(16) describing earlier that Mr. Stifler wanted to maintain a price
(17) list?
(18) A. That's correct.
(19) Q. Okay. And you see on the left side of this document
(20) there appears to be a stamp that's stamped "sold" on some
(21) lots?
(22) A. Yes.
(23) Q. Was that intended to indicate to purchasers that
(24) those lots, the lots in question, were sold for the amount
(25) listed?

### Page 92

(1) MR. COLOMBE: Objection.
(2) MR. ING: Objection to the form of the question,
(3) vague and ambiguous.
(4) MR. COLOMBE: Join, also lack of foundation.
(5) THE WITNESS: I don't know how this "sold" got on
(6) here. Don't know anything about it.
(7) BY MR. REVERE:
(8) Q. Okay. As far as printing materials like this, would
(9) that be something that would be Mr. Stifler's responsibility,
(10) yours, or somebody else's?
(11) (Whereupon Mr. Love and Ms. Kirschenbaum
(12) left the deposition.)
(13) THE WITNESS: Both Tom and I worked with Peck, Sims
(14) Mueller on the preparation of these marketing materials.
(15) BY MR. REVERE:
(16) Q. Okay. I'm sorry, I didn't catch that name you
(17) worked with.
(18) Who?
(19) A. Peck, Sims, Mueller, an advertising and public
(20) relations firm. They are no longer in business.
(21) Q. Okay. Were they a Hawai'i-based or mainland?
(22) A. A Hawai'i-based.
(23) Q. In Honolulu?
(24) A. In Honolulu.
(25) Q. Okay. All right. Do you recall who the particular

Page 121

(1) sentence reads, "The top of the pavilion would then be about
(2) level with the natural hillside rise on the property's north
(3) end and not impact Reddy's views."
(4)     Do you see that?
(5) A. I do.
(6) Q. Again, does that refresh your recollection that the
(7) concern that the committee was dealing with was the Reddys'
(8) views?
(9)     MR. ING: Object to the form of the question, vague
(10) and ambiguous.
(11)     THE WITNESS: It doesn't ring a bell with me.
(12) BY MR. REVERE:
(13) Q. Okay.
(14) A. But obviously from the letter there is reference to
(15) the Reddys on Lot 7. That's clearly in the letter.
(16) Q. Okay. The last sentence reads, "Federman is not
(17) willing to consider an entire redesign of their home, pulling
(18) it back to place pool or pavilions makai of sewer easement and
(19) special setback area as they are 'too far along and already
(20) had approval'".
(21) A. Um-hum.
(22) Q. Do you see that?
(23) A. I do.
(24) Q. But at this time, this is written in May of 2001,
(25) you already wrote them about the controversy involving

Page 122

(1) building the setback back in October of 2000, correct?
(2) A. Well, if you show me the letter.
(3) Q. Well, it was from a few exhibits ago.
(4) A. Which letter are you referring to, which exhibit?
(5) Q. This would be Exhibit 15.
(6) A. Exhibit 15?
(7) Q. Yes.
(8) A. The Jim Bell letter?
(9) Q. Yes.
(10) A. Mr. Bell had written to them, yes.
(11) Q. All right. So, and again, as you sit here today
(12) you're not aware of anything that would prevent the Federmans
(13) from simply building everything that they wanted to build back
(14) outside of the special setback area, correct?
(15)     MR. COLOMBE: Objection, asked and answered,
(16) misstates his prior testimony.
(17)     MR. ING: Join in the objection.
(18)     THE WITNESS: I mean, you're asking me about things
(19) that happened a long time ago. I have no recollection of
(20) this, and I'm sorry, I just can't shed any light on it.
(21) BY MR. REVERE:
(22) Q. Okay. Were you involved in speaking -- did you ever
(23) speak with any prospective purchaser at The Bluffs at Mauna
(24) Kea before they purchased their property?
(25)     MR. ING: Object to the form of the question, asked

Page 123

(1) and answered.
(2)     THE WITNESS: I recall meeting Mr. Hoffee on a
(3) number of occasions prior to his purchasing of property at
(4) Mauna Kea. You know, at the annual homeowners association
(5) meeting I would meet some of these people, but, you know, I
(6) couldn't relate a name and really a name and a face.
(7) BY MR. REVERE:
(8) Q. Okay. Do you recall if you ever had any discussions
(9) with Mr. Hoffee about landscaping or grading credits?
(10) A. Me, personally?
(11) Q. Yeah.
(12) A. I think that matter was handled through Mr. Hoffee's
(13) realtor, Steve Horwitz, and I did not speak directly with John
(14) about that. He was represented by C&H Realty.
(15) Q. Okay. And did you speak with C&H Realty about the
(16) landscape credits?
(17) A. Can't recall the conversations, but Steve Horwitz
(18) chose to bring in the offer, himself, with Tom Stifler. I
(19) guess the reason that I remember it was -- it was, you know,
(20) one of our first, first sales, and it was the consolidation
(21) and subdivision issue that needed to be addressed, so I
(22) remember Steve coming into the office. I don't remember
(23) whether we talked about the landscape credit or not, but I do
(24) remember him bringing in the offer.
(25) Q. Okay. Do you remember if Mr. Hoffee or his realtor

Page 124

(1) ever asked any questions about, you know, why a landscape
(2) credit was being issued and why it was required to be kept
(3) confidential?
(4) A. I do not.
(5) Q. All right. I know you had your realtor's license at
(6) Mauna Kea Realty.
(7)     Did you ever get a commission from any sales?
(8) A. I did not.
(9) Q. All right.
(10) A. Would have been nice.
(11) Q. Was it your understanding that the commissions Mauna
(12) Kea realtors received would be based upon the actual price,
(13) not the actual price plus the landscape credit?
(14)     MR. ING: Object to the form of the question, vague
(15) and ambiguous, misstates the witness' earlier testimony.
(16)     THE WITNESS: The commission was based on the net
(17) sales price.
(18) BY MR. REVERE:
(19) Q. Okay. So the commission would not include any part
(20) of this landscape credit, correct?
(21) A. The net sales price.
(22) Q. Okay. All right. What do you mean by the phrase
(23) "net sales price"?
(24) A. If the sale were ten dollars and the landscape
(25) credit was two dollars, the commission would be based on eight