# EXHIBIT

# L

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

WESTERN SUNVIEW PROPERTIES, LLC,    )    Civil No.
et al.,                             )    CV03-00463DAE/LEK
                                    )
            Plaintiffs,             )
                                    )
      vs.                           )
                                    )
IRWIN FEDERMAN, et al.,             )
                                    )
            Defendants.             )
_____    )

DEPOSITION OF JANET LUM WON

taken on behalf of Plaintiffs at Title Guaranty Escrow

Services, Inc., 75-170 Hualalai Road, Suite C310,

Kailua-Kona, Hawaii  96740, commencing at 10:10 a.m.

on December 1, 2005, by telephone conference, pursuant

to notice.

TAKEN BEFORE:        M. SHARON SOUZA, CSR NO. 184

                     Notary Public, State of Hawaii

        PACIFIC REPORTING SERVICES UNLIMITED

           733 Bishop Street, Suite 1470

           Honolulu, Hawaii  96813

              (808) 524-PRSU

Page 2

1  APPEARANCES:
2  For Plaintiff       TERRANCE M. REVERE, ESQ.
                       1000 Bishop Street, Suite 801
3                      Honolulu, Hawaii  96813
4
   For Defendants      J. DOUGLAS ING, ESQ.
5  Mauna Kea           999 Bishop Street, 23rd Floor
   Properties, Inc.,   Honolulu, Hawaii  96813
6  and Mauna Kea
   Development Corp.
7
   For the witness:    LORRIN HIRANO, ESQ.
8                      Title Guaranty Escrow Services
                       235 Queen Street
9                      Honolulu, Hawaii  96813
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2
3  EXAMINATION BY:                    PAGE NUMBER
4
5  Mr. Revere                   4
6
7
8
9
10  EXHIBITS FOR IDENTIFICATION:
11
12
13        None
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  THURSDAY, DECEMBER 1, 2005          10:10 A.M.
2       (The Reporter's Disclosure Statement was
3  made available to all counsel prior to the
4  commencement of the following proceedings.)
5           JANET LUM WON
6  called as a witness by and on behalf of the
7  Plaintiffs, having been first duly sworn, was examined
8  and testified as follows:
9           EXAMINATION
10 BY MR. REVERE:
11 Q.    Okay.  We'll be right back, I've just got to
12 grab one document.
13     MR. ING:  Before you start questioning, I have
14 some objections to put on the record.
15     This is Douglas Ing, and I'm the attorney for
16 Mauna Kea Properties and Mauna Kea Development Corp
17 and I'm attempting to --
18     THE COURT REPORTER:  You'll have to speak up.
19 Mr. Ing.
20     MR. ING:  I'm the attorney for Mauna Kea
21 Properties and Mauna Kea Development, Corp.  And I'm
22 objecting to the notice and to the form of this
23 deposition.  First, it was my understanding pursuant
24 to an agreement with Chad Love, who is co-counsel for
25 the Plaintiffs in this case, that this deposition was

Page 5

1  going to be postponed.  As a consequence of that,
2  understanding, I did rearrange my schedule for today,
3  and had scheduled other matters -- Mr. Revere has
4  insisted on conducting this deposition today, so I
5  have rearranged my schedule again to appear here for
6  purposes of the deposition.  But I didn't tell him
7  that I would object to the form and notice of the
8  deposition.
9       Secondly, the deposition does not --
10 deposition notice does not accurately state the form
11 and method of this deposition and location, and I'm
12 further objecting to it on that basis.
13     You may proceed if you choose.
14     MR. REVERE:  Okay.  I'll choose to proceed.
15 Just for the record also, we have a transcript of the
16 earlier records deposition of Title Guaranty and there
17 was no agreement to continue this oral deposition as
18 stated in the record.  On that, Mr. Love, I've also
19 talked to him and he said there was no agreement to
20 postpone this, and this was previously scheduled.  And
21 at least two other attorneys at the Watanabe Ing
22 Komeiji firm has participated in this case.  So we are
23 going to proceed.  And as I told counsel, I don't plan
24 on going very long today in any event.  If you want to
25 add anything else, Doug --

DEPOSITION OF JANET LUM WON                    DECEMBER 1, 2005

Page 10

1  Q.    Okay.  If a buyer and a seller enter into a
2  confidentiality agreement, it's not up to the escrow
3  company like Title Guaranty to breach that
4  confidentiality agreement, if that's what the parties
5  want, correct?
6        MR. HIRANO: I'm going to that question as
7  being vague and ambiguous, and without context.
8  A.    Repeat the question.
9        MR. REVERE:  Could you read the question back,
10 please?
11       THE COURT REPORTER:  She's reading it.
12 BY MR. REVERE:
13 Q.    You can answer.
14 A.    It's not up to the escrow company to breach
15 the confidentiality agreement.
16 Q.    Have you done -- has Title Guaranty handled
17 escrows for sales of The Bluffs at Mauna Kea?
18 A.    Yes.
19 Q.    How did that come to pass?
20 A.    An escrow agreement was entered into between
21 Title Guaranty Escrow and Mauna Kea Development.
22 Q.    Okay.  Is that an agreement that was dated
23 September 10th of 1996?
24 A.    I don't have the agreement in front of me.
25 Q.    Okay.  We faxed over an agreement to your

Page 11

1  office.  Maybe we can take a break later to see if you
2  can get that.  But in any event, do you recall from
3  sometime in 1996, Title Guaranty entered into an
4  escrow agreement with Mauna Kea Properties regarding
5  The Bluffs at Mauna Kea?
6  A.    Yes -- if it was 1996, I don't know the date.
7  Q.    Okay.  Has Title Guaranty worked on any other
8  Mauna Kea projects besides The Bluffs at Mauna Kea?
9  A.    Yes.
10 Q.    Okay, what other projects?
11 A.    Ho, I'd have to go get my list.
12 Q.    Well, is there any that you can think of
13 without referring to your list?
14 A.    The Villas at Mauna Kea -- no, if you would --
15 if you would read the list, I could tell you "yes" or
16 "no".
17 Q.    What about the Fairways, did Mauna Kea
18 work on that project?
19 A.    Title Guaranty did, yes.
20 Q.    Oh, excuse me, Title Guaranty, sorry.
21 A.    Yes.
22 Q.    Fairways North and Fairways South?
23 A.    Yes.
24 Q.    Do you know Bill Mielcke?
25 A.    Yes.

Page 12

1  Q.    How long have you known him?
2  A.    Since 1968.
3  Q.    Okay.  And how did you first meet him?
4  A.    I worked at Kona Inn and he was the general
5  manager.
6  Q.    I see.  Do you know a person named Tom
7  Stiffler?
8  A.    Yes.
9  Q.    And how long have you known him?
10 A.    I'm not sure, maybe 1987 or '8, I've known him
11 since then.
12 Q.    Okay.  Do you recall how you first met him?
13 A.    He was the principal broker at Coldwell Banker
14 in Kona.
15 Q.    Okay.  And Coldwell Banker would retain your
16 services from time to time?
17 A.    From time to time.
18 Q.    And what about Chacha Kohler, do you know her?
19 A.    Yes.
20 Q.    How long have you known her?
21 A.    As long as she's been at Mauna Kea, and I've
22 been at Title Guaranty.
23 Q.    Okay.  How is Title Guaranty compensated for
24 work at The Bluffs at Mauna Kea?
25 A.    By payment of escrow fees charged to the

Page 13

1  parties in the transaction.
2  Q.    Okay.  And do you know the amount of escrow
3  fees that were charged for transactions at The Bluffs
4  at Mauna Kea?
5  A.    No, I would have to refer to the specific
6  project.  There would have been an agreed upon escrow
7  fee and title fee quote letter issued to the developer
8  and we followed those fees.
9  Q.    Okay.  And do you know what those fees would
10 be?
11 A.    Normally, when you're handling the entire
12 project, it's approximately fifty percent off of
13 scheduled rate.  And it can be done either -- a set
14 rate for the whole entire project, or it would be
15 based upon the sales price of -- there was usually a
16 sliding scale.
17 Q.    Okay.  Do you know what your scheduled rate
18 was in -- let's say the year 1999?
19 A.    No.
20 Q.    Do you know what your current scheduled rate
21 is?
22 A.    Not without getting the rate card in front of
23 me.
24 Q.    Okay.  Do you have any idea what it would be?
25 A.    It would depend upon the sales price.

DEPOSITION OF JANET LUM WON                    DECEMBER 1, 2005

Page 18

1  contract.
2  BY MR. REVERE:
3  Q.    Is it fair to say that the buyer and the
4  seller were the ones that chose the amount to list on
5  the conveyance tax certificate and not Title Guaranty?
6        MR. ING:  Object to the form of the question,
7  misstates the witness' testimony, and contrary to the
8  witness' testimony, and the document speaks for
9  itself.
10 BY MR. REVERE:
11 Q.    You can answer.
12 A.    Let me read the question.
13        Yes.
14 Q.    Do you recall if you had any discussions with
15 any Mauna Kea representatives about the amounts to put
16 down on conveyance tax certificates?
17        MR. ING:  Object to the form of the question,
18 overly broad, vague and ambiguous.
19 A.    Yes.
20 BY MR. REVERE:
21 Q.    Okay.  What do you recall?
22 A.    I recall confirming the sales price on the
23 conveyance tax certificate was the sales price on the
24 contract.
25 Q.    Okay.  And with whom did you confirm that?

Page 19

1        MR. ING:  Object to the form of the question,
2  misstates the witness' testimony.
3  A.    Tom Stiffler.
4  BY MR. REVERE:
5  Q.    Okay.  And at the time -- was this multiple
6  conversations or just one conversation with
7  Mr. Stiffler?
8  A.    I don't recall.
9  Q.    Okay.  At the time that you had this
10 conversation with Mr. Stiffler, it was your
11 understanding that Mr. Stiffler was the principal
12 broker for Mauna Kea Realty?
13 A.    Yes.
14 Q.    Okay.  And so the principal broker for Mauna
15 Kea Realty was the one who told you the amount to put
16 down on these conveyance tax certificates?
17        MR. ING:  Object to the form of the question,
18 lacks foundation, misstates the witness' testimony,
19 vague and ambiguous.
20 A.    He confirmed the amount to put on the
21 conveyance tax certificate.
22 BY MR. REVERE:
23 Q.    Have you ever heard of the phrase "landscape
24 credits" with regard to The Bluffs at Mauna Kea?
25 A.    Yes.

Page 20

1  Q.    Okay.  Why don't you tell me, what did you
2  hear about them?
3  A.    They were part -- they were an addendum to the
4  contract.
5  Q.    Okay.  Did you ever have any discussions about
6  them or you just saw that in contract?
7  A.    I don't recall.
8  Q.    Does Title Guaranty have any standard
9  operating procedures regarding what information should
10 be included on a conveyance tax certificate?
11 A.    We just comply with making sure it's completed
12 correctly, and names match, the names on the document,
13 and the tax key's accurate -- just normal procedure.
14 Q.    Okay.  So it's sort of a technical function
15 that -- or administrative function that Title Guaranty
16 is performing, correct?
17        MR. ING:  Object to the form of the question,
18 vague and ambiguous.
19 A.    A technical function, yes.
20 BY MR. REVERE:
21 Q.    Okay.  And I just want to be clear here, as
22 you sit here today, you're not sure as to the amount
23 -- well, let me back up.
24        You've reviewed the Federman file, correct?
25 A.    Correct.

Page 21

1  Q.    Based on that review of the Federman file, do
2  you know how much Title Guaranty received for
3  compensation for the escrow services it provided on
4  the Federman transaction?
5  A.    No.
6  Q.    And again, with regards to The Bluffs at Mauna
7  Kea, you're not sure the amounts that Title Guaranty
8  made on each transaction or all the transactions?
9  A.    No.
10 Q.    Okay.  Who would be the person at Title
11 Guaranty that would be the most knowledgeable on that
12 subject?
13 A.    Our accounting department.
14 Q.    Okay.  Do you know any specific individual in
15 the accounting department who would know that
16 information?
17 A.    I would assume that Lois Koano might be able
18 to provide that information.
19 Q.    And does Lois -- does she work out of the Kona
20 office, or Honolulu, or somewhere else?
21 A.    She's our -- the head of our accounting
22 department, I don't know her exact title.
23 Q.    But does she work in Honolulu or Kona?
24 A.    Honolulu.
25 Q.    Okay.  Going back to your review of the

Page 22

1  Federman file, do you recall that three million
2  dollars was listed as the sales price for the Federman
3  transaction?
4  A.    Yes.
5  Q.    Okay.  And again, with regard to the Federman
6  transaction, that information on the sales price was
7  provided to you by Mauna Kea, correct?
8       MR. ING:  Object to the form of the question,
9  asked and answered, overly broad, lacks foundation,
10 misstates the witness' prior testimony.
11      Ms. Reporter, did you get all of that?
12      THE COURT REPORTER:  Yes.
13 BY MR. REVERE:
14 Q.    You can go ahead and answer.
15 A.    That amount was provided -- it was on the
16 contract.
17 Q.    And you mentioned that you had a conversation
18 with Mr. Stiffler about confirming the amount to be
19 put down on the conveyance tax certificate, do you
20 recall if that was with regard to the Federman
21 transaction or another transaction?
22 A.    I don't recall if it was a specific
23 transaction, or just in general.
24 Q.    Okay.  Do you recall anything else about that
25 discussion?

Page 23

1  A.    No.
2  Q.    Okay.  Do you recall what prompted you to have
3  this discussion in the first place, or did he call
4  you?
5  A.    I'm not sure if I initiated the call or not.
6  I believe I did.
7  Q.    Okay.  Do you know what would have prompted
8  you to call him to make an inquiry about what -- about
9  what to put down on the conveyance tax certificate?
10      MR. ING:  Object to the form of the question,
11 vague and ambiguous, misstates the witness' prior
12 testimony.
13 A.    Yes, I do.
14 BY MR. REVERE:
15 Q.    Okay.  What was it?
16 A.    I needed to confirm that the sales price
17 amount was going to show on this conveyance tax
18 certificate, because there appeared to be a possible
19 inconsistency with the broker escrow instructions
20 provided versus the sales contract.
21 Q.    Okay.  Can you explain that to me?
22 A.    Do you have a copy of the broker escrow
23 instructions in front of you?
24 Q.    I got a copy -- well, I've got a copy of the
25 Federman conveyance tax certificate as well as the

Page 24

1  escrow agreement between Mauna Kea and Title Guaranty.
2       Why don't you tell me -- if you got it in
3  front of you, why don't you tell me what it is you're
4  referring to?
5  A.    I don't have it in front of me, I have it in
6  my memory.
7  Q.    Okay.  Why don't you tell me what your memory
8  tells you then?
9  A.    My memory tells me that it showed the sales
10 price of three million dollars, and then it shows a
11 landscaping credit -- minus -- landscaping credit, and
12 then it came up with a title which would have been two
13 million some odd dollars.
14 Q.    2.55 million?
15 A.    Correct.  And I think they used the word "net
16 sales price" on those broker escrow instructions.  I'd
17 have to refer to the actual document.  And I needed to
18 confirm if we were going to show three million dollars
19 or the other amount -- the 2 million 555.
20 Q.    Okay.  And Mr. Stiffler said "Report the three
21 million"?
22      MR. ING:  Object to the form of the question,
23 misstates the witness' testimony, lacks foundation.
24 A.    Correct.
25 BY MR. REVERE:

Page 25

1  Q.    Okay.  And with regard to Title Guaranty's
2  fees, you mentioned earlier that the fees are
3  dependent on the sales price, is that correct?
4  A.    In order to give a quote for the escrow
5  agreement or the quote letter that's issued to the
6  developer, we normally request a price range.  So if
7  it's going to be between two and three million dollars
8  per unit, then we have a basis to do our developer
9  rate.
10 Q.    Okay.  With regard to the Federman sale, did
11 it make a difference, in terms of Title Guaranty's
12 compensation, if the price on the conveyance tax
13 certificate was listed at three million dollars versus
14 2.55?
15 A.    If it was a set rate, which I don't know at
16 this moment, it would not have made a difference.
17 Q.    Okay.  Do you consider a scheduled rate to be
18 different from a set rate?
19 A.    When I was referring to set rate, whatever
20 quote was given to the developer for the escrow and
21 title fees for that specific project, that's -- I
22 would have to read the agreement or the quote letter
23 to refresh my memory.  I don't know if it was set at
24 one thousand dollars per sale, no matter what the
25 price, or if it was fifty percent off of scheduled

DEPOSITION OF JANET LUM WON                    DECEMBER 1, 2005

Page 26

1    rate for each unit.
2    Q.    Okay.  I'm looking at a September 10th, 1996
3    escrow agreement between Title Guaranty and Mauna Kea.
4    And on paragraph 17 of that, it says, "Compensation of
5    escrow.  The compensation of escrow for services
6    rendered under this agreement shall be in amount equal
7    to fifty percent of escrow scheduled rate, plus four
8    percent general excise tax for each lot, payable upon
9    closing to each sales contract."
10        Does that help refresh your recollection as to
11   how Title Guaranty was compensated?
12   A.    Yes.
13   Q.    Okay.  And David Peach, he was president of
14   Title Guaranty in 1996, is that correct?
15   A.    Correct.
16   Q.    Okay.  After Mr. Stiffler said to report three
17   million dollars on conveyance tax certificate, do you
18   recall any other discussions after that point?
19        MR. ING:  Object to the form of the question,
20   vague and ambiguous, misstates the witness' prior
21   testimony.  I don't believe she said he said to report
22   three million.  You're giving her an example.  Well,
23   anyway --
24        MR. REVERE:  You're misstating her testimony,
25   but in any event --

Page 27

1    BY MR. REVERE:
2    Q.    Do you recall any subsequent discussions?
3    A.    Not at this time, no.
4    Q.    Okay.
5         MR. REVERE:  I don't have any further
6    questions at this time.  Thank you very much.
7         Mr. Ing may have some questions or Lorrin may
8    have some questions, but I'm done.
9         MR. ING:  I have no questions at this time.
10   However, my right to strike the entire deposition, and
11   also to depose the witness in the future, pursuant to
12   a proper notice.
13        MR. HIRANO:  I'm going to reserve my right to
14   object to further questions, but I don't have any
15   questions of this witness.
16   A.    Okay.  Thank you very much, and thank you,
17   Madam Reporter.
18        --- oOo ---
19        (The deposition concluded at 10:45 A.M.)
20
21
22
23
24
25

Page 28

1         I, JANET LUM WON, do hereby certify
2    that I have read the foregoing typewritten pages 1
3    through 27, inclusive, and corrections, if any, were
4    noted by me and the same is now a true and correct
5    transcript of my testimony.
6         Dated: _____
7
8
9
10
11
12                    JANET LUM WON
13
14
15   Signed before me this
16   _____
17   day of _____, 2005.
18
19
20
21
22   _____
23
24
25

Page 29

1
2    STATE OF HAWAII          )
                              ) SS.
3    COUNTY OF HAWAII         )
4         I, MERCEDES SHARON SOUZA, CSR NO. 184, Notary
     Public in and for the State of Hawaii do hereby
5    certify:
          That on December 1, 2005, at 10:10 A.M.,
6    appeared before me JANET LUM WON, the witness whose
     deposition is contained herein; that prior to being
7    examined, the witness was by me duly sworn or
     affirmed; that the proceedings were taken in
8    computerized machine shorthand by me and thereafter
     reduced to print under my supervision; that the
9    foregoing represents, to the best of my ability, a
     correct transcript of the proceedings had in the
10   foregoing matter;
          That, if applicable, the witness was notified
11   through counsel, by mail, or by telephone to appear
     and sign; that if the deposition is not signed, either
12   the reading and signing were waived by the witness and
     all parties, or the witness has failed to appear and
13   the original has been sealed unsigned;
          That pursuant to HRCP Rule 30(f)(1) the
14   original will be forwarded to noticing counsel for
     retention.
15        I further certify that I am not counsel for
     any of the parties hereto, nor in any way interested
16   in the outcome of the cause named in the caption.
17   Dated:   December 3, 2005.
18
19
     _____
20   Mercedes Sharon Souza, CSR NO. 184
     Notary Public, State of Hawaii
     My commission expires 6-11-2008
21
22
23
24
25